Theodore E. Tsekerides (*pro hac vice* application to be filed)
theodore.tsekerides@weil.com
Randi W. Singer (*pro hac vice* application to be filed)
randi.singer@weil.com
David Yolkut (*pro hac vice* application to be filed)
david.yolkut@weil.com
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310 8007

Scott A. Edelman, State Bar No. 116927
SEdelman@gibsondunn.com
Nathaniel L. Bach, State Bar No. 246518
NBach@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
2029 Century Park East, Suite 4000
Los Angeles, California 90067
Telephone: (310) 552-8500
Facsimile: (310) 551-8741

REDACTED VERSION OF
DOCUMENT PROPOSED TO
BE FILED UNDER SEAL

Attorneys for Counterclaim Plaintiff
DISCOVERY COMMUNICATIONS, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DISCOVERY COMMUNICATIONS, LLC, a Delaware limited liability company, <br><br> Counterclaim Plaintiff, <br><br> vs. <br><br> LMNO CABLE GROUP, INC., a California corporation, LMNO ENTERTAINMENT GROUP, LLC, a California limited liability company, <br><br> Counterclaim Defendants. | Case No. 2:16-cv-4543-JAK-SK <br><br> **COUNTERCLAIMS FOR DAMAGES, RECOVERY OF PROPERTY, RESTITUTION, ACCOUNTING, DECLARATORY AND INJUNCTIVE RELIEF, TRADEMARK CANCELLATION** <br><br> DEMAND FOR JURY TRIAL |

Discovery Communications, LLC ("<u>Discovery</u>") alleges as follows, upon actual knowledge as to itself, and upon information and belief as to all other matters:

## <u>INTRODUCTION</u>

1.      For over a decade, the LMNO Defendants (defined below) and Discovery enjoyed a long-standing relationship during which the LMNO Defendants produced a number of programs for various Discovery networks.  Unbeknownst to Discovery, the LMNO Defendants utilized that long-standing relationship with Discovery to create a false atmosphere of trust upon which Discovery relied, but the LMNO Defendants secretly and repeatedly betrayed that trust.

2.      Through a call to Discovery's ethics hotline in late 2015 from a whistleblower who worked for one or both of the LMNO Defendants, Discovery recently learned that the LMNO Defendants were, and have been for years, systematically defrauding and victimizing Discovery.  Triggered by the whistleblower, Discovery undertook to determine the scope of the betrayal and the damage the LMNO Defendants inflicted.

3.      Among the steps Discovery undertook was to reach out to the LMNO Defendants to obtain more information and to seek to conduct audits of their books and records relating to their work for Discovery.  Rather than cooperate with Discovery on the audits (as contractually required) and work to quell Discovery's serious concerns, the LMNO Defendants stonewalled, delayed, and frustrated Discovery's efforts.

4.      In the midst of Discovery's efforts to piece together the facts, Discovery was contacted by the Federal Bureau of Investigation in March 2016 seeking information in connection with what Discovery learned was an ongoing federal criminal investigation into the LMNO Defendants' business practices.  Since that

COUNTERCLAIMS

1  initial contact by the FBI, Discovery has been cooperating fully with the federal

2  authorities in their investigation.

3       5.     In addition to cooperating with the federal authorities, Discovery

4  continued its efforts to attempt to obtain information from the LMNO Defendants that

5  only they had access to and controlled.  The LMNO Defendants' response to those

6  efforts actually heightened Discovery's concerns and confirmed some of the wrongful

7  conduct the whistleblower had identified—including LMNO's failure to contribute its

8  share of production budgets for numerous shows.

9       6.     On June 17, 2016, Discovery sent the LMNO Defendants notices of

10  termination relating to certain programs.  Just a week later, on June 24, 2016, LMNO

11  (defined below) filed its Complaint against Discovery in this action.

12       7.     Although Discovery is not privy to the government's investigation, on

13  June 30, 2016—less than a week after LMNO sued Discovery—it was publicly

14  reported that the FBI raided the LMNO Defendants' offices, executing a sealed search

15  warrant in connection with its criminal investigation.

16

17                    **NATURE OF THE COUNTERCLAIMS**

18       8.     Discovery asserts these counterclaims to remedy the rampant deceptive

19  and unlawful conduct perpetrated against Discovery by LMNO Cable Group, Inc.

20  ("LMNO") and LMNO Entertainment Group, LLC ("LEG") (together the "LMNO

21  Defendants"), which has only recently come to light.  LMNO, acting with others,

22  including its President and CEO Eric Schotz ("Schotz"), devised and implemented a

23  scheme designed to systematically and repeatedly overcharge and defraud Discovery

24  in connection with a variety of television programs produced by the LMNO

25  Defendants for Discovery (the "Programs").  This scheme was orchestrated by the

26  LMNO Defendants, Schotz and others, and involved the repeated submission to

27

28                                       3

Discovery of detailed, but fraudulent, production budgets.  The LMNO Defendants used the fraudulent budgets, and false representations of what the LMNO Defendants actually spent in producing the Programs, to induce Discovery to make inflated payments and to wrongfully withhold profit participation payments to Discovery.  The LMNO Defendants further manipulated books and records purposely to reflect false and/or doctored information, while simultaneously maintaining separate books and records that documented the actual costs of production, at substantially lower amounts than those reflected in the false budgets.  These false budgets went far beyond "padding," or generous but good-faith estimates of actual costs, and instead routinely and intentionally overstated the actual costs of production by more than 30%.

9.     Senior executives at LMNO, including Schotz and Ed Horwitz ("Horwitz") (LMNO's Executive Vice President for Production), were aware that the budgets prepared by the LMNO Defendants and submitted to Discovery (and, in many cases, attached as exhibits to the various production agreements) were fraudulent and did not accurately reflect either the real costs of producing the various Programs to which they applied or the amount for which the LMNO Defendants intended to produce the Programs.  As LMNO, LEG, Schotz and Horwitz intended, Discovery relied on these detailed budgets in determining how much it would spend on a Program.  In fact, the scheme to defraud Discovery depended on that reliance. Moreover, all of the information regarding the LMNO Defendants' fraudulent conduct, including as relates to the fraudulent budgets the LMNO Defendants submitted, was in the exclusive knowledge of the LMNO Defendants and their agents and/or representatives.  Discovery was thus unaware, and had no reason to be aware, of the LMNO Defendants' fraudulent conduct.

10.     Throughout their relationship, Discovery and the LMNO Defendants generally produced Programs for Discovery pursuant to one of two contractual

4

arrangements: "co-production" or "commission." For "co-production" shows, Discovery and LMNO would each contribute a set percentage or amount to cover the full cost of producing the show and would share ownership and intellectual property rights in the resulting shows. For "commission" shows, Discovery would pay the full cost of producing the show and would own the intellectual property and other rights in the resulting show.

11.     But by presenting fraudulent and knowingly inflated budgets that overstated actual production costs by the amount of LMNO's contractually agreed-upon share, LMNO purposely deceived Discovery into bearing the entire cost to produce Programs undertaken on a "co-production" basis, while LMNO fraudulently retained (and exploited) intellectual property rights in those Programs.

12.     In addition, the LMNO Defendants prepared and submitted detailed and substantially inflated budgets to Discovery for the commissioned Programs. The LMNO Defendants, Schotz, Horwitz, and others were aware that the actual costs would be significantly less, but knowingly and intentionally provided inflated figures so that they and possibly others could retain excess funding they knew would result from the inflated figures.

13.     An added impact of these fraudulent budget submissions was that Discovery was also deprived of profit participation, or royalties, that LMNO was obligated to report and pay Discovery under the "co-production" model. For example, Discovery was entitled to 20% of the net revenues from the licensing of Programs for international broadcast. To calculate the net revenues upon which royalties were payable to Discovery, LMNO would be entitled to deduct its costs for producing and licensing the Program (including distribution costs, such as third party commissions). Because LMNO was not in fact paying *any* production costs, it should have deducted only the licensing costs in calculating net revenues for reporting and disbursement to

Discovery.  Instead, LMNO compounded its fraud, deducting phantom and non-existing production costs from revenues it received from the exploitation of intellectual property rights fraudulently obtained through inflated budgets such that it asserted that no royalties were owed to Discovery.  In fact, as Discovery had paid the entire cost of production of these Programs, it was entitled to 100% of the royalties from the license, less only the actual licensing costs.

14.     The LMNO Defendants' conduct not only breached various contractual provisions in the agreements between Discovery and the LMNO Defendants, but their conduct also constitutes fraud that resulted in Discovery incurring millions of dollars in damages for which it seeks recovery through these counterclaims.

## THE PARTIES

15.     Discovery is a Delaware limited liability company with its principal place of business in Silver Spring, Maryland.  Discovery is a global media company that provides programming content—both original and purchased—across multiple distribution platforms to 3 billion cumulative subscribers worldwide through a variety of networks.  These networks include the Discovery Channel, TLC, Investigation Discovery ("ID") and Animal Planet.  Discovery Communications, LLC was formerly known as Discovery Communications, Inc. ("DCI"), which is a party to certain of the contracts at issue in these Counterclaims.  As the successor entity, Discovery has all rights of and stands in the shoes of DCI.

16.     Defendant LMNO is a California corporation with its principal place of business in Los Angeles, California.  LMNO is a television production company that has until recently worked with Discovery to produce certain programs for Discovery including, among others, *The Little Couple* and *7 Little Johnstons*, that have aired on various Discovery networks.

COUNTERCLAIMS

17.     Defendant LEG is a California limited liability company with its principal place of business in Los Angeles, California.  LEG is a television production company that has until recently worked with Discovery to produce certain programs for Discovery including *The Coroner: I Speak for the Dead*, which is airing on ID.  On information and belief, LEG is an affiliate of LMNO.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1), because the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between citizens of different states.  This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1338, 28 U.S.C. § 1367(a), and 28 U.S.C. § 2201.

19.     Venue is proper in this District under 28 U.S.C. § 1391(b) and 28 U.S.C. § 1400(a).

20.     This Court has personal jurisdiction over the LMNO Defendants because they are each California citizens and conduct substantial business in this district.

## BACKGROUND FACTS

### I.     Discovery and LMNO Had a Longstanding Business Relationship

21.     Discovery and LMNO have had a business relationship for more than a decade.  That relationship is governed by numerous written agreements, amendments, and "attachments" pertaining to various television programs that Discovery either commissioned from the LMNO Defendants or co-produced with LMNO.  These Programs were then broadcast on Discovery's cable television networks, including TLC and ID.  In total, Discovery paid the LMNO Defendants over $64 million to produce the various Programs at issue.

22.     At issue here are the LMNO Defendants' contractual breaches and fraudulent conduct in connection with sixteen Programs.  Two of the Programs—7

7

*Little Johnstons* and *The Coroner: I Speak for the Dead*—were commissioned by Discovery (together, the "Commissioned Programs").  For these Commissioned Programs, Discovery agreed to pay the entire cost of production in exchange for the LMNO Defendants' production and delivery of the final Programs.  The relevant contracts for the Commissioned Programs provide in exchange for paying all of the production costs, Discovery owns all of the rights in the Commissioned Programs.  LEG is a contract party only in relation to *The Coroner: I Speak for the Dead*.  For all other Programs, the contractual arrangements are between Discovery and LMNO.

23.     Fourteen of the programs were co-produced by Discovery and LMNO: *The Little Couple, Killer Confessions, Murder Book, Unusual Suspects*, *Hollywood & Crime, Baby Genius*, *Bear Whisperer*, *Bipolar Kids* now known as *Bipolar Mysteries: Families in Crisis* ("Bipolar Mysteries"), *Cheating Vegas, Housebound, Insane Bathrooms*, *Meteorite Men*, *NICU Diaries*, and *Surreal Estate* (collectively, the "Co-Produced Programs").  For Co-Produced Programs, Discovery agreed to fund a certain percentage of the production costs, and LMNO was contractually obligated to fund the remaining percentage.  Under this structure, the parties were to share both the production costs and the rights—the latter via a license of certain rights in the Co-Produced Programs from LMNO to Discovery.

24.     Rather than contribute its contractually agreed-upon share of production costs for the Co-Produced Programs, however, LMNO manipulated the detailed budgets that were presented to Discovery (which were in most cases included as exhibits to the production agreements) by inflating them, such that by paying its share of the budget (typically 70%), Discovery was actually paying all of (or, at times, more than) the actual estimated and actual in-fact production costs for the Co-Produced Programs, with LMNO *making no funding contribution at all*.  There is simply no scenario, contractually or pursuant to industry standards, under which Discovery

would pay all of the production costs for a Co-Produced Program, and allow LMNO to retain (and sell) rights in that Program.   Effectively, LMNO attempted to convert the funding arrangement of these Co-Produced Programs into that used for Commissioned Programs (*i.e.*, Discovery paying 100% of the budget) through the deceptive use of fraudulent budgets, without providing Discovery with the benefits associated with Commissioned Programs.  In this way, LMNO was taking advantage of and defrauding Discovery on two fronts:  monetarily and as to the underlying rights.

25.    LMNO was not only substantially inflating budget numbers so that Discovery would pay all of the production costs for the Co-Produced Programs, but in some cases, even the amounts reflected as Discovery's share were in excess of the amount actually required to produce those programs.  Accordingly, the LMNO Defendants, Schotz, Horowitz, and potentially others would reap that excess for themselves.  Even with respect to the Commissioned Programs, the budgets submitted by the LMNO Defendants were manipulated such that Discovery paid in excess of the amount actually necessary to produce those Programs (and actually incurred by the LMNO Defendants in producing the Programs), with the LMNO Defendants pocketing the difference without informing Discovery or seeking to return the overpayments that resulted from such intentional and systematic overcharging.

26.    The budgets that LMNO created and submitted to Discovery for approval, and on which all the contracts were predicated, were false and fraudulent for an additional reason.  LMNO never disclosed that it never intended to and never would contribute to the budgets for the Co-Produced Programs.

**II.    The Contractual Framework and Relevant Agreements**

27.    The Commissioned Programs and the Co-Produced Programs are each subject to a series of written agreements.  As more fully detailed below, Discovery

and the LMNO Defendants entered into various "Master Agreements" setting forth the overall terms and conditions that would provide the framework regarding the production and exploitation of the Programs.  The parties had separate Master Agreements that governed the Commissioned Programs and the Co-Produced Programs.

28.    Using these Master Agreements as a foundation, Discovery and the LMNO Defendants would then enter into "Attachments" that (together with the Master Agreements) governed the production of a particular Program.  Depending on the Program, the parties would also enter into "Amendments" that typically, but not invariably, addressed the renewal of a Program for an additional season and contained specific budgets for those seasons.  Therefore, for a particular Program, there would be a Master Agreement, Attachment, and Amendments that collectively set forth the terms and conditions governing LMNO's or LEG's production of that Program for Discovery.

