# EXHIBIT F



1 Discovery Place
Silver Spring, MD 20910

## COMMISSION ATTACHMENT FOR NEW PROGRAM

ATTACHMENT, between **MIKE MATHIS PRODUCTIONS, INC.** ("Producer") with offices at 87 N. Raymond Avenue, Suite 400, Pasadena, California 91103 on the one hand, and **DISCOVERY COMMUNICATIONS, LLC (f/k/a DISCOVERY COMMUNICATIONS, INC.)** ("Company"), with offices at One Discovery Place, Silver Spring, Maryland 20910 on the other hand, dated as of September 1, 2016 ("Attachment") to the Master Agreement, dated as of January 22, 2001, between Producer and Company (collectively, "Agreement"). Now therefore, in consideration of the foregoing and of the mutual promises and covenants contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

Now therefore, in consideration of the foregoing, the mutual promises and covenants contained herein, the receipt and sufficiency of which are hereby acknowledged, the performance by Producer of its obligations hereunder and in full discharge of all of Company's obligations to Producer in connection with the Program, the parties agree as follows:

I.  The Program

| PROGRAM WORKING TITLE ("Program") | PROGRAM DESCRIPTION | # OF EPISODES | COMMERCIAL LENGTH |
|---|---|---|---|
| *Unusual Suspects (2.0)* | The program uncovers the startling, but true, stories of the most surprising, the most bizarre and the most unlikely criminal suspects ever. | ■ | ■ |

II. Production and Delivery of the Program

The Program, a non-guild/non-union program, shall be produced in accordance with the Production Budget attached hereto as Exhibit C and the Production Schedule attached hereto as Exhibit D. The Materials shall be delivered in accordance with the Company supplied program materials schedule attached hereto as Exhibit E (the "Program Materials") and with the Technical Specifications attached hereto as Exhibit G. For purposes of this Agreement, the Program Materials shall be considered Materials as defined in Article 2.1 of the Master Agreement. All instances in which the defined term "Materials" appears in this Agreement shall be hereafter replaced with the term "Program Deliverables."

September 23, 2016
*Unusual Suspects (2.0)*
Network: ID
Contract ID#: 1058847
Master Contract ID#: 1000950
ANH / MM

**HIGHLY CONFIDENTIAL**                                                                                                         DISC000044966

III. <u>Budget Contribution</u>

Company agrees to pay Producer, and Producer agrees to accept, the amount(s) set forth hereafter:

A. A "Budget Contribution" of ███████████ of the actual, documented final cost of production of the Program based upon the Company approved Production Budget up to a maximum Budget Contribution of ███████████ All overages unless pre-approved by Company in writing, shall be the responsibility of Producer. The Budget Contribution shall be payable in accordance with Exhibit F ("Payment Schedule"). In the event Producer fails to deliver any Program Deliverables pursuant to the applicable Payment Schedule or Producer is in breach or reasonably likely to be in breach of the Agreement and such breach is not cured in accordance with paragraph 12 of Exhibit A to the Master Agreement, Company, in its discretion, has the right to withhold the payment applicable to delivery of such Program Deliverables and all subsequent payments until Producer delivers and Company approves the applicable Program Deliverables or, subject to such paragraph 12, until the breach has been cured. Notwithstanding any provisions of the Master Agreement (including any Exhibits) to the contrary, it is acknowledged and agreed that any payments to Producer by Company after delivery of any Program Deliverables under the Agreement, including the final Program Deliverables, will not constitute approval by Company of the applicable Program Deliverables in whole or in part or waiver of Company's rights with respect to any applicable breach. Further, in the event Company, in its sole discretion, elects to pay Producer any portion of the Budget Contribution in advance of completion of the applicable payment milestone set forth in the Payment Schedule, such payment shall not relieve Producer of any of its obligations to complete the applicable milestone nor be deemed a waiver by Company of any other obligation of Producer hereunder.

B. For purposes of clarity, the Production Budget for the Initial Order includes an approved "Producer Fee" to be retained by Producer for the Program equal to ███ of the final, approved, going-in budget (but shall in no event include production company and/or EP fees, agency fees, host, talent or other participant fees, format fees, contestant prize money, overages, breakage, and non-customary legal fees). The Producer Fee shall cover (i.e., Producer shall use such amount to discharge) all producer/production fees relating to services of Producer and Producer's employees (including without limitation the Executive Producer). For clarity, such Producer Fee does not include compensation for those individuals hired by Producer in connection with the Program that is set forth as separate line items in the approved Production Budget. The Company-approved third-party showrunner shall be a separate budget line item.

