Neville L. Johnson (SBN 66329)
Jennifer J. McGrath (SBN 211388)
Alec R. Govi (SBN 313243)
**JOHNSON & JOHNSON LLP**
439 North Canon Drive, Suite 200
Beverly Hills, California 90210

Telephone:   (310) 975-1080
Facsimile:   (310) 975-1095
Email:       njohnson@jjllplaw.com
             jmcgrath@jjllplaw.com
             agovi@jjllplaw.com

Attorneys for Plaintiff-Intervenors
William Klein, Jennifer Arnold
and Candu Enterprises, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| LMNO CABLE GROUP, INC., a California corporation,<br><br>          Plaintiff,<br><br>          v.<br><br>DISCOVERY COMMUNICATIONS, LLC, a Delaware limited liability company,<br><br>          Defendants.<br>_____<br>DISCOVERY COMMUNICATIONS, LLC, a Delaware limited liability company,<br>          Counterclaim Plaintiff,<br><br>          v.<br><br>LMNO CABLE GROUP, INC., a California corporation, LMNO ENTERTAINMENT GROUP, LLC, a California limited liability company, | CASE NO. 2:16-cv-4543-JAK-SK<br><br>Assigned to Hon. John A. Kronstadt<br><br>**COMPLAINT IN INTERVENTION FOR:**<br><br>**(1)  BREACH OF WRITTEN CONTRACT;**<br>**(2)  BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;**<br>**(3)  FRAUD;**<br>**(4)  CONVERSION;**<br>**(5)  UNFAIR COMPETITION IN VIOLATION OF CAL. BUS. & PROF. CODE § 17200;**<br>**(6)  ACCOUNTING; AND**<br>**(7)  DECLARATORY JUDGEMENT**<br><br>**DEMAND FOR JURY TRIAL** |

Counterclaim
Defendants.

WILLIAM KLEIN, an individual;
JENNIFER ARNOLD, an individual;
and CANDU ENTERPRISES, INC., a
Texas corporation;

Plaintiff-Intervenors,

v.

LMNO CABLE GROUP, INC., a
California corporation; ERIC SCHOTZ,
an individual; and EDWARD
HORWITZ, an individual,

Defendants.

Intervenor-Plaintiffs William Klein ("Klein"), Jennifer Arnold ("Arnold") and Candu Enterprises, Inc.  ("Candu") (collectively "Plaintiff-Intervenors") demanding trial by jury, complain and allege in this Complaint in Intervention as follows:

## INTRODUCTION

1.     This case involves an egregious breach of trust and a lengthy pattern of misrepresentation and fraud by Intervenor-Defendants LMNO Cable Group, Inc. ("LMNO"), Eric Schotz ("Schotz") and Edward Horwitz ("Horwitz") (LMNO, Schotz and Horwitz shall collectively be referred to herein as "Defendants"), who systematically defrauded Plaintiffs over the course of years, engaging in an elaborate scheme to conceal that fraud in order to unjustly misappropriate and divert profits from *The Little Couple* television program to themselves.

2.     Beginning in or about October 2008, LMNO entered into a series of agreements for the services of William Klein and Jennifer Arnold.  Klein and

1   Arnold agreed to be the stars of a reality show entitled *The Little Couple* ("the
2   Program"), which would center around the personal and professional lives of Arnold
3   and Klein, a married couple who both have a form of skeletal dysplasia, more
4   commonly known as dwarfism. The Program focuses on the couple's career and
5   personal accomplishments and their struggles successfully to overcome their
6   disabilities and related health problems.

7          3.      On information and belief, within days of entering into an October
8   2008 "Option Agreement" with Klein and Arnold, LMNO secured a deal by which
9   Discovery Communications ("Discovery") would co-produce the Program.  Further,
10  on information and belief, LMNO had had an ongoing business relationship with
11  Discovery since at least 2002.  Unbeknownst to Plaintiffs when they entered into the
12  Option Agreement, LMNO and Schotz had at that time already embarked on a
13  scheme to falsify records of production and licensing expenditures, as well as to
14  underreport foreign licensing revenues, so as to systemically defraud Discovery and,
15  later Plaintiffs, in connection with the Program.

16         4.      The Program began airing on a Discovery Communications owned
17  network—TLC— in 2009. The Program was and is among the highest-rated on
18  TLC, is critically acclaimed, and has won awards, including the Gracie award. Over
19  the years since it began airing, the Program has dealt with important issues,
20  including Arnold and Klein's struggles with their disabilities, their health issues
21  (including cancer and infertility) and, ultimately, the adoption of their two children,
22  Will and Zoey, who are beloved by viewers and have become an integral part of the
23  Program and its critical and ratings success.

24         5.      The Program was renewed by Discovery multiple times since it began
25  airing and is set to start its ninth season in 2017.

26         6.      As described below, through a series of agreements entered into by
27  Klein and Arnold, on the one hand and LMNO, on the other hand, between 2008
28

and 2014, LMNO at all times agreed to pay Plaintiffs an amount equal to 25% of 100% of LMNO's share of "contingent compensation," i.e., distributable proceeds, from exploitation the Program, after LMNO first received any un-recouped "development, production, and distribution" costs that LMNO paid in connection with the Program.

7.     In exchange, as part of the 2008 Option Agreement, Plaintiffs assigned their intellectual property rights in the Program to LMNO and to Discovery. Further, also as part of the 2008 Option Agreement, Plaintiffs disclaimed any ownership interest in the Program.

8.     On information and belief, as a result of agreements between LMNO and non-party Discovery, LMNO was solely responsible for licensing the Program in foreign countries and territories and for collecting (and accounting for) such foreign licensing revenues.

9.     Between in or about 2009, when the Program commenced production, and the present, Plaintiffs have worked tirelessly as performers on the Program, opening their personal and professional lives, and the lives of their growing family, to cameras and to the scrutiny of the public.  Plaintiffs have at all times abided by the agreements they entered into with Defendant LMNO and performed all services required of them thereunder.  Moreover, the success of the Program has come as a result of Plaintiffs' work, both on and off camera, in connection with the Program and the viewing public's growing fascination with, and interest in, Plaintiffs and their family.

10.     Despite the ratings success of the Program, from in or about 2009 and to the present, Defendants provided Plaintiffs with profit participation statements ("the Profit Participation Statements") showing that LMNO was not earning any contingent compensation from the exploitation of the Program after it recouped its claimed production and distribution costs because —purportedly— there were no

distributable proceeds from the Program. Representatives of LMNO, including Schotz and Horwitz, also indicated verbally—and through LMNO's financial statements (for which they vouched)—that the Program was not selling well in overseas markets and not generating as much foreign licensing revenue (on information and belief, LMNO solely controlled such foreign licensing and the collection of foreign revenues) as was expected.

