Theodore E. Tsekerides (admitted *pro hac vice*)
  theodore.tsekerides@weil.com
Randi W. Singer (admitted *pro hac vice*)
  randi.singer@weil.com
Allison M. Brown (admitted *pro hac vice*)
  allison.brown@weil.com
David Yolkut (admitted *pro hac vice*)
  david.yolkut@weil.com
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, NY 10153-0119
Telephone:  (212) 310-8000
Facsimile:   (212) 310 8007

Scott A. Edelman, State Bar No. 116927
  SEdelman@gibsondunn.com
Nathaniel L. Bach, State Bar No. 246518
  NBach@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
2029 Century Park East, Suite 4000
Los Angeles, California 90067
Telephone:  (310) 552-8500
Facsimile:   (310) 551-8741

Attorneys for Defendant/Counterclaim Plaintiff
DISCOVERY COMMUNICATIONS, LLC

REDACTED VERSION OF
DOCUMENT PROPOSED TO BE
FILED UNDER SEAL

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LMNO CABLE GROUP, INC., a California corporation, and LMNO ENTERTAINMENT GROUP, LLC, a California limited liability company,<br><br>              Plaintiffs,<br><br>      v.<br><br>DISCOVERY COMMUNICATIONS, LLC, a Delaware limited liability company, et al.<br><br>              Defendants. | CASE NO. 2:16-cv-4543-JAK-SK<br><br>**DISCOVERY COMMUNICATIONS, LLC'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>[Declaration of Jhamal Robinson and Declaration of Theodore E. Tsekerides Filed Concurrently Herewith]<br><br>Date: April 2, 2018<br>Time: 8:30 A.M.<br>Place:  Courtroom 10B<br><br>**Judge: Hon. John A. Kronstadt** |

1  | DISCOVERY
2  | COMMUNICATIONS, LLC, a
   | Delaware limited liability company,

3  |                    Counterclaim
4  |                    Plaintiff,

5  |         v.

6  | LMNO CABLE GROUP, INC., a
7  | California corporation, and LMNO
   | ENTERTAINMENT GROUP, LLC, a
8  | California limited liability company,

9  |                    Counterclaim
10 |                    Defendants.

11 | WILLIAM KLEIN, an individual;
   | JENNIFER ARNOLD, an individual;
12 | and CANDU ENTERPRISES, INC., a
   | Texas corporation;

13

14 |                    Plaintiff-Intervenors,
15 |         v.

16 | LMNO CABLE GROUP, INC., a
17 | California corporation; ERIC SCHOTZ,
   | an individual; and EDWARD
18 | HORWITZ, an individual,

19 |                    Defendants.

20

21

22

23

24

25

26

27

28

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that at 8:30 a.m. on April 2, 2018, or as soon thereafter as the matter may be heard in Courtroom 10B of the above-entitled Court, located at 350 West 1st Street, Los Angeles, California, 90012, Defendant and Counterclaim Plaintiff Discovery Communications, LLC ("Discovery") will, and hereby does, move under Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56-1 that this Court grant Discovery's Motion for Partial Summary Judgment (the "Motion"). Specifically, Discovery moves for summary judgment on LMNO Cable Group, Inc.'s ("LMNO") First, Second, Eighth, and Ninth Claims for Relief, as well as LMNO Entertainment Group, LLC's ("LEG", together with LMNO, the "LMNO Defendants") Fourteenth Claim for Relief.

This Motion is based upon this Notice of Motion and Motion, the Memorandum of Points and Authorities below, Discovery's concurrently filed Statement of Uncontroverted Facts and Conclusions of Law, the concurrently filed Declarations of Jhamal Robinson and Theodore E. Tsekerides (together with their attached exhibits), the complete record of this action, matters of which the Court may take judicial notice, and upon such oral argument as may be entertained by the Court.

This Motion is made following the conference of counsel required by Local Rule 7-3 on February 5, 2018 regarding this Motion.

Dated: February 12, 2018          GIBSON, DUNN & CRUTCHER LLP


By:   /s/ Scott A. Edelman
      Scott A. Edelman, State Bar No. 116927
      Nathaniel L. Bach, State Bar No. 246518
      2029 Century Park East, Suite 4000

i

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Los Angeles, California 90067
(310) 552-8500
SEdelman@gibsondunn.com

WEIL, GOTSHAL & MANGES LLP
Theodore E. Tsekerides
Randi W. Singer
Allison M. Brown
David Yolkut
767 Fifth Avenue
New York, New York 10153
(212) 310-8000
theodore.tsekerides@weil.com

*Attorneys for Defendant and Counterclaim
Plaintiff*

ii

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................1

II.   BACKGROUND ..................................................................................1

III.  LEGAL STANDARD ...........................................................................2

IV.   LEG'S COPYRIGHT INFRINGEMENT CLAIM CONCERNING *7 LJ* FAILS AS A MATTER OF LAW. .......................................................2

    A.    Factual and Procedural Background Regarding *7 LJ*.............................2

    B.    Discovery Is Entitled to Summary Judgment on LEG's Claim Concerning Season 2 of 7 LJ (Fourteenth Claim)................................4

V.    LMNO'S COPYRIGHT INFRINGEMENT CLAIMS CONCERNING *THE LITTLE COUPLE* FAIL AS A MATTER OF LAW. ...............................................................................................6

    A.    Factual and Procedural Background Regarding *The Little Couple*...............................................................................................6

    B.    Discovery Is Entitled to Summary Judgment on LMNO's Claim Concerning Season 9, the UK Episodes, and the Special (First Claim). ...................................................................................9

        1.    The Klein-Arnolds' Lives Are Facts That Cannot Be Copyrighted................................................................................11

        2.    LMNO's Treatment Consists of Uncopyrightable Elements and Is Not Substantially Similar to the UK Episodes. ...................................................................................13

        3.    Discovery's Assembly of the Special Was Not Infringing. ...................................................................................16

            a.    Discovery Had the Contractual Right to "Edit" Episodes of *The Little Couple* and Include Them as Part of an "Anthology." ..................................................16

            b.    LMNO Is Equitably Estopped from Pursuing Copyright Infringement Concerning the Special............17

iii

C. Discovery Is Entitled to Summary Judgment on LMNO's Claim Concerning Alleged Out-of-License Airings of *The Little Couple* (Second Claim). ........................................................18

    1. No Reasonably Prudent Person Would Interpret Discovery's License as Expiring the Same Day for Every Episode Regardless of When the Episode Was Produced. .......19

    2. The Record Is Undisputed That Discovery Has a Five-Year License for Each Episode of *The Little Couple.* ..............22

VI. LMNO'S COPYRIGHT INFRINGEMENT CLAIMS CONCERNING *UNUSUAL SUSPECTS* FAIL AS A MATTER OF LAW ...................................................................................25

A. Factual and Procedural Background Regarding *Unusual Suspects* ................................................................25

B. Discovery Is Entitled to Summary Judgment on LMNO's Claim that *Deadly Intent* Infringes LMNO's Copyrights in *Unusual Suspects* (Eighth Claim). ....................................................26

C. Discovery Is Entitled to Summary Judgment on LMNO's Claim Concerning Alleged Out-of-License Airings of Seasons 2-4 of *Unusual Suspects* (Ninth Claim). .......................................29

VII. CONCLUSION...........................................................30

# TABLE OF AUTHORITIES

**Cases**          **Page(s)**

*8th Wonder Entm't, LLC v. Viacom Int'l, Inc.*,
  No. 214CV01748DDPJCG, 2016 WL 6882832
  (C.D. Cal. Nov. 22, 2016)................................................................... *passim*

*Asset Mktg. Sys., Inc. v. Gagnon*,
  542 F.3d 748 (9th Cir. 2008) ..............................................................5, 6

*Bethea v. Burnett*,
  No. CV04-7690JFWPLAX, 2005 WL 1720631 (C.D. Cal. June 28, 2005)......13

*C B Structures, Inc. v. Potomac Elec. Power Co.*,
  122 F. Supp. 3d 247 (D. Md. 2015)..................................................22

*Canares v. Lift Truck Servs., Inc.*,
  322 A.2d 866 (Md. 1974) ................................................................22

*Castorina v. Spike Cable Networks, Inc.*,
  784 F. Supp. 2d 107 (E.D.N.Y. 2011) ..............................................13

*Catalina Enters., Inc. Pension Tr. v. Hartford Fire Ins. Co.*,
  67 F.3d 63 (4th Cir. 1995) ..........................................................19, 21

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)........................................................................2

*Diamond Point Plaza Ltd. P'ship v. Wells Fargo Bank, N.A.*,
  929 A.2d 932 (Md. 2007) ..............................................................19

*DuckHole Inc. v. NBC Universal Media LLC*,
  No. CV 12-10077 BRO CWX, 2013 WL 5797279
  (C.D. Cal. Sept. 6, 2013)................................................................27

*Effects Assocs., Inc. v. Cohen*,
  908 F.2d 555 (9th Cir. 1990) ...........................................................6

