Neville L. Johnson (SBN 66329)
Arun Dayalan (SBN 225255)
Alec R. Govi (SBN 313243)
**JOHNSON & JOHNSON LLP**
439 North Canon Drive, Suite 200
Beverly Hills, California 90210
Telephone: (310) 975-1080
Facsimile: (310) 975-1095
Email: njohnson@jjlllaw.com
        adayalan@jjlllaw.com
        agovi@jjlllaw.com

*Attorneys for Plaintiff-Intervenors*
William Klein, Jennifer Arnold, and Candu
Enterprises, Inc.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

LMNO CABLE GROUP, INC., a
California corporation,

        Plaintiff,

        v.

DISCOVERY COMMUNICATIONS,
LLC, a Delaware limited liability company,

        Defendants.

DISCOVERY COMMUNICATIONS,
LLC, a Delaware limited liability company,
        Counterclaim Plaintiff,

        v.

LMNO CABLE GROUP, INC., a
California corporation, LMNO
ENTERTAINMENT GROUP, LLC, a
California limited liability company,

        Counterclaim
        Defendants.

CASE NO.: 2:16-cv-4543-JAK-SK

**PLAINTIFFS WILLIAM KLEIN, JENNIFER ARNOLD AND CANDU ENTERPRISES, INC.'S OPPOSITION TO DEFENDANTS ERIC SCHOTZ AND LMNO CABLE GROUP, INC'S MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Date: April 2, 2018
Time: 8:30 A.M.
Crtrm.: 10B

Hon. John A. Kronstadt

1  WILLIAM KLEIN, an individual;
   JENNIFER ARNOLD, an individual; and
2  CANDU ENTERPRISES, INC., a Texas
   corporation;
3
                    Plaintiff-Intervenors,
4
                    v.
5
6  LMNO CABLE GROUP, INC., a
   California corporation; ERIC SCHOTZ, an
7  individual; and EDWARD HORWITZ, an
   individual,
8
                    Defendants.
9
10

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     FACTUAL BACKGROUND ............................................................................. 2

        A.   The Agreements ....................................................................................... 2
        B.   Plaintiff's Discovery of LMNO, Schotz and Horwitz' Fraud and Breach .......... 3
        C.   Defendants Actively Conceal Their Fraud ............................................... 4
        D.   Defendants' Fraud and Breach Comes to Light ...................................... 5

III.    LEGAL STANDARD ........................................................................................ 7

IV.     ARGUMENT ...................................................................................................... 8

        A.   The Economic Loss Rule Does Not Apply to Plaintiffs' Claims for Fraud and
             Conversion ............................................................................................... 8

             1.   The Economic Loss Doctrine is not a shield for fraud ..................... 8
             2.   Plaintiffs have suffered considerable damages as a result of Defendants'
                  fraud ..................................................................................................... 9
             3.   Defendants' cited legal authority is easily distinguishable from the facts
                  herein ................................................................................................... 10
             4.   Public policy seeks to prevent contracting parties from defrauding each
                  other ..................................................................................................... 12
             5.   The economic loss doctrine does not apply to Plaintiffs' conversion
                  claim ..................................................................................................... 14

        B.   There Are Genuine Issues of Material Fact Regarding Plaintiffs' Conversion
             Claim ......................................................................................................... 14
        C.   There Are Genuine Issues of Material Fact Regarding Plaintiffs' Fraud Claim
             Against Eric Schotz ................................................................................. 17
        D.   Plaintiffs Can Obtain Rescission Because of Defendants' Material
             Misrepresentations ................................................................................... 18
        E.   Defendants' Motion for Adjudication of Plaintiffs' Declaratory Relief Action
             Should be Denied ..................................................................................... 21
        F.   The Court Should Deny Defendants' Motion to Narrow the Scope of Damages
             on Plaintiffs' Contract Claims ................................................................. 22

V.      CONCLUSION ................................................................................................ 23

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

*Alvarado Orthopedic Research, L.P. v. Linvatec Corp.*
> (S.D. Cal. Aug. 23, 2011) 2011 WL 3703192 .................................................. 11

*Antonick v. Electronic Arts, Inc.*
> (N.D. Cal. Jan 22, 2014) 2014 WL 245018 .................................................. 10

*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*
> (1994) 7 Cal. 4th 503 ............................................................................. 13

*British Airways Board v. Boeing Company,*
> (9th Cir. 1978) 585 F.2d 936 ................................................................... 7

*Calderone v. United States.*
> (6th Cir. 1986) 799 F.2d 254 ................................................................... 7

*Comm. for Idaho's High Desert, Inc. v. Yost*
> (9th Cir. 1996) 92 F.3d 814 ..................................................................... 17

*Davis v. Metro Prods., Inc.*
> (9th Cir. 1989) 885 F.2d 515 ................................................................... 18

*Diamond Multimedia Systems, Inc. v. Superior Court*
> (1999) 19 Cal.4th 1036 ........................................................................... 13

*Dodd v. Cantwell*
> (1960) 179 Cal.App.2d 727 ..................................................................... 16

*Erlich v. Menezes*
> (1999) 21 Cal. 4th 543 ......................................................................... 9,13

*Facebook, Inc. v. Power Ventures, Inc.*
> (9th Cir. 2016, 2017) 844 F.3d 1058 ......................................................... 17

*Farmers Ins. Exchange v. Zerin*
> 53 Cal.App.4th 445 .......................................................................... 14,15,16

*Fontenot v. Upjohn Co.*
> (5th Cir. 1986) 780 F.2d 1190 ................................................................. 8

*Freeman & Mills, Inc., v. Belcher Oil Co.*

(1995) 11 Cal. 4th 85 ............................................................................... 9,12

*Garcia v. Google, Inc.*

(9th Cir. 2015) 786 F.3d 733 ........................................................................ 21

*Grynberg v. Citation Oil & Gas Corp.*

(S.D. 1997) 573 N.W.2d 493 ........................................................................... 1

*JMP Securities, LLP. v. Altair Nanotechnologies, Inc.*

(2012) 880 F. Supp. 2d 1029 ......................................................................... 11

