# EXHIBIT B

Page 1

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3

4    LMNO CABLE GROUP, INC., a        )
     California Corporation,          )    Case No.
5                                     )    2:16-cv-4543JAK
                    Plaintiff,        )    -SK
6                                     )
7               v.                    )    Volume I
                                      )
8    DISCOVERY COMMUNICATIONS,        )    Pages 1-262
     LLC, a Delaware limited          )
     liability company,               )
9                                     )
                    Defendant.        )
10   _____  )
                                      )
11   DISCOVERY COMMUNICATIONS,        )
     LLC, a Delaware limited          )
     liability company,               )
12                                    )
13         Counterclaim Plaintiff,    )
                                      )
14              v.                    )
                                      )
15   LMNO CABLE GROUP, INC., a        )
     California Corporation,          )
     LMNO ENTERTAINMENT GROUP,        )
16   LLC, a California limited        )
     liability company,               )
17                                    )
18         Counterclaim Defendants.   )

19        VIDEOTAPED DEPOSITION OF PAUL IKEGAMI

20                    TAKEN ON

21           THURSDAY, JANUARY 26, 2017

22   Job No: 117945

23   Reported by:

24   BRENDA R. COUNTZ, RPR-CRR

25   CSR NO. 12563

Page  2

1

2

3

4

5

6

7

8

9

10          Videotaped deposition of PAUL A. IKEGAMI,

11     taken at the law firm of Gibson, Dunn & Crutcher,

12     LLP, 2029 Century Park East, Suite 4000, Los

13     Angeles, California, on Thursday, January 26,

14     2017, before Brenda R. Countz, CSR No. 12563.

15

16

17

18

19

20

21

22

23

24

25

1      Q.    And when was that?

2      A.    When he passed away.

3      Q.    And what year was that?

4      A.    2012.

5      Q.    Prior to 2012, did you have any

6    business dealings with LMNO?

7      A.    Me, personally?

8      Q.    You personally.

9      A.    Yes.

10     Q.    In what capacity?

11     A.    Just assisting my father.

12     Q.    Assisting your father.

13           So in 2010, your father was still

14   alive?

15     A.    Yes.

16     Q.    And he was still doing work for LMNO?

17     A.    Yes.

18     Q.    And you were assisting him?

19     A.    Yes.

20     Q.    What types of things were you doing to

21   assist your dad?

22     A.    Printing reports, data entry.

23     Q.    I'm going to show you -- before I do

24   that, LMNO has sued you in California State

25   court, correct?

Page 21

1          A.    Yes.

2          Q.    And you've put in a cross-complaint,

3    correct?

4          A.    Yes.

5                MR. TSEKERIDES:   Mr. Ikegami, you've

6    been handed what has been marked as Exhibit 3.

7    Take a moment and flip through this and let me

8    know if you recognize this document.

9                THE WITNESS:   (Perusing.)

10               (Ikegami Exhibit 3,

11               Cross-Complaint, was marked for

12               identification.)

13               THE WITNESS:   Yes.

14   BY MR. TSEKERIDES:

15         Q.    And what is that document?

16         A.    The cross-complaint.

17         Q.    Did you review it before it was filed?

18         A.    Yes.

19         Q.    I'm not interested in the conversations

20   you might have had with your attorney.  So let me

21   just note on the record any question I may ask

22   you about the document, don't tell me any

23   conversations you had with your attorneys about

24   it, okay?

25               Is the information contained in that

Page 22

1    document based on your personal knowledge?

2         A.   Yes.

3         Q.   So let's go through the document.  If

4    you turn to page two, paragraph eight, there's a

5    statement there that says, "For years, LMNO

6    cheated Discovery and other production partners

7    through a variety of financial slights of hand."

8              Do you see that, paragraph eight, page

9    two?

10        A.   Yes.

11        Q.   Can you explain what you meant by that?

12             MS. GAROFALO:   Objection, lacks

13   foundation.

14   BY MR. TSEKERIDES:

15        Q.   Well, sir, do you believe that comment

16   is true, that I just read?

17        A.   Yes.

18        Q.   What's your basis for saying that?

19        A.   We never honored any of the contracts

20   that we signed.

21        Q.   Who is "we"?

22        A.   Eric.

23        Q.   And how do you know that?

24        A.   Because I saw the contracts.

25        Q.   And when you say they never honored

Page 26

1       A.    I worked out of my office.

2       Q.    Were you an independent contractor for

3   LMNO?

4       A.    Yes.

5       Q.    Did you have an agreement, a written

6   agreement?

