EXHIBIT E

EXHIBIT 3
1-26-17

Ellyn S. Garofalo (SBN 158795)
egarofalo@linerlaw.com
Amir Kaltgrad (SBN 252399)
akaltgrad@linerlaw.com
LINER LLP
1100 Glendon Avenue, 14th Floor
Los Angeles, California 90024.3518
Telephone: (310) 500-3500
Facsimile: (310) 500-3501

Marc S. Nurik (SBN 297951)
marc@nuriklaw.com
Law Offices of Marc S. Nurik
1551 Manning Avenue, Suite 302
Los Angeles, California 90024
Telephone: (310) 909-6828

Attorneys for Defendants Paul Ikegami and Ikegami & Co. Inc. and Cross-Complainant Paul Ikegami

**FILED**
Superior Court Of California
County Of Los Angeles

**DEC 15 2016**

Sherri R. Carter, Executive Officer/Clerk
By _____, Deputy
Charlie L. Coleman

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES, CENTRAL DISTRICT

| | |
|---|---|
| LMNO CABLE GROUP, INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>PAUL IKEGAMI, an Individual; IKEGAMI & CO. INC., a California corporation; and DOES 1-15, inclusive,<br><br>Defendants. | Case No. BC625749  D51<br><br>**CROSS-COMPLAINT FOR:**<br><br>**(1) BREACH OF ORAL CONTRACT; AND**<br>**(2) CONSTRUCTIVE TERMINATION IN VIOLATION OF PUBLIC POLICY.**<br><br>Action Filed: June 30, 2016 |
| PAUL IKEGAMI, an Individual,<br><br>Cross-Complainants<br><br>vs.<br><br>LMNO CABLE GROUP, INC., a California corporation; and ROES 1 through 50, inclusive,<br><br>Cross-Defendants | |

17069.001-3488650v2

CROSS-COMPLAINT

Case No. BC625749

For his Cross-Complaint, Defendant and Cross-Complainant Paul Ikegami alleges as follows:

## I. **INTRODUCTION**

1. In its Complaint, Plaintiff and Cross-Defendant LMNO Cable Group, Inc. ("LMNO" or "Cross-Defendant") contends that accountants Paul Ikegami ("Ikegami" or "Cross-Complainant") and Ikegami & Co. falsified LMNO's books and records to cover up their embezzlement from LMNO. In fact, LMNO used Ikegami as a pawn to cover up LMNO's multi-year scheme to defraud LMNO's television production partners out of millions of dollars in revenues. Ikegami's long relationship with LMNO terminated after Ikegami refused to assist LMNO principal, Eric Schotz ("Schotz"), in concealing the fraud by altering the production and financial records for a reality television show knows as "The Little Couple."

2. After Ikegami blew the whistle on LMNO's fraud, triggering the execution of FBI search warrants at LMNO's offices, LMNO filed its ill-conceived lawsuit as a preemptive strike to silence, or at the very least, discredit its accuser. Amazingly, LMNO filed a similarly trumped-up lawsuit against its former client and primary victim, Discovery Communications, LLC ("Discovery"), in the District Court for the Central District of California (the "Discovery Action"). The allegations in both Complaints are cleverly contrived to deflect attention from LMNO, and shift blame to Ikegami and Discovery.

3. Ikegami brings this cross-complaint to recover damages for breach of oral contract, constructive termination in violation of public policy and intentional infliction of emotional distress. Ikegami's allegations parallel those set forth by Discovery in its Cross-Complaint in the Discovery Action.

### **THE PARTIES**

4. Cross-Complainant Paul Ikegami is, and at all relevant times was, an individual residing in the State of California, County of Los Angeles.

5. Cross-Defendant LMNO Cable Group, Inc. is, and at all relevant times was, a California corporation organized and existing under the laws of the State of California, with its principal place of business in the State of California, County of Los Angeles.

17069.001-3488650v2    1    Case No. BC625749
CROSS-COMPLAINT

6. Cross-Complainant is ignorant of the true names and capacities of Defendants sued herein as ROES 1- 50 inclusive, and therefore sue these Cross-Defendants by such fictitious names. Cross-Complainant will amend the complaint to allege their true names and capacities when ascertained. Cross-Complainant is informed and believes, and based thereon alleges, that each of the fictitiously named Cross-Defendants is negligently responsible in some manner for the occurrences herein alleged, and that Cross-Complainant's losses as herein alleged were proximately caused by such negligence.

