1  STEPHEN R. MICK (SBN 131569)
   smick@btlaw.com
2  KEVIN D. RISING (SBN 211663)
   krising@btlaw.com
3  DAVID W. NELSON (SBN 240040)
   dnelson@btlaw.com
4  **BARNES & THORNBURG LLP**
   2029 Century Park East, Suite 300
5  Los Angeles, California 90067
   Telephone:    310.284.3880
6  Facsimile:    310.284.3894
7  Attorneys for Intervenor-Defendants
   LMNO CABLE GROUP, INC. and
8  ERIC SCHOTZ

9

                    UNITED STATES DISTRICT COURT
10
                   CENTRAL DISTRICT OF CALIFORNIA
11

12  LMNO CABLE GROUP, INC., a          Case No. 2:16-cv-4543-JAK-SK
13  California corporation,
                                       [The Honorable John A. Kronstadt]
14              Plaintiff,
                                       **EXHIBITS B AND C TO**
15       v.                            **DECLARATION OF DAVID W. NELSON**
                                       **IN SUPPORT OF INTERVENOR**
16  DISCOVERY COMMUNICATIONS,          **DEFENDANTS LMNO CABLE GROUP,**
    LLC, a Delaware limited liability  **INC. AND ERIC SCHOTZ'S MOTION**
17  company,                           **FOR SUMMARY JUDGMENT AND**
                                       **PARTIAL SUMMARY JUDGMENT**
18              Defendants.

19  DISCOVERY COMMUNICATIONS,
20  LLC, a Delaware limited liability  Date:      April 2, 2018
    company,                           Time:      8:30 a.m.
21                                     Crtrm:     10B
                Counterclaimant,
22                                     Judge:     Hon. John A. Kronstadt
23       v.

    LMNO CABLE GROUP, INC., a
24  California corporation, and LMNO
    ENTERTAINMENT GROUP, LLC, a
25  California limited liability company,

26              Counter-Defendants.

27

28

---

EXHIBITS A AND B TO DECLARATION OF DAVID W. NELSON IN SUPPORT OF
INTERVENOR DEFENDANTS LMNO CABLE GROUP, INC. AND ERIC SCHOTZ'S
MOTION FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT

# EXHIBIT B

**Highly Confidential**      **LMNO Cable Group, Inc. vs.**
**Discovery Communications, LLC**

1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3   LMNO Cable Group, Inc. a
    California Corporation,
4           Plaintiff,              Case No.
        vs.                         2:16-cv-4543-JAK-SK
5   Discovery Communications, LLC, a
    Delaware Limited Liability
6   Company,
            Defendant.
7   _____

8   Discovery Communications, LLC, a
    Delaware Limited Liability Company
9           Counterclaimant,
        vs.
10  LMNO Cable Group, Inc., a
    California Corporation; LMNO
11  Entertainment Group, LLC, a
    California Limited Liability
12  Company;
            Counterdefendants.
13  _____

14  William Klein, an individual;
    Jennifer Arnold, an individual;
15  and Candu Enterprises, Inc., a
    Texas Corporation
16          Plaintiff-Intervenors,
        vs.
17  LMNO Cable Group Inc., a
    California Corporation; Eric
18  Schotz, an individual; and Edward
    Horwitz, an individual
19          Defendants.
20  _____

21          *** HIGHLY CONFIDENTIAL ***
        VIDEOTAPED DEPOSITION OF WILLIAM W. KLEIN, JR.
22              Los Angeles, California
                    January 12, 2018
23  Reported by:
    MARLA SHARP,
24  RPR, CLR, CCRR, CA CSR
    11924, OR CSR 17-0446, WA CSR 3408
25  JOB NO.:  10039173

1      Q     All right.  And just to pin that down, do

2  you recall any -- prior -- let's set the time frame

3  as prior to signing the option agreement.

4           Do you recall any specific conversations

5  with Eric Schotz?

6      A     I don't recall a specific conversation with

7  him.