### A.    *The Co-Production Agreements*

29.    Discovery and LMNO originally entered into a Master Co-Production Agreement dated January 8, 2002 (the "Master").  That same year, they amended the Master when they entered into an Amended and Restated Master Agreement dated as of December 10, 2002 (the "Amended and Restated Master").  Subsequently, in 2013, the parties made further amendments when they entered into a December 31, 2013 Amendment (the "2013 Master Amendment") that further amended and supplemented both the Master and the Amended and Restated Master (the Master, Amended and Restated Master and 2013 Master Amendment are together with all exhibits appended thereto, collectively referenced herein as the "Co-Production Master Agreements").

30.    The Co-Production Master Agreements imposed a variety of material obligations on LMNO.  For example, Section 1.6 of Exhibit C to the 2013 Master

COUNTERCLAIMS

Amendment provided that "[u]nless otherwise set forth in the Attachment, if the total actual, documented costs of production of the Program are less than the Production Budget hereunder (the difference referred to as the 'Savings'), then Producer shall remit to Company a pro rata portion of the Savings that is equal to the percentage Company contributes to the Production Budget.  For example, if Company's Budget Contribution is 50% of the Production Budget, Company shall receive 50% of the Savings."  Budget Contributions were to be governed by the applicable Attachments pursuant to Section 1.3 of Exhibit C.

31.     Section 2.5 of that same exhibit also provided that if LMNO was unable to finance its portion of a production budget, then for subsequent productions of that Program, Discovery could commission additional episodes, and pay all the production costs itself, but then own all rights for those episodes "throughout the world, in perpetuity."

32.     In addition, pursuant to Section 5.7 of that same exhibit, LMNO was required to keep "books, accounts and records that accurately and fairly reflect in reasonable detail its transactions and disposition of funds paid in connection with carrying out the transactions or services contemplated by this Agreement."

33.     LMNO was also obligated, pursuant to Section 5.2 of that same exhibit, to remit to Discovery a pro rata portion of any tax credits or other governmental subsidies it received.

34.     Paragraph II in the Amended and Restated Master provided that "DCI agrees to pay Producer, and Producer agrees to accept a 'Budget Contribution' equal to a percentage (as set forth in the applicable Attachment) of the actual, documented final cost of production of the Program based upon the DCI approved Production Budget up to the amount set forth in the applicable Attachment.  All overages unless pre-approved by DCI in writing, shall be the responsibility of Producer.  The Budget

COUNTERCLAIMS

1   Contribution shall be payable in accordance with Exhibit H ('Payment Schedule') of
2   the applicable Attachment."

3        35.   Section 4.2 of Exhibit A to the Amended and Restated Master also
4   required LMNO to keep complete books of account showing in detail all expenses and
5   charges incurred in the production of the Programs.

6        36.   Section 10 of Exhibit A to the Amended and Restated Master provides
7   Discovery the right to terminate an applicable Attachment, in addition to any and all
8   other rights Discovery may have, in the event of a default by LMNO for, among other
9   things, failing to cure a default of a material obligation.  That provision further
10  provides that upon termination, Discovery has all rights in Program Materials,
11  including the right to produce additional programs, and LMNO is obligated to deliver
12  to Discovery all Program Materials in its possession or control.

13       37.   These Co-Produced Master Agreements govern the following Programs:
14  *The Little Couple, Killer Confessions, Murder Book, Unusual Suspects*, *Hollywood &*
15  *Crime, Baby Genius*, *Bear Whisperer*, *Bipolar Mysteries*, *Cheating Vegas*,
16  *Housebound*, *Insane Bathrooms*, *Meteorite Men*, *NICU Diaries*, and *Surreal Estate*.
17  As alleged below, these Programs were also subject to additional terms and conditions
18  under various Attachments and Amendments.  The Co-Produced Master Agreements
19  are governed by Maryland law.

20          **1.**   ***The Little Couple***

21       38.   Discovery and LMNO entered into a Co-Production Attachment for New
22  Program, dated November 5, 2008 (together with any exhibits thereto, "*The Little*
23  *Couple* Attachment") that relates specifically to *The Little Couple* Program.  In
24  addition, starting in February 2009, the parties entered into a series of amendments to
25  *The Little Couple* Attachment relating to the production of *The Little Couple*

26
27
28

COUNTERCLAIMS

1    (collectively, and together with any exhibits thereto, "*The Little Couple*
2    *Amendments*").

3         39.    In connection with *The Little Couple* Attachment and each *The Little*
4    *Couple* Amendment thereafter, LMNO prepared detailed budgets that it would submit
5    to Discovery for its approval upon which Discovery's percentage contribution would
6    be calculated and LMNO's percentage contribution would be calculated.  Those
7    budgets were intentionally and secretly inflated by LMNO and submitted to Discovery
8    for Discovery's approval.  Discovery approved such budgets and relied on them being
9    fair and accurate in agreeing to enter into the relevant agreement with LMNO and
10   making its co-funding contribution, which was directly tied to the budget.

11        40.    Section 2.A of *The Little Couple* Attachment states that, "[Discovery]
12   agrees to pay [LMNO] . . . Sixty Six percent (66%) of the Production Budget, up to
13   . . . (USD ▮▮▮▮▮▮) (the 'Budget Contribution') payable in accordance with the
14   Payment Schedule attached hereto as Exhibit H."  The Payment Schedule in Exhibit H
15   to *The Little Couple* Attachment reiterates that "[Discovery's] Contribution" is "66%"
16   and "Co-Funders [LMNO's] Contribution" is "34%" or "▮▮▮▮▮."

17        41.    All relevant subsequent *Little Couple* Amendments reflect that
18   Discovery's contribution to the production costs increased to 70%, with LMNO's
19   contribution decreasing to 30%.   At all times relevant, however, LMNO was always
20   obligated to contribute its percentage of the production costs.  For example, Section 2
21   of Amendment 1, dated as of February 17, 2009, states**,** "[Discovery's] Series Budget
22   Contribution for the First Season of the Program shall be seventy percent (70%) of the
23   final going-in Company approved production budget ('Production Budget'), up to . . .
24   (USD $▮▮▮▮▮) payable in accordance with the Payment Schedule attached hereto
25   as Exhibit H-1 and made a part thereof."  The Payment Schedule in Exhibit H-1 to
26   Amendment 1 dated as of February 17, 2009 states, "[Discovery's] Contribution" is

27

28

COUNTERCLAIMS

"70%" and "Co-Funders [LMNO's] Contribution" is "30%" or "███."  However, LMNO concealed that it never intended to and never in fact did contribute its 30% to the production budget, making Discovery's 70% contribution a de facto 100% budgetary contribution.  LMNO repeated this pattern of fraudulent behavior for each of *The Little Couple* agreements that was supposed to be co-funded.

42.     This 70%/30% arrangement is reiterated in Section 2 of Amendment 3 dated as of August 24, 2009 and Exhibits G-2 and H-2 thereto; Section 3 of Amendment 4 dated as of February 11, 2010 and Exhibits G-3 and H-3 thereto; Section 2 of Amendment 5 dated as of September 10, 2010 and Exhibits G-4 and H-4 thereto; Section 1 of Amendment 9 dated as of November 29, 2011 and Exhibits G-6 and H-6 thereto; Amendment 10 dated as of December 16, 2012 and Exhibits G-6 and H-7 thereto; Section 2 of Amendment 11 dated as of June 11, 2013 and Exhibits G-7 and H-8 thereto; Exhibit H-9 to Amendment 12 dated as of July 1, 2013; Amendment 14 dated as of January 27, 2014 and Exhibit G-8 thereto; Section 2 of Amendment 17 dated as of August 6, 2014 and Exhibit G-9 thereto; and Section 2 to Amendment 21 dated as of July 1, 2015 and Exhibit G-11 thereto.

43.     Section 7.F of *The Little Couple* Attachment provides that if LMNO is unable or declines to finance its portion of a production budget, then Discovery could commission additional episodes for subsequent productions of *The Little Couple*, pay all the production costs itself, but then own all rights for those episodes "throughout the world, in perpetuity."

44.     Pursuant to *The Little Couple* Attachment and *The Little Couple* Amendments, LMNO was obligated to "return any overpayment" to Discovery.

45.     Due to LMNO's failure to contribute to the production costs, Discovery overpaid its contribution as set forth in *The Little Couple* Attachment and *The Little Couple* Amendments at issue herein.

14

46.     In violation of *The Little Couple* Attachment and *The Little Couple* Amendments, LMNO never returned any overpayments owed to Discovery.

47.     Pursuant to Section 7(D)(ii)(a) of *The Little Couple* Attachment, "production budget increases or decreases shall reflect actual and direct costs of production of such episodes in the Season."

48.     Pursuant to Section 5 of *The Little Couple* Attachment, Discovery was to receive 20% of LMNO's Adjusted Gross Revenues from all media in perpetuity.  In other words, if LMNO licensed *The Little Couple* to a third party, Discovery was to receive 20% of those Adjusted Gross Revenues.  In calculating Adjusted Gross Revenues, LMNO was permitted to deduct certain costs and expenses.  These costs and expenses, however, were required to be actual, real, verifiable, and actually incurred by LMNO.

### 2.     *Unusual Suspects*

49.     Discovery and LMNO entered into a Co-Production Attachment for New Program, dated July 3, 2008, as relates to the program *Unusual Suspects* (together with any exhibits thereto, the "*Unusual Suspects* Attachment").  In addition, starting in January 2010, the parties entered into a series of amendments to the *Unusual Suspects* Attachment relating to the production of *Unusual Suspects* (collectively, and together with any exhibits thereto, the "*Unusual Suspects* Amendments").

50.     In connection with the *Unusual Suspects* Attachment and each *Unusual Suspects* Amendment thereafter, LMNO prepared detailed budgets that it would submit to Discovery for its approval upon which Discovery's percentage contribution would be calculated and LMNO's percentage contribution would be calculated.  Those budgets were intentionally and secretly inflated by LMNO and submitted to Discovery for Discovery's approval.  Discovery approved such budgets and relied on them being fair and accurate in agreeing to enter into the relevant

15

1  agreement with LMNO and making its co-funding contribution, which was directly

2  tied to the budget.

3          51.    Section 2.A of the *Unusual Suspects* Attachment states that "[Discovery]

4  agrees to pay [LMNO] and [LMNO] agrees to accept [a Budget Contribution of] Sixty

5  Eight Percent (68%), up to … (USD $███████) (the 'Budget Contribution') payable

6  in accordance with the Payment Schedule attached hereto as Exhibit H."   The

7  Payment Schedule in Exhibit H states "[Discovery's] Contribution is "68%" and "Co-

8  Funders [LMNO's] Contribution" is "32%" or "███████."

9          52.    Later amendments to the *Unusual Suspects* Attachment reiterate

10  LMNO's obligation to contribute a percentage to the production costs and identified

11  the applicable percentage.  This arrangement is set forth in Section 2 of Amendment 3

12  dated as of December 9, 2010 and Exhibits H-2 and G-2 thereto; Exhibit H-2 to

13  Amendment 3 dated as of August 1, 2011; Section 2 of Amendment 4 dated as of

14  September 9, 2011 and Exhibits G-Episode 11 and H-2 thereto; Section 2 of

15  Amendment 5 dated as of September 12, 2011 and Exhibits G-3 and H-3 thereto;

16  Section 2 of Amendment 6 dated as of February 27, 2012 and Exhibits G-4 and H-4

17  thereto; Section 2 of Amendment 7 dated as of July 24, 2012 and Exhibits G-5 and H-

18  5; Section 2 of Amendment 8 dated as of June 14, 2013 and Exhibits G-6 and H-6

19  thereto; Section 2 to Amendment 10 dated as of March 28, 2014 and Exhibit G-7

20  thereto; and Section 2 to Amendment 11 dated as of February 26, 2015 and Exhibit G-

21  8 thereto.

22          53.    Section 8.E of the *Unusual Suspects* Attachment provides that if LMNO

23  is unable to finance its portion of a production budget, then Discovery could

24  commission additional episodes for subsequent productions of *Unusual Suspects*, pay

25  all the production costs itself, but then own all rights for those episodes "throughout

26  the world, in perpetuity."

27

28

COUNTERCLAIMS

54.     Pursuant to the *Unusual Suspects* Attachment and the *Unusual Suspects* Amendments, LMNO was obligated to "return any overpayment" to Discovery.

55.     Due to LMNO's failure to contribute to the production costs, Discovery overpaid its contribution as set forth in the *Unusual Suspects* Attachment and the *Unusual Suspects* Amendments at issue herein.

56.     In violation of the *Unusual Suspects* Attachment and the *Unusual Suspects* Amendments, LMNO never returned any overpayments owed to Discovery.

57.     Pursuant to Section 8(B)(ii)(a) of the *Unusual Suspects* Attachment, "production budget increases or decreases shall reflect actual and direct costs of production of such Additional Episodes in the Production Year."

58.     Pursuant to Section 5 of the *Unusual Suspects* Attachment, Discovery was to receive twenty percent of LMNO's Adjusted Gross Revenues from all media in perpetuity.  In other words, if LMNO licensed *Unusual Suspects* to a third party, Discovery was to receive 20% of those Adjusted Gross Revenues.  In calculating Adjusted Gross Revenues, LMNO was permitted to deduct certain costs and expenses. These costs and expenses, however, were required to be actual, real, verifiable, and actually incurred by LMNO.

### 3.     *Killer Confessions*

59.     Discovery and LMNO entered into a Co-Production Attachment for New Program, dated August 20, 2014, as relates to the program *Killer Confessions* (the "*Killer Confessions* Attachment").  In addition, in November 2015, the parties entered into an amendment to the *Killer Confessions* Attachment relating to the production of *Killer Confessions* (the, "*Killer Confessions* Amendment").

60.     In connection with the *Killer Confessions* Attachment and the *Killer Confessions* Amendment thereafter, LMNO prepared detailed budgets that it would submit to Discovery for its approval upon which Discovery's percentage contribution

COUNTERCLAIMS

would be calculated and LMNO's percentage contribution would be calculated.  Those budgets were intentionally and secretly inflated by LMNO and submitted to Discovery for Discovery's approval.  Discovery approved such budgets and relied on them being fair and accurate in agreeing to enter into the relevant agreement with LMNO and making its co-funding contribution, which was directly tied to the budget.

61.   Pursuant to Section 2.A of the *Killer Confessions* Attachment, "[t]he 'Budget Contribution' for the Program shall be a per episode 'Flat Fee' equal to ████ ███████████████████████ United States Dollars (USD $███████) per episode (for an aggregate payment of ███████████████████████ United States Dollars (USD $████████))."

62.   Based upon written documentation, Discovery understood that its flat fee budget contribution for *Killer Confessions* for season one was 74.5% of the total production costs, or $███████████, with LMNO contributing the remaining 25.5%, or $███████.

63.   Pursuant to Section 2.A(i) of the *Killer Confessions* Attachment, "[f]or subsequent Production Years (if ordered), the Flat Fee shall be seventy-four and one-half percent (74.5%) of the Company-approved production budget for such Production Year, subject to the applicable production budget limits set forth hereunder."