C. If there are any Savings, Producer shall be entitled to ███████████ of the portion of such Savings, if any; provided that the aggregate amount of Savings to which Producer is entitled hereunder shall not exceed ███████████ of the Production Budget. All remaining Savings shall be retained by Company or, if Company has advanced such monies to Producer, shall be promptly refunded to Company. For the avoidance

September 23, 2016
*Unusual Suspects (2.0)*
Network: ID
Contract ID#: 1058847
Master Contract ID#: 1000950
ANH / MM

2

of doubt, all interest income earned on the Budget Contribution, which with Company's prior written approval, is not spent on the production of the Program shall be considered Savings to be shared with Producer as provided herein. Within the Company- approved Production Budget, Producer may cross-collateralize all budgeted line items other than the Producer Fee and production legal fees provided that Producer notifies the Company-production manager within ▓▓▓▓ of any decision to reallocate more than ▓▓▓▓ of one budgeted line item to another.

D. If Company requires material changes to the creative elements of the Program after Company's approval of the Production Budget, Company agrees to negotiate breakage amounts in good faith reflecting the cost of changing the applicable creative elements.

IV. Ownership

Company owns all rights (including, without limitation, copyright) in the Program and all elements thereof, as described more fully in Section 2 of Exhibit A to the Master Agreement. For purposes of clarity, Producer shall not exploit any Program elements or retain any Program Deliverables, including, without limitation, gifts to cast and crew members and Program masters for any purposes without the express written authorization of Company.

V. Production Credit; Copyright Notice

A. The parties agree that the Program and all versions thereof shall contain the following production credit for Company and Producer (Producer's credit, in text form) in all media throughout the world:

*Produced by Mike Mathis Productions for Investigation Discovery*

At its option and expense, Company may substitute another Company entity in the production credit or remove its credit.

B. On each episode which Mike Mathis provides and completes his required services hereunder, he shall be accorded "Executive Producer" credit on a single card in first position among all other Executive Producers.

C. Producer shall include a copyright notice to Company in the following form at the end of the Program:

© [ROMAN NUMERAL YEAR] DISCOVERY COMMUNICATIONS, LLC

VI. Producer Revenue Participation

Producer shall receive ▓▓▓▓ of Company's Adjusted Gross Receipts from all Ancillary Media calculated in accordance with Exhibit H of this Attachment.

September 23, 2016
*Unusual Suspects (2.0)*
Network: ID
Contract ID#: 1058847
Master Contract ID#: 1000950
ANH / MM

3

HIGHLY CONFIDENTIAL

DISC000044968

VII. Key Person

Any person(s) listed below are essential elements to the Program and are a material inducement to Company entering into this Agreement (each, a "Key Person"). The services provided by each Key Person are of a special and unique nature and to lose such services may cause Company irreparable harm.

| Name of Individual | Service to be Performed |
|---|---|
| Mike Mathis | Executive Producer |

The services of the Key Person(s) listed above shall be provided on a non-exclusive, no material interference basis. The Company approved showrunner(s) shall be engaged on a fulltime exclusive basis for all production periods (pre through post).

VIII. Additional Programs

A. Company may order the production of additional episodes of the Program at the same terms and conditions applicable to the Initial Order ("Additional Episodes"), or reduce the number of episodes in the Initial Order or in an order of Additional Episodes, provided that Company: (1) shall pay Producer its Producer's Fee for each episode delivered and accepted by Company as of the date of the notice of order reduction; (2) shall pay Producer a pro-rated amount of the Producer's Fee that is reasonably commensurate with the amount of work done by Producer in accordance with the approved Production Budget and Production Schedule for episodes whose delivery was canceled by Company prior to delivery and acceptance as of the date of the notice of order reduction; and (3) shall pay all costs incurred by Producer in the event of a notice for an order of Additional Episodes is received by Producer after Producer is no longer able to maintain continuous production of the Program without incurring additional costs. In the event of a reduction of the episode order, the parties shall agree on (i) a revised Production Budget reflecting the actual costs of the reduced episode order and the Producer Fee and (ii) a revised Production Schedule and Payment Schedule reflecting the reduced episode order. Notwithstanding the foregoing, if production ceases prior to Company's order of additional episodes and the number of episodes ordered is less than the number ordered in the previous order, then the parties agree that the line items in the budget affected by such reduction shall be negotiated in good faith.