11.     Pursuant to the Option Agreement, written accountings were due from LMNO to Plaintiffs within ninety days of receipt of such accountings by LMNO from Discovery.  Notwithstanding such clear obligation timely to account to Plaintiffs, Plaintiffs often had to request Profit Participation Statements multiple times before they were provided by Defendants, often long after an accounting period had ended. In each instance, however, the Profit Participation Statements showed no distributable proceeds from the Program and no contingent compensation owed to Plaintiffs.

12.     Moreover, LMNO and its employees, including Defendants Schotz and Horwitz, repeatedly made verbal assurances to Plaintiffs that, although delayed, the Profit Participation Statements were correct and that they reflected the actual revenue earned, including from foreign licensing, as well as the costs incurred by LMNO.

13.     In or about December 2015, Plaintiff's representative received a telephone call from, on information and belief, LMNO's former CFO/Head of Finance ("the Whistleblower") who indicated that he wanted Plaintiffs to know that they were owed monies as Defendants had participated in a scheme to significantly misstate and falsify LMNO's production and other costs.

14.     On information and belief—LMNO had, at all times since the inception of the production of the Program, been bound by an agreement with Discovery by which LMNO was required to fund 30% of the budget of the Program (the other

70% of such production costs were paid by Discovery). In fact, on information and belief, LMNO had claimed millions of dollars in costs over eight seasons, none of which (or only a small fraction of which) had actually been paid by LMNO.  LMNO had also, on information and belief, submitted misstated and falsified budgets to Discovery which called for Discovery to contribute more than was necessary to produce the Program in order that LMNO could divert such "overages" to its own accounts.  On information and belief, Defendants Schotz and Horwitz were aware of, and participated in, falsifying costs and revenue amounts and in the creation of fraudulent Profit Participation Statements which reflected inaccurate and untrue costs and revenues and which were provided to Plaintiffs by Defendants.

15.	In other words, on information and belief, LMNO was regularly "recouping" significant amounts of costs which it had not actually expended, thereby enriching itself, including Defendants Schotz and Horwitz, and falsifying and misstating (and in fact eliminating) the distributable proceeds from which the portion of LMNO's contingent compensation owed to Plaintiff was to be paid.  On further information and belief, LMNO, and its employees, apparently even included employee salaries and personal expenses, including "hush money" paid to employees who became aware of LMNO's illegal conduct, as improper and fraudulent costs against the earnings of the Program.

16.	Defendants were also, on information and belief, pocketing certain funds received from Discovery and not contributing them into the pool of money available for production or for distribution as contingent compensation, including to Plaintiffs.

17.	In or about early 2016, Discovery Communications contacted Plaintiffs and informed them that it had also become aware—as a result of a call from the Whistleblower— that there were serious and systematic accounting irregularities in accountings supplied by Defendants to Discovery in connection with the Program.

18.     In addition, Plaintiffs are informed and believe and based thereon allege that LMNO was responsible between the inception of the production of the Program and mid-2016 (when, on information and belief Discovery terminated its co-production agreements with LMNO relating to The Program) for the licensing of the Program in foreign countries and territories and for the collection of revenues generated thereby. Plaintiffs are informed and believe and based thereon allege, that Defendants have systematically failed to report all such foreign licensing revenues actually received by LMNO, thereby fraudulently further reducing the pool of revenues and depriving Plaintiffs of contingent compensation monies to which they were and are entitled.

19.     Moreover, LMNO's failure actually to expend its 30% share of budgeted production costs diminished the quality of the Program—and its marketability—across the board. On information and belief, Discovery is a well-known and well-regarded reality programming producer and Discovery and LMNO agreed upon budgets for each episode of the Program which Discovery deemed appropriate—based on its extensive experience and knowledge in the industry. However, on information and belief, in certain instances the thirty percent of the budget that was supposed to be funded by LMNO was never in fact funded.

20.     This failure by LMNO to pay a significant portion of budgeted production costs has resulted in a diminution in the quality of the Program as a whole and its marketability in all forms and manner of exploitation.  As Plaintiffs are entitled to monies from various forms of exploitation of the Program pursuant to agreements with both Defendants and Discovery (as discussed below), this has reduced the amount of monies that they have and will receive in the future in connection with those seasons of the Programs produced by Defendants with apparently little or no financial contribution from Defendants.

21.     As a result of LMNO's elaborate scheme to breach its contractual

1  obligations to Plaintiffs and to conceal systematic fraud, Plaintiffs could not and did

2  not discover the breach and fraud until such time as they were contacted by the

3  Whistleblower.  Defendants repeatedly assured Plaintiffs—and the Profit

4  Participation Statements reflected—that the Program was not generating

5  distributable proceeds from which contingent compensation would be owed to

6  Plaintiffs.  As Defendants had superior knowledge and access to genuine records of

7  revenues and expenditures to which Plaintiffs had no access, Plaintiffs had no means

8  by which to discover Defendants' rampant fraud and breach.

9          22.     Further, as it has now become clear that Defendants had already

10  embarked on a scheme to defraud Discovery and Plaintiffs at the time that Plaintiffs

11  and LMNO entered into initial 2008 Option Agreement and thereafter, LMNO

12  induced Plaintiffs to sign away their intellectual property rights in the Program—

13  and their ownership interest in the Program—by way of fraud. Plaintiffs relied upon

14  the opportunity to receive contingent compensation in entering the Original

15  Agreement, which they regarded as an essential component of their entire

16  compensation package and a substantial reason for agreeing to participate in the

17  Program.  As Defendants duped Plaintiffs into signing away their valuable

18  intellectual property rights (as well as their ownership interest) in the Program with

19  no intention of ever paying Plaintiffs the compensation due to them, Plaintiffs are

20  entitled to elect to rescind the LMNO Agreements.

21                          **THE PARTIES**

22          23.     Plaintiff-Intervenor William Klein ("Klein") is an individual who

23  resides in Harris County in the State of Texas. Mr. Klein is a businessman, who is or

24  has been involved in the management of several companies.  Mr. Klein is also one

25  of the stars of *The Little Couple*, soon to begin its ninth season on the TLC Network.

26          24.     Plaintiff-Intervenor Dr. Jennifer Arnold ("Arnold") is an individual

27  who resides in Harris County in the State of Texas. Dr. Arnold is a board certified

28

neonatologist.  Plaintiffs William Klein and Jennifer Arnold are married. Plaintiff Jennifer Arnold is one of the stars of *The Little Couple*, soon to begin its ninth season on the TLC Network.