*Funky Films, Inc. v. Time Warner Entm't Co.*,
  462 F.3d 1072 (9th Cir. 2006) .....................................................9, 10

*Interscope Records v. Time Warner, Inc.*,
  No. CV 10–1662 SVW, 2010 WL 11505708 (C.D. Cal. June 28, 2010) ...........5

v

*Milano v. NBC Universal, Inc.*,
    584 F. Supp. 2d 1288 (C.D. Cal. 2008) ...............................................................28

*Nat'l Ass'n for Stock Car Auto Racing, Inc. v. Scharle*,
    356 F. Supp. 2d 515 (E.D. Pa. 2005) .....................................................................5

*Nat'l Basketball Ass'n v. Motorola, Inc.*,
    105 F.3d 841 (2d Cir. 1997) .................................................................................12

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
    134 S. Ct. 1962 (2014) .........................................................................................18

*Progressive Cas. Ins. Co. v. Dunn*,
    665 A.2d 322 (Md. Ct. Spec. App. 1995) .............................................................16

*Residential Holdings III LLC v. Archstone-Smith Operating Tr.*,
    920 N.Y.S.2d 349 (App. Div. 2011) .....................................................................21

*Rice v. Fox Broad. Co.*,
    148 F. Supp. 2d 1029 (C.D. Cal. 2001) ...................................9, 10, 11, 15, 27

*Shaw v. Lindheim*,
    919 F.2d 1353 (9th Cir. 1990) .............................................................................13

*Wash. Metro. Area Transit Auth. v. Potomac Inv. Props., Inc.*,
    476 F.3d 231 (4th Cir. 2007) ..........................................................................19, 22

*Watermark Publishers v. High Tech. Sys. Inc.*,
    No. 95-3839-IEG (CGA), 1997 WL 717677 (S.D. Cal. June 18, 1997) ...........17

*Zella v. E.W. Scripps Co.*,
    529 F. Supp. 2d 1124 (C.D. Cal. 2007) .........................................13, 14, 27

**Statutes**

17 U.S.C. § 201(b) .........................................................................................................4

17 U.S.C. § 204(a) .........................................................................................................5

**Other Authorities**

Federal Rule of Civil Procedure 56 ......................................................................2, 19

Federal Rule of Evidence 201(b) ..............................................................................27

vi

1

Oxford Dictionaries.............................................................................16, 17

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

In 2016, Discovery terminated its business relationship with LMNO after learning from a whistleblower about LMNO's rampant fraud and breaches of contract.  LMNO responded by commencing this action to divert attention away from its wrongful conduct.  At the core of LMNO's gambit are several meritless copyright infringement claims concerning three television programs: *7 Little Johnstons* ("*7 LJ*"), *The Little Couple*, and *Unusual Suspects.*  While the facts and legal theories vary from claim to claim, the claims at issue have one common thread: none of them has merit.  With the factual record now closed, and for the reasons below, Discovery is entitled to summary judgment as to the First, Second, Eighth, Ninth, and Fourteenth Claims for Relief in the Complaint.

### II.   BACKGROUND

Discovery is a global media company that provides programming content through a variety of cable networks.  *See* Statement of Uncontroverted Facts ("56.1") ¶ 1.  LMNO produced several programs with Discovery, including, among others, *7 LJ*, *The Little Couple*, and *Unusual Suspects*.  *See id.* ¶ 2.  The parties' various rights and responsibilities were set forth in Master Agreements.  The parties then entered into an "Attachment" for each individual program that incorporated the terms of the applicable Master Agreement and governed the production of a pilot or first season.  *See id.* ¶ 3.  Thereafter, the parties entered into "Amendments" to the "Attachment" for later seasons and specials.  *Id.*

Discovery agreed with LMNO to produce television programs on either a "commission" or a "co-production" basis.  *See* 56.1 ¶ 4.  Under a "commission" arrangement, the applicable contracts provided that Discovery paid all production costs and owned all intellectual property and other rights in the resulting program.  *See id.* ¶ 5.  *7 LJ* is one of the commissions.  *See id.* ¶ 11.  Under a "co-production"

arrangement, Discovery and LMNO were each contractually obligated to share in the production costs and respectively retained certain intellectual property rights in the resulting program.  *See id.* ¶ 6.  LMNO produced a pilot and eight seasons of the reality show *The Little Couple* as well as eight seasons of a true-crime program *Unusual Suspects* under this co-production arrangement.  *See id.* ¶¶ 38, 123.

In December 2015, LMNO's former Head of Finance called Discovery's ethics hotline and reported that LMNO and its principals had been defrauding Discovery for years.  *See* 56.1 ¶ 7.  Discovery promptly began to investigate LMNO's business practices.  *See id.* ¶ 8.  On June 17, 2016, Discovery terminated its agreements with LMNO and its affiliate LEG including those governing *7 LJ*, *The Little Couple*, and *Unusual Suspects*.  *See id.* ¶ 9.  Just days later, LMNO commenced this lawsuit.  *See* Declaration of Theodore E. Tsekerides ("Tsekerides Decl.") Ex. 1.  The LMNO Defendants later filed a Second Amended Complaint, *see id.* Ex. 2 ("SAC"), and this Motion addresses the five copyright infringement claims alleged therein.

## III.   LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Where the nonmoving party has the burden of proof on an issue, the moving party prevails if there is an absence of evidence to support the nonmoving party's case.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## IV.   LEG'S COPYRIGHT INFRINGEMENT CLAIM CONCERNING *7 LJ* FAILS AS A MATTER OF LAW.

### A.   Factual and Procedural Background Regarding *7 LJ*

*7 LJ* is a reality television series that follows the lives of the Johnstons, a family of seven living with dwarfism.  56.1 ¶ 10.  LMNO initially produced a pilot,

Season 1, Season 1B, and a special of *7 LJ* for Discovery pursuant to a Master Commission Agreement dated January 28, 2004 (the "2004 Master") and a Commission Attachment dated November 10, 2014 (the "*7 LJ* Attachment"). *See id.* ¶¶ 11, 15, 17.  The 2004 Master's terms, which were incorporated into the *7 LJ* Attachment, provide that *7 LJ* is a "work[] made for hire" and that Discovery is the "sole and exclusive" copyright owner in *7 LJ* and "all elements thereof." *See* Declaration of Jhamal Robinson ("Robinson Decl.") Ex. 1 § 2.1.  The 2004 Master further provides, in the alternative, that LMNO "irrevocably assigns" all of its interest in *7 LJ* to Discovery, including "the copyrights therein." *See id.* § 2.2. The *7 LJ* Attachment memorializes that Discovery "owns all rights," including the copyright in *7 LJ* "and all elements thereof." *See* Robinson Decl. Ex. 2 § III.

In 2016, the parties produced Season 2 "under the [2004] Master," but did not execute a separate Amendment, in part due to allegations raised about LMNO at the time.  *See* 56.1 ¶¶ 24-26.  For Season 2, the parties also agreed to a pay-as-you-go arrangement.  *See id.* ¶ 26.  At the time of termination, Discovery had paid LMNO over $2 million for its work on Season 2 and LMNO had finished shooting all Season 2 episodes, but had not yet completed all post-production work.  *See id.* ¶¶ 26-27.  Despite Discovery's repeated requests for the Season 2 materials that it had paid for, LMNO refused to provide them.  *See id.* ¶ 28.  Discovery thus filed an Application for a Writ of Possession ("Application"), seeking immediate possession of the Season 2 "program deliverables," which consisted largely of already-shot raw footage.  *See* Tsekerides Decl. Ex. 8.

Following briefing and oral argument, Magistrate Judge Kim recommended that this Court grant Discovery's Application.  *See* Tsekerides Decl. Ex. 8 (the "Recommendation").  Judge Kim found that in light of the parties' agreement to produce Season 2 under the terms of the 2004 Master, that agreement and the *7 LJ* Attachment "together constituted the parties' pertinent agreement" as to the

production of Season 2 of *7 LJ*.  *See id*. at 9-10.  This Court later wholly adopted the Recommendation, granted the Application, and ordered LMNO to turn over the Season 2 footage to Discovery.  *See* 56.1 ¶ 32; Tsekerides Decl. Ex. 9.  Using the footage, Discovery finalized the episodes for broadcast.  *See* 56.1 ¶¶ 33-34; Robinson Decl. ¶¶ 10-11.  Season 2 of *7 LJ* premiered on TLC, one of Discovery's networks, on May 2, 2017.  *See* 56.1 ¶ 35; Robinson Decl. ¶ 12.  LEG then amended its Complaint, alleging that Discovery "distributed and broadcast, or caused to be broadcast" the footage it had turned over to Discovery in purported violation of LEG's copyrights in such footage.  *See* SAC ¶ 187.