*Lazar v. Superior Court*

(1996) 12 Cal.4th at 631. ............................................................................. 13

*Loop Bldg. Co. V. De Coo*

(1929) 97 Cal. App. 354 ............................................................................... 19

*McBain v. Santa Clara Sav. & Loan Assn.*

(1966) 241 Cal.App.2d 829 ........................................................................... 15

*McCafferty v. Gilbank*

(1967) 249 Cal.App.2d 569 ........................................................................ 14,15

*McGehee v. Coe Newnes/ McGehee ULC.*

(N.D. Cal. Feb. 10, 2004) No. C 03-5145 MJJ, 2004 WL 2452855 ................................ 14

*Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*

(2nd Cir. 1999) 182 F.3d 157 .......................................................................... 8

*Robinson Helicopter, Inc. v. Dana Corp.*

(2004) 34 Cal. 4th 979 ............................................................................. 9,13

*Southern Calif. Gas Co. v. City of Santa Ana*

(9th Cir. 2003) 336 F.3d 885 ......................................................................... 7

*Strategic Diversity, Inc. v. Alchemix Corp.*

666 F.3d 1197 ........................................................................................ 20

1

**STATUTES**

2

California Civil Code §1689, (b)(2),(b)(4) ................................................................. 19

3

California Civil Code §1693 ........................................................................................ 20

4

Fed R. Civ. P. 56 (c) ...................................................................................................... 7

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TABLE OF AUTHORITIES

1  **MEMORANDUM OF POINTS AND AUTHORITIES**

2  **I.      INTRODUCTION**

3  The crux of Intervenor-Defendants LMNO Cable Group, Inc. ("LMNO) and

4  Eric Schotz' ("Schotz") (LMNO and Schotz collectively referred to as

5  "Defendants") motion for summary judgment is that their pervasive fraud is

6  nothing more than a garden variety contract dispute. That despite the fact that they

7  created false records for the sole purpose of defrauding their collaborators –

8  Discovery Communications, LLC and Plaintiffs – the Court should nevertheless

9  ignore the fraud and label it a "simple contract dispute." As one Court put it, "…a

10  contract is not a license allowing one party to cheat or defraud the other." *Grynberg*

11  *v. Citation Oil & Gas Corp.* (S.D. 1997) 573 N.W.2d 493, 501.

12  Defendants have defrauded several people and entities, including Discovery

13  Communications, LLC ("Discovery") and Plaintiffs by falsifying records. What

14  Defendants are claiming is a simple contract dispute is in grim reality a scheme to

15  defraud Plaintiffs William Klein, Jennifer Arnold and Candu Enterprises

16  (hereinafter collectively referred to as "Plaintiffs") from compensation owed to

17  them. By sworn testimony of its former CFO, Paul Ikegami ("Ikegami"), LMNO

18  and its main principals, Eric Shotz and Ed Horowitz, created two sets of financial

19  books in order to misrepresent the costs of producing the show and the earnings

20  from the show. One set of books was for internal use only and was never shown to

21  third parties, including Discovery and Plaintiffs. This first set showed the true costs

22  and profits of the show. It also showed that Defendants did not contribute their

23  required 30% of the production costs. The second set of financials contained several

24  falsehoods, including: that Defendants contributed their required 30% of production

25  costs, that there were deficits running in the millions and that Plaintiffs were not

26  entitled to contingent compensation due to the deficits. Defendants created this

1

1  second set of financial books to defraud Plaintiffs from contractual earnings as a
2  result.

3  　　　Needless to say, this is no simple breach of contract claim as Defendants
4  attempt to color it. Plaintiffs, through their First Amended Complaint ("FAC"),
5  seek damages caused by this fraud and to be restored to the same or similar position
6  as though this fraud never occurred.

7  　　　There is an abundance of disputed material facts in this matter, each of which
8  undermine and refute Defendants' purported entitlement to summary judgment.
9  Taken together, these facts clearly compel denial of the subject motion.

10                     **II.    FACTUAL BACKGROUND**

11  　　　As detailed in Plaintiffs' FAC, LMNO, Schotz, and Horwitz planned to and
12  did systematically defraud Discovery and Plaintiffs in connection with the reality
13  program *The Little Couple*, which features Plaintiffs and their family and which has
14  been co-produced by Discovery and LMNO since 2009 ("the Program"). The
15  Program is hugely popular and is currently in its tenth season.

16  　　　Ms. Arnold is a board-certified neonatologist, and Mr. Klein is a
17  businessman, both of whom have a form of skeletal dysplasia commonly known as
18  dwarfism. Candu Enterprises, Inc. is Klein's and Arnold's loan-out corporation.
19  Between late 2008 and 2014, Plaintiffs entered into a series of agreements (and
20  amendments thereto) with LMNO, the production company which originally
21  contacted them and convinced them to participate in a reality program about their
22  lives as married professionals with dysplasia.

23  　　　**A. The Agreements**

24  　　　The first agreement (the "Option Agreement") that Plaintiffs signed with
25  LMNO, in October 2008, provided that they would convey their intellectual
26  property rights to LMNO and Discovery including "any copyrights, trademarks,
27  and other materials" and their "customary name and likeness rights, the right to use

28

2

[their] name in the series title, performance name, voice, likeness, image, videos, [and] photographs" used in the Program, in perpetuity, in all forms or exploitation. (Defendants' Uncontroverted Material Facts No. 6-7 "DUMF 6-7"). In exchange, Plaintiffs would share in 25% of 100% of LMNO's contingent compensation from the Program, after LMNO recouped certain costs. (DUMF 9). In other words, Plaintiffs' rights to this revenue flowed *through* Defendant LMNO. (DUMF 9). This entitlement is part of the Option Agreement, as well as subsequent amendments thereto. (DUMF 11).

In 2014, Plaintiffs entered into an agreement directly with Discovery (the "Discovery Agreement") which provided them with compensation from various forms of exploitation of the Program. (DUMF 12). The Discovery Agreement provided that Plaintiffs are entitled to various forms of upfront and contingent compensation out of Discovery's share of "Adjusted Gross Revenues" from certain forms of exploitation of the Program. (DUMF 12). The Discovery Agreement superseded and terminated the Option Agreement.