7       A.    No.

8       Q.    So what were your responsibilities when

9   you assumed the CFO title?

10       A.    To oversee the accounting department.

11       Q.    How many people worked in the

12   accounting department at that time?

13       A.    Five to six.

14       Q.    And what responsibilities did the

15   accounting department have?

16       A.    Preparation of accounts payable,

17   accounts receivable, payroll and other accounting

18   reporting functions.

19       Q.    What role did the accounting department

20   have in connection with the productions of

21   various programs?

22       A.    Other than the accounting, nothing.

23       Q.    How would the accounting department

24   receive information regarding cost of goods or

25   expenses that might have been incurred in

Page 27

1  connection with the production of a program?  How

2  would they get that information?

3       A.    We would receive a budget from Ed

4  Horwitz.

5       Q.    And who was he?

6       A.    He was the executive vice-president of

7  production.

8       Q.    Was he there the entire time that you

9  were working for LMNO?

10      A.    Yes.

11      Q.    Back in 2008, did you know how

12  Mr. Horwitz prepared the budget?

13      A.    No.

14      Q.    Did there come a time when you learned

15  how he did prepare the budgets?

16      A.    Yes.

17      Q.    When you first learned how he prepared

18  it, tell me how he did prepare them.

19      A.    He would prepare them in a separate

20  software system and he would prepare the budgets

21  to -- you know, they would negotiate with the

22  networks and he would prepare the budgets based

23  on the agreed items.

24      Q.    How did he come up with the numbers

25  that he put in the budget?

Page 28

1       A.   I don't know.

2       Q.   Who worked with him in creating the

3    budgets from the LMNO side?

4       A.   Eric.

5       Q.   So as far as you know, Eric and Ed are

6    the ones who prepared the budgets?

7       A.   Yes.

8       Q.   So in paragraph 12 there's a reference

9    to you were being advised of potential

10   embezzlement.

11            That's the Rosenthal you were taking

12   about earlier?

13      A.   Yes.

14      Q.   Now you say, "For reasons that baffled

15   Ikegami at the time, the VP of finance was not

16   terminated and Schotz, LMNO's president, declined

17   to authorize the full audit recommended by

18   Ikegami."

19            Do you see that?

20      A.   Yes.

21      Q.   Tell me about that situation.

22      A.   We audited his petty cash and his

23   accounting records for three years and we had

24   come up with a total.  And so we recommended

25   auditing the records for his entire employment,

1  head?  Would Mr. Horwitz be one of them?

2      A.   Yes.

3      Q.   What role did Mr. Schotz have in the

4  production accounting or the corporate

5  accounting?

6      A.   He made all the final decisions.

7      Q.   Paragraph 15 in Exhibit 3 ends with the

8  statement that the records could not be

9  reconciled.

10         Do you see that?

11     A.   Um-hum, yes.

12     Q.   What does that mean?

13     A.   Again, because the corporate accounting

14  and the production accounting are separated,

15  there's nothing to connect them.

16         And as I came to know, the budgets do

17  not equal what the contract is, so there would

18  always be an accounting irregularity.

19     Q.   And you came to learn that once you got

20  into the position of VP of finance?

21     A.   Yes.

22     Q.   So then let's move on to paragraph 16.

23         It says, "In or about April 2015,

24  LMNO's technology director, Justin Welches,

25  resigned over 'ethical issues'."

1    Welches to change that to say that Schotz was on

2    set?

3         A.   Yes.

4         Q.   Why would they do that?

5              MR. RISING:  Objection, lacks

6    foundation, calls for speculation.

7    BY MR. TSEKERIDES:

8         Q.   You can answer.

9         A.   Why would he do that?  Because he

10   needed credit as a director or a writer.

11        Q.   Do you know if Mr. Welches actually

12   altered the records?

13        A.   No.

14        Q.   You don't know or he didn't do it?

15        A.   He did not.

16        Q.   Do you know, did he resign?

17        A.   Yes.

18        Q.   Did he resign because of that, as far

19   as you know?

20        A.   I don't know.

21        Q.   Do you know where he lives?

22        A.   No.

23        Q.   When did you leave LMNO?

24        A.   October 2015.

25        Q.   Now, you are familiar with co-produced

Page 40

1      programs, correct?

2          A.    Yes.

3          Q.    And commissioned programs, correct?

4          A.    Yes.

5          Q.    A co-produced program, a network such

6      as Discovery puts up some of the money, in fact

7      most of the money, and the production company is

8      supposed to put up some percentage, correct?