7. Cross-Complainant is informed and believes, and based thereon alleges, that except as otherwise alleged, each Cross-Defendant referred to herein, including ROES 1 through 50, inclusive, is and at all times material herein was the agent, servant, employee, partner, joint venturer, subsidiary or affiliate of each of the other Cross-Defendants and, in doing the things alleged herein, was acting within the course and scope of such position with the permission, knowledge and consent of each of the other Cross-Defendants, and that the other Cross-Defendants directed and ordered the action beforehand, or alternatively, subsequently ratified and approved the conduct of the other Cross-Defendants.

## II. ALLEGATIONS COMMON TO ALL CAUSES OF ACTION.

### A. Ikegami's Role at LMNO.

8. LMNO is or was a producer of cable network reality shows. For years, LMNO cheated Discovery and other production partners through a variety of financial slights of hand.

9. Defendants were LMNO's accountants. The relationship between LMNO and Ikegami & Co. stretches back approximately thirty years, when Ikegami began to provide tax and accounting related services to LMNO.

10. For many years, Ikegami & Co. prepared LMNO's tax returns based on information provided by LMNO at the close of each fiscal year. The CFO, who was responsible for LMNO's corporate accounting, provided Ikegami with the "final work product" from the corporate accounting system. Production accounting was controlled not by the CFO, but by LMNO's Vice President of Finance ("VP of Finance") who provided Ikegami with an overall cost of goods sold for the relevant line items on LMNO's returns. Back up documents and details from

1  the production accounting records were not provided to Ikegami.

2    11. In or about 2008, LMNO terminated its CFO after an IRS audit. Ikegami assumed
3  the CFO's responsibilities for corporate accounting, while maintaining his independent status.

4    12. Approximately six months later, Ikegami was advised of a potential embezzlement
5  by LMNO's VP of Finance. An audit confirmed the theft. However, for reasons that baffled
6  Ikegami at the time, the VP of Finance was not terminated and Schotz, LMNO's President,
7  declined to authorize the full audit recommended by Ikegami.

8    13. It was not until eighteen months later, that LMNO terminated the VP of Finance
9  on the pretext that Schotz, had "lost confidence in his abilities." Cross-Complainant is informed
10 and believes, and based thereon alleges, that the VP of Finance received a generous "severance"
11 package as "hush" money to for his silence on financial irregularities and fraud in LMNO's
12 production accounting records.

13   14. Schotz then invited Ikegami to assume the role of VP for Finance. The parties
14 agreed that Ikegami would work three days a week out of an executive office at LMNO in
15 exchange for a salary of $6,000 per week.

16   15. As de facto CFO, Ikegami's role had been restricted to corporate accounting. As
17 VP of Finance, Ikegami for the first time became involved in production accounting. Ikegami
18 soon learned that the two departments and their respective accounting systems had been strictly
19 segregated. This was for good reason as the corporate and production accounting records did not
20 balance and could not be reconciled.

21   16. In or about April 2015, LMNO's technology director, Justin Welches ("Welches"),
22 resigned over "ethical issues." Welches, characterized as an "independent contractor," was paid
23 $637,000 in severance in exchange for a non-disclosure agreement. Cross-Complainant is
24 informed and believes, and based thereon alleges, that Welches' severance payment was "hush"
25 money to keep him silent on certain alterations to the LMNO's electronic financial records,
26 including submissions to the Director's Guild of America and the Writer's Guild of America.

27  **B.** **LMNO's Fraud.**

28   17. LMNO produced reality television shows in conjunction with networks such as

1 Discovery, NBC and A&E. Each LMNO production contract, whether for 'work for hire' or 'co-
2 production' projects, provided for LMNO to be paid a standard 10% Producer/Director fee. Under
3 a "work for hire" contract, LMNO would be paid the 10% fee to produce the show, with all rights
4 and ownership interests retained by the network. The production costs were paid entirely by the
5 network, with no contribution from LMNO.

6     18. In contrast, a "co-production" contact provided for LMNO to fund 30% of the
7 production costs. This contribution was known as the "Producer's Deficit." The amount of the
8 Producer's Deficit (i.e. LMNO's 30% contribution) was calculated from budgets and cash flow
9 projections prepared and submitted by LMNO.

10     19. LMNO had the right to recover its 30% Producer's Deficit from international
11 royalties. Once LMNO recouped its Producer's Deficit, LMNO and its network partner were to
12 split the royalties.

13     20. To maximize its revenues, LMNO rigged its budgets, books and records to avoid
14 payment of the Producer's Deficit – a fact concealed from LMNO's network partners.
15 Specifically, LMNO deliberately inflated its production budgets so that the network's 70%
16 contribution was actually a contribution of 100% or more of LMNO's actual productions. For
17 instance, if a show was budgeted at $1 million, LMNO would be required to contribute $300,000
18 with the network contributing $700,000. If LMNO artificially inflated the budge to $1.5 million,
19 the network's 70% contribution would be $1,050,000, more than 100% of the show's actual
20 production costs. Cross-Complainant is informed and believes, and based thereon alleges, that
21 LMNO maintained two sets of accounting records: one showing the real budget and the other
22 showing the inflated budget submitted by LMNO to its network partners.