8      Q     Do you recall whether you had any

9  conversations with Eric Schotz?

10     A     It would be speculative.  I'm not sure when

11 I was originally introduced to Eric.

12     Q     All right.  And do you recall whether you

13 had any conversations with Ed Horwitz prior to

14 signing the option agreement?

15     A     No.

16           MR. JOHNSON:  Could I have a moment to talk

17 to my client, please?

18           MR. NELSON:  We can go off the record.

19           THE VIDEOGRAPHER:  Okay.  Then off the

20 record, 10:21.

21           (Recess taken from 10:21 a.m.

22           to 10:23 a.m.)

23           THE VIDEOGRAPHER:  Back on the record,

24 10:23.

25           MR. NELSON:   Introduce Exhibit 2.

```
 1              (Exhibit 2 was marked for
 2              identification by the reporter.)
 3    BY MR. NELSON:
 4        Q     Take as much time as you need to review
 5    this.  My first question will be whether you
 6    recognize this document.
 7        A     Yes, I recognize the document.
 8        Q     What is this document?
 9        A     This is the original option agreement that
10    was presented to us in October of 2008.  It was
11    misdated 2009.  We corrected that in an amendment
12    later on.
13        Q     And if you turn to page 3, is that your
14    signature under the name "Bill Klein"?
15        A     That is my signature.
16        Q     And then if you turn to the last page,
17    page 7, is your initial there at the bottom of the
18    page?
19        A     That is my initial.
20        Q     Were you involved in negotiation of this
21    agreement with LMNO?
22        A     I was.
23        Q     And were you negotiating this agreement on
24    behalf of both yourself and your wife, Dr. Arnold?
25        A     Yes, I was negotiating on behalf of
```

William W. Klein, Jr.

Highly Confidential          LMNO Cable Group, Inc. vs.
                             Discovery Communications, LLC

1    make sure I understand --

2        A    Sure.

3        Q    -- any claims you're making here.

4            And so, I mean, obviously, in this document

5    there's certain terms that the parties have agreed

6    on.

7            And what I'm trying to understand is

8    whether, in addition to anything that was agreed on

9    in this document, did anyone from LMNO make any

10   statement to you or representation to you that you

11   were relying on in deciding to enter into this

12   agreement?

13       A    No.

14       Q    When you entered into this option

15   agreement, was it your understanding that LMNO was

16   going to own the rights to the show?

17       A    We understood that LMNO would own the

18   rights to the program.

19           If we didn't -- well, what I should say is

20   that, when this document was presented to us, it was

21   assumed that the program would need to be picked up

22   and, if so, that we would see a longer-form

23   agreement that we would address concerns more fully,

24   which I think is referred to in this document as

25   well.

1         There was no long-term assumption from

2    Jennifer or myself -- or at least from me that there

3    wouldn't be a review of all of the rights, all of

4    the compensation associated with a longer-term

5    commitment.

6         Q    So at the time you signed the option

7    agreement, what was your understanding regarding the

8    purpose of the option agreement itself?

9         A    That we would provide you with -- or

10   with -- LMNO with access to our families to produce

11   a television pilot.  And then, if it got picked up,

12   that we would seek a longer-form agreement to

13   finalize all of our relationships.

14        But obviously it specifically states with

15   respect to rights of ownership of the work produced.

16   And so, to that degree, we understood what we

17   signed.

18        Q    So it was your understanding at the time

19   you entered into the option agreement that the

20   option agreement would just govern the pilot, and

21   then if there was further production past the pilot,

22   that you and LMNO would negotiate a new agreement?

23        A    Yeah.  It was implied in this agreement.

24        Q    Did that ever happen?

25        A    No.

1    Q    Do you know why that didn't happen?

2    A    No.

3    Q    Did you ever go back LMNO and say, "We

4    should negotiate a new agreement now that" --

5    A    Every season --

6    Q    -- "Discovery has picked this up for a new

7    season"?

8    A    Not in between the pilot and the new

9    season, no.  Afterwards, between season 1 and 2, I

10   believe we spoke with LMNO through our counsel.