64.   Discovery exercised its contractual option to order a second production year of *Killer Confessions* in an "Amendment 1" to the *Killer Confessions* Attachment, effective as of November 30, 2015.  For this subsequent production year, Discovery understood that its contribution was 74.5% of the total production costs, with LMNO obligated to contribute the remaining 25.5%

65.   Pursuant to Section 6 of the *Killer Confessions* Attachment, Discovery was to receive twenty percent of LMNO's Adjusted Gross Revenues from all media in

18

COUNTERCLAIMS

1  perpetuity.  In other words, if LMNO licensed *Killer Confessions* to a third party,

2  Discovery was to receive 20% of those Adjusted Gross Revenues.  In calculating

3  Adjusted Gross Revenues, LMNO was permitted to deduct certain costs and expenses.

4  These costs and expenses, however, were required to be actual, real, verifiable, and

5  actually incurred by LMNO.

6  **4.**     ***Hollywood & Crime***

7  66.     Discovery and LMNO entered into a Co-Production Attachment for New

8  Program, dated March 16, 2012, as relates to the program *Hollywood & Crime* (the

9  "*Hollywood & Crime* Attachment").

10  67.     In connection with the *Hollywood & Crime* Attachment, LMNO prepared

11  a detailed budget that it submitted to Discovery for its approval upon which

12  Discovery's percentage contribution would be calculated and LMNO's percentage

13  calculation would be calculated.  This budget was intentionally and secretly inflated

14  by LMNO and submitted to Discovery for Discovery's approval.  Discovery approved

15  such budget and relied on it being fair and accurate in agreeing to enter into the

16  relevant agreement with LMNO and making its co-funding contribution, which was

17  directly tied to the budget.

18  68.     Section 2.A of the *Hollywood & Crime* Attachment states that

19  "[Discovery] agrees to pay [LMNO], and [LMNO] agrees to accept . . . 74% of the

20  Production Budget, up to . . . $███████ . . . payable in accordance with the Payment

21  Schedule attached hereto as Exhibit H."  The Payment Schedule in Exhibit H to the

22  *Hollywood & Crime* Attachment states that Discovery's contribution totals 74% and

23  the "Co-Funders [LMNO's] contribution" is "26%"—or "$██████."

24  69.     Pursuant to the *Hollywood & Crime* Attachment, LMNO was obligated

25  to "return any overpayment" to Discovery.

26

27

28

19

COUNTERCLAIMS

70.     Due to LMNO's failure to contribute to the production costs, Discovery overpaid its contribution as set forth in the *Hollywood & Crime* Attachment.

71.     In violation of the *Hollywood & Crime* Attachment, LMNO never returned any overpayments owed to Discovery.

72.     Pursuant to Section 8(B)(ii)(a) of the *Hollywood & Crime* Attachment, "production budget increases or decreases shall reflect actual and direct costs of production of such Additional Episodes in the Production Year."

73.     Section 8.D also provides that if LMNO is unable or declines to finance its portion of a production budget, then Discovery could commission additional episodes for subsequent productions of *Hollywood & Crime*, pay all the production costs itself, but then own all rights for those episodes "throughout the world, in perpetuity."

74.     Pursuant to Section 6 of the *Hollywood & Crime* Attachment, Discovery was to receive twenty percent of LMNO's Adjusted Gross Revenues from all media in perpetuity.  In other words, if LMNO licensed *Hollywood & Crime* to a third party, Discovery was to receive 20% of those Adjusted Gross Revenues.  In calculating Adjusted Gross Revenues, LMNO was permitted to deduct certain costs and expenses. These costs and expenses, however, were required to be actual, real, verifiable, and actually incurred by LMNO.

## 5.     *Murder Book*

75.     Discovery and LMNO entered into a Co-Production Attachment for New Program, dated December 31, 2013, as relates to the program *Murder Book* (the "*Murder Book* Attachment").  In addition, starting in May 2014, the parties entered into amendments to the *Murder Book* Attachment relating to the production of *Murder Book* (the, "*Murder Book* Amendments").

COUNTERCLAIMS

76.     In connection with the *Murder Book* Attachment and the relevant *Murder Book* Amendment thereafter, LMNO prepared detailed budgets that it would submit to Discovery for its approval upon which Discovery's percentage contribution would be calculated and LMNO's percentage contribution would be calculated.  Those budgets were intentionally and secretly inflated by LMNO and submitted to Discovery for Discovery's approval.  Discovery approved such budgets and relied on them being fair and accurate in agreeing to enter into the relevant agreement with LMNO and making its co-funding contribution, which was directly tied to the budget.

77.     Pursuant to Section 2.A of the *Murder Book* Attachment, "[t]he 'Budget Contribution' for the Program shall be a per episode 'Flat Fee' equal to ████████ ██████████████████████████████████████████████████ ████████████ (USD $███████ per episode (for an aggregate payment of ████████████████████████████████████████ United States Dollars (USD $████████))."

78.     Based upon written documentation, Discovery understood that its flat fee budget contribution for *Murder Book* for season one was 70% of the total production costs, or $████████, with LMNO contributing the remaining 30%, or $████████.

79.     Further, Section 2.A(i) of the *Murder Book* Attachment states, "[f]or subsequent Production Years (if ordered), the Flat Fee shall be seventy percent (70%) of the Company-approved production budget for such Production Year, subject to the applicable production budget limits set forth hereunder."

80.     Discovery exercised its contractual option to order a second production year of *Murder Book* in Amendment 2, effective as of February 20, 2015, to the *Murder Book* Attachment.  For this subsequent production year, Discovery understood that its contribution was 70% of the total production costs, with LMNO obligated to contribute the remaining 30%.

21

COUNTERCLAIMS

81.     Pursuant to Section 6 of the *Murder Book* Attachment, Discovery was to receive twenty percent of LMNO's Adjusted Gross Revenues from all media in perpetuity.  In other words, if LMNO licensed *Murder Book* to a third party, Discovery was to receive 20% of those Adjusted Gross Revenues.  In calculating Adjusted Gross Revenues, LMNO was permitted to deduct certain costs and expenses.  These costs and expenses, however, were required to be actual, real, verifiable, and actually incurred by LMNO.

### 6.     *Other Co-Produced Programs*

82.     In addition to the Programs identified above, there were additional Co-Produced Programs, including *Baby Genius*, *Bear Whisperer*, *Bipolar Mysteries*, *Cheating Vegas*, *Housebound*, *Insane Bathrooms*, *Meteorite Men*, *NICU Diaries*, and *Surreal Estate*.  These additional Co-Produced Programs were all governed by the Amended and Restated Master and their respective Attachments and any Amendments thereto that required LMNO to contribute toward the production costs of those Programs, which LMNO fraudulently and deliberately failed to do.

83.     Each of the Attachments for each of these Co-Produced Programs also provide that if LMNO is unable or declines to finance its portion of a production budget, then Discovery could commission additional episodes for subsequent productions of these Co-Produced Programs, pay all the production costs itself, but then own all rights for those episodes "throughout the world, in perpetuity."

### B.     *The Commission Agreements*

84.     There are two Commission Programs that are the subject of these Counterclaims:  *7 Little Johnstons* and *The Coroner: I Speak for the Dead*.  Each is governed by a separate Master Commission Agreement and specific Attachments, as described below, with the Master Commission Agreement for *7 Little Johnstons*

COUNTERCLAIMS

governed by Maryland Law, and the Master Commission Agreement for *The Coroner: I Speak for the Dead* governed by California law.

### 1. *7 Little Johnstons*

85.    The Master Commission Agreement dated January 28, 2004 (the "January 28, 2004 Master") provides that Discovery has 100% ownership of each show described in each Attachment to it.  Specifically, pursuant to Section 2.1 to Exhibit A of the January 28, 2004 Master, "[LMNO] and [Discovery] agree that for the purpose of ownership pursuant to Section 201 of the U.S. Copyright Act (but not for tax or any other similar purposes), the Program and all elements thereof and relating thereto, including without limitation, outtakes, research and publicity materials (collectively, the 'Materials') shall be considered works made for hire for [Discovery] and are the sole and exclusive property of [Discovery], its successors and assigns, for all copyright terms, renewal terms and revivals thereof throughout the world, for all uses and purposes whatsoever (e.g., display, broadcast, sell, transfer, perform, reproduce, prepare derivative works, etc.).  [Discovery] will have the sole and exclusive right to exploit in any manner or media whether now known or hereafter devised all rights in the Materials, including without limitation all intellectual property and other proprietary rights, throughout the world in perpetuity without any additional payment to any individual or entity."

86.    Discovery and LMNO entered into a Commission Attachment for New Program, dated November 10, 2014 (together with any exhibits thereto, the "*7 Little Johnstons* Attachment"), that relates specifically to the *7 Little Johnstons* Program.  In addition, starting in January 2015, the parties entered into amendments to the *7 Little Johnstons* Attachment relating to the production of *7 Little Johnstons* (collectively, and together with any exhibits thereto, the "*7 Little Johnstons* Amendments").

23

COUNTERCLAIMS

87.     Pursuant to the *7 Little Johnstons* Attachment and the *7 Little Johnstons* Amendments, LMNO was obligated to "return any overpayment" to Discovery.

88.     In violation of the *7 Little Johnstons* Attachment and the *7 Little Johnstons* Amendments, LMNO never returned any overpayments owed to Discovery.

89.     Pursuant to Section 5.3 of Exhibit A to the January 28, 2004 Master, LMNO must "keep complete books of account showing in detail all expenses and charges incurred in the production of the Program."

90.     Pursuant to Section 5.2 of Exhibit A to the January 28, 2004 Master, LMNO was obligated to deposit the Budget Contribution "in a segregated bank account set up exclusively for the production of [*7 Little Johnstons*]" and the Budget Contribution "shall not be co-mingled with any other funds of [LMNO] which are not directly connected with the production of [*7 Little Johnstons*]."

91.     LMNO was also obligated, pursuant to Section VIII(K) of the *7 Little Johnstons* Attachment, to remit to Discovery all tax credits or other governmental subsidies it received.

**2.       *The Coroner: I Speak for the Dead***

92.     The Master Commission Agreement dated November 16, 2015 ("November 16, 2015 Master") provides that Discovery has 100% ownership of each show described in each Attachment to it.  Specifically, pursuant to Section 2.1 to Exhibit A of the November 16, 2015 Master, "[LEG] and [Discovery] agree that for the purpose of ownership pursuant to Section 201 of the U.S. Copyright Act (but not for tax or any other similar purposes), the Program and all elements thereof and relating thereto, including without limitation, Program titles, outtakes, research and publicity materials (collectively, the 'Materials') shall be considered works made for hire for [Discovery] and are the sole and exclusive property of [Discovery], its successors and assigns, for all copyright terms, renewal terms and revivals thereof

throughout the world, for all uses and purposes whatsoever (e.g., display, broadcast, sell, transfer, perform, reproduce, prepare derivative works, etc.).  [Discovery] will have the sole and exclusive right to exploit in any manner or media whether now known or hereafter devised all rights in the Materials, including without limitation all trademarks, intellectual property and other proprietary rights, throughout the world in perpetuity without any additional payment to any individual or entity."

93.    Discovery and LEG are parties to the Commission Attachment for New Program, dated as of August 31, 2015 ("*The Coroner: I Speak for the Dead Attachment*"), and any amendments thereto, to the November 16, 2015 Master, relating to the production of the show *The Coroner: I Speak for the Dead* (collectively, "*The Coroner: I Speak for the Dead* Agreement").

94.    Pursuant to Section 5.4 of Exhibit A to the November 16, 2015 Master, LEG must "keep complete books of account showing in detail all expenses and charges incurred, or Additional Funding . . . if received, in the production of the Program."

95.    LEG also must keep "books, accounts and records that accurately and fairly reflect in reasonable detail its transactions and dispositions of funds paid in connection with carrying out the transactions or services contemplated by this Agreement"  pursuant to Section 6.1(c) of Exhibit A to the November 16, 2015 Master.

## III.    Discovery Receives Whistleblower Tip

96.    In late 2015, Discovery received a message via its ethics hotline concerning allegations that LMNO and its principals, including Schotz, had been repeatedly engaging in fraudulent conduct relating to LMNO's production of various programs for Discovery.  Prior to receiving this message, Discovery was wholly unaware of any allegations that LMNO and/or LEG were secretly defrauding

COUNTERCLAIMS

Discovery and violating their contracts.  According to the whistleblower, LMNO's fraudulent conduct included, *inter alia*, systematic fraudulent behavior involving production costs and budgets (including keeping separate, secret internal budgets that reflected the true cost of the Programs it was producing for Discovery, which, for the Co-Produced Programs, were based on Discovery's percentage of the budget contribution only); the failure to properly share with Discovery tax credits LMNO received on productions; and the improper use of LMNO's corporate credit card by certain of its principals for personal expenditures, which would then be expensed as "production costs."

## IV.  Discovery's Response After Learning of the LMNO Defendants' Wrongful Conduct

97.    Taking these allegations very seriously, Discovery requested a meeting with Schotz to discuss the matter.  That meeting took place on February 10, 2016, at the LMNO Defendants' offices.  Discovery set forth its concerns to the LMNO Defendants in detail, but received unsatisfactory answers.

98.    Accordingly, at the close of that February 10, 2016 meeting, Discovery delivered to the LMNO Defendants separate Notices of Audit, Preservation and Default relating to programs *The Little Couple, Killer Confessions*, *The Coroner: I Speak for the Dead*, *Unusual Suspects* and *Hollywood & Crime*, and a Notice of Preservation and Default relating to *7 Little Johnstons* (collectively, the "Notices of Default").

99.    Discovery promptly invoked its audit rights under the relevant agreements, as set forth in the Notices of Default.  The LMNO Defendants requested a meeting with Discovery to explain how they handle the production of Discovery programming.  Discovery agreed to attend, and also desired to include its external auditor at the meeting.  The LMNO Defendants objected to Discovery's request, so

COUNTERCLAIMS

Discovery attended the meeting without its external auditor.  On February 25, 2016, during a meeting at the LMNO Defendants' counsel's office, Discovery again requested access to the LMNO Defendants' books and records to commence an audit for the programs identified in the Notices of Default.  At this meeting, LMNO merely provided two recently "rebuilt and recreated" documents relating to *Hollywood & Crime*—a Program not even in production at the time—as well as a single photograph reflecting the purported state of the LMNO Defendants' purported books and records.  The LMNO Defendants indicated that additional materials would be provided at a later date and so Discovery agreed to sequence the audit, starting with *The Little Couple*.

100.   A month later, the LMNO Defendants indicated the audit could commence but only for the Program *Hollywood & Crime*.  Even then, when Discovery's auditors arrived at LMNO's offices to begin the audit of *Hollywood & Crime*, LMNO provided only three documents and a single photograph.  Two of those documents—*i.e.*, the recently "rebuilt and recreated" documents related to *Hollywood & Crime*—had already been provided, together with the same photograph, to Discovery at the February 25, 2016 meeting.  At no time did LMNO provide Discovery with even the most basic types of documents normally examined in any standard audit.  While LMNO briefly showed Discovery's auditors a lengthy cost ledger—entitled *Hollywood & Crime* Cost "Bible"—LMNO refused to allow Discovery to retain a copy.  LMNO's refusal to provide this basic, obviously relevant Cost "Bible" amplified Discovery's concerns.  Moreover, the LMNO representative who attended the initial audit thwarted Discovery's efforts at every turn, and refused to answer even basic questions.