B. After the Initial Order, Company shall have a series of unlimited, consecutive, exclusive, dependent options (each, an "Additional Season Option", or an "Option"), exercisable in Company's discretion, to engage Producer's services to produce and deliver to Company additional seasons of the Program ("Seasons"). Such options shall be exercisable on a Season by Season basis. If Company has exercised its Additional Season Option, then Company may, at any time and from time to time, during the Season engage Producer and the Executive Producer to produce Additional Episodes of the Program (i.e., beyond Company's initial order for that

September 23, 2016
*Unusual Suspects (2.0)*
Network: ID
Contract ID#: 1058847
Master Contract ID#: 1000950
ANH / MM

4

HIGHLY CONFIDENTIAL                                     DISC000044969

particular Season) at the same terms and conditions applicable to the initial order for that Season, or reduce the number of episodes in the initial Season order or in an order of additional Season episodes, provided that Company: (1) shall pay Producer its Producer's Fee for each episode delivered and accepted by Company as of the date of the notice of order reduction; (2) shall pay Producer a pro-rated amount of the Producer's Fee that is reasonably commensurate with the amount of work done by Producer in accordance with the approved Production Budget and Production Schedule for episodes whose delivery was canceled by Company prior to delivery and acceptance as of the date of the notice of order reduction; and (3) shall pay all costs incurred by Producer in the event of a notice for an order of Additional Episodes is received by Producer after Producer is no longer able to maintain continuous production of the Program without incurring additional costs. In the event of a reduction of the episode order, the parties shall agree on (i) a revised Production Budget reflecting the actual costs of the reduced episode order and the Producer Fee and (ii) a revised Production Schedule and Payment Schedule reflecting the reduced episode order. Notwithstanding the foregoing, if production ceases prior to Company's order of additional episodes and the number of episodes ordered is less than the number ordered in the previous order, then the parties agree that the line items in the budget affected by such reduction shall be negotiated in good faith.

C. After the Initial Order has aired, Company shall have ▇▇▇▇▇▇▇▇▇▇▇▇ to engage Producer on the production of a series based on the Initial Order. Thereafter, Company may exercise each of its Additional Season Options by giving Producer written notice of such exercise no later ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ following delivery of the last episode produced in preceding Production Year. For clarity, the Company's exercise of its Option for a future Season shall not prevent Company from making Additional Episode orders for the then-current Season at the same terms and conditions applicable to the then-current Season. If any Option is exercised by Company, all of the terms and conditions hereof shall be equally applicable to each Season of the Program and shall govern the respective rights, duties and obligations of the parties hereto with respect to each and all of such episodes produced in each Season, except only as follows:

(i) The applicable production schedule, program deliverables and payment schedule for the episodes of a new Season shall be reasonably approved by Company with respect to each Season.

(ii) The applicable production budget for the episodes ordered in each Season shall be approved by Company provided that (a) production budget increases or decreases shall reflect actual and direct costs of production of such episodes in the Season; and (b) the amount of the production budget shall not increase by more than ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ it being understood that the foregoing cap will not apply to incremental increased costs approved by Company in writing and/or incurred as a result of material changes made by Company to the treatment or production requirements (e.g., new location, new talent, etc.).

D. If, at any time prior to the completion of the production of the initial episodes in any Season (including the first Season), Company would like to order Additional Episodes,

September 23, 2016
*Unusual Suspects (2.0)*
Network: ID
Contract ID#: 1058847
Master Contract ID#: 1000950
ANH / MM

HIGHLY CONFIDENTIAL

Producer shall submit a report which shall set forth in reasonable detail any and all cost savings in connection with said increase to the initial episode order whether such episodes are produced on a "weekly" basis or a "stripped" basis.