25.     Plaintiff –Intervenor Candu Enterprises, Inc. ("Candu") is a Texas corporation, organized and existing under the laws of the State of Texas.  Candu Enterprises, Inc. is a loan-out corporation which provides the services of William Klein and Jennifer Arnold in connection with, *inter alia*, the production of the television program, *The Little Couple.*

26.     Defendant LMNO is a California corporation with its principal place of business in Los Angeles, California. On information and belief,  LMNO is a television production company that has until recently co-produced (along with non-party Discovery Communications) numerous television programs, including *The Little Couple*, which airs on TLC network.

27.     Defendant Eric Schotz ("Schotz") is an individual who resides in Los Angeles, California. Schotz is a reality television producer. Schotz is the president and chief executive officer of LMNO and worked closely with Plaintiffs during the production of numerous seasons of the Program.

28.     Defendant Edward Horwitz ("Horwitz") is an individual who resides in Los Angeles, California. Horwitz is a reality television producer. Horwitz was LMNO's executive vice president of production and worked closely with Plaintiffs during the production of numerous seasons of the Program.

29.     Plaintiffs are informed and believe, and on that basis allege, that each Defendant was in some manner responsible for the acts and damages alleged herein, and/or are indebted to Plaintiffs as alleged herein, and that each Defendant participated in the acts alleged herein and that, in participating in such acts, each Defendant was the employee, agent and co-conspirator of each other Defendant, and was acting in the course and scope of such agency and conspiracy.

## **JURISDICTION AND VENUE**

30.     This is an action in intervention in the above captioned-suit as filed by Plaintiff LMNO Cable Group, Inc. ("LMNO") against Discovery Communications, LLC and Counterclaims filed by Discovery Communications, LLC ("Discovery") against LMNO Cable Group, Inc. and LMNO Entertainment Group, LLC ("the Action").

31.     This Court has and had subject matter jurisdiction over LMNO's Complaint pursuant to 17 U.S.C. 501, 15 U.S.C. 1121, 28 U.S.C. 1331, 1338 and 1367(a).

32.     This Court has and had subject matter jurisdiction over Discovery's Counterclaims pursuant to 28 U.S.C. §1332(a)(1), because the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between citizens of different states. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1338, 28 U.S.C. § 1367(a), and 28 U.S.C. § 2201.

33.     This Complaint in Intervention is submitted only pursuant to Order of this Court, if the Court grants the Motion for Intervention under Fed. R. Civ.P. 24 filed by Plaintiff-Intervenors Klein, Arnold and Candu, to which this Complaint in Intervention is attached as an Exhibit.

34.     This Court has subject matter jurisdiction over this Complaint in Intervention pursuant to 28 U.S.C. §1332(a)(1), because the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between citizens of different states.  This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1338, 28 U.S.C. § 1367(a), and 28 U.S.C. § 2201.

35.     Plaintiff-Intervenors Klein, Arnold and Candu have standing to bring this Complaint in Intervention because they have an interest relating to the property or transaction that is the subject of the Action and are so situated that the disposition of the Action may as a practical matter impair or impede their ability to protect that

1 | interest. *See* Fed.R. Civ. P. 24(a).

2 | 36.     This Court has personal jurisdiction over Defendants LMNO, Schotz

3 | and Horwitz, at least because these Defendants respectively have ongoing and

4 | systematic contacts with this District, reside in this District, and have committed

5 | wrongful acts which both occurred within this District, and which have had an

6 | impact or effect in this District.

7 | 37.     Venue is proper in this District under 28 U.S.C. § 1391(b) and 28

8 | U.S.C. § 1400(a).

9 | ### **RIGHT TO INTERVENE**

10 | 38.     Plaintiff-Intervenors repeat and reallege the allegations of all of the

11 | preceding paragraphs as though fully set forth herein.

12 | 39.     On or about May 17, 2017 Plaintiff-Intervenors Klein, Arnold and

13 | Candu filed an *ex parte* Application to seek a hearing date for their Motion for

14 | Intervention under Rule 24, seeking leave to file this Complaint in Intervention in

15 | the above-captioned suit then pending before this Court.

16 | 40.     This Complaint in Intervention will be filed as a matter of right,

17 | because it will be filed if the Court grants the Motion for Intervention referenced in

18 | the prior paragraph. Plaintiff-Intervenors Klein, Arnold and Candu hereby

19 | incorporate the allegations and legal bases for intervention set forth in their Motion

20 | for Intervention herein by reference in their entirety in support of their right to file

21 | and serve this Complaint upon the Defendants LMNO, Schotz and Horwitz.

22 |
23 | ### **FACTS**

24 | 41.     In about mid-2008, LMNO and Schotz approached Plaintiffs Klein and

25 | Arnold and asked them if they would be interested in appearing in a reality show

26 | about their lives as a married couple, both of whom have a form of skeletal

27 | dysplasia. Klein is four feet tall and Arnold is three feet-two inches tall. Both Klein

28 |

and Arnold regularly encounter unique and difficult circumstances as a result of their stature. Klein and Arnold agreed to participate in the Program, opening their home and workplaces to the intrusions of camera crews and the scrutiny of the public, in order to bring needed attention to the struggles faced by those with disabilities and differences.

42.     On or about October 28, 2008, Plaintiffs and LMNO entered into an agreement entitled the "Option Agreement" (due to a typographical error the document was mistakenly dated October 28, 2009). The Option agreement provided that Plaintiffs would receive an upfront fee for each original episode of the Program produced. Further, the Option Agreement provided that Arnold and Klein would be entitled to "Twenty-Five percent [25%] of One Hundred Percent [100%] of LMNO's share of any contingent compensation received by LMNO from the exploitation of the Property by third parties (e.g. all media including television, DVD's, merchandising, domestic and foreign), after LMNO first receives any un-recouped, direct, out of pocket third party customary development, production, and distribution costs."

43.     The Option Agreement also provided that Arnold and Klein granted "to LMNO and the Network. . . customary name and likeness rights, the right to use [Plaintiffs'] name in the series title, performance name, voice, likeness, image, videos, photographs, and any copyrights and trademarks for and related to [the Program], in connection with the development, production and exploitation of the Series and the Network (as is customary) in any manner or media or other form of exploitation now known or hereafter developed, worldwide in perpetuity."

44.     Moreover, the Option Agreement also provides that "[a]ny copyrights, trademarks and other materials owned by [Plaintiffs] which are used by LMNO shall constitute an irrevocable license from [Plaintiffs] to LMNO for LMNO's use in connection with The Program as required by LMNO pursuant to its rights

1  hereunder.”

2       45.    In addition, through the Option Agreement, Plaintiffs agreed that

3  LMNO, upon exercise of the option (which was, in fact, exercised by LMNO),

4  would be “sole and exclusive Owner of the Project/Program and all rights with

5  respect thereto. . . which shall include all rights in and to the material created by

6  [Plaintiffs] . . . .” in “all forms of exploitation.”