**B.**     **Discovery Is Entitled to Summary Judgment on LEG's Claim Concerning Season 2 of *7 LJ* (Fourteenth Claim).**

The Fourteenth Claim fails for a simple reason: Discovery owns the copyrights in Season 2.  ***First***, in the case of a work made for hire arrangement, the party that ordered or commissioned a work in a "written instrument signed by [the parties]" owns the copyright.  *See* 17 U.S.C. § 201(b).  Here, the parties' 2004 Master and the *7 LJ* Attachment (which incorporates the terms of the 2004 Master) provide that *7 LJ* is a "work[] made for hire," thus granting Discovery "sole and exclusive" copyright ownership in "all elements" of the program.  *See* 56.1 ¶¶ 12, 16; Robinson Decl. Ex. 1 § 2.1, Ex. 2 § III.  As this Court has already found, LMNO produced Season 2 under the terms of the 2004 Master and the *7 LJ* Attachment, "which together constituted the parties' pertinent agreement" with respect to *7 LJ*.  *See* 56.1 ¶¶ 31-32.  Accordingly, Discovery "owns all of the rights comprised in the copyright" in Season 2 as a work made for hire, as agreed in two writings signed by the parties.  17 U.S.C. § 201(b).

***Second***, Discovery is the valid copyright owner in any event, as LMNO "irrevocably assign[ed] to [Discovery] all of [LMNO's] interest in" *7 LJ*, "including, without limitation, the copyrights therein for good and valuable

1 | consideration, receipt of which is acknowledged" in the 2004 Master.  56.1 ¶ 13;
2 | Robinson Decl. Ex. 1 § 2.2.  This ownership transfer is valid because the
3 | "instrument of conveyance, or a note or memorandum of the transfer, is in writing
4 | and signed by the owner of the rights conveyed."  17 U.S.C. § 204(a).

That there is no separate, executed Amendment governing only Season 2 is of no consequence either factually or legally.  As a factual matter, it is undisputed that both parties understood that the underlying terms of the 2004 Master and the *7 LJ* Attachment governed Season 2, as they did for other episodes of *7 LJ*.  *See* 56.1 ¶¶ 20-21, 36-37, Tsekerides Decl. Ex. 4 ¶ 11, Ex. 6 ¶ 7 & Ex. A (LMNO's outside counsel stating in an e-mail that "it would make sense to keep [Season 2] under the [2004] Master"), Ex. 10 at 294:22-297:8, Ex. 11 at 130:15-131:1.  And as a legal matter, master agreements transferring copyright ownership to a group of works are enforceable under Section 204(a) without a separate, signed contract for the individual work at issue.  *See Nat'l Ass'n for Stock Car Auto Racing, Inc. v. Scharle*, 356 F. Supp. 2d 515, 523-25 (E.D. Pa. 2005).

Even if there were any genuine dispute as to Discovery's ownership of Season 2 of *7 LJ*—which there is not—LEG's claim of copyright infringement still fails because Discovery at the very least holds an implied, non-exclusive license to distribute Season 2.  *See Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748, 755-57 (9th Cir. 2008) (affirming summary judgment in defendant's favor on copyright infringement claim where defendant had an implied license).  "Whether an implied license exists is ultimately a question of contract law, and as with any implied-in-fact contract, the issue depends upon the objective manifestation of consent under the totality of the circumstances."  *Interscope Records v. Time Warner, Inc.*, No. CV 10–1662 SVW (PJWx), 2010 WL 11505708, at *3 (C.D. Cal. June 28, 2010).

Here, it is undisputed that LMNO produced Season 2 of *7 LJ* at Discovery's request.  *See* 56.1 ¶¶ 18, 25; Tsekerides Decl. Ex. 5 (Schotz Decl.) ¶¶ 10, 12, 17.  It

5

DISCOVERY COMMUNICATIONS, LLC'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

is also undisputed that Discovery paid LMNO over $2 million for LMNO's work in connection with the footage for Season 2.[1]  LMNO's contention that it would be entitled to more money pursuant to a concededly unsigned rider if it had fully performed is the subject of a separate claim for breach of contract, and does not create any genuine dispute that LMNO granted Discovery an implied license to air the Season 2 episodes.  *See Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558-59 (9th Cir. 1990) (finding implied license to use commissioned copyrighted material even without a signed writing).  Because LMNO's "objective intent" was to grant Discovery a license based on the "parties' conduct" at the time of licensing, *see Asset Mktg. Sys.,* 542 F.3d at 756, there is no copyright infringement here.

## V.   LMNO'S COPYRIGHT INFRINGEMENT CLAIMS CONCERNING *THE LITTLE COUPLE* FAIL AS A MATTER OF LAW.

### A.   Factual and Procedural Background Regarding *The Little Couple*

**The Program.**  From 2008 through 2016, LMNO produced *The Little Couple* for Discovery's TLC network.  *See* 56.1 ¶ 38.  *The Little Couple* is a reality television show that follows the daily lives of a family with dwarfism: Dr. Jennifer Arnold (a neonatologist), her husband Bill Klein (a businessman), and, in later seasons, their two young adopted children.  *See id.* ¶ 39.  Each episode of *The Little Couple* consists of a combination of (a) edited footage of actual events in the Klein-Arnolds' lives and (b) interviews with the Klein-Arnolds during which they provide commentary on the events depicted in the episode.  *See id.* ¶ 40.

**The Co-Production Agreement.**  LMNO produced *The Little Couple* under a co-production arrangement governed by the terms of (1) a Co-Production Agreement dated January 8, 2002 (the "Master"); (2) an Amended and Restated Master dated December 10, 2002 (the "Amended and Restated Master"); (3) a

---

[1] *See* 56.1 ¶ 26; Tsekerides Decl. Ex. 5 ¶ 18, Ex. 7 ¶ 10 & Exs. 1-6.

December 31, 2013 Amendment (together with the Master and the Amended and Restated Master, the "Co-Production Master"); (4) a Coproduction Attachment dated November 5, 2008 ("*The Little Couple* Attachment"); and (5) 21 subsequent Amendments (together with the Co-Production Master and *The Little Couple* Attachment, "*The Little Couple* Agreement").  *See* 56.1 ¶¶ 45-46.  *The Little Couple* Agreement provided that Discovery would pay 70% of the production costs for each ordered season in exchange for an exclusive license.  *See id.* ¶¶ 89, 91, 93, 95, 97, 99, 103, 105, 108.  Discovery undisputedly made the required payments.

When Discovery ordered the pilot episode of *The Little Couple*, the parties entered into *The Little Couple* Attachment, which provided Discovery a five-year license for the pilot "commencing on the earlier of (a) the first exhibition of the Program in the Territory; and (b) the date February 15, 2009."  *See* 56.1 ¶ 85; Robinson Decl. Ex. 9.  Since then, both parties have acted with the understanding that Discovery had a five-year license for each later-produced episode, each with a differing expiration date—an understanding made explicit in the Amendments governing later seasons.  *See, e.g.*, 56.1 ¶¶ 101-09.  LMNO also repeatedly informed its international distributors (as well as Bill Klein) that Discovery's license for individual episodes expired on different dates, and even entered into a contract with one distributor that expressly recognized Discovery's five-year license for each episode.  *See id.* ¶¶ 114-22.

**The Special.**  In 2015, Discovery aired a special about Jen and Bill's journey to adopt two children (the "Special").  *See* 56.1 ¶ 67.  The Special was a three-hour compilation, consisting solely of clips of prior episodes of *The Little Couple* created pursuant to the Amended and Restated Master, which gave Discovery the right "to edit, modify or alter [*The Little Couple*] in any manner" and to include [*The Little Couple*] "as part of an anthology or series of programs under the [*The Little Couple*'s] title or another title."  *See* 56.1 ¶¶ 67-68; Robinson Decl. Ex. 7,

Exhibit A § 3.1(b).  Discovery notified LMNO of its plans to create the Special prior to broadcasting, and LMNO provided a requested music agreement for the Special.  *See* 56.1 ¶¶ 69-70; Tsekerides Decl. Exs. 23-24.  After the Special was broadcast, LMNO's outside counsel expressed concerns about the creation of the Special without LMNO's involvement.  *See* 56.1 ¶ 74; Tsekerides Decl. Ex. 37.

Despite its clear contractual right to create the Special, in the interests of furthering the parties' relationship, Discovery resolved LMNO's concerns by providing the Special to LMNO and agreeing not to broadcast it again (which it has not).  *See* 56.1 ¶¶ 78-79; Tsekerides Decl. Ex. 12 at 108:12-115:6, Ex. 38.  As part of that resolution, the parties also entered into a new development deal for "Nailed in Detroit," for which Discovery paid LMNO $20,000.  *See* 56.1 ¶ 82; Tsekerides Decl. Ex. 27.  There was no further dispute about the Special until LMNO filed its Complaint.

***Season 9***.  After terminating its relationship with LMNO, Discovery began production of a new season of *The Little Couple* ("Season 9") with another producer.  *See* 56.1 ¶ 47.[2]  Footage of real-life events in the Klein-Arnolds' lives as they occurred in 2016 and 2017, including birthdays, holidays, vacations, medical appointments, Jen's new job, the family's move to Florida, and other routine daily activities was edited and arranged to create Season 9.  *See id.* ¶ 48.