At the same time, Plaintiffs entered into a "Surviving Agreement" with LMNO which reiterated Plaintiffs' entitlement to 25% of LMNO's profit participation in the Program and added a negotiated provision where in the event that LMNO distributes or exploits the Program directly, Plaintiffs would be entitled to receive 25% of 100% of LMNO's "Net Proceeds." (DUMF 14).

Discovery and LMNO acted as co-producers of the Program. (DUMF 12). To that end, LMNO and Discovery entered into a series of written agreements by which they would share in the revenues and profits from the various forms of exploitation of *The Little Couple*.

## B. Plaintiff's Discovery of LMNO, Schotz and Horwitz' Fraud and Breach

Plaintiffs eventually learned that from the outset of their relationship with

**PLAINTIFFS' OPPOSITION TO DEFENDANTS ERIC SCHOTZ AND LMNO CABLE GROUP INC'S MOTION FOR SUMMARY JUDGMENT**

1   LMNO, LMNO intended to bring Discovery on as a co-producer and planned

2   systematically to defraud both Discovery and Plaintiffs by grossly inflating

3   purported expenses, falsifying accounting documents, and contending that no

4   contingent compensation was due to Plaintiffs. (Plaintiffs' Uncontroverted Material

5   Facts 1-4 "PUMF 1-4").

6          Eric Schotz, President and Chief Executive Officer at LMNO, and Edward

7   Horwitz, LMNO's former Executive Vice President of Production, directly

8   participated, orchestrated and perpetrated this fraudulent scheme. (PUMF 3,7,8,9).

9   Schotz and Horwitz each made repeated intentional misstatements to Plaintiffs and

10  their representatives, including that financial statements sent to Plaintiffs were

11  accurate and reflected LMNO's actual revenues and costs in connection with the

12  production and foreign distribution of the Program. (PUMF  3,7,8,9). Schotz and

13  Horwitz consistently claimed – during verbal conversations and in writings

14  provided to Plaintiffs – that the Program had substantial losses and that LMNO was

15  therefore not recouping any contingent compensation or distributable proceeds.

16  (PUMF 11). This information was all intentionally false. The Program was in fact

17  making a profit and there were no losses incurred by LMNO because LMNO was

18  contributing towards the production cost as it was required to. (PUMF 1-4).

19  Because of the long-standing relationship of trust which had developed between

20  Plaintiffs and LMNO, Schotz, and Horwitz, Plaintiffs did not suspect – and had no

21  way of knowing – that these statements were false and deceptive. (PUMF 17).

22          C. **Defendants Actively Conceal Their Fraud**

23          Pursuant to provisions of the Option Agreement and Surviving Agreement,

24  Defendants were required to send Plaintiffs written accountings of contingent

25  compensation payments due and Net Proceeds payments (under the Surviving

26  Agreement only). During the entirety of the business relationship, however,

27  Plaintiffs had to repeatedly hound Defendants to provide an accounting. (PUMF

28
                                              4

11). Specifically, Schotz and Horwitz would communicate to Plaintiffs and/or their representatives that they apologized for the long delays and made up endless excuses for the delay. (PUMF 11). Plaintiffs learned later that this delay was due to the fact that Defendants needed extra time to falsify records to conceal their fraud. (PUMF 1-4).

### D. Defendants' Fraud and Breach Comes To Light

In late 2015/ early 2016, Plaintiffs were contacted by a whistleblower, Paul Ikegami, an employee who had been Chief Financial Officer and Head of Finance at LMNO, who informed their representatives that LMNO had defrauded them. (PUMF 1-10). Discovery later also contacted Plaintiffs and informed them that it, too, had been contacted by Ikegami. (PUMF 14). It was later learned that the FBI had launched its own inquiry into LMNO's business practices. Plaintiffs ultimately discovered that Defendants were defrauding them from the very beginning.

Ikegami informed Plaintiffs that Defendants were creating separate financial books in order to deceive them into believing there was no contingent compensation owed. (PUMF 1-10). Pursuant to the co-producer agreement with Discovery, Discovery was to contribute 70% of the production costs for the Program and LMNO was to contribute 30% of the production costs. (PUMF 1-4). This arrangement was set forth in the very beginning of the business relationships among the three parties. (PUMF 1-4). Unbeknownst to Discovery and Plaintiffs, however, LMNO was not contributing to the Program and was instead using the 70% contributed by Discovery as the entire production budget, thereby reducing the quality of the Program. (PUMF 1-4). Defendants had been engaging in this misrepresentation that they were contributing their production costs portion from the very beginning of the contractual relationship with Plaintiffs. Since contingent compensation under the Option Agreement and the Surviving Agreement was only due after LMNO recouped its costs, LMNO had to devise a way to show in the

**PLAINTIFFS' OPPOSITION TO DEFENDANTS ERIC SCHOTZ AND LMNO CABLE GROUP INC'S MOTION FOR SUMMARY JUDGMENT**

profit participation statements that the show was running a deficit thereby disclosing any possibility of contingent compensation. (PUMF 1-10). Defendants falsified the financial records for the Program under the direction of both Schotz and Horwitz to create the falsehood that the Program was running a deficit. (PUMF 1-10).

Ikegami testified as to Defendants' fraud, as follows:

Q:    So going back to these hard copy files that you mentioned that LMNO sent to your office, you also testified that they were sent there so you could, I think you said, recreate the books?
A:    Yes.
Q:    What do you mean by recreate the books?
A:    We were going to recreate the accounting records for The Little Couple.
Q:    Do you know why you were going to be doing that?
A:    Yes.
Q:    Okay, tell me why.
A:    Because we didn't fund the producer's deficit.
Q:    What precipitated this recreation of the records? Like why were you doing it now, or at that time as opposed to some other time?
A:    Because there was a conversation with talent from that show, the talent and their attorneys.
Q:    And what was that conversation?
A:    They had questions with regards to international royalties.
Q:    And would the international royalties be impacted by the producer's deficit?
A:    Yes
      …
Q:    So what was the recreation of the accounting records meant to do?
A:    To illustrate that the 30 percent producer's deficit had, in fact, been contributed.
Q:    And how are you supposed to go about doing that?
A:    Realigning expenses and moving expenses into that database or into that show.
      …

6

Q:  So take expenses that should have been for one show and say this was really like a Little Couple expense?