9          A.    Yes.

10         Q.    And in commissioned, the network puts

11     up 100 percent of the money, right?

12         A.    Yes.

13         Q.    And many of the programs that Discovery

14     had with LMNO were co-productions, correct?

15         A.    Yes.

16             MR. RISING:   Objection, lacks

17     foundation.

18     BY MR. TSEKERIDES:

19         Q.    And most of them were 70/30 split;

20     Discovery pays 70, LMNO pays 30?

21         A.    Yes.

22             MR. RISING:   Objection, lacks

23     foundation.

24     BY MR. TSEKERIDES:

25         Q.    So have you actually seen some of these

Page 41

1   contracts that set out the 70/30 split?

2       A.   Yes.

3       Q.   So you have personal knowledge of that,

4   right?

5       A.   Yes.

6       Q.   And under that concept, the producer is

7   actually supposed to contribute its 30 percent,

8   right?

9       A.   Yes.

10          MR. RISING:   Objection, calls for a

11  legal conclusion, calls for speculation, lacks

12  foundation, the document speaks for themselves.

13          MR. TSEKERIDES:   Are you done?

14          MR. RISING:   I might have more.

15          MR. TSEKERIDES:   Okay.   You can object

16  to the form and that's about it.

17  BY MR. TSEKERIDES:

18      Q.   That contribution by the production

19  company is sometimes known as a producer's

20  deficit, right?

21      A.   Yes.

22          MR. RISING:   Objection, lacks

23  foundation, calls for speculation, overbroad.

24          If you want to ask him about a specific

25  contract --

Page 44

1      Q.   And this would be -- were you involved

2  in any way in attempting to recover those

3  producer's deficits for LMNO?  Were you involved

4  in any way in that?

5      A.   No.

6      Q.   Did you ever calculate how much revenue

7  LMNO might be getting for licensing

8  internationally?

9      A.   No, not specifically.

10      Q.   The recovery of the 30 percent

11  producer's deficit would assume that 30 percent

12  was actually contributed, right?

13      A.   Yes.

14      Q.   So let's move on to 20.

15           20 says, "To maximize its revenues,

16  LMNO rigged its budgets, books and records to

17  avoid payment of the producer's deficit - a fact

18  concealed from LMNO's network partners," do you

19  see that?

20      A.   Yes.

21      Q.   What does that refer to?

22      A.   Exactly what it says.

23      Q.   And what knowledge do you have that

24  LMNO rigged its budgets, books and records?

25      A.   Ed told me.

Page  45

1    Q.    Ed Horwitz told you that?

2    A.    Yes.

3    Q.    What did he say?

4    A.    That -- well, we would have discussions

5    about the contracts, and the contracts again do

6    not match the accounting production records.

7    Q.    So in addition to Ed telling you, did

8    you also see that yourself?

9    A.    Yes.

10   Q.    And you saw that the contracts and the

11   budgets didn't match the accounting records?

12         MR. RISING:  Objection, overbroad,

13   lacks foundation, calls for speculation.

14         THE WITNESS:  There were two budgets.

15   BY MR. TSEKERIDES:

16   Q.    Okay, explain.

17   A.    There was a network budget and an

18   internal LMNO budget.

19   Q.    So the network budget, is that the

20   budget that the network saw?

21   A.    Yes.

22   Q.    And what was the LMNO budget?

23         MR. RISING:  Objection, lacks

24   foundation.

25   BY MR. TSEKERIDES:

1      Q.    Is that an internal budget?

2      A.    Yes.

3      Q.    To your knowledge, did any of the

4   networks ever see that budget?

5      A.    Never.

6      Q.    What else did Mr. Horwitz tell you in

7   terms of -- strike that.

8          What did Mr. Horwitz tell you in terms

9   of how long that process had been going on with

10  the two budgets?

11     A.    I don't recall him stating any specific

12  date or length of time.

13     Q.    Was it going on at least as of the time

14  that you were the VP of finance?

15     A.    Yes.

16     Q.    Do you know if it was going on in 2008

17  while you were assuming the CFO responsibilities,

18  if you know?

19     A.    I don't recall.

20     Q.    So picking up on your point, let's go

21  to the end of 20.

22          It says "Cross-Complaint is informed

23  and believed and based thereon alleges that LMNO

24  maintained two sets of accounting records, one

25  showing the real budget and the other showing the

1  inflated budget submitted by LMNO to its network

2  partners."

3          Do you see that?

4      A.   Yes.

5      Q.   Is that what you were just talking

6  about now?

7      A.   Yes.

8      Q.   And what were the differences between

9  the two, if you know?