23     21. The network contracts required LMNO to establish a separate bank account for
24 each production. LMNO would provide the networks with production binders giving the false
25 impression not only that the accounts were being created, but that LMNO was depositing its 30%
26 Producer's Deficit directly into those accounts. The networks, however, were actually being
27 instructed to wire funds directly to LMNO's operations checking account. LMNO would then
28 manipulate its payables and milestones (triggers for payments to LMNO) in order to transfer the

1 minimum amount of money into the production accounts and retain as much of the production contributions in its own operating account as possible.

22. This was only the tip of the iceberg. LMNO routinely inflated budgets substantially over what LMNO knew would be the actual production costs; often as much as 55% less than projected for the networks. The 'underages' (i.e., the difference between the budgeted and actual production costs) were pocketed by LMNO. LMNO also routinely misrepresented to its network partners that it had not recouped its Producer's Deficit – a complete fiction as LMNO never made the contribution in the first place. This fiction permitted LMNO to retain 100% of the international royalties without any split paid to LMNO's network partners.

23. LMNO would also routinely charge its network partners for fabricated costs and expenses that allegedly. Through this ruse, LMNO diverted even more money its own coffers.

24. As a result of the above described schemes, LMNO's network partners were defrauded out of millions of dollars in revenues including:

    (a) an excessive 10% Producer/Director fee based on artificially inflated budgets;

    (b) the 30% Producer's Deficit which LMNO covertly withheld, increasing network contributions to 100% or more of actual budgets;

    (c) fabricated production costs and expenses; and

    (d) 50% of foreign royalties withheld on the ruse that LMNO had not recouped its mythical Producer's Deficit.

25. These were only some of the methods used by LMNO to manipulate and falsify financial records, including payables to control the flow of money and conceal its diversion of funds.

### C. Ikegami's Constructive Termination for Refusal to Participate in LMNO's Fraud.

26. "The Little Couple" is a long running reality show produced by LMNO pursuant to a 'co-production' deal with Discovery.

27. In addition to other compensation, the show's talent, William Klein and Dr. Jennifer Arnold (collectively, the "Talent"), were to receive 50% of LMNO's share of foreign

royalties after LMNO recouped its Producer's Deficit. Since LMNO never contributed the Producer's Deficit, the Talent was entitled to 25% of all international royalties (or one half of the 50% to which LMNO was legitimately entitled). The payments were never made.

28. After the "The Little Couple's" fifth season, an attorney for the Talent requested an accounting of their back end money. Any such accounting threatened to expose LMNO's schemes including its failure to contribute the Producer's Deficit and distribute international royalties as required under the show's co-production agreement.

29. Panicked, Schotz directed Ikegami to prepare false royalty reports reflecting massive production losses (begging the question as to why the show would be entering its ninth season). Schotz further instructed Ikegami to remove LMNO's books and records from the company's office and to alter the financial records to conceal LMNO's fraud. It was initially contemplated that this could be achieved by transferring expenses from other shows onto the books of "The Little Couple." To create back-up for the fictional expenses, Schotz suggested using Photo Shop to modify bank statements and other records.

30. To induce Ikegami to participate in the falsification of LMNO's financial records, Ikegami was promised a new compensation package, increasing his compensation to $50,000 per month. Ikegami was also to be rewarded with a "special" which, in LMNO parlance, meant that the company would pay an employee's personal expenses as additional compensation. The disguised compensation would then be allocated as costs or expenses to LMNO co-productions. This practice was routine at LMNO.

31. As a 'special' for his role in falsifying LMNO's financial records, Schotz promised to pay Ikegami's personal American Express bills. Hence, in an eight month period, LMNO paid Ikegami's American Express bills in amounts ranging from $15,000 to $20,000. Cross-Complainant is informed and believes, and based thereon alleges, that Ikegami's personal expenses were allocated to the budgets of LMNO co-productions.

32. After initially agreeing to Schotz's scheme, Ikegami balked at reallocating expenses from other shows to "The Little Show." Although Ikegami returned the documents removed at Schotz's request, to protect against LMNO's destruction or alteration of evidence,

1 Ikegami forwarded copies of cost reports, week ending reports and other financial information to
2 himself for safekeeping.