11   Q    Did you ever have any understanding that

12   you would share ownership of the copyrights in "The

13   Little Couple" program with LMNO?

14   A    No.

15        MR. NELSON:  I'm going to introduce

16   Exhibit 3.

17        MR. JOHNSON:  Was there an answer to that?

18        THE WITNESS:  No.  As in "no" was the

19   answer.

20        MR. NELSON:  Yes, there was an answer.

21        THE COURT REPORTER:  One second.

22        (Exhibit 3 was marked for

23        identification by the reporter.)

24   BY MR. NELSON:

25   Q    This is a document that's --

```
 1              MR. BACH:  David, before you move on, what
 2    does the record reflect with respect to the last
 3    question?  I think based -- Neville was right that
 4    it may not have been clear for the record.
 5              MR. JOHNSON:  Was there an answer to his
 6    last question?
 7              MR. NELSON:  Yeah.
 8              Well, why don't you read back the last
 9    question and answer for everyone's sake.
10              (The record was read as follows:
11              Q    Did you ever have any understanding
12              that you would share ownership of the
13              copyrights in "The Little Couple"
14              program with LMNO?
15              A    No.)
16    BY MR. NELSON:
17         Q    This document, Exhibit 3, is Bates labeled
18    LMNO136940 through 136946.
19              After you've taken the opportunity that you
20    need to review this, my question will be:  Do you
21    recognize this agreement?
22         A    Yes.  I'm familiar with the agreement.
23         Q    What is this document?
24         A    This is the surviving agreement between
25    us -- my wife, myself, and Candu -- maybe not
```

1   Candu -- and LMNO when the talent agreement was

2   moved to Discovery Communications.

3       Q      If you turn to page 7, is that your

4   signature, as best you can tell, above the name

5   "Bill Klein"?

6       A      I couldn't tell.

7       Q      Is it your recollection that you did sign

8   this agreement?

9       A      It is my recollection that I signed it.

10      Q      Did you have any involvement in the

11  negotiation of this agreement with LMNO?

12      A      No.   I had counsel that negotiated this

13  agreement with LMNO.

14      Q      Did you personally have any conversations

15  with LMNO regarding the negotiation of this

16  agreement?

17      A      Not that I can recall.

18      Q      And you mentioned that you had a counsel.

19  Was that --

20      A      Roger Armstrong.

21      Q      -- Roger Armstrong who was responsible for

22  negotiating this agreement on your behalf?

23      A      That's correct.

24      Q      Even though you didn't negotiate it, did

25  you read through the agreement before you signed it?

1          A     No.   No.

2          Q     This e-mail is dated November 5th, 2010.

3     So this comes about two years into your relationship

4     with LMNO.

5               Prior to this date, do you recall receiving

6     any information from anyone at LMNO regarding

7     international sales?

8          A     Mostly conversations that the show was to

9     be exploited internationally and that we would

10    receive quarterly statements once sales started to

11    come in from -- I believe it was Endemol at first

12    and then it was, after some time of poor

13    performance, that it would be moved to Southern

14    Star.

15               And I don't know at what point it

16    transferred from Southern Star to Cineflix, but I

17    know the relationship there was short.

18         Q     All right.  So --

19         A     But those were through conversation, from

20    what I can recall.

21               THE COURT REPORTER:  "But those" what?

22               THE WITNESS:  Were through conversation.

23    BY THE WITNESS:

24         Q     Who at LMNO did you have conversations with

25    regarding this topic?

1              Dr. Arnold entered the conference room.)

2    BY MR. NELSON:

3        Q    Welcome back, Mr. Klein.

4             My question for you -- and, again, I want

5    to be very specific here -- is:  Can you tell me

6    anything that Eric Schotz told to you that you

7    considered to be a misrepresentation?

8        A    No, not until we received word through

9    counsel that there was --

10            MR. JOHNSON:  You're not supposed to talk

11   about what you got from counsel.