101.   Because the LMNO Defendants indicated they would require more time to provide documents and information related to Discovery's audit, Discovery

COUNTERCLAIMS

1  provided the LMNO Defendants with an extension of the "cure period" identified in

2  the Notices of Default, ultimately allowing the LMNO Defendants until April 18,

3  2016 to cure the identified defaults.

4      102.   In the nearly three-month period following delivery of Discovery's

5  Notices of Default, the LMNO Defendants offered no meaningful access to their

6  books and records and provided no assurances that their material breaches would or

7  could be cured.  In the limited audits that LMNO allowed to go forward, Discovery's

8  auditors' observations supported the claim made by the whistleblower that LMNO

9  was secretly pegging its own internal budget and costs to only Discovery's

10  contribution to the total approved budget.

11      103.   In a letter dated April 18, 2016—the close of the extended cure period—

12  the LMNO Defendants' outside counsel *admitted* that the LMNO Defendants failed to

13  keep any records validating the costs of production of the Programs and that LMNO

14  had not been contributing its share of production costs for Co-Produced Programs as it

15  was contractually obligated to do.  Thus, the LMNO Defendants not only failed to

16  cure the identified, material defaults, their counsel's letter confirmed that they were in

17  material breach of their various agreements with Discovery.

18      104.   Accordingly, on or around June 17, 2016, Discovery sent the LMNO

19  Defendants Notices of Termination relating to *The Little Couple*, *Unusual Suspects*,

20  *Killer Confessions*, *Hollywood & Crime*, *The Coroner: I Speak for the Dead*, and *7*

21  *Little Johnstons* (the last of which was made effective as of July 2, 2016) (collectively,

22  the "Notices of Termination").  In connection with the termination, and consistent

23  with its rights under the various agreements, Discovery requested that the LMNO

24  Defendants return to Discovery all Program Materials and/or Program Deliverables

25  (as defined in the relevant agreements) relating to the Programs.  Notwithstanding

26

27

28

COUNTERCLAIMS

repeated requests, the LMNO Defendants have refused to return Program Materials and/or Program Deliverables for *Killer Confessions* and *7 Little Johnstons*.

## V. LMNO's Wrongful Use of Discovery's Trademarks

105. Discovery is the registered owner of the distinctive mark THE LITTLE COUPLE, registered in the Principal Register of the United States Patent & Trademark Office ("PTO"), Reg. No. 4,062,239, in relation to entertainment and educational services. Discovery also has common law rights in the mark THE LITTLE COUPLE in connection with entertainment services and related services and goods, referred to collectively as "Discovery's Marks."

106. Discovery first began airing *The Little Couple* on its TLC network on or about May 26, 2009, and the show has continuously aired on TLC since that time, and has never appeared on any other television network in the United States. Through Discovery's efforts and actions to market, fund, advertise, and promote *The Little Couple* over the course of eight seasons, 134 episodes, and seven years, and by broadcasting the show on Discovery's network TLC, the mark has gained widespread recognition and became famous. As LMNO admits in its Complaint, *The Little Couple* is a successful show.

107. Moreover, the general public associates *The Little Couple* with Discovery and TLC, not with LMNO. Discovery has promoted the mark THE LITTLE COUPLE not only through television advertisements, but also online, in print, and through various instrumentalities of popular culture to educate consumers in the United States and around the world that they can view *The Little Couple* program on Discovery's TLC network and related channels. As a result, THE LITTLE COUPLE has become specifically valuable to Discovery, possessing strong secondary meaning among consumers.

COUNTERCLAIMS

108.   On or about, September 20, 2010, Discovery applied to register the mark THE LITTLE COUPLE as a word mark for "Entertainment and educational services in the nature of television and multimedia program series featuring subjects of general human interest distributed via various platforms across multiple forms of transmission media; providing entertainment information to others via a global computer network." On or about November 29, 2011, the PTO issued a certificate of registration for Discovery's mark THE LITTLE COUPLE for the same services, as U.S. Patent & Trademark Office Reg. No. 4,062,239.

109.   Annexed hereto as Exhibit A is a true and correct copy of the PTO registration certificate evidencing Discovery's ownership of the trademark THE LITTLE COUPLE and a printout from the PTO's website setting forth the status of this mark.  The registration for THE LITTLE COUPLE is valid, subsisting, and unrevoked.

110.   Following Discovery's termination of its relationship with LMNO relating to *The Little Couple* on or about June 17, 2016, LMNO has unlawfully used and exploited Discovery's registered trademarks, including its mark THE LITTLE COUPLE, through, *inter alia*, on information and belief, the sale of apparel related to *The Little Couple*.  LMNO has no credible claim to ongoing association with *The Little Couple* show or Discovery's mark THE LITTLE COUPLE given that Discovery has lawfully terminated the production agreements with LMNO.

111.   On information and belief, LMNO is continuing to attempt to create false associations between LMNO and *The Little Couple* generally, through the sale of apparel and merchandise, and otherwise.

112.   LMNO's unauthorized use of Discovery's mark is particularly harmful given the FBI's recent raid on LMNO, which creates a danger that the public will

30

COUNTERCLAIMS

1   associate *The Little Couple* and the real individuals who appear on the show with the

2   investigation into LMNO's criminality.

3   **FIRST CLAIM FOR RELIEF**

4   **Breach of Written Contract against LMNO**
    **(LMNO's Failure to Contribute Its Share of the Production Costs for Certain**

5   **Co-Produced Programs)**

6       113.   Discovery repeats and realleges each of the allegations set forth in

7   paragraphs 1 through 112, above, as though set forth in full herein.

8       114.   LMNO systematically and repeatedly failed to contribute its contractually

9   required portion of the production costs for LMNO's production of *The Little Couple*,

10  *Unusual Suspects*, *Hollywood & Crime*, *Killer Confessions*, and *Murder Book*, in

11  violation of the Co-Production Master Agreements and applicable Attachments and

12  Amendments thereto.

13      115.   The Co-Production Master Agreements are valid and enforceable

14  contracts that governed LMNO's production of *The Little Couple*, *Unusual Suspects*,

15  *Hollywood & Crime*, *Killer Confessions*, and *Murder Book* for Discovery.

16      116.   *The Little Couple* Attachment is a valid and enforceable contract that

17  governed LMNO's production of *The Little Couple* for Discovery.

18      117.   *The Little Couple* Amendments dated as of February 17, 2009, as of

19  August 24, 2009, as of February 11, 2010, as of September 10, 2010, as of November

20  29, 2011, as of December 19, 2012, as of June 11, 2013, as of July 1, 2013, as of

21  January 27, 2014, as of August 6, 2014, and as of July 1, 2015 are valid and

22  enforceable contracts that governed LMNO's production of *The Little Couple* for

23  Discovery (together with the Co-Production Master Agreements, *The Little Couple*

24  Attachment, and all *The Little Couple* Amendments, "*The Little Couple* Agreement").

25      118.   The *Unusual Suspects* Attachment is a valid and enforceable contract that

26  governed LMNO's production of *Unusual Suspects* for Discovery.

27

28

31

119.   The *Unusual Suspects* Amendments dated as of December 9, 2010, as of August 1, 2011, as of September 9, 2011, as of September 12, 2011, as of February 27, 2012, as of July 24, 2012, as of June 14, 2013, as of March 28, 2014, and as of February 26, 2015 are valid and enforceable contracts that governed LMNO's production of *Unusual Suspects* for Discovery (together with the Co-Production Master Agreements, the *Unusual Suspects* Attachment, and all other *Unusual Suspects* Amendments, the "*Unusual Suspects* Agreement").

120.   The *Hollywood & Crime* Attachment is a valid and enforceable contract that governed LMNO's production of *Hollywood & Crime* for Discovery (together with the Co-Production Master Agreements, the *Hollywood & Crime* Agreement").

121.   The *Killer Confessions* Attachment is a valid and enforceable contract that governed LMNO's production of *Killer Confessions* for Discovery (together with the Co-Production Master Agreements and all *Killer Confessions* Amendment(s), the "*Killer Confessions* Agreement").

122.   The *Murder Book* Attachment is a valid and enforceable contract that governed LMNO's production of *Murder Book* for Discovery (together with the Co-Production Master Agreements and all *Murder Book* Amendments, the "*Murder Book* Agreement").

123.   Discovery has performed all of its obligations under the Co-Production Master Agreements, *The Little Couple* Agreement, the *Unusual Suspects* Agreement, the *Hollywood & Crime* Agreement, the *Killer Confessions* Agreement, and the *Murder Book* Agreement.

124.   By failing to pay its contractually required portion of the production costs for *The Little Couple*, LMNO materially breached *The Little Couple* Agreement, resulting in damages to Discovery, the amount which will be proven at trial.

COUNTERCLAIMS

125.    By failing to pay its contractually required portion of the production costs for *Unusual Suspects*, LMNO materially breached the *Unusual Suspects* Agreement, resulting in damages to Discovery, the amount which will be proven at trial.

126.    By failing to pay its contractually required portion of the production costs for *Hollywood & Crime*, LMNO materially breached the *Hollywood & Crime* Agreement, resulting in damages to Discovery, the amount which will be proven at trial.

127.    By failing to pay its contractually required portion of the production costs for *Killer Confessions*, LMNO materially breached the *Killer Confessions* Agreement, resulting in damages to Discovery, the amount which will be proven at trial.

128.    By failing to pay its contractually required portion of the production costs for *Murder Book*, LMNO materially breached the *Murder Book* Agreement, resulting in damages to Discovery, the amount which will be proven at trial.

**SECOND CLAIM FOR RELIEF**
**Breach of Written Contract against LMNO**
**(LMNO's Failure to Return Overpayments to Discovery**
**for Certain Co-Produced Programs)**

129.    Discovery repeats and realleges each of the allegations set forth in paragraphs 1 through 128, above, as though set forth in full herein.

130.    Relying upon LMNO's fraudulent production budgets for *The Little Couple*, *Unusual Suspects*, and *Hollywood & Crime*, Discovery's actual payments exceeded the amounts due pursuant to the relevant governing agreements and LMNO systematically and repeatedly failed to return these overpayments, including any "Savings," owed to Discovery for *The Little Couple*, *Unusual Suspects*, and *Hollywood & Crime*, in violation of the Co-Production Master Agreements and applicable Attachments and Amendments thereto.

33

131. The Co-Production Master Agreements are valid and enforceable contracts that governed LMNO's production of *The Little Couple*, *Unusual Suspects*, and *Hollywood & Crime* for Discovery.

132. *The Little Couple* Agreement is a valid and enforceable contract that governed LMNO's production of *The Little Couple* for Discovery.

133. The *Unusual Suspects* Agreement is a valid and enforceable contract that governed LMNO's production of *Unusual Suspects* for Discovery.

134. The *Hollywood & Crime* Agreement is a valid and enforceable contract that governed LMNO's production of *Hollywood & Crime* for Discovery.

135. Discovery has performed all of its obligations under the Co-Production Master Agreements, *The Little Couple* Agreement, the *Unusual Suspects* Agreement, and the *Hollywood & Crime* Agreement.

136. By failing to return overpayments owed to Discovery for *The Little Couple*, LMNO materially breached *The Little Couple* Agreement, resulting in damages to Discovery, the amount which will be proven at trial.

137. By failing to return overpayments to Discovery for *Unusual Suspects*, LMNO materially breached the *Unusual Suspects* Agreement, resulting in damages to Discovery, the amount which will be proven at trial.

138. By failing to return overpayments to Discovery for *Hollywood & Crime*, LMNO materially breached the *Hollywood & Crime* Agreement, resulting in damages to Discovery, the amount which will be proven at trial.

### THIRD CLAIM FOR RELIEF
**Breach of Written Contract against LMNO**
**(LMNO's Failure to Keep Fair and Accurate Books, Accounts, and Records for Certain Co-Produced Programs)**

139. Discovery repeats and realleges each of the allegations set forth in paragraphs 1 through 138, above, as though set forth in full herein.

140.   LMNO systematically and repeatedly failed to keep fair and accurate books, accounts, and records for *The Little Couple*, *Unusual Suspects*, *Hollywood & Crime*, *Killer Confessions*, and *Murder Book*, in violation of the Co-Production Master Agreements.

141.   The Co-Production Master Agreements are valid and enforceable contracts that governed LMNO's production of *The Little Couple*, *Unusual Suspects*, *Hollywood & Crime*, *Killer Confessions*, and *Murder Book* for Discovery.

142.   *The Little Couple* Agreement is a valid and enforceable contract that governed LMNO's production of *The Little Couple* for Discovery.

143.   The *Unusual Suspects* Agreement is a valid and enforceable contract that governed LMNO's production of *Unusual Suspects* for Discovery.

144.   The *Hollywood & Crime* Agreement is a valid and enforceable contract that governed LMNO's production of *Hollywood & Crime* for Discovery.

145.   *The Killer Confessions* Agreement is a valid and enforceable contract that governed LMNO's production of *Killer Confessions* for Discovery.

146.   The *Murder Book* Agreement is a valid and enforceable contract that governed LMNO's production of *Murder Book* for Discovery.

147.   Discovery has performed all of its obligations under the Co-Production Master Agreements, *The Little Couple* Agreement, the *Unusual Suspects* Agreement, the *Hollywood & Crime* Agreement, the *Killer Confessions* Agreement, and the *Murder Book* Agreement.

148.   By failing to keep fair and accurate books, accounts, and records for *The Little Couple*, LMNO has materially breached *The Little Couple* Agreement, including Section 5.7 of Exhibit C to the 2013 Master Amendment, resulting in damages to Discovery, the amount which will be proven at trial.

COUNTERCLAIMS

149.   By failing to keep fair and accurate books, accounts, and records for *Unusual Suspects*, LMNO has materially breached the *Unusual Suspects* Agreement, including Section 5.7 of Exhibit C to the 2013 Master Amendment, resulting in damages to Discovery, the amount which will be proven at trial.

150.   By failing to keep fair and accurate books, accounts, and records for *Hollywood & Crime*, LMNO has materially breached the *Hollywood & Crime* Agreement, including Section 5.7 of Exhibit C to the 2013 Master Amendment, resulting in damages to Discovery, the amount which will be proven at trial.

151.   By failing to keep fair and accurate books, accounts, and records for *Killer Confessions*, LMNO has materially breached the *Killer Confessions* Agreement, including Section 5.7 of Exhibit C to the 2013 Master Amendment, resulting in damages to Discovery, the amount which will be proven at trial.