IX. Additional Provisions

A. (i) The fulfillment of Company's obligations with respect to a given production order set forth hereunder is expressly contingent upon (each, a "Production Contingency"):

    a. Submission of a treatment, production budget, production schedule, and payment schedule for the Program approved by Company in writing for such order.

    b. Company's approval of the creative, the showrunner and production legal counsel (JTWAMMK is pre-approved) for the Program.

    c. Delivery to and approval by Company of customary background check(s) on Program participants/key production personnel and/or talent in the Program (as determined by Company), at Company's cost, and Producer's assistance in obtaining any such background checks(s) if so requested by Company, with respect to persons engaged at the start of a given order. The foregoing shall constitute as a contingency only to the extent that such background checks can reasonably be performed at the start of each production order.

    d. Company's approval of its form personal/appearance/location releases to be used by Producer in connection with the production of the Program. The foregoing shall constitute a contingency only to the extent that such form personal/appearance/location releases can be approved at the start of each production order.

    e. Company's approval of Producer's legal production plan for the Program.

(ii) Producer understands that no portion of Company's Budget Contribution will be released until each Production Contingency is completely satisfied. (On a non-precedential basis: Company acknowledges that pursuant to the terms of the Payment Schedule attached hereto with respect to the Initial Order, a portion of Company's Budget Contribution will be released prior to each Production Contingency being completely satisfied. For subsequent production orders, Company will release the Budget Contribution in accordance with an agreed upon Payment Schedule, which may allow for the release of a portion of the Budget Contribution prior to each Production Contingency being completely satisfied). Notwithstanding the foregoing, any payment made prior to satisfaction of any Production Contingency shall not be deemed a waiver of the applicable Production Contingency, and if any Production Contingency hereunder is not satisfied, Company has the right to terminate this Agreement by written notice to Producer, and Producer shall reimburse Company fully for all payments of the Budget

September 23, 2016
*Unusual Suspects (2.0)*
Network: ID
Contract ID#: 1058847
Master Contract ID#: 1000950
ANH / MM

6

HIGHLY CONFIDENTIAL

DISC000044971

Contribution previously made by Company hereunder as of the date of such termination not otherwise irrevocably committed, or paid, to a third party in accordance with this Agreement, the Production Budget, and the Production Schedule; provided that Producer will also be entitled to receive, and Company shall pay, a pro-rated amount of Producer's production fee that is reasonably commensurate with the amount of work done by Producer.

B. Producer shall conduct sufficient screening of those individuals appearing in the Program who will not be undergoing background checks in accordance with paragraph IX.A.(i)c. above (via computer databases, including, but not limited to, Google and Lexis/Nexis or an equivalent research company) to reveal criminal records, sex offenses, and any potentially embarrassing public relations issues. Company acknowledges that the cost of such screenings shall be a budgeted item and the depth and thoroughness of said screenings shall be consistent with the amounts recognized by Company in the budget therefor. Upon completion of such screening, Producer shall promptly inform Company if the screening reveals that any individual featured in the Program has a criminal record, is a sex offender or has been involved in any activities or incidents that may cause Company public relations issues, and provide details regarding same.

C. Notwithstanding the provisions of Section 1.2 of Exhibit A to the Master Agreement, with respect to any third party still and stock footage licensed by Producer in connection with the Program, Producer shall secure all media rights for ▉▉▉▉▉▉▉▉▉▉▉▉ excluding Standard Television rights in the U.S. (which Producer does not have to secure) and Theatrical Media rights anywhere in the world (which Producer does not have to secure); provided Producer shall negotiate in advance the appropriate step-up fees, which are subject to Company's approval, to permit Company to secure all rights in all media (excluding Theatrical Media) ▉▉▉▉▉▉▉▉▉▉▉▉

D. Notwithstanding section 8 (Insurance) of the Master Agreement, Producer agrees that unless otherwise notified by Company, Company's exploitation and Producer's production of the Program hereunder shall be subject to and governed by the terms of the Company blanket E&O policy set forth in the Program Deliverables. Producer agrees to meet all of the requirements for insurability under the policy and abide by the terms and conditions thereunder. Producer expressly acknowledges and agrees that coverage under such policy may be rescinded or revoked at any time if Company determines, in its sole discretion, that a separate E&O policy must be secured for the Program under circumstances that may include, but shall not be limited to, Producer's failure to provide Company and its insurers truthful and accurate information in connection with the application and/or clearance processes, and/or failure to inform Company and its insurers in writing of any changes that would render the application and/or clearance information untruthful, inaccurate, or misleading or that would otherwise differ in any material respect from information already submitted.