7       46.    In subsequent years Plaintiffs and LMNO entered into three

8  amendments to the Option Agreement dated July 30, 2009, November 1, 2010, and

9  November 1, 2011, respectively (“the Amendments”). None of the Amendments

10  altered or changed LMNO’s obligation to pay to Plaintiffs 25% of 100% of

11  LMNO’s contingent compensation, after LMNO “ first receives any un-recouped

12  direct, out of pocket third party customary development, production and distribution

13  costs.”

14       47.    In or about mid-2014, as the success of the Program continued and

15  grew, Plaintiffs entered into an agreement directly with Discovery Communications,

16  entitled “Talent and Access Agreement” and dated as of June 1, 2014 (“the

17  Discovery Replacement Agreement.”) The Discovery Replacement Agreement

18  superceded the 2008 Option Agreement and the Amendments thereto and entitled

19  Plaintiffs to various forms of upfront and contingent compensation out of

20  Discovery’s share of adjusted gross revenues from certain forms of exploitation of

21  the Program.

22       48.    At the same time—on or about June 1, 2014—Candu entered into a

23  “surviving” agreement with LMNO (“the Surviving Agreement”) by which

24  Plaintiffs retained their ongoing rights to 25% of 100% of LMNO’s contingent

25  compensation from “the exploitation of the [The Program] by third parties (e.g. all

26  media including television, DVD’s, merchandising, publishing, domestic and

27  foreign), after [LMNO] first recoups any un-recouped direct, out of pocket third

28

party customary development, production and distribution costs." Similarly, pursuant to Section 3 of the Surviving Agreement, in the event that LMNO "distributes or otherwise exploits the [The Program] directly, [Plaintiffs] shall be entitled to receive 25% of 100% of [LMNO's] 'Net Proceeds'."

49.     The terms of the Surviving Agreement also provide that Plaintiffs will convey certain intellectual property rights, including the right to use Klein and Arnold's photographic likenesses on certain items of merchandising, referred to therein as "Permitted Artist Likeness Merchandise."

50.     The Option Agreement, the Amendments and the Surviving Agreement shall herein be collectively referred to as "The LMNO Agreements."

51.     During the time period between 2008 and late 2015, Plaintiffs worked tirelessly on the Program, opening their lives and home to cameras and thereby becoming fixtures in many American and foreign households. Plaintiffs at all times complied with their contractual obligations to LMNO and were an integral part of the tremendous success of the Program.

**Defendants Actively Conceal Their Fraud and Deception**

52.     Pursuant to Section 3 of the Option Agreement, as well as Section 3 of the Surviving Agreement, Plaintiffs were to receive "written accountings. . . from LMNO along with any contingent compensation payments due within a period of ninety (90) days from LMNO's receipt of any written accountings and contingent compensation payments due from the applicable Network and/or distributor."

53.     In addition, pursuant to Section 3 of the Surviving Agreement, to the extent that LMNO distributed or exploited the Program directly, LMNO was obligated to furnish Plaintiffs with "such quarterly accountings within forty-five (45) days after the end of each quarter."

54.     However, during the entirety of the business relationship between the Parties, Plaintiffs had to repeatedly contact LMNO and its employees, including

Defendants Schotz (LMNO's President and Chief Executive Officer) and Horwitz (at that time, LMNO's Executive Vice President for Production) to obtain accountings and financial statements relating to the amount of contingent compensation owed to LMNO—and by extension—to Plaintiffs. Plaintiffs also—on numerous occasions—sought information about the number and location of foreign countries and territories where LMNO was purportedly licensing the Program.

55.     Frequently during that time period, Defendants would offer excuses for Defendants' failure timely to provide accounting statements to Plaintiffs. LMNO and its executives, including Schotz and Horwitz would recite a litany of reasons that LMNO's accountings had not been completed or were not ready for review, including even personal and family problems allegedly encountered by LMNO's CFO/Head of Finance.

56.     Ultimately, however, on each such occasion when Plaintiffs sought up-to-date accountings, they were provided by Defendants with Profit Participation Statements and other documents, each of which showed a loss and that LMNO had received no "contingent compensation" and/or distributable proceeds from which Plaintiffs could be paid their contractual 25% entitlement. On information and belief, unbeknownst to Plaintiffs, as discussed below, these statements contained misstatements of material fact.

57.     Moreover, during verbal conversations between Plaintiffs and LMNO executives, Defendants consistently claimed that the Program had substantial losses and that LMNO was not therefore receiving any contingent compensation and/or distributable proceeds. LMNO executives, including Defendants Horwitz and Schotz, also indicated to Plaintiffs that the Program was not selling well overseas and that foreign licensing revenues were thus not as significant as had been anticipated or could be expected from a similar type of program.

58.     On information and belief, unbeknownst to Plaintiffs at the time, all of

Defendants' statements regarding the Program's financial performance were false and deceptive. As a result of the long-standing relationship of trust between Plaintiffs and Defendants and because of Defendants Schotz and Horwitz's repeated assurances, Plaintiffs had no way of knowing at the time that the accounting statements—and the verbal claims by Schotz and Horwitz—were misrepresentations designed to conceal Defendants' misappropriation of funds and ongoing fraudulent diversion of the profits of the Program to themselves.

**Discovery of the Breach and Fraud**

59.     In or about December 2015, Plaintiffs were contacted by an individual who purported to be a former LMNO CFO/Head of Finance ("the Whistleblower"). The Whistleblower indicated to Plaintiffs' representative that Plaintiffs were owed money from LMNO, as LMNO had falsified its books and records relating to its production and licensing costs. The Whistleblower went on to indicate that, while at LMNO, he had been asked to keep two sets of books—one reflecting actual expenditures and revenues earned by LMNO—and one reflecting the false production and licensing costs allegedly incurred by LMNO, but which were, on information and belief, never in fact incurred.

60.     Upon receiving this information from the Whistleblower, Plaintiffs immediately attempted to meet with the Whistleblower and obtain more information. Plaintiffs also contacted LMNO in or about July 2016 to initiate an audit. Shortly thereafter, in or about early 2016, Plaintiffs were contacted by Discovery Communications and informed that Discovery, too, had received communications from the Whistleblower.

61.     On information and belief, apparently as a result of Plaintiffs' request for an audit at some point during the relationship between the Parties, Defendant Shotz directed the Whistleblower to prepare false financial documents showing massive production losses, to alter financial records to conceal this fraud and to use

Photo Shop to modify bank statements and other records so that the documents appeared to support the fabricated losses.

62.     On information and belief, by in or about early 2016—Discovery undertook an investigation into The Whistleblower's claims of financial irregularities and fraud. Further, on information and belief, LMNO stonewalled and delayed Discovery's attempt to investigate its financial malfeasance and fraud.

63.     In or about March 2016, on information and belief, Discovery was contacted by the Federal Bureau of Investigation which had launched its own inquiry into what Discovery had learned was an ongoing federal criminal investigation into LMNO's business practices.