The first two episodes of Season 9 feature the family's May 2016 trip to the United Kingdom ("UK Episodes").  *See* 56.1 ¶ 50.  When Jen was invited to be the keynote speaker at a conference in Scotland, the family decided to accompany her.  *See* 56.1 ¶¶ 51-54; Tsekerides Decl. Exs. 13, 18.  Bill and Jen later provided their travel plan ideas to LMNO (who was still working with Discovery at the time).  *See* 56.1 ¶¶ 55-56; Tsekerides Decl. Exs. 19, 20.  LMNO converted the family's

---

[2] Discovery is the trademark owner of the mark "The Little Couple."  *See* 56.1 ¶ 44; Tsekerides Decl. Ex. 28.

8

DISCOVERY COMMUNICATIONS, LLC'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

ideas into a one-page treatment for a one-hour episode featuring the family's trip to the UK. *See* 56.1 ¶¶ 57-58; Tsekerides Decl. Exs. 21, 39. LMNO and Discovery discussed producing an episode depicting the UK vacation, but ultimately Discovery worked with another producer because LMNO refused to produce such episodes under terms agreeable to Discovery. *See* 56.1 ¶¶ 59-61; Tsekerides Decl. Exs. 22, 29, 36.

**LMNO's Claims.** LMNO asserts various copyright infringement claims relating to *The Little Couple*. First, LMNO alleges that Season 9 infringes LMNO's asserted copyrights in Seasons 1-8. *See* SAC ¶¶ 77-80. It further claims that the UK Episodes are "derivative work[s]" of both Seasons 1-8 and LMNO's one-page treatment. *See id.* ¶ 70. Second, LMNO contends that Discovery copied portions of episodes for which it purportedly has the copyrights and "used those portions to create unauthorized derivative works" resulting in the Special. *See id.* ¶¶ 67-69. Third, years after Discovery has been publicly airing *The Little Couple* on its networks, LMNO now asserts that Discovery aired certain episodes out of license, on grounds that the license for *every* episode purportedly expired nearly four years ago on February 15, 2014. *See id.* ¶ 86.

## B. Discovery Is Entitled to Summary Judgment on LMNO's Claim Concerning Season 9, the UK Episodes, and the Special (First Claim).

To prevail on its copyright infringement claims, LMNO must establish both "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Funky Films, Inc. v. Time Warner Entm't Co.,* 462 F.3d 1072, 1076 (9th Cir. 2006). "The mere fact that a work is copyrighted does not mean that every element of the work may be protected . . . [A]ccordingly, copyright protection may **extend only to those components of a work that are original to the author.**" *Rice v. Fox Broad. Co.*, 148 F. Supp. 2d 1029, 1050 (C.D.

Cal. 2001), *aff'd in part, rev'd in part on other grounds*, 330 F.3d 1170 (9th Cir. 2003) (emphasis added).

In the absence of direct evidence of "copying," the plaintiff must show that (1) the alleged infringer had "access to the plaintiff's work" and (2) "the two works are substantially similar." *Funky Films*, 462 F.3d at 1076 (internal quotation marks omitted). The substantial similarity analysis consists of two components: an intrinsic test and an extrinsic test. *Id.* at 1077. Courts may conduct the extrinsic analysis on summary judgment and dispose of claims without the need for a jury to conduct an intrinsic comparison of the works. *Id.* "[A] plaintiff who cannot satisfy the extrinsic test necessarily loses on summary judgment." *Rice*, 148 F. Supp. 2d at 1051.

The extrinsic test is an objective analysis that typically examines the "'articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events' in the two works." *Funky Films*, 462 F.3d at 1077. Crucially, however, in conducting the extrinsic analysis, courts first must take care to "filter out and disregard the non-protectable elements," including facts and ideas, *id.*, and "then apply the relevant limiting doctrines in the context of the particular medium involved . . . includ[ing] the 'merger' and 'scènes à faire' doctrines," *Rice*, 148 F. Supp. 2d at 1052. Under the merger doctrine, "where there is only one way, or a limited number of ways, to express a particular idea, . . . the idea is said to 'merge' with its expression," and the expression of such ideas is not protected by copyright. *Id.* Similarly, scènes à faire are "scenes that flow naturally from unprotectable basic plot premises," *8th Wonder Entm't, LLC v. Viacom Int'l, Inc.*, No. 214CV01748DDPJCG, 2016 WL 6882832, at *4 (C.D. Cal. Nov. 22, 2016), and are "'as a practical matter indispensable, or at least standard in the treatment of a given [idea],'" *Rice*, 148 F. Supp. 2d at 1053. In determining whether any particular element constitutes scènes à faire, the "question is whether

that particular expression is so typical of the genre (e.g., a car chase in an action film) as to be 'indispensable.'"  *Id.* at 1052-53.  "Summary judgment may be particularly appropriate where a court determines that a substantial portion of a copyrighted work is non-protected, or subject to limiting doctrines."  *Id.* at 1054.

### 1.   The Klein-Arnolds' Lives Are Facts That Cannot Be Copyrighted.

LMNO's claim that Discovery infringed its copyrights in Seasons 1-8 of *The Little Couple* by producing and airing Season 9 fails as a matter of law.[3]  The crux of LMNO's claim—which it alleged well before Season 9 ever aired[4]—is that Season 9 *must* infringe LMNO's asserted copyrights because it features "the same characters and actors" and "continues the overall plotlines and storylines, . . . including family vacations, medical issues, [and] job issues" that were introduced during Seasons 1-8.  SAC ¶ 79.  But copyright law does not grant LMNO a monopoly on the biographical facts of the Klein-Arnolds' lives, nor does it preclude Discovery (or anyone else, for that matter) from filming subsequent events in the family's lives.

LMNO's allegations ignore a fundamental precept of copyright law: facts cannot be copyrighted.  *See 8th Wonder Entm't.,* 2016 WL 6882832, at *4 ("[F]acts within a work are not protected by copyright.").  Thus, while LMNO may own a copyright in any given episode that it produced, such a copyright would

---

[3] For purposes of *this motion only*, it is assumed that LMNO owns valid copyrights in the episodes that comprise Seasons 1-8 of *The Little Couple*.  Discovery has asserted (but does not seek summary judgment on) a counterclaim for a judgment declaring that it now owns all rights to Seasons 1-8 due to LMNO's failure to contribute its contractual share to the production costs.  *See* Tsekerides Decl. Ex. 3 (Eighteenth Claim for Relief).

[4] Discovery offered to allow LMNO's experts to view episodes from Season 9 before they aired, but LMNO's counsel never sought to schedule any viewings.  Tsekerides Decl. ¶ 42.

extend only to the *expressive elements of that episode*—for example, LMNO's particular compilation, arrangement, and presentation of those facts. *See id.* The copyright would *not* cover the facts themselves, much less any *future facts* of those same individuals' lives. *See id.*

In this way, LMNO's asserted copyrights in Seasons 1-8 are much like a broadcaster's rights to telecast an athletic event. Even though *broadcasts* of athletic events are protected by copyright law to the extent they require original authorship—in the form of "guiding the activities of the . . . cameramen and choosing which of their electronic images are sent out to the public and in what order"—the underlying facts of the athletic event are not copyrightable. *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 847 (2d Cir. 1997). A basketball game, for example, is "not 'authored' in any common sense of the word" and "[u]nlike movies, plays, television programs, or operas, athletic events are competitive and have no underlying script . . . [and] may also result in wholly unanticipated occurrences." *Id.* at 846. Therefore, there is no copyright infringement when someone "reproduce[s] only facts from the broadcast, [but] not the expression or description of the game that constitutes the broadcast." *Id.* at 847.

The same is true here. *The Little Couple* is a reality television program, and like basketball games, the events depicted on the show are the biographical unscripted events in the Klein-Arnolds' lives as they unfold. Though LMNO could hold a copyright in an individual episode of *The Little Couple* to the extent the episode reflects LMNO's authorship and creative expression—*e.g.*, its decisions regarding what footage to use and what order to present it in—LMNO still would hold no rights in the underlying facts of the family's lives. And if LMNO cannot copyright the facts depicted in episodes in Seasons 1-8, it certainly cannot copyright all *future* facts about the family's lives, including the entirely different

set of facts depicted in Season 9.  Accordingly, Discovery could not have infringed LMNO's copyrights to Seasons 1-8 merely by filming a reality show about the Klein-Arnolds at a future time.[5]

### 2. LMNO's Treatment Consists of Uncopyrightable Elements and Is Not Substantially Similar to the UK Episodes.

Discovery is also entitled to summary judgment with respect to LMNO's allegations that the UK Episodes "constitute[] an unauthorized derivative work" of a treatment that LMNO drafted.  SAC ¶ 76.  Like other treatments for reality television programs that courts have considered, LMNO's treatment for the UK trip consists entirely of unprotectable elements.  *See 8th Wonder Entm't.*, 2016 WL 6882832, at *7 (granting summary judgment in part because treatment was "a composition of biographical facts and general accounts of a concept"); *Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1133-35 (C.D. Cal. 2007) (dismissing claim that *Rachael Ray* cooking show infringed treatment for a cooking/talk show because, *inter alia*, generic elements of a talk/cooking show are unprotectable); *Bethea v. Burnett*, No. CV04-7690JFWPLAX, 2005 WL 1720631, at *11 (C.D. Cal. June 28, 2005) (granting summary judgment and holding *The Apprentice* did not infringe treatment outlining unprotectable idea for a show about individuals competing for promotions in a corporation).