A:  Yes.

Q:  To try to make it look like there was 30 percent?

A:  Yes.

…

Q:  Did somebody ask you to do this recreation?

A:  Yes.

Q:  And who was that?

A:  Eric [Schotz].  (PUMF  9).

As this excerpt makes clear, there is ample testimony in regard to this aforementioned rampant fraud. Therefore, any argument by Defendants that there are undisputed facts regarding the absence of this fraud is easily dispelled.

## III.   LEGAL STANDARD

The burden of establishing that there is no genuine issue of material fact lies initially with the moving party, and resolution of all doubts should be made in favor of the party opposing the motion. *British Airways Board v. Boeing Company*, 585 F.2d 936, 951 (9th Cir. 1978). The moving party must shoulder the initial burden of proof as to each material fact upon which it has the burden of persuasion at trial. "*Where the moving party has the burden…his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.*" *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (emphasis in original), quoting from Summary Judgment under the Federal Rules: Defining Genuine Issues of Material Fact, 99 FRD 465, 487-488 (1984); *Southern Calif. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) [citing text].

The moving party also must meet the ultimate burden in persuading the Court that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56 (c). "If the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is

1   asserting an affirmative defense, he must establish beyond peradventure *all* of the

2   essential elements of the claim or defense to warrant judgment in his favor."

3   *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original).

4   "Because summary judgment is a 'drastic device,' cutting off a party's right to

5   present its case to a jury, the moving party bears a 'heavy burden' of demonstrating

6   the absence of any triable issues of material fact." *Nationwide Life Ins. Co. v.*

7   *Bankers Leasing Ass'n, Inc.*, 182 F.3d 157, 160 (2nd Cir. 1999).

8

9   **IV.   ARGUMENT**

10   **A. The Economic Loss Rule Does Not Apply to Plaintiffs' Claims for**

11   **Fraud and Conversion**

12   **1.   The Economic Loss Doctrine is not a shield for fraud**

13   Defendants have sought to dismiss the fraud claim against LMNO based

14   solely on the economic loss rule, but their application of this rule is fatally flawed.[1]

15   Defendants would have the Court believe that their committing pervasive fraud

16   wherein they created an entirely separate set of financial books that showed costs

17   that were never expended by LMNO and deficits that were never incurred by

18   LMNO for the sole purpose of deceiving Plaintiffs into believing that there was no

19   contingent compensation owed is nothing more than a "simple contract dispute."

20   The purpose of the economic loss doctrine is to avoid plaintiffs from double

21   dipping into essentially the same claimed damages. It is not, however, a shield for

22   fraud. Despite Defendants' arguments to the contrary, there are consequences for

23   fraudulently breaching a contract. Defendants cannot commit fraudulent acts and

24   face no liability.

25

26

27   _____

[1] LMNO's Motion for Partial Summary Judgment as to Plaintiff's fraud claim only
seeks adjudication via the economic loss doctrine. It does not controvert any of the
28   elements of fraud.

8

The Supreme Court of California stated the rule regarding when both contract and tort claims may be made, "Generally, outside the insurance context, "a tortious breach of contract ... may be found when (1) the breach is accompanied by a traditional common law tort, **such as fraud or conversion**; (2) the means used to breach the contract are tortious, involving deceit or undue coercion; or (3) one party intentionally breaches the contract intending or knowing that such a breach will cause severe, unmitigable harm in the form of mental anguish, personal hardship, or substantial consequential damages." (emphasis added) *Erlich v. Menezes*, (1999) 21 Cal. 4th 543 (*quoting Freeman & Mills, Inc., v. Belcher Oil Co.*, (1995) 11 Cal. 4th 85, 105; *see also Robinson Helicopter, Inc. v. Dana Corp.,* (2004) 34 Cal. 4th 979, 990).

Here, the conduct committed by Defendants fit precisely within all three of these parameters. Defendants have not just breached the Agreements, they have committed fraud. They have intentionally misrepresented the financial books for the Program going so far as to create an entirely different set of financial books to perpetrate this fraud. (PUMF 9). Defendants were not contributing their 30% of the production costs from the very beginning (PUMF 1-4). When Defendants did provide accountings to Plaintiffs regarding the costs and profits of the Program dating to the inception of the Program, it showed that Defendants were contributing the 30% in production costs. (PUMF 1-4, 9). Defendants intentionally misrepresented this fact to deprive Plaintiffs of their contingent compensation. (PUMF 2). Again, this is no simple failure to pay money due under a contract; this was intentional, rampant fraud.

2. Plaintiffs have suffered considerable damages as a result of Defendants' fraud

Plaintiffs suffered more than just contract damages. They have suffered considerable emotional distress damages, out-of-pocket damages and Defendants

9

1  did not merely fail to pay compensation owed Plaintiffs or timely provide

2  accounting statements to Plaintiff, they committed egregious acts of deceit to cover

3  their pervasive fraud. Then, on reliance that Defendants were providing real and

4  legitimate financials for the Program, Plaintiffs continued their contractual status.

5  They suffered considerable emotional damage from this betrayal and continue to.

6  (PUMF 23). Additionally, as they were consistently told by Horwitz and Schotz

7  that their show was running a deficit and was not profitable, it changed Plaintiffs'

8  bargaining position whenever talks of renegotiating the contract were brought up.

9  (PUMF 22). Plaintiffs then had to pay their transactional attorney Roger Armstrong

10  to inquire about the accountings and make repeated demands for accountings,

11  which amounts to considerable out-of-pocket expenses.  (PUMF 21). These

12  damages extend beyond mere breach of contract damages. Defendants are also

13  liable for punitive damages stemming from their pervasive fraud as their conduct

14  was intentional and despicable.