10      A.   The internal budget had no producer's

11  deficit or producer's contribution.

12      Q.   Does that mean the internal budget

13  reflected that LMNO paid no contribution towards

14  that program?

15      A.   Yes.

16          MR. RISING:   Objection.   Vague and

17  ambiguous, lacks foundation, calls for

18  speculation.

19  BY MR. TSEKERIDES:

20      Q.   We'll go through a lot of these

21  documents in a bit, but do you know if the

22  internal budgets reflected that the network was

23  paying 100 percent of those co-produced programs?

24      A.   Could you state that again?

25      Q.   Sure.   Do you know if the internal

1  budgets reflected that the network was paying 100

2  percent of the cost for the production?

3         MR. RISING:  Objection, vague and

4  ambiguous, calls for speculation.

5         THE WITNESS:  Yes.

6  BY MR. TSEKERIDES:

7      Q.  Let's look at paragraph 21.  There's a

8  reference here to the network contracts requiring

9  LMNO to establish a separate bank account for

10  each production.

11         Do you see that?

12      A.  Yes.

13      Q.  What does that mean?

14      A.  That each show has to have its own

15  dedicated bank account.

16      Q.  So each show like The Little Couple,

17  Meteorite Men, whatever other shows there were,

18  they were supposed to have their own bank

19  account?

20      A.  Yes.

21      Q.  So was the idea that if, we'll take The

22  Little Couple, for example, that if there was

23  production for a given season of The Little

24  Couple and Discovery sent money, it was supposed

25  to go to a specific account dedicated to The

1    specific production account, it was in the

2    checking account, and then as needed money would

3    be taken from that account and put into the

4    production account?

5         A.    Yes.

6         Q.    But as far as you are aware, the

7    entirety of the money should have been in the

8    production account for that particular

9    production, correct?

10        A.    Yes.

11        Q.    Let's go on to paragraph 22.   That says

12   that, "LMNO routinely inflated budgets

13   substantially over what LMNO knew would be the

14   actual production costs, often as much as 55

15   percent less than projected for the networks."

16             Do you see that?

17        A.    Yes.

18        Q.    How do you know that that took place?

19        A.    Through communications with Ed and

20   Eric.

21        Q.    Is that also reflected in the cost

22   reports?

23        A.    Yes.

24        Q.    Let's drill down a little bit on the

25   communications between Ed and Eric on this topic.

Page 54

1          What did they tell you, as best you can

2    recall?

3          A.   That the budgets were -- can you repeat

4    that?

5          Q.   Yes.  I'm focusing you on the

6    conversations you had with Ed and Eric about the

7    inflated budgets.

8          A.   Yes.

9          Q.   And I'm asking you what did they tell

10   you.

11         A.   There was nothing in particular.  Just

12   I knew they were inflated.

13         Q.   And you knew that from the cost reports

14   and from the discussions?

15         A.   The cost reports and the discussions.

16   It was kind of unsaid.  Everything was kind of

17   kept close to the vest.

18         Q.   Who, at LMNO, knew about the inflated

19   budgets?

20         A.   Ed, Eric, myself and Paul Wang.

21         Q.   Anybody else as far as you know?

22         A.   Not as far as I know.

23         Q.   Do you know if Mr. Rosenthal, did he

24   know?

25         A.   He did.

Page 67

1    now?

2         A.   No.

3         Q.   So going back to these hard copy files

4    that you mentioned that LMNO sent to your office,

5    you also testified that they were sent there so

6    you could, I think you said, recreate the books?

7         A.   Yes.

8         Q.   What do you mean by recreate the books?

9         A.   We were going to recreate the

10   accounting records for The Little Couple.

11        Q.   Do you know why you were going to be

12   doing that?

13        A.   Yes.

14        Q.   Okay, tell me why.

15        A.   Because we didn't fund the producer's

16   deficit.

17        Q.   What precipitated this recreation of

18   the records?  Like why were you doing it now, or

19   at that time as opposed to some other time?

20        A.   Because there was a conversation with

21   talent from that show, the talent and their

22   attorneys.

23        Q.   And what was that conversation?

24        A.   They had questions with regards to

25   international royalties.

Page 68

1     Q.    And would the international royalties

2   be impacted by the producer's deficit?

3     A.    Yes.

4     Q.    And if there were no producer's

5   deficit, presumably the royalties owed to The

6   Little Couple talent would be higher?

7     A.    Yes.

8     Q.    And so were they threatening to audit?

9     A.    Not at that time.

10    Q.    So what was the recreation of the

11  accounting records meant to do?