3     33. On or about October 14, 2015, Ikegami formally severed his ties with LMNO and
4 requested a severance package. The request was denied. Ikegami also became a whistleblower.
5 In or about late November or early December 2015, Ikegami telephoned the Discovery ethics
6 hotline to report LMNO's fraud. Ikegami subsequently alerted federal prosecutors to the massive
7 fraud that had been orchestrated by Schotz and LMNO. As a result, on or about June 30, 2016,
8 the FBI executed search warrants at LMNO's offices.

9     34. After the search warrants were executed, LMNO brazenly filed the within action
10 against Ikegami accusing him of embezzlement and extortion. Not surprisingly, LMNO's
11 Complaint is silent on facts set forth herein.

## FIRST CAUSE OF ACTION

### (For Breach of Oral Contract)

### (Against LMNO)

15     35. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 34
16 inclusive, as though fully set forth herein.

17     36. In or about October 2008, Cross-Complainant entered into an oral agreement with
18 LMNO pursuant to which Ikegami agreed to serve as LMNO's VP of Finance. In exchange for
19 Ikegami's services, LMNO agreed to pay Ikegami a salary of $6,000 per week (the "Agreement").
20 Ikegami entered into the oral agreement in reliance on LMNO's promise to pay compensation.

21     37. Between October 2008 and October 2015, Ikegami served as LMNO's VP of
22 Finance and LMNO paid Ikegami $6,000 per week for his services.

23     38. Ikegami performed all obligations required to be performed under the Agreement.

24     39. Cross-Defendant breached the Agreement by failing and refusing to pay for
25 services contracted by Cross-Defendant and provided by Cross-Complainant pursuant to the
26 Agreement.

27     40. The Agreement contained a covenant of good faith and fair dealing. Cross-
28 Defendant breached the covenant of good faith and fair dealing by, among other things, instructing

1 | Ikegami to falsify LMNO's financial records.

41. As a proximate result of LMNO's breaches, Cross-Complainant has been damaged in an amount to be proven at the time of trial, but not less than $1 million.

## SECOND CAUSE OF ACTION

### (For Constructive Termination in Violation of Public Policy)

### (Against LMNO)

42. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 41 inclusive, as though fully set forth herein.

43. On or about October 14, 2015, Ikegami was forced to resign as LMNO's CFO and VP of Finance, after refusing to falsify LMNO's financial books and records as directed by Schotz, and participate in LMNO's ongoing scheme to defraud its network production partners.

44. LMNO's fraud and the directive to falsify LMNO's books and records to conceal the fraud violated public policy and the law.

45. The conditions leading to Ikegami's resignation were so intolerable any reasonable person in Ikegami's position would have resigned.

46. LMNO intentionally created, or knowingly permitted to exist, such intolerable conditions.

47. A reasonable employer would have realized that a reasonable person in Ikegami's position would be compelled to resign.

48. As a proximate result of Cross-Defendant's conduct, Cross-Complainant has been damaged in an amount to be proven at the time of trial, but not less than $1 million.

49. In doing the things herein alleged, Cross-Defendant acted with malice, oppression or fraud in conscious disregard of Cross-Complainant's rights, thereby entitling Cross-Complainant to an award of exemplary and punitive damages in an amount appropriate to punish Cross-Defendant and deter others from engaging in similar misconduct.

## PRAYER FOR RELIEF

WHEREFORE, Cross-Complainant prays for judgment as follows:

**ON THE FIRST CAUSE OF ACTION:**

1. For damages according to proof.

**ON THE SECOND CAUSE OF ACTION:**

1. For damages according to proof; and
2. For exemplary and punitive damages.

**ON ALL CAUSES OF ACTION:**

1. For costs of suit herein incurred; and
2. For such further relief the Court deems just and proper.

Dated: December 15, 2016

LINER LLP

By: _____
Ellyn S. Garofalo
Attorneys for Defendants Paul Ikegami and Ikegami & Co. Inc.
and Cross-Complainant Paul Ikegami

17069.001-3488650v2

9

Case No. BC625749

CROSS-COMPLAINT

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 1100 Glendon Avenue, 14th Floor, Los Angeles, CA 90024.3518.

On December 15, 2016, I served true copies of the following document(s) described as **CROSS-COMPLAINT** on the interested parties in this action as follows:

Stephen R. Mick, Esq.
Kevin D. Rising, Esq.
David W. Nelson, Esq.
BARNES & THORNBURG LLP
2029 Century Park East, Suite 300
Los Angeles, CA 90067-3012

*Attorneys for Plaintiff*
*LMNO Cable Group, Inc.*

**BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed above and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with Liner LLP's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid. I am a resident or employed in the county where the mailing occurred. The envelope was placed in the mail at Los Angeles, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on December 15, 2016, at Los Angeles, California.

_____
Christine Loui Pineda

17069.001-3488650v2

Case No. BC625749

CROSS-COMPLAINT