12            THE WITNESS:  Okay.  So no, there was no

13   direct representation that Eric had provided that I

14   feel was a misrepresentation of the truth.

15   BY MR. NELSON:

16       Q    Okay.  We've gone through some e-mails that

17   were either sent or forwarded by Ed Horwitz.  And

18   I'd like to set those aside.  And my question does

19   not include those e-mails.

20            Apart from those e-mails, do you contend

21   that Ed Horwitz made any other misrepresentation to

22   you?

23       A    Is there a specific reference?

24       Q    Well, I mean, you are --

25       A    You mean in general?

```
 1              THE WITNESS:  Well, in deference to all of
 2    that.
 3              MR. JOHNSON:  All right.  We need to take
 4    another break.
 5              MR. NELSON:  All right.  We'll go off the
 6    record.
 7              THE WITNESS:  Sorry.
 8              THE VIDEOGRAPHER:  Okay.  Off the record,
 9    1:36.
10              (Recess taken from 1:36 p.m.
11              to 1:45 p.m.)
12              THE VIDEOGRAPHER:  We're back on the
13    record, 1:45 p.m.
14              MR. NELSON:  Can you read back the last
15    question?
16              (The record was read as follows:
17              Q    What, if anything, did you do to --
18              well, address the situation?)
19              THE WITNESS:  So in February we did, in
20    fact, speak with Discovery.  And at that point I
21    worked with our counsel to decide how we would
22    handle things moving forward.
23    BY MR. NELSON:
24       Q    In December 2015, you were in the middle of
25    filming season 8 of the show, correct?
```

1    A     I believe we were.

2    Q     And did that filming continue until

3    approximately the end of January 2016?

4    A     I don't recall exactly when we finished up

5    filming, but it was around then.

6    Q     And you continued to do work with LMNO

7    during that period, correct?

8    A     Yes.

9    Q     And you continued getting paid for your

10   participation in the show, correct?

11   A     That's correct.

12   Q     You didn't tell LMNO that you wanted to

13   stop participating in the show?

14   A     That's correct.

15   Q     You didn't tell LMNO that you wanted to

16   tear up the contract with them?

17   A     That's correct.

18   Q     Then in March and April you were talking

19   with LMNO about filming a season 9, correct?

20   A     That's correct.

21   Q     And you were talking with LMNO about

22   filming a trip to Scotland and England that you were

23   planning to take in the beginning of May 2016,

24   correct?

25   A     Yes.

William W. Klein, Jr.

1   Q     You wanted to continue filming the show,
2   correct?
3       A     Depending on the result -- assuming my
4   trust wasn't betrayed, yes.
5       Q     All right.
6       A     I had no reason to stop filming.
7       Q     And you were making a good deal of money
8   from the show, correct?
9       A     Yes.
10      Q     And as long as LMNO was the producer, you
11  were continuing to work with LMNO, correct?
12      A     That's correct.
13      Q     Being on "The Little Couple" has benefited
14  you and your --
15      A     Oh, I'd like to add to my last statement,
16  though, that at that point Discovery owned our
17  talent agreement.  So we weren't actually able to
18  make those decisions without Discovery.
19          It became more complicated once we were in
20  a three-way relationship directly.  So I don't know
21  that it was necessarily something that we could have
22  made a decision on.
23      Q     Right, which is what I'm saying.  As long
24  as LMNO was the producer --
25      A     As long as Discovery elected to have LMNO

William W. Klein, Jr.

**Highly Confidential**

**LMNO Cable Group, Inc. vs.
Discovery Communications, LLC**

1    produce the show --

2        Q    It was your intent to continuing working

3    with LMNO?

4        A    It wasn't our decision to make.

5        Q    Well -- but your decision wouldn't have

6    been, "We're just going to stop working on the

7    show," correct?

8        A    I think that's -- that's a tough question

9    to answer.  I don't know.

10       Q    Well, that's not what you did.  I mean, you

11   continued working with LMNO, didn't you, until

12   Discovery chose to bring in another producer?

13       A    That's correct.

14       Q    Being on "The Little Couple" has benefited

15   you and your family financially, correct?