152.   By failing to keep fair and accurate books, accounts, and records for *Murder Book*, LMNO has materially breached the *Murder Book* Agreement, including Section 5.7 of Exhibit C to the 2013 Master Amendment, resulting in damages to Discovery, the amount which will be proven at trial.

## FOURTH CLAIM FOR RELIEF
### Breach of Written Contract against LMNO
### (LMNO's Failure to Tender Accurate Co-Production Budgets Reflecting Actual and Direct Costs of Production )

153.   Discovery repeats and realleges each of the allegations set forth in paragraphs 1 through 152, above, as though set forth in full herein.

154.   LMNO systematically failed to tender accurate production budgets that reflected actual and direct costs of production for *The Little Couple*, *Unusual Suspects*, and *Hollywood & Crime* in violation of the applicable Program agreements.

155.   *The Little Couple* Agreement is a valid and enforceable contract that governed LMNO's production of *The Little Couple* for Discovery.

36

156.   The *Unusual Suspects* Agreement is a valid and enforceable contract that governed LMNO's production of *Unusual Suspects* for Discovery.

157.   The *Hollywood & Crime* Agreement is a valid and enforceable contract that governed LMNO's production of *Hollywood & Crime* for Discovery.

158.   Discovery has performed all of its obligations under *The Little Couple* Agreement, the *Unusual Suspects* Agreement, and the *Hollywood & Crime* Agreement.

159.   By failing to tender accurate production budgets that reflected actual and direct costs of production for *The Little Couple*, LMNO has materially breached *The Little Couple* Agreement, resulting in damages to Discovery, the amount which will be proven at trial.

160.   By failing to tender accurate production budgets that reflected actual and direct costs of production for *Unusual Suspects*, LMNO has materially breached the *Unusual Suspects* Agreement, resulting in damages to Discovery, the amount which will be proven at trial.

161.   By failing to tender accurate production budgets that reflected actual and direct costs of production for *Hollywood & Crime*, LMNO has breached the *Hollywood & Crime* Agreement, resulting in damages to Discovery, the amount which will be proven at trial.

## FIFTH CLAIM FOR RELIEF
### Breach of Written Contract against LMNO
### (LMNO's Failure to Pay Discovery Its Share of LMNO's Adjusted Gross Revenue for Certain Co-Produced Programs)

162.   Discovery repeats and realleges each of the allegations set forth in paragraphs 1 through 161, above, as though set forth in full herein.

163.   Upon information and belief, LMNO has received revenue from its exploitation of *The Little Couple*, *Unusual Suspects*, *Hollywood & Crime*, *Killer*

37

*Confessions*, and *Murder Book*.  LMNO has failed to pay Discovery 20% of LMNO's Adjusted Gross Revenue from all media as required pursuant to Attachments for *The Little Couple*, *Unusual Suspects*, *Hollywood & Crime*, *Killer Confessions*, and *Murder Book*.

164.   *The Little Couple* Attachment is a valid and enforceable contract that governed LMNO's production of *The Little Couple* for Discovery.

165.   The *Unusual Suspects* Attachment is a valid and enforceable contract that governed LMNO's production of *Unusual Suspects* for Discovery.

166.   The *Killer Confessions* Attachment is a valid and enforceable contract governed LMNO's production of *Killer Confessions* for Discovery.

167.   The *Hollywood & Crime* Attachment is a valid and enforceable contract that governed LMNO's production of *Hollywood & Crime* for Discovery.

168.   The *Murder Book* Attachment is a valid and enforceable contract that governed LMNO's production of *Murder Book* for Discovery.

169.   Discovery has performed all of its obligations under *The Little Couple* Attachment, the *Unusual Suspects* Attachment, the *Killer Confessions* Attachment, the *Hollywood & Crime* Attachment, and the *Murder Book* Attachment.

170.   By failing to pay Discovery 20% of LMNO's Adjusted Gross Revenue from all media for *The Little Couple*, LMNO has materially breached Section 5 of *The Little Couple* Attachment, resulting in damages to Discovery, the amount which will be proven at trial.

171.   By failing to pay Discovery 20% of LMNO's Adjusted Gross Revenue from all media for *Unusual Suspects*, LMNO breached Section 5 of the *Unusual Suspects* Attachment, resulting in damages to Discovery, the amount which will be proven at trial.

COUNTERCLAIMS

172.   By failing to pay Discovery 20% of LMNO's Adjusted Gross Revenue from all media for *Killer Confessions*, LMNO breached Section 6 of the *Killer Confessions* Attachment, resulting in damages to Discovery, the amount which will be proven at trial.

173.   By failing to pay Discovery 20% of LMNO's Adjusted Gross Revenue from all media for *Hollywood & Crime*, LMNO breached Section 6 of the *Hollywood & Crime* Attachment, resulting in damages to Discovery, the amount which will be proven at trial.

174.   By failing to pay Discovery 20% of LMNO's Adjusted Gross Revenue from all media for *Murder Book*, LMNO breached Section 6 of the *Murder Book* Attachment, resulting in damages to Discovery, the amount which will be proven at trial.

**SIXTH CLAIM FOR RELIEF**
**Breach of Written Contract against LMNO**
**(LMNO's Failure to Pay Discovery Its Share of Additional Funding**
**for *The Little Couple*)**

175.   Discovery repeats and realleges each of the allegations set forth in paragraphs 1 through 174, above, as though set forth in full herein.

176.   Upon information and belief, LMNO received tax credits or other governmental subsidies for *The Little Couple*.

177.   LMNO failed to remit to Discovery a pro rata portion of any tax credits or other governmental subsidies it received for *The Little Couple*, in violation of the 2013 Master Amendment.

178.   The 2013 Master Amendment is a valid and enforceable contract that governed LMNO's production of *The Little Couple* for Discovery.

179.   Discovery has performed all of its obligations under the 2013 Master Amendment.

180.   By failing to remit to Discovery a pro rata portion of any tax credits or other governmental subsidies it received for *The Little Couple*, LMNO has materially breached Section 5.2 of Exhibit C to the 2013 Master Amendment, resulting in damages to Discovery, with the precise amount to be proven at trial.

## SEVENTH CLAIM FOR RELIEF
### Breach of Written Contract against LEG
### (LEG's Failure to Keep Fair and Accurate Books, Accounts, and Records for *The Coroner: I Speak for the Dead*)

181.   Discovery repeats and realleges each of the allegations set forth in paragraphs 1 through 180, above, as though set forth in full herein.

182.   LEG systematically and repeatedly failed to keep fair and accurate books, accounts, and records for *The Coroner: I Speak for the Dead*, in violation of the November 16, 2015 Master.

183.   The November 16, 2015 Master is a valid and enforceable contract that governed LEG's production of *The Coroner: I Speak for the Dead* for Discovery.

184.   Discovery has performed all of its obligations under the November 16, 2015 Master.

185.   By failing to keep fair and accurate books, accounts, and records for *The Coroner: I Speak for the Dead*, LEG has materially breached Sections 5.4 and 6.1(c) of Exhibit A to the November 16, 2015 Master, resulting in damages to Discovery, the amount which will be proven at trial.

## EIGHTH CLAIM FOR RELIEF
### Breach of Written Contract against LMNO
### (LMNO's Failure to Keep Fair and Accurate Books, Accounts, and Records for *7 Little Johnstons*)

186.   Discovery repeats and realleges each of the allegations set forth in paragraphs 1 through 185, above, as though set forth in full herein.

187.   LMNO systematically and repeatedly failed to keep fair and accurate books, accounts, and records for *7 Little Johnstons*, in violation of the January 28, 2004 Master.

188.   The January 28, 2004 Master is a valid and enforceable contract that governed LMNO's production of *7 Little Johnstons* for Discovery.

189.   Discovery has performed all of its obligations under the January 28, 2004 Master.

190.   By failing to keep fair and accurate books, accounts, and records for *7 Little Johnstons*, LMNO has materially breached Section 5.3 of Exhibit A to the January 28, 2004 Master, resulting in damages to Discovery, the amount which will be proven at trial.

## NINTH CLAIM FOR RELIEF
### Breach of Written Contract against LMNO
### (LMNO's Failure to Pay Discovery All Additional Funding for
### *7 Little Johnstons*)

191.   Discovery repeats and realleges each of the allegations set forth in paragraphs 1 through 190, above, as though set forth in full herein.

192.   Upon information and belief, LMNO received tax credits or other governmental subsidies for *7 Little Johnstons*.

193.   LMNO failed to remit to Discovery all tax credits or other governmental subsidies it received for *7 Little Johnstons*, and/or cooperate with Discovery in obtaining such subsidies, in violation of Section VIII(K) of the *7 Little Johnstons* Attachment.

194.   The *7 Little Johnstons* Attachment is a valid and enforceable contract that governed LMNO's production of *7 Little Johnstons* for Discovery.

195.   Discovery has performed all of its obligations under the *7 Little Johnstons* Attachment.

COUNTERCLAIMS

196.   By failing to remit to Discovery all tax credits or other governmental subsidies it received for *7 Little Johnstons*, and/or cooperate with Discovery in obtaining such subsidies, LMNO has materially breached Section VIII(K) of the *7 Little Johnstons* Attachment, resulting in damages to Discovery, the amount which will be proven at trial.

**TENTH CLAIM FOR RELIEF**
**Breach of Written Contract against LMNO**
**(LMNO's Failure to Return Any Overpayments to Discovery for *7 Little Johnstons*)**

197.   Discovery repeats and realleges each of the allegations set forth in paragraphs 1 through 196, above, as though set forth in full herein.

198.   LMNO failed to return overpayments owed to Discovery for *7 Little Johnstons*, in violation of the January 28, 2004 Master, *7 Little Johnstons* Attachment, and *7 Little Johnstons* Amendments (together, the "*7 Little Johnstons* Agreement").

199.   The *7 Little Johnstons* Agreement is a valid and enforceable contract that governed LMNO's production of *7 Little Johnstons* for Discovery.

200.   Discovery has performed all of its obligations under the *7 Little Johnstons* Agreement.

201.   By failing to return overpayments owed to Discovery for *7 Little Johnstons*, LMNO materially breached the *7 Little Johnstons* Agreement, resulting in damages to Discovery, the amount which will be proven at trial.

**ELEVENTH CLAIM FOR RELIEF**
**Breach of Written Contract against LMNO**
**(LMNO's Failure to Deposit Budget Contribution into a Segregated Bank Account for *7 Little Johnstons*)**

202.   Discovery repeats and realleges each of the allegations set forth in paragraphs 1 through 201, above, as though set forth in full herein.

42

COUNTERCLAIMS

203.   LMNO systematically and repeatedly failed to deposit Discovery's production budget contribution into a segregated bank account set up exclusively for the production of *7 Little Johnstons* and instead commingled Discovery's contribution with other funds which were not directly connected with the production of *7 Little Johnstons*, in violation of Section 5.2 of Exhibit A to the January 28, 2004 Master.

204.   The January 28, 2004 Master is a valid and enforceable contract that governed LMNO's production of *7 Little Johnstons* for Discovery.

205.   Discovery has performed all of its obligations under the January 28, 2004 Master.

206.   By failing to deposit Discovery's production budget contribution into a segregated bank account set up exclusively for the production of *7 Little Johnstons* and by commingling Discovery's contribution with other funds which were not directly connected with the production of *7 Little Johnstons*, LMNO has materially breached Section 5.2 of Exhibit A to the January 28, 2004 Master, resulting in damages to Discovery, the amount which will be proven at trial.

## <u>TWELFTH CLAIM FOR RELIEF</u>
### Breach of Implied Covenant of Good Faith and Fair Dealing for *The Coroner: I Speak for the Dead* against LEG

207.   Discovery repeats and realleges each of the allegations set forth in paragraphs 1 through 206, above, as though set forth in full herein.

208.   LEG and Discovery were parties to the *The Coroner: I Speak for the Dead* Agreement that governed LEG's production of *The Coroner: I Speak for the Dead* for Discovery.

209.   There is an implied duty of good faith and fair dealing in every contract under California law, including *The Coroner: I Speak for the Dead* Agreement.

43

1    210.   Discovery fully performed its obligations under *The Coroner: I Speak*

2  *for the Dead* Agreement, or was excused from doing so.

3    211.   All conditions required for LEG's performance had occurred or were

4  excused.

5    212.   LEG breached the implied covenant of good faith and fair dealing in *The*

6  *Coroner: I Speak for the Dead* Agreement and unfairly interfered with Discovery's

7  right to receive the full benefits of *The Coroner: I Speak for the Dead* Agreement by

8  tendering a false, overinflated production budget for season one of *The Coroner: I*

9  *Speak for the Dead* to Discovery, forcing Discovery to pay a false, overinflated

10  amount over and above the amount needed to produce the Program.  Had LEG

11  provided an accurate production budget, Discovery would have received the full

12  benefits of *The Coroner: I Speak for the Dead* Agreement without paying any

13  additional, inflated amounts.

14    213.   As a direct and proximate result of LEG's breach of the implied covenant

15  of good faith and fair dealing, Discovery has been damaged, the amount of which will

16  be proven at trial.

17    **THIRTEENTH CLAIM FOR RELIEF**

18    **Fraud against LMNO Defendants**

19    214.   Discovery repeats and realleges each of the allegations set forth in

20  paragraphs 1 through 213, above, as though set forth in full herein.

21    215.   Discovery's financial contributions towards each of the Co-Produced

22  Programs—*The Little Couple*, *Unusual Suspects*, *Killer Confessions*, *Hollywood &*

23  *Crime*, *Murder Book*, *Baby Genius*, *Bear Whisperer*, *Bipolar Mysteries*, *Cheating*

24  *Vegas*, *Housebound*, *Insane Bathrooms*, *Meteorite Men*, *NICU Diaries*, and *Surreal*

25  *Estate*—and each of the Commissioned Programs—*7 Little Johnstons* and *The*

26  *Coroner: I Speak for the Dead—* were based on its belief and reliance that the budget

27

28

COUNTERCLAIMS

1    numbers the LMNO Defendants provided to Discovery were accurate, submitted in

2    good faith, and not contrived.

3        216.   In submitting budgets to Discovery in connection with the various

4    Programs, the LMNO Defendants made specific, false representations regarding the

5    budget amounts for each of the Co-Produced and Commissioned Programs.

6    Specifically, the LMNO Defendants artificially inflated each of its production budgets

7    in order to drive up Discovery's contribution amounts, and improperly used

8    Discovery's contributions for non-production related purposes.

9        217.   For example, on or around October 30, 2008, Horwitz prepared and/or

10   submitted to Discovery an incorrect, fraudulent production budget of $███████ for the

11   pilot for *The Little Couple* as reflected in Exhibit G to *The Little Couple* Attachment.

12       218.   On or around February 12, 2009, Horwitz prepared and/or submitted to

13   Discovery an incorrect, fraudulent production budget of $███████ for season one of

14   *The Little Couple* as reflected in Exhibit G-1 to Amendment 1 dated as of February

15   17, 2009 to *The Little Couple* Attachment.