E. Company shall be entitled to claim the entire Additional Funding (as defined below), if any, which may be available in connection with the Program, and Producer agrees that it shall not apply for any portion of such Additional Funding without Company's prior written

September 23, 2016
*Unusual Suspects (2.0)*
Network: ID
Contract ID#: 1058847
Master Contract ID#: 1000950
ANH / MM

HIGHLY CONFIDENTIAL                                                                                      DISC000044972

permission. Producer agrees to cooperate with Company to assist Company in obtaining the maximum benefit of any Additional Funding. Producer shall, at Company's request and in a timely manner, apply for any applicable tax credits, cash rebates, upfront/back-end production funding, proceeds from trading tax credits or any other production financing or subsidies from any government entity that are available to Company and/or Producer in connection with the production of the applicable Program ("Additional Funding"). Producer shall be responsible for including in the production budget submitted by Producer any actual, verifiable third-party expenses anticipated by Producer relating directly to applying for and securing the Additional Funding and, if preapproved by Company, such expenses shall form part of the Company approved Production Budget. If after approval of the production budget the parties identify additional sources of Additional Funding which Company wants Producer to attempt to obtain, prior to incurring any expenses relating to applying for and securing such Additional Funding, the parties will agree upon a budget and cash flow schedule for such additional expenses. If Producer is successful in securing Additional Funding, Producer shall remit to Company all Additional Funding amounts received by Producer, if any, less a [REDACTED] administrative fee and any actual, verifiable third-party expenses incurred by Producer relating directly to applying for and securing the Additional Funding and pre-approved by Company in writing, which were not included in the Company approved Production Budget. Producer shall have no obligation to incur any such expenses not pre-approved by Company. Producer shall not be entitled to claim Additional Funding if Company applies for Additional Funding. If Producer is unsuccessful in securing Additional Funding, Company shall reimburse Producer for such pre-approved additional expenses incurred by Producer which were not included in the Company approved Production Budget. Producer represents and warrants that it shall abide by all applicable state laws and regulations in connection with applying for and securing Additional Funding.

F.   (i)   Producer is required to, and represents and warrants that it will, comply with the rules and regulations relating to the depictions of sexual content in programming in accordance with the United States' Department of Justice ("DOJ") laws under 18 U.S.C. Sections 2257 and 2257A regarding sexual content. Such rules require, among other things, (1) recordkeeping and labeling obligations if the Program depicts performers engaged in actual sex acts and (2) record keeping and labeling obligation or the filing with the United States government (within sixty days after the start of production) of a certification about Producer's business practices ("DOJ Certification Form") if the Program contains depictions of lascivious exhibitions or simulated sex.

(ii)   At a minimum, as required in the Payment Schedule attached hereto, Producer shall submit to Company either (1) a confirming statement (in the form suggested by Company) that the Program contains no depictions of lascivious exhibitions or simulated sex ("Company DOJ Compliance Letter") or (2) a copy of Producer's DOJ Certification Form as filed if the Program does contain depictions of lascivious exhibitions or simulated sex, provided once Producer has provided its DOJ Certification Letter to Company it shall have satisfied its obligations to do so for any future programs produced by the entity signing below.

September 23, 2016
*Unusual Suspects (2.0)*
Network: ID
Contract ID#: 1058847
Master Contract ID#: 1000950
ANH / MM

HIGHLY CONFIDENTIAL                                                            DISC000044973

G.  For purposes of this Attachment, "Standard Television" shall mean television distribution by a UHF or VHF television broadcast station or by unencrypted digital transmission, the video and audio portions of which are intelligibly receivable without charge by means of standard roof top or television set built-in antennas; provided, for purposes of this Agreement the broadcast like those in England by the BBC in which a license fee, tax or similar charge is made for use of a television shall be considered Standard Television. Without limiting the foregoing, Standard Television shall include conventional, over-the-air television as well as the collection of retransmission copyright royalties related thereto.

H.  For purposes of this Attachment, "Theatrical Media" shall mean the distribution, licensing, sale, rental and/or exploitation to any person, entity or venue including, but not limited to, cinemas, auditoriums, concert halls and other venues for exploitation or exhibition to audiences where a charge for viewing is made.