64.     On or about June 17, 2016, on information and belief, Discovery sent LMNO notices of termination of Discovery's agreements with LMNO relating to certain programs, including *The Little Couple*.

65.     On or about June 24, 2016, LMNO filed suit against Discovery. On August 1, 2016, Discovery counter-sued, alleging that LMNO has engaged in massive, systematic and secretive fraud and malfeasance.

**Plaintiffs Become Aware of the Scope of Defendants' Malfeasance, Entitling them to Elect to Rescind the LMNO Agreements and/or to Money Damages**

66.     On information and belief, LMNO and Discovery had "co-production" agreements relating to *The Little Couple* which provided that Discovery would fund 70% of the total production costs of The Program, while LMNO would fund 30%. On information and belief, LMNO did not actually pay 30% of such production costs, but rather, submitted to Discovery detailed, but fraudulent, production budgets. On information and belief, LMNO either produced episodes of the Program for only the 70% budget amount furnished by Discovery or submitted wildly inflated budgets that allowed LMNO to produce the Program for the amount of Discovery's budget contribution alone and then pocket the rest of such funds.  In either instance, such episodes of the Program would be of lesser quality than if they

1  had been produced for actual, budgeted amounts.

2      67.     On information and belief, Defendants LMNO, Schotz and Horwitz

3  knowingly and intentionally provided inflated figures so that they, and possibly

4  others, could retain excess funding they knew would result from the inflated

5  budgets.

6      68.     On information and belief, Defendants' blatant fraud in claiming

7  production and distribution expenditures which LMNO did not in fact make,

8  deprived Plaintiffs of contingent compensation amounts to which they were and are

9  entitled. Plaintiffs are entitled to 25% of 100% of LMNO's contingent compensation

10 and/or distributable proceeds, once LMNO has recouped its costs. To calculate

11 contingent compensation amounts owed to Plaintiffs, LMNO was entitled first to

12 recoup its costs out of any revenues earned from the exploitation of The Program.

13     69.     Thus, on information and belief, LMNO was at all times "recouping"

14 false "costs" out of revenues earned from the Program—enriching itself while at the

15 same time reducing the amount of revenue available as "contingent compensation"

16 and/or distributable proceeds. LMNO's false and fraudulent "costs" were reflected

17 on financial statements provided to Plaintiffs by Defendants, which in turn resulted

18 in paper losses and no contingent compensation and/or Distributable proceeds

19 payments to Plaintiffs.

20     70.     In addition, on information and belief, although LMNO has repeatedly

21 failed to produce full and adequate records regarding where, i.e. in what foreign

22 countries and territories the Program has been licensed and what licensing fees have

23 been earned, Plaintiffs are informed and believe and hereon allege, that LMNO has

24 failed to report and account to Plaintiffs for all revenues which it has received from

25 the foreign licensing of the Program. Plaintiffs are also informed and believe that

26 LMNO has failed to report amounts refunded or rebated to it by taxing authorities in

27 the form of production tax credits or rebates.

28

71.     Moreover, Plaintiffs are informed and believe, and thereon allege, that Defendants failed properly to account to Discovery with regard to LMNO's actual development, production and distribution costs (which Defendants grossly overstated) and failed to report revenue LMNO earned in connection with foreign licensing and other forms of exploitation, as well as what LMNO received from taxing authorities in the form of tax credits or rebates.  As such, Plaintiffs, who were entitled to various forms of upfront and contingent compensation out of Discovery's share of "Adjusted Gross Revenues" from certain forms of exploitation of the Program pursuant to the 2014 Discovery Replacement Agreement, were deprived of amounts that would otherwise have been paid to them under that agreement with Discovery.

72.     Finally, LMNO's failure to contribute at least 30% of production costs over a period of eight seasons has diminished the quality of the Program and diminished its value in the marketplace at present and going forward. This has reduced the amount of revenue which can and will be earned by Plaintiffs in connection with various forms of exploitation of the Program in an amount to be determined at trial.

## FIRST CLAIM FOR RELIEF

### Breach of Written Contract

### (By Plaintiffs Klein and Arnold Against Defendant LMNO)

73.     Plaintiffs repeat and incorporate herein by reference the allegations set forth above as though fully set forth herein.

74.     Pursuant to Section 3 of the Option Agreement, and Section 3 of the Surviving Agreement, Plaintiffs were and are entitled to "Twenty-Five percent [25%] of One Hundred Percent [100%] of LMNO's share of any contingent compensation received by LMNO from the exploitation of the Property by third parties (e.g. all media including television, DVD's, merchandising, domestic and

1  foreign), after LMNO first received any un-recouped, direct, out of pocket third
2  party customary development, production, and distribution costs.

3       75.    Pursuant to Section 3 of the Surviving Agreement, in the event that
4  LMNO "distributes or otherwise exploits the [The Program] directly, Artist shall be
5  entitled to receive 25% of 100% of [LMNO's] "Net Proceeds."  LMNO was at all
6  relevant times herein handling the licensing of The Program in foreign countries and
7  territories directly.

8       76.    Defendant LMNO has, from 2008 to present, failed to pay amounts
9  actually owed to Plaintiffs as Plaintiffs' portion of LMNO's contingent
10 compensation and/or distributable proceeds from the exploitation of the Program in
11 violation of Section 3 of the Option Agreement and Section 3 of the Surviving
12 Agreement.

13      77.    LMNO has materially breached the LMNO Agreements by grossly and
14 artificially inflating its purported costs expended in connection with the
15 development, licensing and production of the Program, thereby resulting in
16 underreporting of revenues owed to Plaintiffs as their portion of LMNO's
17 contingent compensation and/or Net Revenues. Moreover, LMNO has failed fully to
18 report and account for all revenues earned by it in connection with the licensing of
19 the Program in foreign countries and territories.

20      78.    Pursuant to Section 3 of the Option Agreement, Plaintiffs were to
21 receive "written accountings. . . from LMNO along with any contingent
22 compensation payments due within a period of ninety (90) days from LMNO's
23 receipt of any written accountings and contingent compensation payments due from
24 the applicable Network and/or distributor."  Pursuant to Section 3 of the Surviving
25 Agreement, to the extent that LMNO distributed or exploited the Program directly,
26 LMNO was obligated to furnish Plaintiffs with "such quarterly accountings within
27 forty-five (45) days after the end of each quarter."

28

79.     LMNO has materially breached its obligations to Plaintiffs by failing repeatedly to provide accountings in a timely manner (or at all) pursuant to Section 3 of the Option Agreement and/or Section 3 of the Surviving Agreement.

80.     Plaintiffs have performed all of their obligations under the LMNO Agreements, including the Option Agreement and the Surviving Agreement, including performing services and granting their intellectual property rights, and ownership rights in the Program, to LMNO.