In other words, the treatment is vague and fails to articulate any protectable "elements, themes, characters, prior story lines, . . . format and structure," SAC ¶ 70—indeed, LMNO has identified none—that could support a finding of substantial similarity.  *See Castorina v. Spike Cable Networks, Inc.*, 784 F. Supp.

---

[5] That Seasons 1-8 and Season 9 share the same title ("The Little Couple") does not alter this conclusion.  Titles are not copyrightable.  *Shaw v. Lindheim*, 919 F.2d 1353, 1362 (9th Cir. 1990).  Moreover, Discovery owns the trademark "The Little Couple."  *See* Tsekerides Decl. Ex. 28.

2d 107, 111-12 (E.D.N.Y. 2011) ("[T]he treatment's vagueness . . . undercuts its protectability, because—the less 'specifics' and 'detail' [a treatment] contain[s], the less . . . uniquely" original or expressive it is.).

*Characters*.  The "characters" in the treatment are actual people over whom LMNO cannot assert any copyright rights.  *8th Wonder Entm't, LLC*, 2016 WL 6882832, at *7 (facts of real-life characters' biographies are not copyrightable).

*Plot, Setting, and Sequence of Events*.  The treatment does not contain any protectable plot or "sequence of events by which the author [] expresses his theme or idea."  *Zella*, 529 F. Supp. 2d at 1135.  The basic *premise* in the treatment and in the UK Episodes may be similar: the Klein-Arnolds travel to Scotland for Jen's conference and then turn the trip into a family vacation.  *See* 56.1 ¶ 58; Tsekerides Decl. Ex. 39.  But that unprotectable idea did not even originate with LMNO: the family had already decided to travel to Scotland.  *See* 56.1 ¶¶ 52-54; Tsekerides Decl. Ex. 13 at 398:1-21, 403:5-8 & Ex. 18.  Thus, the premise and the setting in the treatment are merely biographical events that would have happened whether captured on camera or not; they do not constitute copyrightable expression that can support a finding of substantial similarity.  *8th Wonder Ent.*, 2016 WL 6882832, at *4 ("[F]acts within a work are not protected by copyright.").

Furthermore, any specific events outlined in the treatment are activities that naturally flow from the basic premise of travel to a conference and a vacation. These include *de rigueur* sightseeing and shopping experiences one might include on an itinerary for a vacation to the UK, such as visits to a scotch distillery, touring Buckingham Palace, and London Bridge.  In short, such sightseeing events are "scenes which 'must' be done" in a program depicting a vacation in the UK, and

thus must be filtered out of the substantial similarity analysis.  *Rice*, 148 F. Supp. 2d at 1053.[6]

*Pace*.  The treatment contemplates one episode to be shot over the course of nine days, *see* 56.1 ¶ 58; Tsekerides Decl. Ex. 39, while the UK Episodes consist of two episodes shot over the course of eight days.  *See* 56.1 ¶ 63.  But even if the pace in the treatment and the UK Episodes were comparable, it "flow[s] naturally from [the] unprotectable basic plot premise[]" of a trip to a professional conference followed by a few days of family vacation and thus constitutes an unprotectable scènes à faire.  *See 8th Wonder Entm't*, 2016 WL 6882832, at *4.

*Themes and Mood*.  The treatment does not set forth any specific and articulable mood or thematic approach, and thus theme and mood do not provide a basis to find substantial similarity.  *See 8th Wonder Entm't*, 2016 WL 6882832, at *6-7 (granting summary judgment in part because treatment did not "require[] any particular thematic approach" or set forth any "discernible mood").

Taken together, LMNO's allegations regarding Season 9 and the UK Episodes amount to little more than a mistaken theory that by virtue of having selected and arranged the footage for earlier episodes depicting the Klein-Arnolds' biography, LMNO can exclude Discovery from filming and distributing works that feature the family at a later time.  Copyright law does not offer LMNO the level of protection it seeks: *no one* is entitled to a monopoly over any family's biographical facts.  Moreover, the only specific work that LMNO points to as a basis for substantial similarity—its treatment for an episode about a trip to Scotland and England—is comprised almost entirely of unprotectable facts, ideas, and scènes à faire.  Filtering out these unprotectable elements from the Court's extrinsic analysis leaves LMNO with nothing to support its allegations.

---

[6] *See also* 56.1 ¶ 66; Tsekerides Decl. Ex. 13 at 278:20-24, 287:20-25.

### 3. Discovery's Assembly of the Special Was Not Infringing.

LMNO further alleges that Discovery's assembly of the Special from clips of prior episodes of *The Little Couple* infringed LMNO's copyrights in those episodes. *See supra* at 9. This allegation is belied not only by the plain letter of the parties' agreement—which permitted Discovery to "edit" episodes and include them in an "anthology"—but also by the doctrine of equitable estoppel, which precludes LMNO from bringing this claim because the parties previously resolved this dispute. As there is no genuine dispute of material fact as to this claim, Discovery is entitled to summary judgment.

#### a. Discovery Had the Contractual Right to "Edit" Episodes of *The Little Couple* and Include Them as Part of an "Anthology."

The clear and unambiguous language of the Amended and Restated Master granted Discovery the right to create the Special. Specifically, pursuant to Section 3.1(B) of the Amended and Restated Master (which is governed by Maryland law), Discovery had "the right to ***edit*, modify or alter the Program [*The Little Couple*] in any manner and to include the Program [*The Little Couple*] as part of an *anthology*** or series of programs under [*The Little Couple*'s] title or another title." *See* 56.1 ¶ 68; Robinson Decl. Ex. 7 at Exhibit A § 3.1(b) (emphasis added).

Courts must "give words their usual, ordinary, and accepted meaning." *Progressive Cas. Ins. Co. v. Dunn*, 665 A.2d 322, 326 (Md. Ct. Spec. App. 1995). To do so, Maryland courts routinely look to dictionary definitions. *See id.* Oxford's English dictionary defines the verb "edit" as "[c]hoose material for (a film or radio or television programme) and arrange it to form a coherent whole" and lists the synonyms "assemble, organize, put together, arrange."[7] What is more,

---

[7] *See Edit*, Oxford Dictionaries, https://en.oxforddictionaries.com/definition/edit (last visited Feb. 7, 2018).

Discovery's bargained-for "right to edit" is broad and unrestricted; it may do so "in any manner" under the Amended and Restated Master.  *See* 56.1 ¶ 68; Robinson Decl. Ex. 7 at Exhibit A § 3.1(b)

A reasonably prudent person—utilizing dictionary definitions—would also interpret the term "anthology" as referring to "a collection."  *See Anthology*, Oxford Dictionaries, https://en.oxforddictionaries.com/definition/anthology (last visited Feb. 7, 2018).  The Special—which is a three-hour compilation consisting solely of prior clips of *The Little Couple*—plainly qualifies.  *See supra* at 7-8. Because Discovery was well within its contractual rights to "edit" episodes of *The Little* Couple "in any manner"—including by shortening them and including them "as part of an anthology" under the title "The Little Couple"—LMNO's claim fails as a matter of law.  *See* 56.1 ¶ 68; Robinson Decl. Ex. 7 at Exhibit A § 3.1(b).

### b.    LMNO Is Equitably Estopped from Pursuing Copyright Infringement Concerning the Special.

In addition, the doctrine of equitable estoppel separately forecloses LMNO's claim regarding the Special.  Under California law, there are four elements to an equitable estoppel defense to a copyright infringement claim: "(1) [LMNO] must know the facts of [Discovery's] infringing conduct; (2) [LMNO] must intend that [its] conduct be acted on or must so act that [Discovery] has a right to believe that it is so intended; (3) [Discovery] must be ignorant of the true facts; and (4) [Discovery] must detrimentally rely on [LMNO's] conduct."  *Watermark Publishers v. High Tech. Sys. Inc.*, No. 95-3839-IEG (CGA), 1997 WL 717677, at *8 (S.D. Cal. June 18, 1997) (plaintiff who delayed bringing claim after learning of defendant's alleged infringement and after defendant had taken steps to resolve dispute was equitably estopped from bringing copyright infringement claim).