15              3.   <u>Defendants' cited legal authority is easily distinguishable from the</u>

16                   <u>facts herein</u>

17         Defendants' reliance on *Antonick v. Electronic Arts, Inc.*, 2014 WL 245018

18  (N.D. Cal. Jan 22, 2014) to support their argument that any misrepresentations they

19  committed were merely representations that they were performing under the

20  contract is misplaced. In *Antonick*, the plaintiff, a video game programmer, sought

21  damages against the video game manufacturer he contracted with to create a video

22  football game due to unpaid royalties stemming from sales of the game and

23  derivative works. *Id*. The plaintiff alleged both breach of contract and fraud, but the

24  Court dismissed the fraud claim invoking the economic loss rule since the

25  defendant simply did not perform its obligations under the contract. *Id* at 13-14.

26  The plaintiff did not allege any conduct by the defendant that went beyond mere

27  breach of contract. *Id*. Here, Defendants did not simply fail to pay Plaintiffs under

28

10

1  the contract. Defendants created fictional financial books to deceive Plaintiffs into

2  believing that the show where they divulge and display their lives to millions of

3  people was unprofitable. This was not a matter of simply not paying monies owed.

4  Defendants <u>falsified financial records</u>. There is no similar allegation in *Antonick*.

5  Plaintiffs relied on these misrepresentations by Defendants to their utter detriment

6  and suffered considerable emotional distress and out-of-pocket damages.

7        Defendants also cite to *Alvarado Orthopedic Research, L.P. v. Linvatec*

8  *Corp.*, 2011 WL 3703192 (S.D. Cal. Aug. 23, 2011) despite there being barely a

9  resemblance between those facts and the facts at issue herein. In *Alvarado*, the

10 plaintiff, the designer of a surgical blade, had a licensing agreement with a

11 distributer/ seller to sell the blades wherein the plaintiff received royalty payments.

12 *Id*. That agreement was later assigned to the defendant. *Id*. Plaintiff felt that

13 defendant was not paying the appropriate royalties and eventually sued alleging

14 claims for breach of contract and fraud. *Id*. Specifically, the plaintiff, in his fraud

15 claim, alleged that the defendant did not provide complete and accurate royalty

16 reports and as a result did not pay plaintiff the full amount of royalties due under

17 the agreement. *Id* at 3. The Court, naturally, dismissed the fraud claim because the

18 fraud claim allegations "mirrored" the breach of contract claim allegations and thus,

19 the economic loss rule applied. *Id*.  There was, however, no allegation as there is

20 here that the defendant created an alternate set of sales figures to deceive the

21 plaintiff into believing there was no money due. Hence, there was no scienter or

22 plausibility that there was intentional conduct on the part of the defendant. There

23 was also no similar suffering of emotional distress damages. The cases are vastly

24 dissimilar.

25        Finally, Defendants have inaptly cited *JMP Securities, LLP. v. Altair*

26 *Nanotechnologies, Inc.*, 880 F. Supp. 2d 1029 (2012). In *JMP*, plaintiff, a financial

27 advisor, was hired by the defendant, a technology firm, to advise it during a

28

11

1  potentially significant financial transaction. *Id* at 1032-1033. Plaintiff would receive
2  a percentage fee depending on the size and/or type of transaction. *Id*. Plaintiff
3  eventually sued defendant alleging breach of contract and fraud based on not
4  getting a higher fee percentage based on the type of financial transaction that did
5  occur. *Id* at 1042-1043. The plaintiff, however, as in the previous cited cases, does
6  not differentiate between his fraud and breach of contract claims. The Court, in
7  applying the economic loss rule and dismissing the fraud claim, stated, "[p]ut
8  simply, [plaintiff] has taken the allegations underpinning a straightforward claim
9  for breach of commercial contract and recast them as torts. The tort claims consist
10  of nothing more than [defendant]'s alleged failure to make good on its contractual
11  promises. *Id* at 1042. Hence, there were no allegations in *JMP* that the defendant
12  deceived the plaintiff by falsifying records as there is here. No scienter and no proof
13  that there was an intentional misrepresentation. *JMP* involves a simple breach of
14  contract for which there can be no tort claim.

15       Thus, all of Defendants' cited authority are easily distinguishable from the
16  facts herein.

17       4. Public policy seeks to prevent contracting parties from defrauding each
18          other

19       To allow Defendants' fraud to pass as simple breach of contract would be
20  contrary to public policy and a perversion of business practices. As the Court in
21  *Robinson Helicopter* noted,

22            '[C]ourts will generally enforce the breach of a
23            contractual promise through contract law, except when
24            the actions that constitute the breach violate a social
25            policy that merits the imposition of tort remedies.'
26            (*Freeman & Mills, Inc. v. Belcher Oil Co.* (1995) 11
27            Cal.4th 85, 107 (conc. & dis. opn. of Mosk, J.).)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Similarly, " '[c]ourts should be careful to apply tort remedies only when the conduct in question is so clear in its deviation from socially useful business practices that the effect of enforcing such tort duties will be ... to aid rather than discourage commerce.' " (*Erlich v. Menezes, supra,* 21 Cal.4th at p. 554) 'In pursuing a valid fraud action, a plaintiff advances the public interest in punishing intentional misrepresentations and in deterring such misrepresentations in the future. [Citation.] Because of the extra measure of blameworthiness inhering in fraud, and because in fraud cases we are not concerned about the need for 'predictability about the cost of contractual relationships' [citation], fraud plaintiffs may recover 'out-of-pocket' damages in addition to benefit-of-the bargain damages." (*Lazar v. Superior Court, supra,* 12 Cal.4th at 631, 638, In addition, "California also has a legitimate and compelling interest in preserving a business climate free of fraud and deceptive practices." (*Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036, 1064).

*Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 991–92 (2004).

The Supreme Court of California further stated, "Focusing on intentional conduct gives substance to the proposition that a breach of contract is tortious only when some independent duty arising from tort law is violated. *Id.* (*quoting Applied Equipment Corp. v. Litton Saudi Arabia Ltd.,* 7 Cal. 4th 503, 515 (1994); *see also Robinson Helicopter, supra*, at 990). The intentional conduct is the creating and

13

masking of the fraud by Defendants. Defendants intentionally "recreated" the financials to deceive Plaintiffs. This intentional conduct also violates the duty of good faith and fear dealing inherent in every contract by committing the aforementioned fraud which was pled as a separate claim in the FAC. Defendants, however, and have not brought a motion for summary adjudication as to that claim.