12    A.    To illustrate that the 30 percent

13  producer's deficit had, in fact, been

14  contributed.

15    Q.    And how are you supposed to go about

16  doing that?

17    A.    Realigning expenses and moving expenses

18  into that database or into that show.

19    Q.    I understand the moving expenses.   When

20  you say realign expenses, do you mean something

21  different or is that the same --

22    A.    Meaning like a payroll from a different

23  -- move expenses into that budget or into that

24  expense category.

25    Q.    So take expenses that should have been

1   for one show and say this was really like a

2   Little Couple expense?

3        A.   Yes.

4        Q.   To try to make it look like there was

5   30 percent?

6        A.   Yes.

7        Q.   Could you time frame this for me?  Do

8   you know when this happened?  Was this around

9   2015?

10        A.   Yes.

11        Q.   And I'm sorry if you testified to this.

12             Who made the request of you to --

13   strike that.

14             Did somebody ask you to do this

15   recreation?

16        A.   Yes.

17        Q.   And who was that?

18        A.   Eric.

19        Q.   And by Eric you mean Mr. Schotz?

20        A.   Yes.

21        Q.   Anybody else?

22        A.   No.

23        Q.   Did anybody else at LMNO know you were

24   going to be doing this?

25        A.   I think Ed knew.

1    everything.

2    BY MR. TSEKERIDES:

3         Q.   Did you have any discussions with

4    Mr. Horwitz about this?

5         A.   Yes.

6         Q.   So you told Mr. Horwitz that you were

7    asked to recreate the accounting records for The

8    Little Couple?

9              MR. RISING:   Objection, leading.

10   BY MR. TSEKERIDES:

11        Q.   Did you have a discussion with

12   Mr. Horwitz about recreating The Little Couple

13   accounting records?

14        A.   Yes.

15        Q.   How far along in this recreation

16   project did you get?

17        A.   I didn't.

18        Q.   You didn't?

19        A.   No.

20        Q.   So paragraph 29 indicates that, "Schotz

21   directed Ikegami to prepare false royalty reports

22   reflecting massive production losses."

23             Do you see that?

24        A.   Yes.

25        Q.   Is this the recreation project you are

Page 76

1    talking about?

2         A.   No.

3         Q.   What is 29 referring to then?

4         A.   We were requested -- it was requested

5    of us to prepare royalty statements for Dr.

6    Jennifer Arnold and Mr. Klein.

7         Q.   So how would you go about preparing a

8    false royalty report?

9         A.   I compiled the data with the contracts

10   as well as the international sales reports.

11        Q.   And how would that be a false royalty

12   report?

13        A.   Well, we would insert the producer's

14   deficit.

15        Q.   So in the royalty reports that were

16   being prepared for the talent, you inserted the

17   producer's deficit that you are saying did not

18   exist?

19        A.   Yes.

20        Q.   29 goes on to say, "Schotz further

21   instructed Ikegami to remove LMNO's books and

22   records from the company's office and to alter

23   the financial records to conceal LMNO's fraud."

24             Do you see that?

25        A.   Yes.

1      Q.    Is that the recreation project?

2      A.    Yes.

3            MR. RISING:   Objection, overbroad,

4   lacks foundation.

5   BY MR. TSEKERIDES:

6      Q.    The last sentence in 29 says that, "To

7   create backup for the fictional expenses, Schotz

8   suggested using Photoshop to modify bank

9   statements and other records."

10           Do you see that?

11     A.    Yes.

12     Q.    How would using Photoshop have allowed

13  you to modify bank statements?

14           MR. RISING:   Objection, lacks

15  foundation, calls for speculation.

16  BY MR. TSEKERIDES:

17     Q.    You can answer.

18     A.    I don't believe it would.

19     Q.    And you had a discussion with Mr.

20  Schotz about this suggestion?

21     A.    Yes.

22     Q.    And what did he say to you?

23     A.    That we needed to recreate the

24  expenses.

25     Q.    And he suggested using Photoshop?

Page 138

1    BY MR. TSEKERIDES:

2        Q.    What is the basis of your

3    understanding?

4        A.    I'm not sure I understand.

5        Q.    How do you know that that took place?

6        A.    It says so right here, amongst other

7    conversations that I've had.

8        Q.    And you are on this e-mail, right?

9        A.    Yes.

10            MR. RISING:  Objection, move to strike.

11   The document speaks for itself and it doesn't say

12   that it was actually buried.

13            MS. GAROFALO:  Objection.  You control

14   the record.  I'm not sure he has any authority to

15   move to strike.