16       A    Correct.

17       Q    You would agree that you are better off

18   financially today than you would have been had you

19   never participated in "The Little Couple" show,

20   correct?

21            MR. JOHNSON:  Calls for speculation.

22            THE WITNESS:  I would say that our

23   situation is unique and that the contents of the

24   program are what made the program.

25            So I don't know whether or not it could

1          MR. NELSON:  Exhibit 14.

2          (Exhibit 14 was marked for

3          identification by the reporter.)

4    BY MR. NELSON:

5       Q     Take your time to review.  And my first

6    question will be:  Do you recognize this document?

7       A     Yes, I recognize this document.

8       Q     What is this document?

9       A     This is a document that was between us and

10   Discovery Communications to move forward with a new

11   renewal term.

12      Q     What seasons do you -- are associated with

13   the renewal term?

14      A     I am not absolutely sure.  It says -- it

15   says fourth and fifth.  To what seasons they

16   specifically apply to, I don't know.

17      Q     Does this agreement govern your current

18   participation on "The Little Couple"?

19      A     It's an amendment to our current agreement

20   on "The Little Couple."

21      Q     All right.  So this is part of the overall

22   agreement that governs your current participation in

23   "The Little Couple," correct?

24      A     I believe so.

25      Q     All right.

1      A      I'm not an attorney, but yeah.

2      Q      And if we look at the first paragraph, it

3   talks about the agreement that's being amended.   So

4   I'm going to read that.

5               "Reference is made to that certain

6               agreement, dated October 28, 2008 (as

7               amended and supplemented through the

8               date hereof)" -- defined as "(the

9               'Agreement') between Candu Enterprises,

10              Inc. (Lender), f/s/o Jennifer Arnold and

11              Bill Klein" --

12              THE COURT REPORTER:   "F/s/o" --

13   BY MR. NELSON:

14      Q      -- "f/s/o Jennifer Arnold and

15              Bill Klein and their children, Will

16              Klein and Zoey Klein (collectively,

17              'The Family'), on the one hand, and

18              Discovery Talent Services, LLC

19              ('Company') the successor-in-

20              interest to LMNO Cable Group, Inc.,

21              on the other hand..."

22              Do you recognize that this is referencing

23   the original option agreement that we've looked at

24   as Exhibit 2?

25      A      It would seem to be referencing that

1    agreement.

2         Q     All right.

3         A     Although at that time it wasn't inclusive

4    of the kids.

5         Q     And the original option agreement,

6    Exhibit 2, is defined in Exhibit 14 here as "the

7    Agreement," correct?

8         A     Of Exhibit -- I'm sorry.  Your question

9    once more?

10        Q     If you look at the top of Exhibit 14, the

11   original option agreement, which is Exhibit 2, is

12   defined in Exhibit 14 as "the Agreement," correct?

13        A     Yes.

14        Q     Okay.  If you turn to page 3 under the --

15        A     Does it matter that it's -- yeah.  No.

16   Never mind.  Okay.

17        Q     If you turn to page 3, the writing under

18   "Accepted and Agreed To," it states:

19             "Except as otherwise herein amended

20             and supplemented the Agreement between

21             us is in all other" respects -- "in all

22             other aspects hereby ratified and

23             confirmed."

24             Do you see that?

25        A     Yes.

William W. Klein, Jr.

Highly Confidential          LMNO Cable Group, Inc. vs.
                             Discovery Communications, LLC

1        Q     And do you understand that that is stating

2     that this amendment is ratifying and confirming the

3     option agreement which we've looked at as Exhibit 2?

4              MR. BACH:   I'm going to object.   That calls

5     for a legal conclusion.

6              THE WITNESS:   I'm not quite sure what it

7     applies to, whether it's to talent amendment 1 for

8     our agreement with Discovery or to the original

9     option agreement.

10    BY MR. NELSON:

11       Q     If you look under the name Candu

12    Enterprises Inc. on that page, is that your

13    signature?