16       219.   On or around August 7, 2009, Horwitz prepared and/or submitted to

17   Discovery an incorrect, fraudulent production budget of $███████ for season two of

18   *The Little Couple* as reflected in Exhibit G-2 to Amendment 3 dated as of August 24,

19   2009 to *The Little Couple* Attachment.

20       220.   On or around February 5, 2010, Horwitz prepared and/or submitted to

21   Discovery an incorrect, fraudulent production budget of $███████ for season three

22   of *The Little Couple* as reflected in Exhibit G-3 to Amendment 4 dated as of February

23   11, 2010 to *The Little Couple* Attachment.

24       221.   On or around August 23, 2010, Horwitz prepared and/or submitted to

25   Discovery an incorrect, fraudulent production budget of $███████ for season four of

26

27

28

COUNTERCLAIMS

1    *The Little Couple* as reflected in Exhibit G-4 to Amendment 5 dated as of September

2    10, 2010 to *The Little Couple* Attachment.

3         222.   On or around November 10, 2011, Horwitz prepared and/or submitted to

4    Discovery an incorrect, fraudulent production budget less talent fee of $███████ for

5    season five of *The Little Couple* as reflected in Exhibit G-6 to Amendment 9 dated as

6    of November 29, 2011 to *The Little Couple* Attachment.

7         223.   On or around June 10, 2013, Horwitz prepared and/or submitted to

8    Discovery an incorrect, fraudulent production budget of $███████ for season six of

9    *The Little Couple* as reflected in Exhibit G-7 to Amendment 11 dated as of June 11,

10   2013 to *The Little Couple* Attachment.

11        224.   On or around January 22, 2014, Horwitz prepared and/or submitted to

12   Discovery an incorrect, fraudulent production budget of $███████ for season "6B"

13   of *The Little Couple* as reflected in Exhibit G-8 to Amendment 14 dated as of January

14   27, 2014 to *The Little Couple* Attachment.

15        225.   On or around August 6, 2014, Horwitz prepared and/or submitted to

16   Discovery an incorrect, fraudulent production budget of $███████ for season seven

17   of *The Little Couple* as reflected in Exhibit G-9 to Amendment 17 dated as of August

18   6, 2014 to *The Little Couple* Attachment.

19        226.   On or around March 12, 2015, Horwitz prepared and/or submitted to

20   Discovery an incorrect, fraudulent production budget of $██████ for additional

21   episodes for season seven of *The Little Couple* as reflected in Exhibit G-10 to

22   Amendment 20 dated as of March 24, 2015 to *The Little Couple* Attachment.

23        227.   On or around June 24, 2015, Horwitz prepared and/or submitted to

24   Discovery an incorrect, fraudulent production budget of $███████ prepared by

25   Horwitz for season eight of *The Little Couple* as reflected in Exhibit G-11 to

26   Amendment 21 dated as of July 1, 2015 to *The Little Couple* Attachment.

27

28

COUNTERCLAIMS

228.   On or around July 9, 2008, Horwitz prepared and/or submitted to Discovery an incorrect, fraudulent production budget of $█████ for season one of *Unusual Suspects* as reflected in Exhibit G to the *Unusual Suspects* Attachment.

229.   On or around December 3, 2010, Horwitz prepared and/or submitted to Discovery an incorrect, fraudulent production budget of $█████ prepared by Horwitz for season two of *Unusual Suspects* as reflected in Exhibit G-2 to Amendment 3 dated as of December 9, 2010 to the *Unusual Suspects* Attachment.

230.   On or around September 9, 2011, Horwitz prepared and/or submitted to Discovery an incorrect, fraudulent production budget of $████ for an additional episode of season two of *Unusual Suspects* as reflected in Exhibit G-Episode 11 to Amendment 4 dated as of September 9, 2011 to the *Unusual Suspects* Attachment.

231.   On or around September 14, 2011, Horwitz prepared and/or submitted to Discovery an incorrect, fraudulent production budget of $█████ for season three of *Unusual Suspects* as reflected in Exhibit G-3 to Amendment 5 dated as of September 12, 2011 to the *Unusual Suspects* Attachment.

232.   On or around April 2, 2012, Horwitz prepared and/or submitted to Discovery an incorrect, fraudulent production budget of $█████ for season four of *Unusual Suspects* as reflected in Exhibit G-4 to Amendment 6 dated as of February 27, 2012 to the *Unusual Suspects* Attachment.

233.   On or around July 16, 2012, Horwitz prepared and/or submitted to Discovery an incorrect, fraudulent production budget of $█████ for season five of *Unusual Suspects* as reflected in Exhibit G-5 to Amendment 7 dated as of July 24, 2012 to the *Unusual Suspects* Attachment.

234.   On or around June 12, 2013, Horwitz prepared and/or submitted to Discovery an incorrect, fraudulent production budget of $█████ for season six of

COUNTERCLAIMS

*Unusual Suspects* as reflected in Exhibit G-6 to Amendment 8 dated as of June 14, 2013 to the *Unusual Suspects* Attachment.

235.   On or around March 21, 2014, Horwitz prepared and/or submitted to Discovery an incorrect, fraudulent production budget of $██████ for season seven of *Unusual Suspects* as reflected in Exhibit G-7 to Amendment 10 dated as of March 28, 2014 to the *Unusual Suspects* Attachment.

236.   On or around February 11, 2015, Horwitz prepared and/or submitted to Discovery an incorrect, fraudulent production budget of $██████ for season eight of *Unusual Suspects* as reflected in Exhibit G-8 to Amendment 11 dated as of February 26, 2015 to the *Unusual Suspects* Attachment.

237.   On or around March 16, 2012, Horwitz prepared and/or submitted to Discovery an incorrect, fraudulent production budget of $██████ for six one-hour episodes of *Hollywood & Crime* as reflected in Exhibit G to the *Hollywood & Crime* Attachment.

238.   On or around September 9, 2014, Horwitz prepared and/or submitted to Discovery an incorrect, fraudulent production budget of $██████ for season one of *Killer Confessions* as reflected in a document entitled "Budget Assumptions."

239.   On or around December 8, 2015, Horwitz prepared and/or submitted to Discovery an incorrect, fraudulent production budget of $██████ for season two of *Killer Confessions* as reflected in a document entitled "Budget Assumptions."

240.   On or around January 21, 2014, Horwitz prepared and/or submitted to Discovery an incorrect, fraudulent production budget of $██████ for season one of *Murder Book* as reflected in a document entitled "Budget Assumptions."

241.   On or around February 27, 2015, Horwitz prepared and/or submitted to Discovery an incorrect, fraudulent production budget of $██████ for season two of *Murder Book* as reflected in a document entitled "Budget Assumptions."

48

242.   On or around April 2, 2010, Horwitz prepared and/or submitted to Discovery an incorrect, fraudulent production budget of $███ for one one-hour program of *Baby Genius* as reflected in Exhibit G to the *Baby Genius* Attachment dated April 5, 2010 entered into between Discovery and LMNO.

243.   On or around July 16, 2008, Horwitz prepared and/or submitted to Discovery an incorrect, fraudulent production budget of $███ for two one-hour programs of *Bear Whisperer* as reflected in Exhibit G to the *Bear Whisperer* Attachment dated June 16, 2008 entered into between Discovery and LMNO.

244.   On or around June 10, 2010, Horwitz prepared and/or submitted to Discovery an incorrect, fraudulent production budget of $███ for a second production year of *Bear Whisperer* as reflected in Exhibit G to the *Bear Whisperer* Attachment dated April 29, 2010 entered into between Discovery and LMNO.

245.   On or around January 29, 2010, Horwitz prepared and/or submitted to Discovery an incorrect, fraudulent production budget of $███ for one one-hour program of *Bipolar Mysteries* as reflected in Exhibit G to the *Bipolar Mysteries* Attachment dated January 29, 2010 entered into between Discovery and LMNO.

246.   On or around March 7, 2012, Horwitz prepared and/or submitted to Discovery an incorrect, fraudulent production budget of $███ for three one-hour episodes of *Cheating Vegas* as reflected in Exhibit G to the *Cheating Vegas* Attachment dated March 8, 2012 entered into between Discovery and LMNO.

247.   On or around March 8, 2010, Horwitz prepared and/or submitted to Discovery an incorrect, fraudulent production budget of $███ for one one-hour pilot of *Housebound* as reflected in Exhibit G to the *Housebound* Attachment dated as of February 9, 2010 entered into between Discovery and LMNO.

248.   On or around August 28, 2012, Horwitz prepared and/or submitted to Discovery an incorrect, fraudulent production budget of $███ for one half-hour

COUNTERCLAIMS

1  pilot of *Insane Bathrooms* as reflected in Exhibit G to the *Insane Bathrooms*

2  Attachment dated November 28, 2012 entered into between Discovery and LMNO.

3       249.   On or around September 22, 2008, Horwitz prepared and/or submitted to

4  Discovery an incorrect, fraudulent production budget of $█████ for one one-hour

5  pilot of *Meteorite Men* as reflected in Exhibit G to the *Meteorite Men* Attachment

6  dated October 7, 2008 entered into between Discovery and LMNO (the "*Meteorite*

7  *Men* Attachment").

8       250.   On or around July 8, 2009, Horwitz prepared and/or submitted to

9  Discovery an incorrect, fraudulent production budget of $█████ for an additional

10  six episodes of *Meteorite Men* as reflected in Exhibit G-1 to Amendment 1 dated as of

11  June 29, 2009 to the *Meteorite Men* Attachment.

12       251.   On or around May 25, 2010, Horwitz prepared and/or submitted to

13  Discovery an incorrect, fraudulent production budget of $█████ for season two of

14  *Meteorite Men* as reflected in Exhibit C-3 to Amendment 3 dated May 26, 2010 to the

15  *Meteorite Men* Attachment.

16       252.   On or around March 7, 2011, Horwitz prepared and/or submitted to

17  Discovery an incorrect, fraudulent production budget of $█████ for season three

18  of *Meteorite Men* as reflected in Exhibit C-4 to Amendment 4 dated as of March 8,

19  2011 to the *Meteorite Men* Attachment.

20       253.   On or around January 26, 2010, Horwitz prepared and/or submitted to

21  Discovery an incorrect, fraudulent production budget of $█████ for ten half-hour

22  programs of *NICU Diaries* as reflected in Exhibit G to the *NICU Diaries* Attachment

23  dated January 29, 2010 entered into between Discovery and LMNO.

24       254.   On or around December 11, 2012, Horwitz prepared and/or submitted to

25  Discovery an incorrect, fraudulent production budget of $█████ for one one-hour

26

27

28

COUNTERCLAIMS

pilot of *Surreal Estate* as reflected in Exhibit G to the *Surreal Estate* Attachment dated November 28, 2012 entered into between Discovery and LMNO.

255.   On or around November 9, 2014, Horwitz prepared and/or submitted to Discovery an incorrect, fraudulent production budget of $███ for the pilot for *7 Little Johnstons* as reflected in Exhibit C to the *7 Little Johnstons* Attachment.

256.   On or around January 12, 2015, Horwitz prepared and/or submitted to Discovery an incorrect, fraudulent production budget of $███ for season one of *7 Little Johnstons* as reflected in Exhibit C-1 to Amendment 1 dated as of January 9, 2015 to the *7 Little Johnstons* Attachment.

257.   On or around March 31, 2015, Horwitz prepared and/or submitted to Discovery an incorrect, fraudulent production budget of $███ for a special one-hour Q&A episode of *7 Little Johnstons* as reflected in Exhibit C-2 to Amendment 2 dated as of March 31, 2015 to the *7 Little Johnstons* Attachment.

258.   On or around May 4, 2015, Horwitz prepared and/or submitted to Discovery an incorrect, fraudulent production budget of $███ for season "1B" of 7 *Little Johnstons* as reflected in Exhibit C-3 to Amendment 3 dated as of May 13, 2015 to the *7 Little Johnstons* Attachment.

259.   On or around December 14, 2015, Horwitz prepared and/or submitted to Discovery an incorrect, fraudulent production budget of $███ for season one of *The Coroner: I Speak for the Dead* in a document entitled "Budget Assumptions."

260.   As alleged above, each of the above production budgets prepared and/or submitted by the LMNO Defendants and Horwitz for the Co-Produced Programs and Commissioned Programs—as well as numerous others not included among the illustrative and non-exhaustive examples enumerated above—was false, misleading, artificially inflated, and materially inaccurate.

261.   The LMNO Defendants, Schotz, and Horwitz were aware that each of the production budgets was false, misleading, artificially inflated, and materially inaccurate.

262.   The LMNO Defendants' fraudulent misrepresentations, through Horwitz, were made for the purpose of defrauding Discovery, and with the intent of deceiving Discovery into increasing and overpaying its budget contributions for each of the Co-Produced Programs and Commissioned Programs by millions of dollars.

263.   Discovery relied on the LMNO Defendants' fraudulent misrepresentations in approving the production budgets for each of the Co-Produced Programs and Commissioned Programs.  Discovery's payments of its pro-rata portion of the production budgets for each of the Co-Produced Programs were predicated on LMNO's purportedly truthful calculation of those production budgets.  Similarly, Discovery's payments for the production budgets for each of the Commissioned Programs were predicated on the LMNO Defendants' purportedly truthful calculation of those production budgets.

264.   At the time of the LMNO Defendants' fraudulent misrepresentations, Discovery believed them to be true.  In reliance on these fraudulent misrepresentations, Discovery was induced to provide its budget contributions for each of the Co-Produced Programs and the Commissioned Programs by millions of dollars.

265.   Each of the budgets submitted by LMNO for the Co-Produced Programs and by the LMNO Defendants for the Commissioned Programs was reviewed by Discovery and its employees, which would frequently ask questions to the LMNO Defendants about estimated cost projections.  Budgets often went through multiple drafts before a final, going-in budget was submitted to Discovery for approval.

COUNTERCLAIMS

1   Discovery relied on the good-faith nature of such negotiations and representations
2   made during the course of the budget discussions.

3       266.   Had Discovery known the actual facts, it would have acted differently to
4   protect its interests.  Discovery's reliance on the LMNO Defendants' fraudulent
5   misrepresentations was justifiable.

6       267.   LMNO, LEG, Schotz, Horwitz, and the LMNO Defendants' employees
7   and agents actively concealed the fact that these budgets did not represent the true
8   intended cost of production and never informed Discovery that the Programs were
9   produced for less than the budgets reflected.

10      268.   Discovery first became aware that the LMNO Defendants might have
11  engaged in fraudulent budgeting in late 2015, when Discovery received a message on
12  its ethics hotline concerning allegations that the LMNO Defendants and their
13  principals, including Schotz, had been repeatedly engaging in fraudulent conduct
14  relating to the LMNO Defendants' production of various Programs for Discovery.

15      269.   As a direct and proximate result of the false promises that the LMNO
16  Defendants made without intent to perform them, Discovery has suffered damages,
17  the precise amount and scope of which will be determined at trial.