I.  Company shall have the right to issue and control all publicity and promotion of the Program and all matters related thereto. Producer shall not issue any press release or publicity materials with respect to this Agreement and any Program without the prior written consent and approval of Company. Notwithstanding the foregoing, Producer shall have the right to issue incidental, non-derogatory comments in press releases and publicity materials related to Producer's corporate publicity efforts after Company has issued its initial press release regarding the Program.

J.  Company will have the right to terminate this Agreement as it relates to any Program at any time without cause provided that Company will reimburse Producer for all actual, documented out-of-pocket costs incurred by Producer or irrevocably committed as of the date of termination in accordance with the approved Production Budget and Production Schedule. Any such costs that relate to obligations extending beyond the date of termination (e.g., long term talent commitments, if irrevocable) will also be reimbursed provided such costs are documented and verified and Company approves such costs in writing (provided that in the event that such costs are consistent with the approved budget and otherwise reasonable, Company will be obliged to approve such costs). Producer will be entitled to receive, and Company shall pay, a pro-rated amount of Producers production fee that is reasonably commensurate with the amount of work done by Producer as of the date of termination in accordance with the approved Production Budget and Production Schedule. Upon termination of the Agreement, Producer will promptly deliver to Company all Program Deliverables of any kind produced as of the date of termination, as well as all agreements relating thereto, and Company will have all rights under the Agreement in such Program Deliverables regardless of the stage of completion. Should Producer fail to comply, Company may enter Producer's premises to take possession of all or any part of the contracts or Program Deliverables not delivered by Producer hereunder. Notwithstanding any termination under this section, the indemnities, warranties, representations and all rights granted to Company hereunder in the Program Deliverables shall remain in full force and effect.

September 23, 2016
*Unusual Suspects (2.0)*
Network: ID
Contract ID#: 1058847
Master Contract ID#: 1000950
ANH / MM

HIGHLY CONFIDENTIAL

DISC000044974

K. Company hereby agrees to defend, indemnify and hold harmless Producer, its affiliates, licensees, assignees and parent, subsidiary and affiliated companies, and the officers, directors, shareholders, employees and agents of all such entities (hereinafter "Producer and its Affiliates") against and from any and all claims, damages, liabilities, costs and expenses (including without limitation reasonable outside attorneys' fees and costs) resulting from claims or actions (1) brought by LMNO Cable Group, Inc., its affiliates, licensees, assignees and parent, subsidiary and affiliated companies, and the officers, directors, shareholders, employees and agents of all such entities (hereinafter "LMNO") against Producer and its Affiliates and/or (2) brought by third parties other than LMNO but arising out of the business relationship and/or dispute between LMNO and Company. In addition, Company shall indemnify and hold harmless Producer and its Affiliates from all costs and expenses (including without limitation reasonable outside attorneys' fees and costs) sustained in connection with responding to and/or complying with discovery requests (such as document production requests and deposition requests) related to the dispute between Company and LMNO. Although it is anticipated that Company shall furnish its own attorneys in connection with the foregoing, Company and its Affiliates shall be entitled to engage separate counsel, the cost of which will be borne by Company, to the extent that joint representation is deemed inappropriate as a result of actual or potential conflicts of interest. Producer shall notify Company of any such claims within seven (7) days of Producer receiving notice of any such claims. Company will promptly adjust, settle, defend or otherwise dispose of such claims at its sole cost.

X. Standard Terms and Conditions

The parties agree that, except as expressly modified hereby, the Master Agreement shall be ratified, confirmed and included herein. In the event of any inconsistency between the terms of this Attachment and the Master Agreement, the terms of this Attachment shall govern.

IN WITNESS WHEREOF, the parties have executed this Attachment as of the date first set forth above.

MIKE MATHIS PRODUCTIONS, INC.

By: _____
Printed Name: Mike Mathis
Title: President
Date: 9.22.2016

DISCOVERY COMMUNICATIONS, LLC

By: Kevin Bennett
Printed Name: Kevin Bennett
Title: General Manager
Date: 9/30/16

September 23, 2016
Unusual Suspects (? 0)
Network: ID
Contract ID#: 1058847
Master Contract ID#: 1000950
ANH / MM

APPROVED BY LEGAL

10

HIGHLY CONFIDENTIAL

DISC000044975