81.     By failing to account for all of its foreign licensing revenues, by fraudulently inflating its development, production and licensing costs, and by failing to provide timely accountings to Plaintiffs, LMNO has materially breached Section 3 of the Option Agreement and Section 3 of the Surviving Agreement, resulting in damages to Plaintiffs, the amount of which will be proven at trial.

## SECOND CLAIM FOR RELIEF

### Breach of Implied Covenant of Good Faith and Fair Dealing

### (By Plaintiffs Klein and Arnold Against Defendant LMNO)

82.     Plaintiffs repeat and incorporate herein by reference the allegations set forth above as though fully set forth herein.

83.     The LMNO Agreements entered into between the parties each contains an implied covenant of good faith and fair dealing by which neither party may do anything to deprive the other party of benefit and protections of the LMNO Agreements.

84.     Plaintiffs fully performed their obligations under The LMNO Agreements, or were excused from doing so.

85.     Defendant LMNO breached the implied covenant of good faith and fair dealing by failing to keep truthful and accurate accountings of revenues earned from foreign licensing and other forms of exploitation, and by failing to truthfully and accurately account for its production, licensing, and distribution costs.

86.     Defendant LMNO also breached the implied covenant of good faith and fair dealing by failing to contribute its portion of development, production and licensing costs to the Program, thereby diminishing the value of the Program as a whole.

87.     As a direct and proximate result of LMNO's breach of the implied covenant of good faith and fair dealing, Plaintiffs have been damaged, the amount of which will be proven at trial.

## THIRD CLAIM FOR RELIEF

### Fraud

### (By All Plaintiffs Against All Defendants)

88.     Plaintiffs repeat and incorporate herein by reference the allegations set forth above as though fully set forth herein.

89.     Defendants have committed four variations of fraud.

Fraudulent Inducement

90.     Defendants LMNO and Schotz misrepresented to Plaintiffs that LMNO would— in exchange for Plaintiffs' ongoing services on the Program as well as the assignment of Plaintiffs' intellectual property—pay Plaintiffs an amount equal to 25% of 100% of Defendant LMNO's contingent compensation and/or Distributable proceeds received from the exploitation of the Program in all media after LMNO received any unrecouped customary costs. This representation was false when made. In fact, Defendants LMNO, Schotz and Horwitz had—at the time that the Plaintiffs and LMNO entered into the 2008 Option Agreement, Amendments thereto, and the 2014 Surviving Agreement— embarked on and begun to carry out a systematic scheme to (1) falsify LMNO's production, distribution, and licensing costs and (2) to underreport revenues received by LMNO from foreign licensing of the Program (and from other forms of exploitation), in order to create artificial losses designed to

benefit Defendants while depriving Plaintiffs of contingent compensation and/or distributable proceeds to which they were and are entitled.

91.     Defendants knew that their representations were false each time they were made because in fact Defendants intended to (and did) carry out a scheme to systematically defraud Plaintiffs by falsifying their purported costs and underreport their revenues earned in connection with the exploitation of the Program.

92.     In addition, Defendants LMNO, Schotz and Horwitz also fraudulently accounted to third party Discovery with regard to LMNO's actual development, production and distribution costs (which LMNO grossly overstated) and failed to report revenue earned in connection with foreign licensing and other forms of exploitation, as well as monies received from taxing authorities in the form of tax credits.  Plaintiffs, who were entitled to various forms of upfront and contingent compensation out of Discovery's share of "Adjusted Gross Revenues" from certain forms of exploitation of the Program, pursuant to the 2014 Discovery Replacement Agreement, were also– as a direct consequence of Defendants' fraud—deprived of amounts that would otherwise have been paid to them under that agreement with third party Discovery.

93.     Defendants intended to defraud and induce Plaintiffs to enter into the 2008 Option Agreements, the Amendments thereto, and the 2014 Surviving Agreement, in order to induce Plaintiffs to provide services on the Program and to grant their valuable intellectual property and ownership rights in the Program to Defendants.

94.     Plaintiffs relied on Defendants' promises and worked long hours producing the Program and performing in each and every episode produced. Plaintiffs justifiably relied on Defendants' promises because Plaintiffs believed that Defendants each had a longstanding business relationship with Discovery Communications, were seasoned reality producers and/or production executives, and

1    were truthful about costs incurred and revenues received from foreign licensing and

2    other sources of exploitation.

3                          Deceit per Cal. Civil Code § 1572

4        95.    Defendants LMNO and Schotz made a promise to Plaintiffs that

5    Defendants would, in exchange for Plaintiffs' services and the assignment of their

6    intellectual property and ownership rights, pay Plaintiffs 25% of 100% of LMNO's

7    contingent compensation and/or Distributable proceeds without any intention of

8    performing it.  Defendants LMNO, Schotz and Horwitz made a series of

9    misrepresentations to Plaintiffs over the course of eight seasons of the production of

10   the Program, falsely claim inflated costs and underreporting actual revenues.

11       96.    Defendants also fraudulently accounted to third party Discovery with

12   regard to LMNO's actual development, production and distribution costs (which

13   Defendants grossly overstated) and failed to report revenue earned in connection

14   with foreign licensing and other forms of exploitation, as well as monies received

15   from taxing authorities in the form of tax credits.  Defendants' fraud thus also

16   deprived Plaintiffs of amounts that would otherwise have been paid to them under

17   Plaintiff's 2014 Discovery Replacement Agreement with third party Discovery.

18       97.    Defendants knew that the promises to Plaintiffs were false when made,

19   as Defendants had a longstanding business relationship with third party Discovery

20   and had already embarked on a scheme to systematically defraud Discovery and

21   Plaintiffs.

22       98.    Defendants' promises were made with the intent to defraud and induce

23   Plaintiffs to rely upon them. Defendants intended to defraud and induce Plaintiffs to

24   enter into the 2008 Option Agreement, the Amendments thereto, and the 2014

25   Surviving Agreement, in order to induce Plaintiffs to provide services on the

26   Program and assign their valuable intellectual property and ownership rights to

27   Defendants.

28

1    99.    Plaintiffs were unaware of Defendants' intention not to perform the
2  promises.

3                                    Actual Fraud

4    100.    Defendants LMNO and Schotz, through connivance, intended to induce
5  Plaintiffs to enter into the LMNO Agreements and to use Plaintiffs' significant
6  efforts and talents as performers on the Program and profit from Plaintiffs'
7  assignment of intellectual property rights and ownership in the Program by
8  promising to compensate Plaintiffs with 25% of Defendants' contingent
9  compensation and/or Distributable proceeds without the intention of ever paying
10  such monies to Plaintiffs. In fact, in furtherance of its fraudulent scheme,
11  Defendants LMNO, Schotz and Horwitz routinely provided Plaintiffs with Profit
12  Participation Statements that contained false and inflated production, licensing, and
13  distribution costs and which did not account for all foreign licensing revenues.
14  Defendants also provided third party Discovery with false accountings of their costs,
15  as well as underreporting their revenues from foreign licensing and other forms of
16  exploitation, in addition to monies received from tax authorities as production tax
17  credits or rebates, thereby depriving Plaintiffs of monies owed to them from third
18  party Discovery.