All four elements are present here.  LMNO first raised its purported issues with the Special back in 2015, when the Special aired.  *See* 56.1 ¶ 74; Tsekerides

Decl. Ex. 37.  At that time, LMNO's outside counsel represented to Discovery that LMNO was "prepared to move on" from this issue, *see* 56.1 ¶ 81; Tsekerides Decl. Ex. 26, based on Discovery's agreement to return the Special to LMNO[8] and Discovery's representation that it would not air the Special again.[9]  Discovery also entered into a new development deal with LMNO for "Nailed in Detroit" with the understanding that this would make peace with LMNO following the dispute.[10]

In agreeing to those terms and holding up its half of the bargain, Discovery was entirely unaware of LMNO's position, expressed for the first time in litigation, that the deal did not resolve LMNO's alleged claims.  Lacking such awareness, Discovery relied upon LMNO's misrepresentations to its own detriment by agreeing to provide the Special to LMNO and not air it and by entering into a development deal with LMNO.  Accordingly, LMNO should not be allowed to revive long-settled issues through its First Claim.  *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1977 (2014).

## C.  Discovery Is Entitled to Summary Judgment on LMNO's Claim Concerning Alleged Out-of-License Airings of *The Little Couple* (Second Claim).

Throughout the parties' eight-year relationship co-producing *The Little Couple*, Discovery aired the program pursuant to the rights granted in *The Little Couple* Agreement.  LMNO was well aware of these airings (as was anyone who checked a TV Guide).  Yet, not until its SAC did LMNO ever take the position that any of those airings fell outside the term of Discovery's license.  The reason for LMNO's sudden epiphany that Discovery aired scores of episodes of *The Little Couple* out of license is simple: LMNO concocted this infringement claim to seek

---

[8] *See* 56.1 ¶ 78; Tsekerides Decl. Ex. 38, Ex. 12 at 109:11.
[9] *See* 56.1 ¶ 79; Tsekerides Decl. Ex. 38, Ex. 12 at 108:12-14.
[10] *See* 56.1 ¶¶ 82-83; Tsekerides Decl. Ex. 27; Tsekerides Decl. Ex. 12 at 108:12-115:6.

some purported advantage in this litigation, based on a nonsensical reading of *The Little Couple* Agreement that not even LMNO believed was true prior to this lawsuit.  Accordingly, LMNO's copyright infringement claim for alleged out-of-license broadcasts of episodes of *The Little Couple* fails as a matter of law.[11]

    **1.**    **No Reasonably Prudent Person Would Interpret Discovery's License as Expiring the Same Day for Every Episode Regardless of When the Episode Was Produced.**

The expiration date of Discovery's licenses for episodes of *The Little Couple* is a matter of contract interpretation.  If a court determines that a contract is unambiguous on the dispositive issue, it may interpret the contract as a matter of law and grant summary judgment because no interpretive facts are genuinely at issue.  *See Wash. Metro. Area Transit Auth. v. Potomac Inv. Props., Inc.*, 476 F.3d 231, 235 (4th Cir. 2007).  Under governing Maryland law, "[a] contract is not ambiguous simply because, in litigation, the parties offer different meanings to the language."  *Diamond Point Plaza Ltd. P'ship v. Wells Fargo Bank, N.A.*, 929 A.2d 932, 952 (Md. 2007).  Rather, "[i]t is for ***the court, supposing itself to be that reasonably prudent person***, to determine whether the language is susceptible of more than one meaning."  *Id.* (emphasis added).

In construing the contract, the court is to ascertain and give effect to the parties' intentions at the time of contracting.  *Catalina Enters., Inc. Pension Tr. v. Hartford Fire Ins. Co.*, 67 F.3d 63, 65 (4th Cir. 1995).  To ascertain such intentions, the court must "construe the instrument as a whole."  *Id*. (quoting *Collier v. MD-Individual Practice Ass'n, Inc.*, 607 A.2d 537, 539 (Md. 1992)).  Doing so means considering not only the contractual language, but also the

---

[11] In light of a potential issue of fact concerning just nine specific episodes, Discovery does not seek summary judgment as to Episodes 301-09 of *The Little Couple*.  *See* Fed. R. Civ. P. 56(a).

19

DISCOVERY COMMUNICATIONS, LLC'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

character of the contract, its object and purposes, and the factual circumstances of the parties at the time of execution.  *Id.*

Here, *The Little Couple* Attachment initially granted Discovery a license in the North American territory ***for the pilot*** with an "Exhibition Period" of "[f]ive (5) years commencing on the earlier of (a) the first exhibition of the Program in the Territory; and (b) the date February 15, 2009."  *See* 56.1 ¶ 85; Robinson Decl. Ex. 9.  For the reasons set forth below, a reasonably prudent person similarly would interpret the whole of *The Little Couple* Agreement as providing Discovery a five-year license for each additional episode produced after the pilot.

*First*, *The Little Couple* Attachment itself provided Discovery with "unlimited, consecutive, exclusive options" to order additional seasons of *The Little Couple*, in which case "all of the terms and conditions hereof shall be equally applicable to each Season of the Program."  *See* 56.1 ¶¶ 86, 88.  When Discovery ordered additional seasons, it secured a five-year license period for each episode that it ordered, just as it contracted for a five-year license period for the pilot.

*Second*, Amendment 19, dated as of March 31, 2015, expressly recognizes Discovery's "***contractual five (5) year license term for each respective* Season**" of *The Little Couple*.  *See* 56.1 ¶ 107; Robinson Decl. Ex. 27 (emphasis added).

*Third*, as set forth in the agreed-upon production schedules that are incorporated into the Amendments governing later seasons, the airdates for those later episodes fall *after* the expiration of Discovery's license for the pilot (February 15, 2014).  *See* Robinson Decl. Exs. 22, 25, 29.  This confirms what should already be obvious: that Discovery's licenses for later seasons (produced years after the pilot) expired well *after* Discovery's license for the pilot.

By contrast, LMNO's claim is based on a strained interpretation that Discovery's license allegedly expired on February 15, 2014 (*i.e.*, five years after February 15, 2009) *not only for the pilot, but for all later-produced episodes* of the

series as well, regardless of when they were produced or aired.  *See* SAC at Second

Claim.  To support its view, LMNO must read the "Grant of Rights" provision in

*The Little Couple* Attachment improperly and in isolation—ignoring the additional

provisions and production schedules in *The Little Couple* Agreement that

memorialize Discovery's five-year license for each episode.

But "[i]t is axiomatic under Maryland law that a court should avoid reading

a contract in a way that produces an absurd result, especially when a reasonable

interpretation is available." *Catalina*, 67 F.3d at 66.  Consistent with that well-

settled principle, courts have granted summary judgment where the non-moving

party's contract interpretation was absurd.  *See id.* (affirming summary judgment

and rejecting contract interpretation that would have completely eliminated

coverage exclusion from insurance policy agreement); *Residential Holdings III

LLC v. Archstone-Smith Operating Tr.*, 920 N.Y.S.2d 349, 352-53 (App. Div.

2011) (applying Maryland law and granting summary judgment where plaintiffs'

contract interpretation was absurd and would have undone a $1.2 billion deal).

Here, LMNO's crabbed reading of *The Little Couple* Agreement would lead

to patently absurd results.  Season after season, Discovery consistently paid LMNO

the same 70% percentage share of what were to be the production costs for *The

Little Couple* in exchange for a license to exploit the episodes.  *See* 56.1 ¶¶ 89, 91,

93, 95, 97, 99, 103, 105, 108.  Yet LMNO's interpretation would leave Discovery

with a truncated license period—far less than the five-year period that Discovery

bargained for—*for all episodes of Seasons 1-5*.  For example, in Amendment 10

dated as of December 16, 2012, Discovery ordered additional episodes of Season

5, for which it agreed to pay LMNO several hundred thousands of dollars (in

addition to the millions it had already paid for earlier episodes of the same season).

*See* 56.1 ¶ 97; Robinson Decl. Ex. 18.  Amendment 10 includes a production

schedule and provides that these additional episodes would not be finalized for

21

DISCOVERY COMMUNICATIONS, LLC'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

airing until late April through mid-July of 2013—*less than a year before* February 15, 2014.  *See* Robinson Decl. Ex. 18 at DISC0000000375.  Under LMNO's nonsensical reading, Discovery ordered these Season 5 episodes at great cost, only to be able to exploit them for a few months.

Even more astonishingly, LMNO's contract interpretation would leave Discovery **without any license term at all** for all episodes in Seasons 6B, 7, and 8.  By LMNO's account, the license period for all such episodes expired **before they had even begun to air**.  That interpretation, of course, directly contradicts *The Little Couple* Agreement, including the Amendments governing each of those seasons.  *See* 56.1 ¶¶ 100-01, 103-04, 108-09; Robinson Decl. Ex. 22 at DISC0000000423, Ex. 25 at DISC0000000451, Ex. 29 at DISC0000000494.  Given these admissions and the commercial realities of the parties' contractual arrangement, a reasonable person would interpret *The Little Couple* Agreement as granting Discovery five-year licenses *for each episode*.