     5.  <u>The economic loss doctrine does not apply to Plaintiffs' conversion claim.</u>

Regarding the conversion claim, Defendants cite *McGehee v. Coe Newnes/ McGehee ULC*, No. C 03-5145 MJJ, 2004 WL 2452855 (N.D. Cal. Feb. 10, 2004) and again misapplies the facts to the present case. *McGhee* does not involve the pervasive fraud committed by Defendants herein. The economic loss doctrine does not apply with respect to the conversion claim as Defendants' conduct constitutes actionable fraud and breach of an independent duty not to commit said fraud. Plaintiffs have suffered considerable emotional distress damages and out-of-pocket damages as a result of Defendants wrongfully possessing Plaintiffs' contingent compensation that go beyond the contract damages.

Therefore, as it is abundantly clear that the economic loss rule does not apply to the fraud and conversion claims and Defendants' motion should be denied.

**B.  <u>There Are Genuine Issues of Material Fact Regarding Plaintiffs' Conversion Claim</u>**

Plaintiffs also meet the first element of conversion:  a right to possess the property at issue.  While a mere contractual right to property does not meet the first element of conversion, a plaintiff's <u>equitable lien</u> on the property to which it is contractually entitled is sufficient to create a definable interest required to establish conversion.  *McCafferty v. Gilbank* (1967) 249 Cal.App.2d 569, 575-576 (finding conversion where the plaintiff established that the agreement at issue gave rise to an equitable lien in favor of the plaintiff over the property allegedly converted); *see*

14

*Farmers Ins. Exchange v. Zerin*, 53 Cal.App.4th 445, 454-456.  Neither legal title nor absolute ownership of the property is necessary to establish the first element of conversion.  *Zerin*, 53 Cal.App.4th at 451-452 ("A party need only allege it is entitled to immediate possession at the time of conversion.") (internal quotations and citations omitted).

Where a defendant's promise to pay the plaintiff from a specific fund and considerations of detrimental reliance or unjust enrichment are implicated, a conversion plaintiff may establish the existence of an equitable lien.  *See Zerin*, *supra*, 53 Cal.App.4th at 454-456.  *Zerin* explains the policy behind the rule:

> The rationale of the rule permitting recovery on a theory
> of equitable lien is essentially this: that it would be
> inequitable and unjust to withhold from those persons
> who have by their labor and materials enhanced the value
> of the property the loan fund [*sic*] which constituted a
> material inducement to them in supplying such labor and
> materials and upon which they relied for reimbursement.
> Where the lender has received the benefit of the
> claimant's performance, and therefore a more valuable
> security for its note, it is not justified in withholding or
> appropriating to any other use money originally intended
> to be used to pay for such performance and relied upon by
> the claimant in rendering its performance.' "

*Id.* (citing *McBain v. Santa Clara Sav. & Loan Assn.* (1966) 241 Cal.App.2d 829, 836).  Courts look to the conduct of the parties and the background of their interactions to determine whether an equitable lien arises with respect to the conversion plaintiff's right in certain property.  *McCafferty*, *supra*, 249 Cal.App.2d at 574-575.  ***Where the plaintiff has enhanced the value of the fund in reliance on***

15

***an agreement to reap the benefits of their work, an equitable lien on the***
***plaintiff's portion of the fund arises***. *Id.* (finding an equitable lien in favor of
conversion plaintiff where the plaintiff forewent pursuing rights against the
defendant due to the parties' agreement that the plaintiff would be entitled to the
property at issue, where the defendant was holding the plaintiff's agreed-upon
portion of proceeds from a settlement); *Dodd v. Cantwell* (1960) 179 Cal.App.2d
727, 733-735 (finding an equitable lien in favor of plaintiffs who worked for years
on a ranch on the promise they would be paid from proceeds of the sale of the
ranch).  Courts focus on the existence of considerations of detrimental reliance or
unjust enrichment in finding an equitable lien on certain property.  *E.g.*, *Zerin*,
*supra*, 53 Cal.App.4th at 455.

Here, Plaintiffs were the stars of a reality show centered around their lives.
Due to the public's interest in them and their accomplishments, struggles, and
everyday undertakings, the show has spanned nine seasons.  Without Plaintiffs'
work and efforts, the Program would not have continued for nine seasons and
yielded the revenue it did.  Further, Plaintiffs' agreement with LMNO provides that
LMNO is to provide Plaintiffs with their contingent compensation payments and an
accounting of such within 90 days of LMNO's receipt of its share of contingent
compensation from third parties.  (LMNO UF 2 – the contract at § 3.)  The
agreement also provides Plaintiffs with industry audit rights.  *Id.*  Analogous to
*McCafferty* and *Dodd* above, Plaintiffs **relied** on the contingent compensation
payments and false accountings they received from LMNO and did not pursue their
audit rights against LMNO and its principals for years.  As a result, due to LMNO's
and its principals' fraudulent scheme, the LMNO parties were unjustly enriched by
being able to keep the funds Plaintiffs were entitled to under the contract.

As such, the circumstances gave rise to an equitable lien in favor of Plaintiffs
with respect to their agreed share of contingent compensation that the LMNO

**PLAINTIFFS' OPPOSITION TO DEFENDANTS ERIC SCHOTZ AND LMNO CABLE
GROUP INC'S MOTION FOR SUMMARY JUDGMENT**

1   parties fraudulently withheld.  Plaintiffs have thus established a genuine issue of

2   fact as to the first element of conversion, which is the only element addressed in

3   Defendants' motion.

4         **C. There Are Genuine Issues of Material Fact Regarding Plaintiffs'**

5               **Fraud Claim Against Eric Schotz**

6         The entirety of Defendants' motion regarding the fraud claim against Schotz

7   is premised on Defendants conflating whether Plaintiffs knew at the time a

8   statement was made that Schotz was misrepresenting critical facts to them or

9   whether they learned afterwards that a previously made statement was in fact a

10  material misrepresentation. Pursuant to Paul Ikegami's sworn testimony, Schotz

11  and Horwitz, together, orchestrated and directed the misrepresentations to

12  Plaintiffs, including the creation of false financial records. (PUMF 3,7,8,9). Thus,

13  each time Horwitz and/or Schotz emailed profit statements to Plaintiffs and/ or their

14  attorney Roger Armstrong that contained these falsified figures, Schotz was

15  communicating a material misrepresentation to Plaintiffs.