16            MR. TSEKERIDES:  He can say whatever he

17   wants.  I don't care.  It's a non-event.

18   Whatever he says is a non-event.

19   BY MR. TSEKERIDES:

20        Q.    Sir, do you have any personal knowledge

21   that charges made for personal items were

22   included in production costs charged to a

23   particular program?

24        A.    Yes.

25            MR. RISING:  Objection, lacks

1    foundation that he knows what personal knowledge

2    means.

3    BY MR. TSEKERIDES:

4        Q.   Mr. and Ms. Schotz have children,

5    correct?

6        A.   Yes.

7        Q.   Did they work for LMNO?

8        A.   Yes.

9        Q.   In what capacity?

10       A.   Well, the middle son worked for Eric on

11   a regular basis after he graduated college.

12       Q.   What was his name?

13       A.   Andrew.

14       Q.   What did he do for Eric?

15       A.   I'm not sure.  He worked in

16   development, I believe.

17       Q.   And he had two other children?

18       A.   Yes.

19       Q.   Samantha and Zachary?

20       A.   Yes.

21       Q.   Did he work for LMNO?

22       A.   No.

23       Q.   Do you know if they used the LMNO Amex

24   corporate card?

25       A.   Yes.

Page 192

1   related to a program that don't appear on the

2   cost report?

3        A.   No.

4        Q.   Everything should be reflected on the

5   cost report as it relates to that program?

6        A.   Yes.

7             MR. TSEKERIDES:   Why don't we take a

8   short break for the court reporter.

9             (Break taken.)

10            THE VIDEOGRAPHER:   This marks the

11   beginning of disk number four.   We are back on

12   the record.   The time is 2:56.

13            MR. TSEKERIDES:   Mr. Ikegami, you've

14   been handed Exhibit 33, Bates stamped ACF 22 to

15   24.

16            THE WITNESS:   (Perusing.)

17            (Ikegami Exhibit 33, Document

18            Bates Stamped ACF 22 to 24, was

19            marked for identification.)

20   BY MR. TSEKERIDES:

21        Q.   Do you recognize this document?

22        A.   Yes.

23        Q.   And what is it?

24        A.   It's the cost report for The Little

25   Couple.

1    Q.    And you are familiar with the cost

2 reports that LMNO had, right?

3    A.    Yes.

4    Q.    You see where it has on the first page,

5 "Above the line"?

6    A.    Yes.

7    Q.    What does that refer to?

8    A.    Above the line expenses like writers,

9 executive producers, things that are not out in

10 the field.

11    Q.    So above the line is not out in the

12 field?   How would you describe above the line?

13    A.    That's how I would describe it, like

14 the executive producers, the writers and EPs, et

15 cetera.

16    Q.    And you see then it has "below the

17 line" a little further down?

18    A.    Um-hum.

19    Q.    What are those?

20    A.    Those are direct expenses like travel,

21 hotel and production expenses.

22    Q.    And then if you look on the next page

23 in the middle, it has "Below the line

24 post-production."

25            What does that mean?

1      A.    That is the post-production expenses.

2      Q.    So that's after shooting?

3      A.    Yes.

4      Q.    Is that where the RHS Studios would

5   show up?

6      A.    Yes.

7      Q.    And then it has "Below the line other

8   charges."

9            What does that refer to?   Do you see at

10  the bottom?

11     A.    Yeah.   These look like more overhead

12  expenses.

13     Q.    Overhead expenses, how are they

14  attributed to the show then?

15     A.    Like a prorated portion of the

16  insurance; a prorated of the Lexus Nexis.

17     Q.    Who at LMNO decides how to prorate an

18  expense like insurance to a particular program or

19  a particular cost report?

20     A.    Ed would make those decisions.

21     Q.    Did he have to have them approved by

22  anybody?

23     A.    No.

24     Q.    And then there's an entry under the

25  "Below the line other charges" that says

1   "Breakage."   And then under that it says "LMNO

2   overhead."

3            Do you see that?

4       A.   Yes.

5       Q.   First of all, I guess the question is

6   what does breakage mean, if you know?

7       A.   Breakage would be usually extraordinary

8   expenses that weren't budgeted.

9       Q.   Extraordinary expenses?

10      A.   Yes.

11      Q.   Not budgeted?

12      A.   That's how I understood them.

13      Q.   So what would "LMNO overhead" mean

14  under "breakage" in this The Little Couple 3 cost

15  report?

16      A.   I think those were the allocated

17  overhead -- those were the expenses that were

18  allocated to LMNO overhead.