14       A     That's correct.

15       Q     And you signed this as the CEO and co-owner

16    on behalf of Candu Enterprises?

17       A     That's correct.

18       Q     And you signed it on April 19th, 2017?

19       A     That's correct.

20       Q     So on April 19th, 2017, you were ratifying

21    and confirming the original option agreement,

22    correct?

23             MR. JOHNSON:   What paragraph is that you

24    were reading from?

25             THE WITNESS:   It's the "Accepted and Agreed

```
 1   To."
 2              MR. JOHNSON:  Yeah.
 3   BY MR. NELSON:
 4       Q      My question may have gotten lost.  I'll
 5   just ask it again.
 6              On April 19th, 2017, in signing this
 7   document, you were ratifying and confirming the
 8   option agreement, correct?
 9       A      And all of its changes since then, no?
10       Q      So you were ratifying and confirming the
11   option agreement as amended and supplemented,
12   correct?
13       A      Correct.
14              MR. JOHNSON:  Doesn't mean that he's not
15   suing for breach and seeking rescission.
16              MR. NELSON:  Well, indeed.  So that's my
17   next question.
18   BY MR. NELSON:
19       Q      Despite the fact that, on April 19th, 2017,
20   you ratified and confirmed the existence of the
21   option agreement, are you still offering and seeking
22   to rescind the option agreement --
23              MR. JOHNSON:  You know what?  I'll make it
24   clear for you.
25   ///
```

1            CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

2

3            I, Marla Sharp, certified shorthand

4      reporter in the State of California, hereby certify:

5            That the foregoing videotaped deposition

6      of WILLIAM W. KLEIN, JR., was taken before me on

7      January 12, 2018, at which time the witness was duly

8      sworn by me;

9            That the testimony of the witness and all

10     colloquy and objections made at the time of the

11     deposition were recorded stenographically by me and

12     thereafter transcribed, said transcript being a true

13     copy of my shorthand notes thereof;

14           That review of the transcript (X) was

15     ( ) was not requested before completion of the

16     deposition; ( ) that the witness has failed or

17     refused to approve the transcript.

18           I further certify I am neither financially

19     interested in the action nor a relative or employee

20     of any attorney of any of the parties.

21           In witness whereof, I have subscribed my

22     name and signature this date, January 23, 2018.

23

24     _____

25     Marla Sharp
       RPR, CLR, CCRR, CSR No. 11924

# EXHIBIT C

```
 1              UNITED STATES DISTRICT COURT

 2      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4   LMNO Cable Group, Inc. A California
     Corporation,
 5
                         Plaintiff,
 6            vs.                          Case No.:
                                           2:16-cv-4543-JAK-SK
 7   Discovery Communications, LLC, a
     Delaware Limited Liability Company,
 8
                         Defendant.
 9   ───────────────────────────────────────

10   Discovery Communications, LLC, a
     Delaware Limited Liability Company,
11
                         Counterclaimant,
12            vs.

13   LMNO Cable Group, Inc. a California
     Corporation; LMNO Entertainment Group,
14   LLC, a California Limited Liability
     Company,
15
                         Counterdefendants.
16   ───────────────────────────────────────

17   (CONTINUED ON NEXT PAGE)

18              **CONFIDENTIAL**

19          VIDEOTAPED DEPOSITION OF

20           JENNIFER L. ARNOLD

21         CENTURY CITY, CALIFORNIA

22       THURSDAY, JANUARY 11, 2018

23

     REPORTED BY:
24   JAMIE L. ASBURY
     CSR NO. 13308, CLR
25   JOB NO.: 10039172
```

**Confidential**

Jennifer Arnold

**LMNO Cable Group, Inc. vs.
Discovery Communications, LLC**

1    Q    Looking at the entire time that you are working

2   with LMNO, so I'm approximating 2008 to 2016, do you

3   recall personally having any conversation, either in

4   person or on the phone, with anyone at LMNO regarding

5   the compensation that was owed to you under any of your

6   agreements with LMNO?