18              **FOURTEENTH CLAIM FOR RELIEF**
19  **Recovery of Personal Property/Claim and Delivery for *Killer Confessions***
20                      **against LMNO**

21      270.   Discovery repeats and realleges each of the allegations set forth in
22  paragraphs 1 through 269, above, as though set forth in full herein.

23      271.   Section 10 of Exhibit A to the Amended and Restated Master provides:
24  "[u]pon termination, [Discovery] shall have all rights granted under this Amendment
25  and Restatement in all Program Materials (which rights will include the right to
26  produce additional programs), regardless of the stage of completion, and [LMNO]

27
28
                              53

shall promptly deliver, or cause to be delivered, to [Discovery] all Program Materials in [LMNO's] possession or control as of the date of termination."

272.   As alleged in greater detail above, LMNO breached the *Killer Confessions* Agreement and Discovery terminated the *Killer Confessions* Attachment in its June 17 Notice of Termination.

273.    Pursuant to the terms of the Amended and Restated Master and Discovery's right to possession of Program Materials after termination as set forth therein, Discovery's June 17 Notice of Termination demanded that LMNO deliver to Discovery all Program Materials, now known as "Program Deliverables," for *Killer Confessions* within two business days (collectively, the "<u>*Killer Confessions* Detained Program Deliverables</u>.").

274.   Discovery also demanded LMNO's return of the *Killer Confessions* Detained Program Deliverables in a letter dated June 23 sent to LMNO (the "<u>June 23 Letter</u>").

275.   As set forth in the June 23 Letter, the *Killer Confessions* Detained Program Deliverables include all research materials for approved stories and stories in the pipeline including contact information for participants connected to stories for season two of *Killer Confessions*, all draft scripts for season two of *Killer Confessions*, all edit scripts for season two of *Killer Confessions,* all footage shot with logs for season two of *Killer Confessions*, all story string outs for season two of *Killer Confessions*, and EDL's for uncompleted  projects for season two of *Killer Confessions*.

276.   The *Killer Confessions* Detained Program Deliverables are valuable to Discovery and necessary for continued production of the Program.  Although not ascertainable at the present time, the value of the *Killer Confessions* Detained Program Deliverables is no less than $2 million.

COUNTERCLAIMS

277.   Upon information and belief, Discovery alleges that the *Killer Confessions* Detained Program Deliverables are located at LMNO's offices at 15821 Ventura Boulevard, Suite 320, Encino, California, 91436, except those Detained Program Deliverables which have been moved to other locations without Discovery's knowledge.

278.   Despite the terms of the Amended and Restated Master, and notwithstanding Discovery's June 17 Notice of Termination and Discovery's June 23 Letter, LMNO has refused to deliver the *Killer Confessions* Detained Program Deliverables to Discovery, and all such Detained Program Deliverables remain unjustly and wrongfully in LMNO's possession.

279.   Under the terms of the Amended and Restated Master and applicable California law, Discovery is entitled to immediate possession of the *Killer Confessions* Detained Program Deliverables before judgment in this action is entered.

280.   Under the terms of the Amended and Restated Master and applicable California law, Discovery is entitled to a final judgment for possession of the *Killer Confessions* Detained Program Deliverables.

281.   During, and as a proximate result of, LMNO's wrongful possession and detention of the *Killer Confessions* Detained Program Deliverables, Discovery has and continues to suffer the loss of these Detained Program Deliverables, the precise amount of which will be determined at trial.

## FIFTEENTH CLAIM FOR RELIEF
### Recovery of Personal Property/Claim and Delivery for *7 Little Johnstons* against LMNO Defendants

282.   Discovery repeats and realleges each of the allegations set forth in paragraphs 1 through 281, above, as though set forth in full herein.

55

283.   The parties' production of *7 Little Johnstons* is governed by, among other things, the January 28, 2004 Master.

284.   Section 12.3 of Exhibit A to the January 28, 2004 Master provides: "[u]pon termination of the Agreement, Producer will promptly deliver to Company all Program Materials of any kind produced as of the date of termination, as well as all agreements relating thereto, and Company will have all rights under the Agreement in such Program Materials regardless of the stage of completion.  Should Producer fail to comply, Company may enter Producer's premises to take possession of all or any part of the contracts or Materials not delivered by Producer hereunder."

285.   As alleged in greater detail above, LMNO breached the *7 Little Johnstons* Agreement and Discovery terminated the *7 Little Johnstons* Attachment in its June 17 Notice of Termination.

286.   Further, Discovery and LMNO entered into an agreement, pursuant to the January 28, 2004 Master, through which Discovery commissioned the production of season two of *7 Little Johnstons*, and consequently owned all rights in the Program Materials for all episodes in that season (the "*7 Little Johnstons* Season Two Agreement").  Discovery has performed its material obligations under the *7 Little Johnstons* Season Two Agreement.

287.   Discovery's June 17 Notice of Termination demanded that the LMNO Defendants deliver to Discovery all Program Materials, now known as "Program Deliverables," for *7 Little Johnstons* within two business days of July 2, 2016 (collectively, the "*7 Little Johnstons* Detained Program Deliverables").

288.   Discovery also demanded the LMNO Defendants' return of the *7 Little Johnstons* Detained Program Deliverables in its June 23 Letter.

289.   As set forth in Discovery's June 23 Letter, the *7 Little Johnstons* Detained Program Deliverables include all source material delivered on drives for

COUNTERCLAIMS

seasons one and two of *7 Little Johnstons*, masters completed through July 2, 2016 for seasons one and two of *7 Little Johnstons*, rough cuts, fine cuts, and locked cuts completed through July 2, 2016 delivered on HDCAM-SR for seasons one and two of *7 Little Johnstons*, graphics master(s) for seasons one and two of *7 Little Johnstons*, source tape logs for seasons one and two of *7 Little Johnstons*, music cue sheets for masters for seasons one and two of *7 Little Johnstons*, EDL's for uncompleted projects  for seasons one and two of *7 Little Johnston,* any additional program content for seasons one and two of *7 Little Johnstons*, the US Labor Report for seasons one and two of *7 Little Johnstons*, the cost report as of July 2, 2016 for seasons one and two of *7 Little Johnstons*, and all Program Deliverables identified on Program Deliverables exhibit as of July 2, 2016 for seasons one and two of *7 Little Johnstons*.

290.   The *7 Little Johnstons* Detained Program Deliverables are valuable to Discovery and necessary for continued production of the Program.  The value of the *7 Little Johnstons* Detained Program Deliverables is no less than $2 million and likely well in excess of that amount.

291.   Upon information and belief, Discovery alleges that the *7 Little Johnstons* Detained Program Deliverables are located at the LMNO Defendants' offices at 15821 Ventura Boulevard, Suite 320, Encino, California, 91436, except those Detained Program Deliverables which have been moved to other locations without Discovery's knowledge.

292.   Despite the terms of the January 28, 2004 Master and the *7 Little Johnstons* Season Two Agreement, and notwithstanding Discovery's June 17 Notice of Termination and Discovery's June 23 Letter, the LMNO Defendants have refused to deliver the *7 Little Johnstons* Detained Program Deliverables to Discovery, and all such Detained Program Deliverables remain unjustly and wrongfully in the LMNO Defendants' possession.

293.   Under the terms of the January 28, 2004 Master, the *7 Little Johnstons* Season Two Agreement, and applicable California law, Discovery is entitled to immediate possession of the *7 Little Johnstons* Detained Program Deliverables before judgment in this action is entered.

294.   Under the terms of the January 28, 2004 Master, the *7 Little Johnstons* Season Two Agreement, and applicable California law, Discovery is entitled to a final judgment for possession of the *7 Little Johnstons* Detained Program Deliverables.

295.   During, and as a proximate result of, the LMNO Defendants' wrongful possession and detention of the *7 Little Johnstons* Detained Program Deliverables, Discovery has and continues to suffer the loss of these Detained Program Deliverables, the precise amount of which will be determined at trial.

### SIXTEENTH CLAIM FOR RELIEF
### Unfair Competition in Violation of Cal. Bus. & Prof. Code § 17200 *et seq.* against LMNO

296.   Discovery repeats and realleges each of the allegations set forth in paragraphs 1 through 295, above, as though set forth in full herein.

297.   As alleged above, LMNO has breached contracts, defrauded Discovery, and violated federal law, including 15 U.S.C. §§ 1114, 1125(a), and 1125(c).

298.   In committing any or all of the acts alleged above, LMNO has engaged in unlawful, unfair, or fraudulent business acts or practices within the meaning of California Business & Professions Code section 17200 *et seq.*

299.   As a result of LMNO's unlawful, unfair, and fraudulent business practices—including failing to contribute its required share of production expenses and then submitting fraudulent budgets designed to conceal this failure—LMNO effectively produced the Co-Produced Programs pursuant to a Commission arrangement.  Pursuant to California Business & Professions Code section 17203, as a

result of these unlawful, unfair and fraudulent business practices, Discovery is entitled to restitution in the form of an assignment of all rights in the Co-Produced Programs, which Discovery would have owned pursuant to a Commission Agreement or any other agreement by which it funded 100% of the budget for such shows.

## SEVENTEENTH CLAIM FOR RELIEF
### Accounting for Certain Programs against LMNO

300.   Discovery repeats and realleges each of the allegations set forth in paragraphs 1 through 299, above, as though set forth in full herein.

301.   LMNO has not accounted to Discovery for the amount of royalties due to Discovery under the Adjusted Gross Revenues provisions relating to *The Little Couple*, *Unusual Suspects*, *Hollywood & Crime*, *Killer Confessions*, and *Murder Book*, and has actively blocked, frustrated, and refused to honor Discovery's contractually provided rights (which it invoked) to audit LMNO's books regarding the same, including Discovery's right to "verify[] the payments made to [Discovery]" under the Adjusted Gross Revenue provisions.  LMNO is contractually obligated to provide an accounting to Discovery under the Adjusted Gross Revenue provisions relating to *The Little Couple*, *Unusual Suspects*, *Hollywood & Crime*, *Killer Confessions*, and *Murder Book*, which provide that "[LMNO] shall render to [Discovery] periodic statements prepared by an authorized agent of [LMNO] showing, in summary form, the calculation of all Adjusted Gross Revenues . . . ."

302.   Providing an accurate accounting related to the Adjusted Gross Revenue provisions is sufficiently complicated—particularly in light of the alleged unavailability, incompleteness and inaccuracy of LMNO's books and records—that it merits the relief afforded by this claim.

303.   LMNO has not accounted to Discovery for the amount of Additional Funding received by LMNO and payable to Discovery for *The Little Couple* and *7*

59

*Little Johnstons*, and has actively blocked, frustrated, and refused to honor Discovery's contractually provided rights (which it invoked) to audit LMNO's books regarding the same.  LMNO is contractually obligated to provide an accounting to Discovery in connection with Additional Funding received for these two Programs. *The Little Couple* Agreement provides that "[LMNO] shall remit to [Discovery] a pro rata portion of the Additional Funding amounts received by [LMNO] that is equal to the percentage [Discovery] contributes to the Production Budget."  The *7 Little Johnstons* Agreement provides that "[i]f [LMNO] is successful in securing Additional Funding, [LMNO] shall remit to [Discovery] all Additional Funding amounts received by [LMNO]."  Providing an accurate accounting related to the Additional Funding is sufficiently complicated—particularly in light of the alleged unavailability, incompleteness and inaccuracy of LMNO's books and records—that it merits the relief afforded by this claim.

304.   LMNO has not accounted to Discovery for the amount of overpayments made by Discovery to LMNO in funding the Programs, and has actively blocked, frustrated, and refused to honor Discovery's contractually provided rights (which it invoked) to audit LMNO's books regarding the same.  Providing an accurate accounting related to Discovery's overpayments is sufficiently complicated— particularly in light of the alleged unavailability, incompleteness and inaccuracy of LMNO's books and records—that it merits the relief afforded by this claim.

305.   Discovery is entitled to and seeks such accountings.

## EIGHTEENTH CLAIM FOR RELIEF
### Declaratory Judgment of Ownership of the Co-Produced Programs

306.   Discovery repeats and realleges each of the allegations set forth in paragraphs 1through 305, above, as though set forth in full herein.

307.   There is an actual and justiciable controversy between Discovery, on the one hand, and LMNO, on the other, as to whether LMNO's failure to perform its material obligations under the Co-Production Master Agreements, Attachments, and Amendments thereto—including, without limitation, its failure to finance its portion of the production costs for the Co-Produced Programs—has resulted in Discovery owning all rights throughout the world, in perpetuity, to any episodes and seasons of the Co-Produced Programs in which LMNO has submitted fraudulent budgets designed to induce Discovery to pay all production costs and hide the fact that LMNO failed to contribute any portion of the production costs.

308.   As set forth above, Discovery contends that as a result of LMNO's failure to finance its contractually required portion of the costs for the Co-Produced Programs, Discovery "owns all rights" to any episodes and seasons of the Co-Produced Programs for which LMNO has failed to finance its portion of the production costs "throughout the world, in perpetuity" as reflected in and based upon, among other things, Section 2.5 to Exhibit C of the 2013 Master Amendment; Section 7(f) of *The Little Couple* Attachment; Section 8(e) of the *Unusual Suspect*s Attachment; Section 8(d) of the *Hollywood & Crime* Attachment; Section 7.D of the *Baby Genius* Attachment dated April 5, 2010; Section 8.E of the *Bear Whisperer* Attachment dated June 16, 2008; Section 7.D of the *Bipolar Mysteries* Attachment dated January 29, 2010; Section 8.D of the *Cheating Vegas* Attachment dated March 8, 2012; Section 7.F of the *Housebound* Attachment dated February 9, 2010; Section 7.C of *the Insane Bathrooms* Attachment dated November 28, 2012; Section 8.E of the *Meteorite Men* Attachment; Section 7.D of the *NICU Diaries* Attachment dated January 29, 2010; and Section 7.C of the *Surreal Estate* Attachment dated November 28, 2012.

61

COUNTERCLAIMS

309.   Notwithstanding its wrongful conduct described herein, LMNO asserts that it owns all rights to prior episodes and seasons of the Co-Produced Programs.

310.   To resolve this justiciable controversy, Discovery seeks a declaration pursuant to 28 U.S.C. § 2201 that Discovery owns all rights throughout the world, in perpetuity, to any episodes and seasons of the Co-Produced Programs including *The Little Couple, Killer Confessions, Murder Book, Unusual Suspects*, *Hollywood & Crime, Baby Genius*, *Bear Whisperer*, *Bipolar Mysteries*, *Cheating Vegas*, *Housebound, Insane Bathrooms, Meteorite Men, NICU Diaries*, and *Surreal Estate* in which LMNO has failed to finance its portion of the production costs.

## NINETEENTH CLAIM FOR RELIEF
### Trademark Infringement and Unfair Competition Under Sections 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a) against LMNO

311.   Discovery repeats and realleges each of the allegations set forth in paragraphs 1 through 310, above, as though set forth in full herein.