19    101.    For example, on or around November 5, 2010, April 22, 2011,
20  September 11, 2013, March 28, 2014, November 19, 2014, June 26, 2015  and April
21  5, 2016, Defendant Horwitz, on behalf of and at the direction of Defendants LMNO
22  and Schotz, prepared and/or submitted to Plaintiffs incorrect, fraudulent Profit
23  Participation Statements and other documents. As alleged above, each of these
24  statements as well as others—not including the illustrative and non-exhaustive
25  examples enumerated above— were false, misleading, and materially inaccurate in
26  that each reflected costs not actually incurred and failed to reflect the true amount of
27  licensing and other revenues received by LMNO from third parties.

28

102.    Defendants were aware that these Profit Participation Statements were false, misleading, and materially inaccurate.

103.    Defendants' fraudulent misrepresentations were made for the purpose of defrauding Plaintiffs, with the intent of making plaintiffs believe that the Program had not generated net profit (due to fraudulently inflated costs and the underreporting of foreign licensing and other revenues) which would entitle Plaintiffs to their portion of contingent compensation and/or Distributable proceeds and/or Adjusted Gross Revenues from third party Discovery.

104.    Plaintiffs relied on Defendants' misrepresentations, that LMNO would and had properly accounted for its costs and foreign licensing and other revenues, in entering into each of the LMNO Agreements, in providing their services and those of their children over eight seasons of production of the Program, and in assigning their intellectual property rights and ownership interest in the Program to Defendant LMNO.

105.    At the time that each of Defendants' fraudulent misrepresentations were made, Plaintiffs believed them to be true. Information regarding Defendant LMNO's costs and foreign licensing and other revenues received by LMNO were provided to Plaintiffs—as is customary in the industry— in summary fashion and without back-up documentation. As such, Plaintiffs could not have discovered Defendants' misrepresentations, which were actively concealed from them. Moreover, LMNO employees, including Defendants Schotz and Horwitz, made verbal misrepresentations to Plaintiffs that the Program had not, at any time, made distributable proceeds which would entitle Plaintiffs to contingent compensation. LMNO employees, including Defendants Schotz and Horwitz also falsely indicated that the Program was not "selling well" in foreign markets. Plaintiffs' reliance on Profit Participation Statements provided by Defendants and on Defendants' verbal assurances was reasonable and justifiable.

106.    Had Plaintiffs known the true facts, they would have acted to protect their interests and would never have entered into any of the LMNO Agreements.

107.    Plaintiffs only became aware of Defendants' fraudulent misrepresentations for the first time in December 2015, when they were contacted by the Whistleblower.

108.    As a direct and proximate result of the false promises the Defendants made without intent to perform and its material misrepresentations, Plaintiffs have suffered damages, the precise amount and scope of which will be determined at trial.

<u>Concealment per Cal. Civil Code § §1572 & 1710</u>

109.    Defendants concealed and/or suppressed material facts from Plaintiffs including that Defendants never intended to pay Plaintiffs contingent compensation, and/or Distributable proceeds and that the Profit Participation Statements supplied to Plaintiffs by Defendants contained false and inaccurate information regarding revenues earned by Defendants (which were underreported) and costs incurred by Defendants (which were falsified) in connection with the Program.    In fact, Defendants altered and manipulated financial documentation in order to deceive Plaintiffs about LMNO's expenditures and revenues in connection with the Program.

110.    Moreover, Defendants also routinely supplied third party Discovery with false and misleading accounting statements, the provision of which resulted in less monies being paid by third party Discovery to Plaintiffs than what Plaintiffs were in fact owed had Defendants' accounting statements not been fraudulent.

111.    Defendants were under a duty to disclose those facts to Plaintiff because (a) Defendants had exclusive knowledge of the foregoing material facts, which Defendants knew were not known or readily available to Plaintiff, and (b) the Defendants had an obligation provide truthful accountings of costs and revenues from the Program.

112.    Defendants intentionally concealed or suppressed the material facts with

the intent to defraud Plaintiff because, by concealing or suppressing the facts, Defendants were able to continue to utilize Plaintiff's efforts and Plaintiffs' intellectual property and ownership rights in developing and producing the Program.

113.    Plaintiffs were completely unaware of the material facts and would not have acted as they did if they had known of the material facts.

114.    As a direct and proximate result of Defendants' fraud, Plaintiff has suffered damages, including direct, consequential, and incidental losses in an amount to be proven at trial.

115.    Defendants' conduct as described herein was done with a conscious disregard of Plaintiff's rights, with the intent to vex, annoy, and/or harass Plaintiff and to unjustly profit from Plaintiff's efforts, connections and intellectual property. Such conduct was unauthorized and constitutes oppression, fraud, and/or malice, entitling Plaintiffs to an award of punitive damages in an amount appropriate to punish or set an example of the Defendants in an amount to be determined at trial.

116.    As an alternative to damages, Plaintiffs may elect the remedies of rescission and restitution.

## FOURTH CLAIM FOR RELIEF

### CONVERSION

### (By All Plaintiffs Against All Defendants)

117.    Plaintiffs repeat and incorporate herein by reference the allegations set forth above as though fully set forth herein.

118.    Plaintiffs have a definable interest in a sum of money that is capable of identification from Defendants' books and records, which are being held by Defendants, even though such sums rightfully belong to Plaintiffs.

119.    The amount of money converted is capable of identification after discovery of  Defendants' books and records, which are exclusively in Defendants' possession.

120.    Defendants have converted Plaintiffs' money and are making use of it.

121.    As a direct and proximate result of Defendants' conversion, Plaintiffs have suffered actual damages, including emotional distress damages, in an amount according to proof at trial.

122.    Defendants' conduct as described herein was done with a conscious disregard of the rights of the Plaintiffs, with the intent to unjustly profit at Plaintiffs' expense.  Such conduct was unauthorized and constitutes oppression, fraud, and/or malice, entitling Plaintiffs to an award of punitive damages in an amount appropriate to punish or set an example of Defendants in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

### Unfair Competition in Violation of Cal. Bus. & Prof. Code § 17200 *et seq.*
### (By All Plaintiffs Against Defendant LMNO)

123.    Plaintiffs repeat and incorporate herein by reference the allegations set forth above as though fully set forth herein.

124.    As alleged above, Defendant LMNO breached the LMNO Agreements and defrauded Plaintiffs by preparing and submitting false and fraudulent accounting statements and diverting funds earned from the exploitation of the Program.

125.    In committing any or all of the acts alleged above, Defendant LMNO engaged in unlawful, unfair, or fraudulent business acts or practices within the meaning of California Business & Professions Code section 17200 *et seq.*

126.    As a result of Defendant LMNO's unlawful, unfair, and fraudulent business practices—including falsifying accounting records, underinflating revenues, and overinflating costs—LMNO effectively deprived Plaintiffs of their rightful share of contingent compensation and/or Distributable proceeds and/or Adjusted Gross Revenues due under the LMNO Agreements and under Plaintiffs

2014 Discovery Replacement Agreement.

127.    Pursuant to California Business & Professions Code section 17203, as a result of these unlawful, unfair and fraudulent business practices, LMNO must restore to Plaintiffs any property, which may have been acquired by means of such unfair business practice, including any and all intellectual property rights and ownership rights in the Program assigned or granted to Defendant LMNO by Plaintiffs.

## SIXTH CLAIM FOR RELIEF

### Accounting

### (By Plaintiffs Klein and Arnold Against Defendant LMNO)

128.    Plaintiffs repeat and incorporate herein by reference the allegations set forth above as though fully set forth herein.

129.    Defendant LMNO has not accounted to Plaintiffs for the amount of contingent compensation due to Plaintiffs under the LMNO Agreements, and has actively blocked, frustrated, and refused to honor Plaintiffs' contractually provided rights (which it invoked) to audit LMNO's books regarding the same, including Plaintiffs' "customary industry audit rights with regards to [LMNO] concerning any and all contingent compensation due [Plaintiffs]."

130.    LMNO is contractually obligated to provide an accounting to Plaintiffs under the contingent compensation provisions, section 3 of the 2014 Surviving Agreement and Section 3 of the 2008 Option Agreement, which provide that "[Plaintiffs] shall be entitled to receive reasonably detailed, written accountings (including copies of any and all network and other third party accounting statements received by [LMNO]) from [LMNO] along with any and all contingent compensation payments (including, without limitation, distributable proceeds and Net Merchandising Receipts) due within a period of ninety (90) days from [LMNO's] receipt of any written accountings and contingent compensation

payments due from the applicable network and/or distributor."  The Surviving Agreement also provides that to the extent that LMNO distributed or exploited the Program directly, LMNO was obligated to furnish Plaintiffs with "such quarterly accountings within forty-five (45) days after the end of each quarter."

131.    Providing an accurate accounting related to Plaintiffs' entitlement to contingent compensation and/or Distributable proceeds is sufficiently complicated—particularly in light of the alleged unavailability, incompleteness and inaccuracy of Defendant LMNO's books and records—that it merits the relief afforded by this claim.

132.    Plaintiffs are entitled to and seeks such accountings

**SEVENTH CLAIM FOR RELIEF**

**Declaratory Judgment of Ownership of Intellectual Property Rights**

**(By Plaintiffs Klein and Arnold Against Defendant LMNO)**

133.    Plaintiffs repeat and incorporate herein by reference the allegations set forth above as though fully set forth herein.

134.    There is an actual and justiciable controversy between Plaintiffs, on the one hand, and Defendant LMNO, on the other, as to whether LMNO's failure to perform its material obligations under the LMNO Agreements—including, without limitation, its fraudulent reporting of costs and revenues derived from the Program and payable to Plaintiffs—has resulted in Plaintiffs owning certain intellectual property rights in and to the Program.

135.    As set forth above, Plaintiffs contend that as a result of LMNO's scheme to systematically defraud Plaintiffs, falsify accounting records, and fail to pay Plaintiffs their required portion of contingent compensation and/or Distributable proceeds from the Program, Plaintiffs thereby retain all of their intellectual property rights and ownership rights in and to the Program which Plaintiffs purported to grant, assign or license to LMNO under the terms of the LMNO Agreements.

136.     Notwithstanding its wrongful conduct described herein, Defendant LMNO asserts that it owns all of Plaintiffs' intellectual property and ownership rights which were purportedly assigned, granted and/or licensed to LMNO by Plaintiffs through the LMNO Agreements.

137.     To resolve this justiciable controversy, Plaintiffs seek a declaration pursuant to 28 U.S.C. § 2201 that Plaintiffs own and hold their intellectual property rights throughout the world, including in connection with their performances on each and every episode of the Program, in perpetuity.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

1.     That Plaintiffs be awarded compensatory and consequential damages according to proof on their First through Fourth Claims for Relief (Breach of Written Contract, Breach of Implied Covenant of Good Faith and Fair Dealing, Fraud, and Conversion) in an amount to be proven at trial;

2.     For compensatory damages or rescission of the LMNO Agreements and restitution, at Plaintiffs' election at time of trial, for their Third Claim for Relief (Fraud);

3.     For punitive damages for their Third Claim for Relief (Fraud) and Fourth Claim for Relief (Conversion);

4.     For emotional distress damages for their Fourth Claim for Relief (Conversion);

5.     For restitution on their Fifth Claim for Relief (California Unfair Competition Law) in the form of an assignment of all intellectual property rights and ownership interest in the Program, which Plaintiffs would have owned had they not entered into the LMNO Agreements;

6.     For an accounting on their Sixth Claim for Relief (Accounting) for the

amount of contingent compensation and/or Distributable proceeds due to Plaintiffs under the LMNO Agreements;

7.      For a determination and order on their Seventh Claim for Relief (Declaratory Judgment) of Plaintiffs' ownership rights, and intellectual property rights, in and to the Program;

8.      For such other and further relief as the Court deems proper, just, and equitable.

Plaintiff also demands trial of this matter by jury.

DATED: May 17, 2017                 JOHNSON & JOHNSON LLP


By: /s/ Jennifer J. McGrath
_____
Neville L. Johnson
Douglas L. Johnson
Jennifer J. McGrath

*Attorneys for Plaintiff-Intervenors*
William Klein, Jennifer Arnold,
and Candu Enterprises Inc.

33
COMPLAINT IN INTERVENTION

1

2

## <u>DEMAND FOR A JURY TRIAL</u>

3

4        Plaintiffs request a trial by jury on all issues for which they are entitled to a
jury.

5

6    DATED: May 17, 2017                    JOHNSON & JOHNSON LLP

7

8                                    By: /s/ Jennifer J. McGrath

9                                        Neville L. Johnson

10                                       Douglas L. Johnson
                                         Jennifer J. McGrath
11
                                         *Attorneys for Plaintiff-Intervenors*
12                                       William Klein, Jennifer Arnold,
                                         and Candu Enterprises Inc.
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT IN INTERVENTION