### 2. The Record Is Undisputed That Discovery Has a Five-Year License for Each Episode of *The Little Couple*.

Even if *The Little Couple* Agreement, construed as a whole, were reasonably susceptible to LMNO's interpretation of Discovery's license term—which it is not—there is other undisputed evidence in the record demonstrating that Discovery had a five-year license for each episode.  Faced with an ambiguous contract, the Court next would consider extrinsic evidence to determine the parties' intent, which would include the "negotiations of the parties, the circumstances surrounding execution of the contract, the parties' own construction of the contract and the conduct of the parties."  *Canares v. Lift Truck Servs., Inc.*, 322 A.2d 866, 874 (Md. 1974).  Where the extrinsic evidence is, as a matter of law, dispositive of the interpretative issue, a court may grant summary judgment on that basis.  *Wash. Metro. Area Transit Auth.*, 476 F.3d at 235; *see also C B Structures, Inc.*

1   *v. Potomac Elec. Power Co.*, 122 F. Supp. 3d 247, 248-49 (D. Md. 2015) (granting
2   summary judgment where contract ambiguous and extrinsic evidence undisputed).

3       Here, the record is undisputed that Discovery's licenses for all episodes of
4   *The Little Couple* did ***not*** expire on the same fixed date.  ***First***, LMNO consistently
5   informed its international distributors that Discovery's licenses expired on a rolling
6   basis.  *See* 56.1 ¶¶ 114-15.  In February 2010, Endemol (a distributor) asked
7   LMNO whether the "License Period" for Season 2 of *The Little Couple* "is the
8   same as Season 1."  *See* 56.1 ¶ 114; Tsekerides Decl. Ex. 33.  LMNO Executive Ed
9   Horwitz responded that Discovery's license period for Season 2 was five years and
10  expired in 2015.  *See id.*

11      LMNO later granted Cineflix, another distributor, a license to distribute *The*
12  *Little Couple* in foreign territories not already licensed to Discovery.  *See generally*
13  Tsekerides Decl. Ex. 14.  In November 2014, LMNO provided Cineflix with a
14  chart that set forth ***several different Discovery license expiration dates***, each
15  individually calculated and tied to different seasons.  *See* 56.1 ¶ 115; Tsekerides
16  Decl. Ex. 34 at LMNO00013583-84.  Lest there be any doubt, LMNO's chart
17  further provides that the license periods for many of these seasons had not yet
18  expired as of November 2014.  *See id.*

19      Further, 18 months ***after*** what it now contends is the February 15, 2014
20  "expiration date," LMNO expressly acknowledged to Cineflix that Discovery's
21  license for Seasons 4 and 5 of *The Little Couple* ***had not yet expired*** in a written
22  agreement between Cineflix and LMNO.  *See* 56.1 ¶ 116; Tsekerides Decl. Ex. 32.
23  Cineflix understood, based on LMNO's representations, that for ███████████
24  ████████████████████████████████████████████████████████
25  ████████████████████████████████  *See* 56.1 ¶ 118;
26
27
28

DISCOVERY COMMUNICATIONS, LLC'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1  Tsekerides Decl. Ex. 14 (Porporino Dep. Tr.) at 33:16-21.[12]

2       **Second**, LMNO also informed the Klein-Arnolds that Discovery had a five-

3  year license period for each episode.  *See* 56.1 ¶ 120.  Specifically, on April 23,

4  2014 (more than two months after what LMNO now alleges was the expiration of

5  Discovery's license), Bill emailed LMNO's Mr. Horwitz concerning international

6  exploitation of *The Little Couple*.  *See id.*; Tsekerides Decl. Ex. 31.  Mr. Horwitz

7  responded unequivocally: "[LMNO] will have season 1 back, worldwide, in

8  August of this year **and season 2 in February of 2015, etc**."  *Id.* (emphasis added).

9       **Third**, LMNO's contemporaneous internal documents directly contradict the

10  made-for-litigation contract interpretation LMNO now attempts to advance.  A

11  2015 report prepared by LMNO states that Discovery has a separate five-year

12  license period for each episode of *The Little Couple*.  *See* 56.1 ¶¶ 121-22;

13  Tsekerides Decl. Ex. 35 at LMNO0132864.  Accordingly, because the undisputed

14  record evidence—including LMNO's contemporaneous admissions from

15  LMNO—supports Discovery's interpretation of *The Little Couple* Agreement,

16  summary judgment is warranted on LMNO's Second Claim.[13]

---

20  [12] Mr. Porporino also testified that ███████████████████████████████
21  ████████████████████  *See* 56.1 ¶ 119; Tsekerides Decl. Ex. 14 at 9:4-8.

21  [13] LMNO is likely to attempt to rely on a mischaracterization of testimony from
22  Discovery's Lisa Williams-Fauntroy in opposition, but such reliance would be
23  misplaced.  While there seemed to be some confusion between the examiner and
24  Ms. Williams-Fauntroy on this topic, Ms. Williams-Fauntroy addressed this issue
25  later in her deposition and made clear that LMNO's position made no sense.  *See,*
*e.g.*, Tsekerides Decl. Ex. 10 at 276:3-9.  She also submitted an errata to make the
26  record clear.  At bottom, the undisputed facts—including LMNO's own
27  contemporaneous business records and communications—confirm that Discovery
is entitled to summary judgment on LMNO's Second Claim for Relief.

1
2

## VI.   LMNO'S COPYRIGHT INFRINGEMENT CLAIMS CONCERNING *UNUSUAL SUSPECTS* FAIL AS A MATTER OF LAW

3

### A.   Factual and Procedural Background Regarding *Unusual Suspects*

4

5     ***The Program.***  *Unusual Suspects* is a true-crime television series produced

6     by LMNO that aired on Discovery's Investigation Discovery ("<u>ID</u>") network for

7     eight seasons.  *See* 56.1 ¶ 123.  Each episode of *Unusual Suspects* depicts a

8     different true crime that over the course of the program is revealed to have been

9     committed by an unexpected perpetrator (hence the program title).  *See id.* ¶ 124.

10    *Unusual Suspects* incorporates a mix of actual footage and photos, dramatic

11    reenactments of the crime and ensuing investigation, suspenseful narration, and

12    commentary from persons involved in or affected by the crime (typically the

13    victim's family and friends, detectives involved in the investigation, and journalists

14    who reported on the incident).  *See id.*  Over the course of each episode, the viewer

15    learns about the victim, the chronology of the investigation, possible leads, and

16    ultimately the identity of the perpetrator.  *See id.*

17    ***Co-Production Agreement.***  LMNO produced the first four seasons of

18    *Unusual Suspects* under the terms of the Co-Production Master, a Coproduction

19    Attachment dated July 3, 2008 ("*Unusual Suspects* <u>Attachment</u>") and Amendments

20    1-6 (together, the "*Unusual Suspects* <u>Agreement</u>").  *See* 56.1 ¶ 129.  The *Unusual*

21    *Suspects* Agreement provided that Discovery would pay LMNO approximately

22    70% of the production costs for each of these seasons in exchange for an exclusive

23    license, *see id.* ¶¶ 135, 137, 139, and there is no dispute that Discovery paid the

24    required amounts.  In the *Unusual Suspects* Attachment, LMNO first granted

25    Discovery a five-year license for Season 1 "commencing on the earlier of (a) the

26    first exhibition of the applicable episode in the relevant Territory; and (b) the date

27    November 15, 2008."  *See id.* ¶ 130; Robinson Decl. Ex. 34.  Since then, LMNO

28

communicated both internally and to third parties that Discovery's licenses for episodes in Seasons 2-4 did *not* all expire on November 15, 2013, as LMNO now contends. *See, e.g.*, 56.1 ¶¶ 141-44; Tsekerides Decl. Exs. 34-35.

*Deadly Intent*.  In late 2016, after terminating its relationship with LMNO, Discovery contracted with a third-party production company to begin producing a new program titled *Unusual Suspects: Deadly Intent* ("*Deadly Intent*").  *See* 56.1 ¶ 125.  *Deadly Intent* depicts an entirely different set of crimes, locations, and characters from those featured in *Unusual Suspects*, using a combination of real footage, dramatic reenactment, and commentary from the parties involved.  *See id.* ¶ 126; Robinson Decl. Exs. 42-43 (Episodes 2 and 7).  *Deadly Intent* first aired on October 4, 2017.  *See* 56.1 ¶ 127.

*LMNO's Claims*.  LMNO brings two causes of action relating to *Unusual Suspects*.  First, LMNO alleges that Discovery infringed LMNO's copyrights in *Unusual Suspects* because each episode of *Deadly Intent* "constitutes an unauthorized derivative work" of *Unusual Suspects*.  *See* SAC ¶ 136 (Eighth Claim).  LMNO also alleges that Discovery aired episodes of *Unusual Suspects* Seasons 2-4 after the license for those episodes had expired.  *See* SAC at Ninth Claim.  As with its out-of-license claim involving *The Little Couple*, LMNO takes the position that Discovery's license for *every* episode in Seasons 2-4 expired on the same date (here, November 15, 2013).  *See id.* ¶ 145.

### B.   Discovery Is Entitled to Summary Judgment on LMNO's Claim that *Deadly Intent* Infringes LMNO's Copyrights in *Unusual Suspects* (Eighth Claim).

LMNO in effect alleges that because it once produced a true-crime series for Discovery, Discovery is now foreclosed from producing another true-crime series about the same general idea.  Here again, as with *The Little Couple*, LMNO misunderstands the scope of U.S. copyright law.  The only similarities between

1  *Unusual Suspects* and *Deadly Intent* are the generic idea of a true-crime series

2  about "twist villains" and other stock elements that are nearly ubiquitous in the

3  true-crime genre.  These similarities are not copyrightable.  But even if copyright

4  law did protect the generic elements and concepts on which LMNO improperly

5  bases its claim here, the two programs are not substantially similar: *Deadly Intent*

6  documents an entirely different set of true crimes, characters, and settings from

7  those depicted in *Unusual Suspects*.

8  **  *Elements, Format, Structure, and Mood.***  LMNO cannot copyright the

9  generic elements and format of *Unusual Suspects*: actual crime-scene footage and

10  photos, dramatic reenactments of the crime, interviews with real-life persons

11  familiar with the crime, and commentary from a somber narrator who builds

12  suspense throughout each episode.[14]  *See* 56.1 ¶ 124.  Many true-crime programs

13  rely on these stock elements.  *See id.* ¶ 128 (citing examples).  ID alone currently

14  airs at least nine shows that utilize this format and structure, and other non-

15  Discovery networks have similar shows.  *See id.*  LMNO therefore cannot rely on

16  its use of these elements in *Unusual Suspects* to gain a monopoly over staples of

17  the genre that are so ingrained that they have merged with the idea of a true-crime

18  program.  For example, in *Zella*, the court held that the elements of a host inviting

19  a celebrity guest to a studio and cooking together in the studio were not

20  copyrightable because they merged with the very idea of a cooking/talk show.  *See*

21  529 F. Supp. 2d at 1135.  Similarly, here, the format, structure, and elements of

22

23  [14] Discovery requests that the Court take judicial notice of these elements as
common elements of the true-crime television genre.  *See* FRE 201(b).  Courts take

24  judicial notice of elements of a particular genre where the elements "can be
verified simply by watching television for any length of time."  *See Zella*, 529 F.

25  Supp. 2d at 1129 (taking notice of the elements of a cooking/talk show); *DuckHole*

26  *Inc. v. NBC Universal Media LLC*, No. CV 12-10077 BRO CWX, 2013 WL
5797279, at *4 (C.D. Cal. Sept. 6, 2013) (taking notice of the tone and certain plot

27  ideas "common to comedic television shows").

28

*Unusual Suspects* are not copyrightable and cannot be considered in the Court's substantial similarity analysis.

To the extent *Unusual Suspects* and *Deadly Intent* both create a suspenseful mood through their use of background music, narration, and dramatic reenactments, the mood conveyed on each show is likewise a stock element of the true-crime genre. At a minimum, a suspenseful mood is a scènes à faire of the genre or has merged with the idea of a true-crime program and cannot be part of the analysis. *See Zella*, 529 F. Supp. 2d at 1136 (dismissing similarities in "upbeat mood" as "merely another example of scènes à faire"); *Rice,* 148 F. Supp. 2d at 1058 ("[I]t is quite clear that a 'mood' of 'secrecy and mystery' must 'merge' with a show that is about the 'mysteries of magic,' and revelation thereof . . . . [and] is at minimum a '*scènes à faire*' of the genre.").

**Theme.**  Although both *Unusual Suspects* and *Deadly Intent* portray crimes that were committed by unexpected perpetrators, this is merely a general idea common to the true-crime genre that is not protected by copyright law and does not support substantial similarity.  *See Milano v. NBC Universal, Inc.*, 584 F. Supp. 2d 1288, 1297 (C.D. Cal. 2008) (granting summary judgment and holding that *Biggest Loser* did not infringe treatment for a weight loss program).  Simply put, the trope of the "twist villain" is not protected by copyright.

***Characters, Pace, Plots, Settings, and Dialogue.***  Critically, the characters, pace, plots, and settings in *Deadly Intent* and *Unusual Suspects* are entirely different.  *Deadly Intent* documents a new set of actual crimes never covered on *Unusual Suspects*.  *See* 56.1 ¶ 126; Robinson Decl. ¶ 35.  Each episode of *Deadly Intent* therefore features a completely different cast of characters and dialogue, takes place in a different setting, and follows a different plot and pace.  But even if *Unusual Suspects* and *Deadly Intent* were similar with respect to these elements, these elements all reflect the *facts* of the true crime documented in each episode

and its ensuing investigation and are not protectable.  For example, the characters featured on the program are either actual persons familiar with the crime and investigation or actors depicting real-life victims and perpetrators, while the setting is the place where the crime took place and was investigated.  *See* 56.1 ¶ 124; Robinson Decl. ¶ 29.  In other words, the plot, sequence of events, pace, settings, and dialogue all are derived entirely from the facts of the underlying crime documented in the episode.  As such, they reflect unprotectable facts that must be disregarded in analyzing any similarities between the two programs.  *See 8th Wonder Entm't*, 2016 WL 6882832, at *4.

### C.  Discovery Is Entitled to Summary Judgment on LMNO's Claim Concerning Alleged Out-of-License Airings of Seasons 2-4 of *Unusual Suspects* (Ninth Claim).

As with *The Little Couple*, LMNO asserts that Discovery infringed its copyrights in Seasons 2-4 of *Unusual Suspects* by airing episodes after Discovery's licenses supposedly expired.  This claim is based on the same unreasonable license interpretation and should be rejected for the same reasons.  *See supra* § V.C.

The "Grant of Rights" provision in the *Unusual Suspects* Attachment granted Discovery a license for each episode of **_Season 1_** for "five (5) years in such Territory commencing on the earlier of (a) the first exhibition of the applicable episode in the relevant Territory; and (b) the date November 15, 2008." *See* 56.1 ¶ 130; Robinson Decl. Ex. 34.  The Attachment further provided that "the same terms and conditions" governing Season 1 apply to later-ordered seasons, including a five-year license term for each "applicable episode."  *See id*. Discovery paid its percentage of the production costs for Seasons 2-4 of *Unusual Suspects* pursuant to subsequent Amendments in 2010, 2011, and, 2012, respectively.  *See* 56.1 ¶¶ 135, 137, 139; Robinson Decl. Exs. 36, 39, 40.

Thus, like *The Little Couple* Agreement (*see supra* § V.C.), the *Unusual*

*Suspects* Agreement, interpreted as a whole, granted Discovery a five-year license for each episode in Seasons 2-4, depending on when the episode first aired.  It would have been absurd for Discovery to have continued to pay roughly the same percentage of production costs—totaling millions of dollars for the episodes comprising Seasons 2-4—only to then receive a truncated license period in return.  Take, for example, Season 4.  Discovery entered into an Amendment on February 27, 2012 that picked up a new season of thirteen episodes, and paid LMNO over $2.5 million on a co-production basis for the right to exploit such episodes.  *See* 56.1 ¶ 139; Robinson Decl. Ex. 40.[15]

As noted, the Court can also consider the undisputed record evidence.  *See supra* § V.C.2.  That evidence confirms that Discovery's licenses for those episodes did *not* commonly expire on November 15, 2013.  For example, in the same November 2014 presentation to Cineflix discussed above, *supra* § V.C.2, LMNO represented that Discovery's "use[]" of each individual season of *Unusual Suspects* extended for "5 YEARS," resulting in a late 2016 expiration date for Season 2, a mid-2017 expiration date for Season 3, and a late 2017 expiration date for Season 4.  *See* 56.1 ¶ 142; Tsekerides Decl. Ex. 34 at LMNO0013592-93.  And LMNO's internal communications establish that Discovery's license period for each episode of Seasons 2-4 has a different expiration date.  *See* 56.1 ¶¶ 143-44; Tsekerides Decl. Ex. 35 at LMNO0132872-73.

## VII.  CONCLUSION

For the reasons set forth above, summary judgment should be granted to Discovery on the LMNO Defendants' First, Second, Eighth, Ninth, and Fourteenth Claims for Relief.

---

[15] Discovery 30(b)(6) Lisa Williams-Fauntroy testified that "there would be no point in producing shows that . . . had less than a five-year exhibition period."  *See* 56.1 ¶ 111; Tsekerides Decl. Ex. 10 at 270:25-271:2.

Dated: February 12, 2018          GIBSON, DUNN & CRUTCHER LLP

By:   /s/ Scott A. Edelman
      Scott A. Edelman, State Bar No. 116927
      Nathaniel L. Bach, State Bar No. 246518
      2029 Century Park East, Suite 4000
      Los Angeles, California 90067
      (310) 552-8500
      SEdelman@gibsondunn.com

      WEIL, GOTSHAL & MANGES LLP
      Theodore E. Tsekerides
      Randi W. Singer
      Allison M. Brown
      David Yolkut
      767 Fifth Avenue
      New York, New York 10153
      (212) 310-8000
      theodore.tsekerides@weil.com

      *Attorneys for Defendant and Counterclaim*
      *Plaintiff*