16        Furthermore, Schotz is the CEO of LMNO and directed all of its operations,

17  along with Horwitz, including the material misrepresentations. As the primary

18  corporate officer, Schotz is particularly and specifically liable, as is Horwitz. The

19  Ninth Circuit affirmed this liability in *Facebook, Inc. v. Power Ventures, Inc.*, 844

20  F.3d 1058 (9th Cir. 2016), cert. denied, 138 S. Ct. 313, 199 L. Ed. 2d 206 (2017), as

21  follows:

22
23              A "corporate officer or director is, in general, personally
24              liable for all torts which he authorizes or directs or in
25              which he participates, notwithstanding that he acted as an
26              agent of the corporation and not on his own behalf."
27              *Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814,
28              823 (9th Cir. 1996) (internal quotation marks omitted).

17

**PLAINTIFFS' OPPOSITION TO DEFENDANTS ERIC SCHOTZ AND LMNO CABLE
GROUP INC'S MOTION FOR SUMMARY JUDGMENT**

1
2
3
4
5
6
7
8

> Cases finding "personal liability on the part of corporate
> officers have typically involved instances where the
> defendant was the 'guiding spirit' behind the wrongful
> conduct, or the 'central figure' in the challenged corporate
> activity." *Davis v. Metro Prods., Inc.*, 885 F.2d 515, 523
> n.10 (9th Cir. 1989) (internal quotation marks and ellipsis
> omitted).
>
> *Id* at 1069.

9  Therefore, as Schotz and Horwitz were the guiding spirits they are personally
10 liable for the wrongful conduct.

11  **D. <u>Plaintiffs Can Obtain Rescission Because of Defendants' Material</u>**
12  **<u>Misrepresentations</u>**

13  Defendants contend that Plaintiffs are not entitled to rescission because: (1)
14 Plaintiffs cannot prove that LMNO made any misrepresentation to induce Plaintiffs
15 to enter into the 2008 Option Agreement; (2) Plaintiffs have waived any right to
16 rescission by continuing to perform under the Option Agreement; and (3) it would
17 be impracticable to attempt to unwind a ten-year old agreement. None of
18 Defendants' arguments are persuasive.

19  Contrary to Defendants' contention, Plaintiffs can indeed prove that LMNO
20 made material misrepresentations to induce Plaintiffs into entering the Option
21 Agreement. Defendants, in their motion, are intentionally ignoring the fact that even
22 though the first alleged misrepresentation was communicated in 2010, that
23 communication involved profit participations statements that dated to the beginning
24 the business relationship. (PUMF 11). Plaintiffs have alleged that Defendants
25 intended to defraud Plaintiffs from the beginning. Defendants never intended on
26 paying any portion of contingent compensation to Plaintiffs. Plaintiffs have testified
27 that they would not have entered into the Option Agreement with Defendants had

28

18

they known that Defendants would defraud them, which Defendants were doing from day one. (PUMF 19).

Moreover, it is established law that the consideration for the obligation of the rescinding party fails, in whole or in part, through the fault of the party as to whom he rescinds. See Cal. Civ. Code §1689(b)(2) Additionally, if the consideration for the obligation of the rescinding party, before it is rendered to him, fails in a material respect from any cause, a party to a contract may rescind. See Cal. Civ. Code §1689(b)(4). A refusal or failure of a party fully to perform his part of the contract constitute a partial failure of consideration which under Cal. Civ. Code. §1689 gives the other party a right to rescind. *Loop Bldg. Co. V. De Coo*, (1929) 97 Cal. App. 354, 365. Hence, Defendants' material misrepresentations such as creating and submitting falsified records to Plaintiffs to deprive them of contingent compensation as described herein automatically gave Plaintiffs the right to rescind. Also, it is natural and just for Plaintiffs to be able to rescind this contract and relationship since it was based on a fraud in its inception and duration.

Regarding Defendants' argument that Plaintiffs' were not diligent in seeking rescission, all the evidence points to the contrary. Plaintiffs did in fact seek rescission soon after they discovered that the possible fraud committed by Defendants was actual fraud. While it is true that Plaintiffs were tipped off by the whistleblower Paul Ikegami about the fraud in or about December 2015, they were diligent in investigating the fraud. Plaintiffs were contacted by Discovery later in 2016 that they were also contacted by the whistleblower and were investigating. (PUMF 14). Discovery essentially told Plaintiffs to stand by. Plaintiffs then sought to intervene in the present lawsuit when they discovered the true facts and extent of the fraud. (PUMF 15). There was no waiver or laches. Moreover, Plaintiffs' signing an agreement with Discovery in 2017 does not lend any credence to Defendants' argument that the original agreement with LMNO was ratified. Defendants were cut

19

1   out at that point due to their fraud. Furthermore, under California Civil Code § 1693,

2   rescission cannot be denied based on delay unless LMNO can show that it was

3   substantially prejudiced. Since LMNO makes no such showing, delay cannot be

4   basis for dismissing rescission as a form of relief.

5       Defendants' argument that the supposed difficult logistics of rescinding the

6   Agreement because of the passage of time is not persuasive. Defendants have

7   received a windfall based on their fraud. Defendants cite *Strategic Diversity, Inc. v.*

8   *Alchemix Corp.*, 666 F.3d 1197, 1207-1208 in support of this argument, but that

9   case is easily distinguishable. In *Strategic Diversity*, the Court concluded that

10  restitution was impractical in a securities fraud context because security interests

11  could not be unfurled as they were held as collateral on other debts. Id. Here, the

12  only party truly affected is LMNO. Plaintiffs potentially seek to be restored to their

13  original position under an election of remedies and seek restoration of their

14  intellectual property rights. Plaintiffs have a separate deal with Discovery now and

15  Discovery will not be affected by rescission of the LMNO contract especially since

16  Discovery and LMNO refused to include Plaintiffs in their apparent confidential

17  settlement, the terms of which Plaintiffs were not made privy to.

18      Moreover, as of now, Defendants are still getting paid for profits from the

19  Program and are still in contract with Plaintiffs under the Surviving Agreement.

20  Plaintiffs should not have to endure this fraudulent relationship any further.

21  Defendants should be stripped of all their contractual rights and their profits from

22  their fraud should be stripped as well. At the very least, in consideration of

23  Defendants' fraud, Plaintiffs should be able to stand in the shoes of LMNO when

24  the current deal runs out.

25  //

26      **E. Defendants' Motion for Adjudication of Plaintiffs' Declaratory Relief**

27      **Action Should be Denied**

28

**PLAINTIFFS' OPPOSITION TO DEFENDANTS ERIC SCHOTZ AND LMNO CABLE
GROUP INC'S MOTION FOR SUMMARY JUDGMENT**

1    Defendants contend that Plaintiffs have no legal claim to the ownership
2 interests in the intellectual property rights associated with the Program, but their
3 reasoning and argument are not persuasive. First, Defendants completely ignore the
4 fact that they are being sued for breach of contract and fraud. Plaintiffs are seeking
5 the intellectual property rights they signed away in their agreement with Defendants
6 because of the fraud committed by Defendants inducing them to enter into said
7 agreement. It is true that, at the time of entering into the Option Agreement with
8 Defendants in 2008, Plaintiffs knew they were signing away their intellectual
9 property rights in the Program to Defendants, but they did not know that
10 Defendants intended from the beginning to defraud them. This distinction is
11 critical, and it is completely and conveniently ignored by Defendants.

12    Second, Defendants present, with no legal authority or evidence, that they are
13 undoubtedly the "creator" by virtue of being the producer. Defendants cite *Garcia*
14 *v. Google, Inc.*, 786 F.3d 733,741-44 (9th Cir. 2015) wherein the Ninth Circuit held,
15 that the law does not allow an individual actress to claim copyright ownership in an
16 entire film. In *Garcia*, however, the actress plaintiff was attempting to claim
17 ownership in a video despite she only having a five second part in a fifteen-minute
18 video. *The Little Couple*, conversely, is an unscripted reality show based on the
19 lives of Plaintiffs. Plaintiffs directed the themes and substance of each show. If the
20 Program showed Plaintiffs going to London or going to China and/or India to adopt
21 their children, it is because Plaintiffs directed it. This is a case of first impression as
22 there has not been a copyright claim brought by a reality show star when the reality
23 show is based solely on that star's life.

24    Defendants' contribution is slight, especially in light of the fact that they did
25 not contribute any production costs towards the Program! Again, Defendants are
26 completely forgetting that they committed fraud. **Defendants provide no**
27 **undisputed facts that they wholly created or "fixed" the show other than just**
28

21

**pointing to the fact that they held the title of "producer**." That is not enough for a motion for summary judgment. That title is now in doubt considering that they falsified their contributions to the Program. Defendants present no facts in their motion showing what contributions they made towards the creation of the Program. Because this is a motion for summary judgment, this absence of evidence is fatal. As is abundantly clear, there are genuine issues of material fact regarding Plaintiffs' declaratory relief claim and the motion should be denied.

       **F.**  <u>**The Court Should Deny Defendants' Motion to Narrow the Scope of Damages on Plaintiffs' Contract Claims**</u>

Defendants are asking the Court to disregard and/or strike clear language of the Surviving Agreement for no legitimate, legal purpose other than it will cause them to lose money. The language in the Surviving Agreement is crystal clear regarding revenue derived from LMNO's direct exploitation of the Program: Plaintiffs are to receive 25% of 100% of LMNO's "Net Proceeds." (PUMF 12). Defendants do everything they can in their motion to shy away from these clear and purposeful words. LMNO directly handled the licensing of the Program in foreign countries and territories. Defendants go as far as to include the Merriam-Webster Dictionary definition of the word "contingent," but conveniently do not offer the definition of "net proceeds." Whether it be convenient or not for LMNO, through the clear, unmistakable language of the Surviving Agreement, Plaintiffs are entitled to 25% of 100% of all revenue derived from LMNO's direct exploitation of the Program. It is the role of experts to determine the value of this exploitation regardless of whether LMNO lumped a bunch of shows together and licensed them to Cineflix. Plaintiffs do not disagree with any of Defendants' legal authority directing the Court to honor clear contract language and the intent of the parties as it is Defendants that are ignoring the clear contract language and intent of the parties.

1      The fact that LMNO lumped all these shows together and licensed them to

2  Cineflix does not allow them to strike this clause of the Surviving Agreement.

3  Defendants, in their motion, are attempting to avoid paying Plaintiffs their portion

4  of the "Net Proceeds" by claiming that it would be too difficult to pin point what

5  those proceeds are because they combined several shows in their licensing

6  agreement with Cineflix. Their argument is not a persuasive reason to ignore clear

7  contract language. Plaintiffs gave up additional name and likeness rights for this

8  contract provision and Defendants are asking the Court to essentially void the

9  contract.

10

11  **V.    <u>CONCLUSION</u>**

12      Based on the foregoing, it is respectfully submitted that the Court issue an

13  Order denying Defendants' Motion for Summary or, in the Alternative, Partial

14  Summary Judgment.

15

16

17

18  DATED:  February 26, 2018           JOHNSON & JOHNSON LLP

19                   By  /s/ Neville L. Johnson

20                       Neville L. Johnson

21                       Arun Dayalan

                        *Attorneys for Plaintiff-Intervenors*

22                       William Klien, Jennifer Arnold, and

                     Candu Enterprises, Inc.

23

24

25

26

27

28

**PLAINTIFFS' OPPOSITION TO DEFENDANTS ERIC SCHOTZ AND LMNO CABLE GROUP INC'S MOTION FOR SUMMARY JUDGMENT**