19      Q.   By Mr. Horwitz?

20      A.   Yes.

21      Q.   So let's go across now where we have

22  headings.   So you have account number.

23            Do you know what that refers to?

24      A.   Yes.

25      Q.   What's that?

1        A.    The account number that ties to the

2   general ledger code.

3        Q.    Those tie to general ledger codes?

4        A.    They are called bibles but they are

5   known as general ledgers.

6        Q.    I have seen things called bible runs?

7        A.    Bible run, it's another term for a

8   general ledger run.

9        Q.    So bible run, general ledger run,

10  synonymous?

11       A.    Yes.

12       Q.    Gotcha.

13            Account description, what does that

14  mean?

15       A.    The title of the account in the

16  database.

17       Q.    So in the database there is something

18  under writer, executive producer, so on?

19       A.    Yes.

20       Q.    Previous cost to date, what does that

21  mean?

22       A.    That is the cost they incurred prior to

23  this report being issued.

24       Q.    Actual costs this period?

25       A.    Again, if this was a weekly run it

Page 197

1   would be the weekly expenses that would be in

2   that column for the week.

3        Q.   Now this one in particular, Exhibit 33

4   says "Estimated final costs."

5             What does that mean?  Do you see at the

6   very top?

7        A.   Yes, estimated final cost is the

8   difference between the budget and what we haven't

9   paid or what we haven't spent.

10        Q.   So this is meant to be like the final

11   cost?

12        A.   Yes.

13        Q.   "Committed," what does that mean?

14        A.   Either it has been booked into the

15   system with a PO or has been, say, for example,

16   payroll run or payroll taxes, things that are

17   already committed and being assigned to the show.

18        Q.   But not necessarily paid yet?

19        A.   That is correct.

20        Q.   Total cost to date?

21        A.   Is the totality of the committed and

22   the actual and previous.

23        Q.   Cost to complete, what does that mean?

24        A.   It's the difference between the total

25   cost and the estimated final cost.

Page 198

1      Q.    And then the estimated final cost is

2 what?

3      A.    Is what we would assume the final

4 production cost to be for that line item.

5      Q.    And then "Budgeted" as it appears on

6 this document, Exhibit 33, what does that refer

7 to?

8      A.    That refers to the internal budget

9 numbers that were imported into the system to

10 drive the production accounting.

11      Q.    So this would be an example of an

12 internal cost report?

13      A.    Yes.

14      Q.    Reflecting the internal budget,

15 correct?

16      A.    Yes.

17      Q.    As distinct from the budget that was

18 shared with the network, correct?

19      A.    Yes.

20      Q.    Now, if you look at page three,

21 Exhibit 33, which is essentially the last page,

22 it has the grand totals?

23      A.    Yes.

24      Q.    And on this cost report for budgeted

25 amount it has 2,097,149, correct?

1        A.    Correct.

2        Q.    Now, if you pull out that Exhibit 32

3    that I handed you before and look at The Little

4    Couple 3, row 30, the contribution from the

5    network is 2,927,149, right?

6        A.    Yes.

7        Q.    Those are the same numbers, right?

8        A.    Yes.

9        Q.    Going back to Exhibit 33, the estimated

10   final cost for production of The Little Couple

11   season three was $1,785,515, right?

12       A.    Correct.

13       Q.    Those are actual costs incurred by

14   LMNO, right?

15       A.    Yes.

16       Q.    So where it says "Variance," 311,634,

17   that's a variance between actual costs incurred

18   and the budgeted number reflecting Discovery's

19   contribution, right?

20       A.    Correct.

21       Q.    Are you aware of any other document in

22   all the years that you worked at LMNO where,

23   separate from the cost report, there would be

24   other costs incurred in connection with a program

25   that are being tracked, but not in a cost report?

Page  230

1       Q.    What was Mr. Horwitz' involvement in

2   dealing with royalties, both as it relates to

3   monies coming into LMNO and monies that were to

4   go out to either the talent or the networks?

5   What was his involvement?

6            MR. RISING:   Objection, lacks

7   foundation, calls for speculation.

8            THE WITNESS:   What was his involvement?

9   BY MR. TSEKERIDES:

10      Q.    Yes.

11      A.    He was in charge of it.

12      Q.    And how do you know that?

13      A.    Because he was the only one that would

14  handle that.

15      Q.    So while you were working at LMNO, are

16  you aware of anyone else besides Mr. Horwitz

17  handling the royalties?

18      A.    No.

19            MR. TSEKERIDES:   Looking at Exhibit 44,

20  Bates Stamped IKEGAMI 132776 to 777, and the

21  document, the attachment, hopefully you have it,

22  was produced natively and we printed that out.

23            THE WITNESS:   (Perusing.)

24            (Ikegami Exhibit 44, Document

25            Bates Stamped IKEGAMI 132776 to

1           777, was marked for

2           identification.)

3    BY MR. TSEKERIDES:

4        Q.    So this is an e-mail from you to

5    Mr. Horwitz and cc.ing Mr. Schotz dated March 28,

6    2014.

7           Have you seen this document before?

8        A.    Yes.

9        Q.    And what is it?

10       A.    This is the international royalty

11   report that we prepared.

12       Q.    This was prepared by LMNO?

13       A.    Yes.

14       Q.    And is this for royalties that would be

15   owed to The Little Couple?

16       A.    Yes.

17       Q.    The actual talent?

18       A.    Yes.

19       Q.    So let's turn to the attachment.  Who

20   prepared the actual attachment, if you know?

21       A.    I did.

22       Q.    And where did you get the numbers for

23   the producer's deficit?

24       A.    From the contracts.

25       Q.    And are those numbers reflected on the

1    cost reports?

2         A.    No.

3         Q.    And was this attachment sent to The

4    Little Couple?

5         A.    I believe it was.   I didn't send it.

6         Q.    Who was responsible, to your knowledge,

7    for sending the royalty reports to the talent?

8         A.    Ed.

9         Q.    So, according to this schedule, this

10   attachment, there was still a deficit of $3.5

11   million, right, according to the attachment?

12        A.    Yes.

13        Q.    Is it your testimony that that's not

14   accurate?

15        A.    Yes.

16        Q.    So if you took out the beginning

17   producer's deficit of 4.6 million and compared

18   that to the ending producer's deficit, if the 4.6

19   didn't exist, there would be a positive number at

20   the end, right?

21        A.    Yes.

22        Q.    And would that positive number be owed

23   to the talent?

24        A.    Yes.

25        Q.    If you can pull out that Exhibit 33

1   that we had, The Little Couple 3 cost report.

2        A.   (Perusing.)

3        Q.   And then keep with you Exhibit 44.

4             Are you with me?

5        A.   Yes.

6        Q.   So Exhibit 44 reflects producer's

7   deficit of 898,778, right, for season three?

8        A.   Say that number again.

9        Q.   Let me start over.

10            For season three of The Little Couple,

11  the document attached to Exhibit 44 that you

12  prepared reflects a producer's deficit of

13  898,778, right?

14       A.   Correct.

15       Q.   Now, if you look on Exhibit 33, where

16  is the producer's deficit on that document?

17       A.   It's not.

18            MR. TSEKERIDES:  Mr. Ikegami, you have

19  45 in front of you, right?

20            THE WITNESS:  Yes.

21            (Ikegami Exhibit 45, Document

22            Bates Stamped IKEGAMI 132720, was

23            marked for identification.)

24  BY MR. TSEKERIDES:

25       Q.   And this is an e-mail Bates Stamped

Page 260

1                        DECLARATION

2

3           I hereby declare I am the deponent in

4    the within matter; that I have read the foregoing

5    deposition and know the contents thereof, and I

6    declare that the same is true of my knowledge,

7    except as to the matters which are therein stated

8    upon my information or belief, and as to those

9    matters, I believe it to be true.

10          I declare under the penalties of perjury

11   of the State of California that the foregoing is

12   true and correct.

13          Executed on the_____day of_____,

14   2017, at_____, California.

15

16

17

18          _____

19                 W I T N E S S

20

21

22

23

24

25

Page 261

1    STATE OF CALIFORNIA      )   SS

2    COUNTY OF LOS ANGELES    )

3             I, BRENDA R. COUNTZ, Certified Shorthand

4    Reporter No. 12563 for the State of California,

5    do hereby certify:

6             That prior to being examined, the

7    witness named in the foregoing deposition was

8    duly sworn to testify the truth, the whole truth,

9    and nothing but the truth;

10            That said deposition was taken down by

11   me in shorthand at the time and place therein

12   named and thereafter transcribed and that the

13   same is a true, correct, and complete transcript

14   of said proceedings.

15            Before completion of the deposition,

16   review of the transcript [ x ] was [  ] was not

17   requested.  If requested, any changes made by the

18   deponent during the period allowed are appended

19   hereto.

20            I further certify that I am not

21   interested in the outcome of the action.

22   Witness my hand this 2nd day of February, 2017.

23

24   _____

25            Brenda R. Countz, CSR No. 12563