7    A    I don't recall any conversations that I

8   personally had about compensation.

9    Q    Do you recall compensations that you were

10   involved in regarding -- start over, because I may have

11   said the wrong word there.

12        Do you recall any conversations that you were

13   involved in that involved the compensation that was owed

14   to you under any of the agreements with LMNO?

15        MR. JOHNSON:  Excluding conversations with your

16   husband and Armstrong, you are free to answer.

17        THE WITNESS:  No, not outside of those two.

18   BY MR. NELSON:

19    Q    Okay.  Do you recall having any personal

20   conversation with LMNO regarding any contingent

21   compensation that would have been owed to you and your

22   husband under the agreements with LMNO?

23    A    Not that I remember.

24    Q    Do you recall personally having any

25   conversation with LMNO regarding the foreign sales for

**Confidential**

1    **The Little Couple program?**

2         **A    No, I don't remember any of those.**

3         MR. NELSON:  All right.  I'm going to introduce

4    Exhibit 3.

5              (Deposition Exhibit 3 was marked for

6              identification.)

7         THE WITNESS:  Thank you.

8    BY MR. NELSON:

9         Q    The document Bates-labeled LMNO 124203 through

10   124222.

11            Again, review, to the extent necessary, and my

12   first question will be:  Have you ever seen this email

13   before?

14        A    Not that I'm aware of.

15        Q    Do you recall if you ever saw any of the

16   information that was attached to this email before?

17        A    So far, as I'm going through, I don't recall

18   seeing any of these documents before.  But I'm still

19   going through.

20            I, sadly, don't recall any of these documents.

21        Q    Did you rely on any of the information that was

22   sent with this email, for any purpose?

23        A    Not that I'm aware of.

24        Q    As you sit here today, do you personally know

25   whether the information provided with this email was

1    BY MR. NELSON:

2        Q    As you sit here today, do you believe that LMNO

3    has made misrepresentations to you concerning the amount

4    of money that you are owed under the contract with LMNO?

5             MR. JOHNSON:   Same instruction.

6             THE WITNESS:   My answer would be the same.   I

7    cannot answer.

8    BY MR. NELSON:

9        Q    Do you know who Paul Ikegami is?

10            MR. JOHNSON:   If your information comes only

11   from your husband, Armstrong, or me and my office, you

12   can't answer.   If you have other knowledge, please go

13   ahead.

14            THE WITNESS:   My knowledge only comes from my

15   husband and our counsel, so I can't answer that

16   question.

17   BY MR. NELSON:

18       Q    Have you ever personally spoken to Paul Ikegami

19   or been involved in any conversations with Paul Ikegami?

20       A    No, I have not.

21       Q    What is your relationship to Candu Enterprises,

22   Inc.?

23       A    It is -- I'm a member of the company.

24       Q    Are you -- are you a director?

25       A    I actually don't know the answer to that

**Confidential**

Jennifer Arnold

LMNO Cable Group, Inc. vs.
Discovery Communications, LLC

1      I, the undersigned, a Certified Shorthand

2  Reporter of the State of California, do hereby certify:

3      That the foregoing proceedings were taken

4  before me at the time and place herein set forth; that

5  any witnesses in the foregoing proceedings, prior to

6  testifying, were duly sworn; that a record of the

7  proceedings was made by me using machine shorthand,

8  which was thereafter transcribed under my direction;

9  that the foregoing transcript is a true record of the

10  testimony given.

11      Further, that if the foregoing pertains to the

12  original transcript of a deposition in a federal case,

13  before completion of the proceedings, review of the

14  transcript [ X ] was [   ] was not requested.

15

16      I further certify I am neither financially

17  interested in the action nor a relative or employee of

18  any attorney or party to this action.

19      IN WITNESS WHEREOF, I have this date

20  subscribed my name.

21

22  Dated: January 23, 2018

23

24  _____

     Jamie L. Asbury

25    CSR 13308, CLR