312.   Discovery owns the mark THE LITTLE COUPLE, Reg. No. 4062239, which is a valid, federally registered trademark entitled to protection under the Lanham Act, and owns common law rights in the mark THE LITTLE COUPLE in connection with entertainment services and related services and goods, referred to collectively as "Discovery's Marks."

313.   As noted earlier, evidence of Discovery's ownership of the trademark THE LITTLE COUPLE is annexed hereto as Exhibit A in the form of a true and correct copy of the PTO registration certificate for Discovery's THE LITTLE COUPLE mark and a printout from the PTO's website setting forth the status of this mark, showing that the registration is valid, subsisting, and unrevoked.

314.   Discovery's Marks are in full force and effect.  Discovery has never abandoned them, nor has Discovery ever abandoned the goodwill of its businesses in

1  connection thereto.  Discovery intends to continue to preserve and maintain its rights

2  with respect to Discovery's Marks.

3      315.   LMNO has used Discovery's Marks in commerce in a number of ways,

4  including, but not limited to, on information and belief, procuring and offering for sale

5  apparel bearing the mark THE LITTLE COUPLE.

6      316.   On information and belief, consumers who purchase apparel from LMNO

7  are not aware that Discovery did not approve, endorse, or license the products and that

8  LMNO is no longer affiliated with Discovery.

9      317.   LMNO's unauthorized and intentional use of Discovery's Marks in

10  connection with entertainment services and related merchandise infringes on

11  Discovery's exclusive rights in its federally registered mark and in its common law

12  rights, and is likely to cause confusion, mistake or deception as to the source of the

13  services offered by LMNO.  Such use is also likely to cause confusion as to whether

14  Discovery is sponsoring, has authorized or is somehow affiliated with LMNO's

15  productions or the sale of LMNO products.

16      318.   On information and belief, LMNO has used and is using Discovery's

17  Marks to sell apparel.

18      319.   On or about July 3, 2014, LMNO apparently applied for its own

19  registration for a stylized logo version of THE LITTLE COUPLE trademark, but in

20  International Class 25 for "T-shirts and sweatshirts; Hats."  LMNO also applied to

21  register its mark in Class 16 for "Calendars" and "Greeting cards" but withdrew that

22  portion of the application after failing to produce specimens showing use of the

23  trademark on such goods.  On or about July 14, 2015, the PTO issued a certificate of

24  registration for LMNO's logo version of THE LITTLE COUPLE mark for "clothing,

25  namely, T-shirts and sweatshirts; Hats" only, as U.S. Patent & Trademark Office Reg.

26  No. 4,774,145.

27

28

COUNTERCLAIMS

320.    As part of the trademark prosecution process, LMNO represented to the PTO that its use of the logo version of THE LITTLE COUPLE mark was designed to create consumer associations with the program airing on TLC and not for apparel generally by submitting specimens to demonstrate LMNO's use of the logo on products that clearly relate to the show, including on a mug, a pillow, and pet clothing. In fact, LMNO also submitted specimens that showed LMNO's use of the logo version of THE LITTLE COUPLE mark and the same character names on a mug, a pillow, and pet clothing.  These specimens confirm that the only purpose of LMNO's registration was communicate to consumers that the goods that bear the logo that is the subject of the registration are affiliated with, connected to, and associated with *The Little Couple*  program.  Discovery did not approve LMNO's separate registration of a logo version the mark THE LITTLE COUPLE by LMNO.

321.    LMNO's unauthorized use of Discovery's Marks in connection with LMNO's goods are likely to cause consumer confusion with respect to Discovery's sponsorship, relationship or affiliation.

322.    LMNO's actions have caused, and will continue to cause, irreparable harm to Discovery and an incalculable loss of goodwill and damages.

323.    LMNO's unauthorized and intentional use of the registered THE LITTLE COUPLE trademark in connection with its production and apparel constitutes trademark infringement in violation of Sections 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a).

324.    LMNO's infringement has damaged Discovery in an amount to be determined at trial.

325.    LMNO's infringement has caused and unless restrained by this Court will continue to cause Discovery irreparable injury.

COUNTERCLAIMS

326.   Following LMNO's breach and the consequent termination of any agreement between Discovery and LMNO regarding *The Little Couple*, LMNO has no right or need to use Discovery's mark THE LITTLE COUPLE and thus, LMNO's registration for the mark THE LITTLE COUPLE in International Class 25 for apparel (U.S. Patent & Trademark Office Reg. No. 4,774,145) should be cancelled in order to avoid consumer confusion.

## TWENTIETH CLAIM FOR RELIEF
### Trademark Dilution Under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c) against LMNO

327.   Discovery repeats and realleges each of the allegations set forth in paragraphs 1 through 326, above, as though set forth in full herein.

328.   Discovery's Marks are famous and distinctive:   Discovery's Marks have been in use nationwide since May 2009 and are generally recognized by consumers as emanating from Discovery and the show known as *The Little Couple*.

329.   Upon information and belief, LMNO is making use of Discovery's Marks in commerce through its use on merchandise.

330.   LMNO's use of Discovery's Marks began in 2014—years after Discovery had spent millions of dollars promoting *The Little Couple* and after the show (and Discovery's Marks) had already become a household brand.

331.   On information and belief, LMNO began to sell apparel using Discovery's Marks in order to exploit the success of the show *The Little Couple* and Discovery's investment in making the show a success.

332.   LMNO's use of Discovery's Marks to create an association in consumers' minds with Discovery's famous and distinctive marks constitutes dilution by blurring in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(d) because it has lessened and will continue to lessen the capacity of Discovery's Marks

COUNTERCLAIMS

to distinguish Discovery's products and services from those of others and has diluted the distinctive quality of Discovery's famous and nationally recognized trademarks.

333.   LMNO's use of Discovery's Marks also constitutes dilution by tarnishment.  LMNO was recently raided by the FBI, which received widespread attention in the media and industry press.  In the context of the raid and now public allegations of criminality, this perceived association between Discovery and LMNO arising from LMNO's use of Discovery's Marks harms the reputation of Discovery's Marks.

334.   Discovery has been, and absent injunctive relief, will continue to be irreparably harmed by LMNO's actions.

335.   Discovery has no adequate remedy at law for LMNO's dilution of THE LITTLE COUPLE mark.

## TWENTY-FIRST CLAIM FOR RELIEF

### Trademark Dilution Under California Business and Professions Code § 14247 against LMNO

336.   Discovery repeats and realleges each of the allegations set forth in paragraphs 1 through 335, above, as though set forth in full herein.

337.   LMNO's acts as described above dilute and detract from the distinctiveness of Discovery's Marks, resulting in damage to Discovery and the substantial business and goodwill symbolized by Discovery's Marks in violation of California's anti-dilution statute, Cal. Business and Professions Code § 14247.

## PRAYER FOR RELIEF

WHEREFORE, Discovery Communications, LLC, demands judgment against LMNO Cable Group, Inc. (on its First through Sixth, Eighth through Eleventh, and Thirteenth through Twenty-First Claims For Relief) and LMNO Entertainment Group, LLC (on its Seventh, Twelfth, Thirteenth, and Fifteenth Claims for Relief) as follows:

1. That Discovery be awarded compensatory and consequential damages according to proof on its First through Thirteenth Claims for Relief (Breach of Written Contract, Breach of Implied Covenant of Good Faith and Fair Dealing, and Fraud) in an amount to be proven at trial.

2. That Discovery be awarded immediate possession of the *Killer Confessions* Detained Program Deliverables before judgment in this action as well as final judgment for possession on its Fourteenth Claim for Relief (Recovery for Personal Property/ Claim and Delivery).

3. That Discovery be awarded immediate possession of the *7 Little Johnstons* Detained Program Deliverables before judgment in this action as well as final judgment for possession on its Fifteenth Claim for Relief (Recovery for Personal Property/ Claim and Delivery).

4. For restitution on its Sixteenth Claim for Relief (California Unfair Competition Law) in the form of an assignment of all rights in the Co-Produced Programs, which Discovery would have owned pursuant to a Commission Agreement or any other agreement by which it funded 100% of the budget for such shows.

5. For an accounting on its Seventeenth Claim for Relief (Accounting) for (i) the amount of royalties due to Discovery under the Adjusted Gross Revenues provisions relating to *The Little Couple*, *Unusual Suspects*, *Hollywood & Crime*, *Killer Confessions*, and *Murder Book*; (ii) the amount of Additional Funding received by LMNO and payable to Discovery for *The Little Couple* and *7 Little Johnstons*; and (iii) the amount of overpayments made by Discovery to LMNO in funding the Programs.

COUNTERCLAIMS

6. For a determination and order on its Eighteenth Claim for Relief (Declaratory Judgment) that Discovery owns all rights throughout the world, in perpetuity, to any episodes and seasons of the Co-Produced Programs—including *The Little Couple, Killer Confessions, Murder Book, Unusual Suspects, Hollywood & Crime, Baby Genius, Bear Whisperer, Bipolar Mysteries, Cheating Vegas, Housebound, Insane Bathrooms, Meteorite Men, NICU Diaries,* and *Surreal Estate*—in which LMNO has failed to finance its portion of the production costs.

7. That Discovery be awarded trebled damages for its Nineteenth (Trademark Infringement) Claim for Relief, and the costs of prosecuting that Claim for Relief, including its reasonable attorneys' fees, pursuant to applicable law, including 15 U. S. C. § 1117.

8. For a preliminary and permanent injunction for its Twentieth (Trademark Dilution) and Twenty-First (Trademark Dilution under California Business and Professions Code) Claims for Relief enjoining LMNO and its officers, directors, partners, agents, subcontractors, employees, representatives, licensees, and related companies or entities, and all others acting in concert or participation with it from:

   a. directly or indirectly selling or offering for sale any product or service bearing Discovery's Marks (specifically, the words "The Little Couple") or any terms confusingly similar to Discovery's Marks;

   b. infringing, or causing any other entity to infringe Discovery's Marks;

   c. diluting, by blurring or tarnishment, or causing any other entity to dilute Discovery's Marks;

COUNTERCLAIMS

d.  unfairly competing with Discovery in any manner whatsoever; and

e.  making any use of Discovery's Marks and/or terms confusingly similar thereto unless specifically authorized by Discovery.

9.   Cancelling LMNO's trademark registration with the PTO (U.S. Reg. No. 4,774,145);

10.  For such other and further relief as the Court deems proper, just, and equitable.

Dated: August 1, 2016                         GIBSON, DUNN & CRUTCHER LLP

                                       By:   /s/ Scott A. Edelman
_____

                                       Scott A. Edelman, State Bar No. 116927
                                       Nathaniel L. Bach, State Bar No. 246518
                                       2029 Century Park East, Suite 4000
                                       Los Angeles, California 90067
                                       (310) 552-8500
                                       sedelman@gibsondunn.com

                                       WEIL, GOTSHAL & MANGES LLP
                                       Theodore E. Tsekerides
                                       Randi W. Singer
                                       David Yolkut
                                       767 Fifth Avenue
                                       New York, New York 10153
                                       (212) 310-8000
                                       theodore.tsekerides@weil.com

                                       *Attorneys for Defendant and Counterclaim Plaintiff*

COUNTERCLAIMS

## DEMAND FOR JURY TRIAL

Discovery hereby demands a trial by jury to decide all issues so triable in this case.

Dated: August 1, 2016

GIBSON, DUNN & CRUTCHER LLP

By:  /s/ Scott A. Edelman

Scott A. Edelman, State Bar No. 116927
Nathaniel L. Bach, State Bar No. 246518
2029 Century Park East, Suite 4000
Los Angeles, California 90067
(310) 552-8500
sedelman@gibsondunn.com

WEIL, GOTSHAL & MANGES LLP
Theodore E. Tsekerides
Randi W. Singer
David Yolkut
767 Fifth Avenue
New York, New York 10153
(212) 310-8000
theodore.tsekerides@weil.com

*Attorneys for Defendant and Counterclaim Plaintiff*

70

COUNTERCLAIMS

EXHIBIT A



# United States of America

### United States Patent and Trademark Office

# THE LITTLE COUPLE

**Reg. No. 4,062,239**
**Registered Nov. 29, 2011**

**Int. Cl.: 41**

**SERVICE MARK**

**PRINCIPAL REGISTER**

DISCOVERY COMMUNICATIONS, LLC (DELAWARE LIMITED LIABILITY COMPANY)
ONE DISCOVERY PLACE
SILVER SPRING, MD 20910

FOR: ENTERTAINMENT AND EDUCATIONAL SERVICES IN THE NATURE OF TELEVISION AND MULTIMEDIA PROGRAM SERIES FEATURING SUBJECTS OF GENERAL HUMAN INTEREST DISTRIBUTED VIA VARIOUS PLATFORMS ACROSS MULTIPLE FORMS OF TRANSMISSION MEDIA; PROVIDING ENTERTAINMENT INFORMATION TO OTHERS VIA A GLOBAL COMPUTER NETWORK, IN CLASS 41 (U.S. CLS. 100, 101 AND 107).

FIRST USE 5-26-2009; IN COMMERCE 5-26-2009.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

SER. NO. 85-133,912, FILED 9-20-2010.

TIMOTHY FINNEGAN, EXAMINING ATTORNEY



*Director of the United States Patent and Trademark Office*

---

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL
TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE
DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

---

**Requirements in the First Ten Years***
**What and When to File:**

> *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. *See* 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

> *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between the 9th and 10th years after the registration date.*
> *See* 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

> You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

---

**The United States Patent and Trademark Office (USPTO) will NOT send you any future notice or reminder of these filing requirements.**

---

***ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the USPTO. The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. *See* 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. *See* 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

Trademark Electronic Search System (TESS)                    http://tmsearch.uspto.gov/bin/showfield?f=doc&state=4806:5tp860.2.1



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Sun Jul 31 03:21:02 EDT 2016*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP |

Logout   Please logout when you are done to release system resources allocated for you.

## Record 1 out of 1

| TSDR | ASSIGN Status | TTAB Status |   *( Use the "Back" button of the Internet Browser to return to TESS)*

# THE LITTLE COUPLE

| | |
|---|---|
| **Word Mark** | THE LITTLE COUPLE |
| **Goods and Services** | IC 041. US 100 101 107. G & S: Entertainment and educational services in the nature of television and multimedia program series featuring subjects of general human interest distributed via various platforms across multiple forms of transmission media; providing entertainment information to others via a global computer network. FIRST USE: 20090526. FIRST USE IN COMMERCE: 20090526 |
| **Standard Characters Claimed** | |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Serial Number** | 85133912 |
| **Filing Date** | September 20, 2010 |
| **Current Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | September 13, 2011 |
| **Registration Number** | 4062239 |
| **Registration Date** | November 29, 2011 |
| **Owner** | (REGISTRANT) Discovery Communications, LLC LIMITED LIABILITY COMPANY DELAWARE One Discovery Place Silver Spring MARYLAND 20910 |
| **Attorney of Record** | Anthony V. Lupo |
| **Type of Mark** | SERVICE MARK |

| Register | PRINCIPAL |
| Live/Dead Indicator | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP |

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY