UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-04543 JAK (SKx) | Date | May 15, 2020 |
|---|---|---|---|
| Title | LMNO Cable Group, Inc. v. Discovery Communications, LLC | | |

#

| Present: The Honorable | JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE |
|---|---|

| Andrea Keifer | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:**     **(IN CHAMBERS) ORDER RE DEFENDANT EDWARD HORWITZ'S MOTION TO DISMISS (DKT. 219);**

**DEFENDANT EDWARD HORWITZ'S MOTION FOR SUMMARY JUDGMENT (DKT. 239);**

**DEFENDANT LMNO CABLE GROUP, INC. AND ERIC SCHOTZ'S MOTION FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT (DKT. 241);**

**PLAINTIFF-INTERVENORS' MOTION FOR LEAVE TO AMEND EXPERT WITNESS DISCLOSURE (DKT. 234)**

I.     <u>Introduction</u>

LMNO Cable Group, Inc. ("LMNO") brought this action against Discovery Communications, LLC ("Discovery"), advancing claims arising out of the production of certain television programs, including the reality show *The Little Couple*. Dkt. 1 ("Complaint"). Discovery filed a counterclaim against LMNO and LMNO Entertainment Group, LLC ("LEG"). Dkt. 17 ("Counterclaim"). On February 20, 2018, a stipulation was filed to dismiss with prejudice the pending claims between Discovery and both LMNO and LEG, pursuant to a confidential settlement agreement. Dkt. 248. Consequently, the Complaint, two amended complaints (Dkts. 128, 177), and the Counterclaim were dismissed with prejudice as to LMNO, LEG, Discovery and 21 broadcast distributors who had been named as defendants. Dkt. 251. Accordingly, this litigation has concluded with respect to the claims among those parties.

On June 19, 2017, an order issued that granted the motion to intervene brought by William Klein ("Klein"), Jennifer Arnold ("Arnold"), and Candu Enterprises, Inc. ("Candu") (collectively "Plaintiffs").[1] Dkt. 143. Plaintiffs' First Amended Complaint in Intervention ("FACI"), which is the operative pleading, advances the following causes of action against LMNO and/or two of its employees -- Edward Horwitz ("Horwitz") and Eric Schotz ("Schotz") (collectively, "Defendants"): (i) breach of written contract --

---

[1] These parties are identified in certain filings as "Intervenors" or "Plaintiff-Intervenors." Because the underlying claims and counterclaims between LMNO and Discovery have been dismissed and the claims in intervention are the only remaining affirmative ones, for clarity, these parties are referred to as "Plaintiffs" in this Order.

#

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-04543 JAK (SKx) | | Date | May 15, 2020 |
|---|---|---|---|---|
| Title | LMNO Cable Group, Inc. v. Discovery Communications, LLC | | | |

against LMNO; (ii) breach of implied covenant of good faith and fair dealing -- against LMNO; (iii) fraud -- against LMNO, Schotz, and Horwitz; (iv) conversion -- against LMNO, Schotz, and Horwitz; (v) violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.* ("UCL") -- against LMNO; (vi) accounting -- against LMNO; and (vii) declaratory judgment as to ownership of intellectual property rights -- against LMNO. FACI ¶¶ 73-142, Dkt. 213.

On February 6, 2018, Plaintiffs filed a Motion to Amend Expert Witness Disclosure (the "Expert Witness Motion"). Dkt. 234. LMNO and Schotz filed an opposition to the Expert Witness Motion. Dkt. 249. Plaintiffs filed a reply. Dkt. 254.

On February 12, 2018, Horwitz filed a Motion for Summary Judgment as to the two claims -- fraud and conversion -- in which he is a defendant. Dkt. 239 ("Horwitz Motion").[2] On the same day, LMNO and Schotz filed a Motion for Summary Judgment and Partial Summary Judgment as to certain of the claims advanced against them. Dkt. 241 ("LMNO Motion") (collectively, the "MSJs"). Plaintiffs filed oppositions to both MSJs. Dkts. 255, 256. Replies were filed by LMNO and Schotz (Dkt. 257), and Horwitz (Dkt. 258), respectively.

A hearing was held on April 2, 2018. Dkt. 263. For the reasons stated in this Order, the Horwitz Motion is **GRANTED**, the LMNO Motion is **GRANTED IN PART** and **DENIED IN PART**, and the Expert Witness Motion is **MOOT**.

## II.    Factual Background

### A.    The Parties

Klein and Arnold, who are married, are featured on *The Little Couple* (the "Program"), which is aired on the TLC Network. *See* Plaintiffs' Opposition to Defendants LMNO and Schotz's Statement of Uncontroverted Facts in Support of LMNO Motion ("LMNO SUF") ¶ 4, Dkt. 255-9. Candu is a loan-out corporation through which the services of Klein and Arnold are provided in connection with the production of the Program. *Id.*

LMNO is a cable television production company that previously co-produced the Program. *Id.* ¶¶ 1, 3. Schotz is the President and Chief Executive Officer ("CEO") of LMNO. *Id.* ¶ 2. Horwitz was a salaried employee of LMNO between April 2003 and August 2016. *See* Horwitz's Response to Plaintiffs' Opposition to Horwitz Statement of Uncontroverted Facts ("Horwitz SUF") ¶ 5, Dkt. 260; Horwitz Depo. Tr. 418:1-7, Ex. 4 to Horwitz Motion, Dkt. 239-3 at 76-96. At LMNO Horwitz was Executive Vice President of Production and Intentional Distribution. Horwitz SUF ¶ 5. In that role he was responsible for overseeing the production of certain programming, including the Program. *Id.*

Discovery is a "global media company" that "provides programming content—both original and purchased—across multiple distribution platforms." Dkt. 17 ¶ 15. The FACI does not advance any claims against Discovery. Further, as noted, under the settlement agreement among Discovery, LMNO

---

[2] Horwitz previously filed a Motion to Dismiss the fraud and conversion claims pursuant to Fed. R. Civ. P. 12(b)(6). Dkt. 219. Because the issues raised in the Horwitz Motion are included in the arguments raised by the prior motion to dismiss, it is **MOOT**.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-04543 JAK (SKx) | Date | May 15, 2020 |
|----------|--------------------------|------|--------------|
| Title | LMNO Cable Group, Inc. v. Discovery Communications, LLC | | |

and LEG, the claims advanced by and against Discovery were dismissed. Therefore, Discovery is no longer a party to this action. It is, however, a party to certain of the contracts on which the claims advanced by Plaintiffs against LMNO are based.

B.      The Relevant Contracts Among Plaintiffs, LMNO and Discovery

1.      The Option Agreement

On October 28, 2008, Klein and Arnold entered an "Option Agreement" with LMNO. *See* LMNO SUF ¶ 6; Option Agreement, Ex. F to Declaration of David Nelson ("Nelson Decl."), Dkt. 241-2 at 52-58. The Option Agreement granted to LMNO the exclusive option to produce the Program, which was to be based on the daily activities of Klein and Arnold. LMNO SUF ¶ 7. Under the Option Agreement, LMNO was to be "the sole and exclusive Owner" of the Program. *See* Option Agreement, Terms and Conditions ¶ 8. As consideration for granting these rights, the Option Agreement provided for an upfront, per-episode fee payable to Klein and Arnold. *See* Option Agreement § 2(b). It also provided certain "contingent compensation" for Klein and Arnold:

> Artist shall be entitled to Twenty-Five Percent (25%) of One Hundred Percent (100%) of LMNO's share of any contingent compensation received by LMNO from the exploitation of the [Program] by third parties (e.g. all media including television, DVD's, merchandising, domestic and foreign), after LMNO first receives any un-recouped, direct, out of pocket third party customary development, production and distribution costs. In the event LMNO distributes or otherwise exploits the Property directly, the LMNO and Artist shall negotiate the definition of 'profits' in good faith based on the custom and practice of the industry.

Option Agreement § 3.

Klein and Arnold also obtained certain accounting and audit rights under the Option Agreement:

> Artist shall receive written accountings (including Network accounting statements) from LMNO along with any contingent compensation payments due within a period of ninety (90) days from LMNO's receipt of any written accountings and contingent compensation payments due from the applicable Network and/or distributor. Artist shall have customary industry audit rights with regards to LMNO (e.g. once per year during normal business hours).

*Id.*[3]

2.      The Co-Production Agreement

---

[3] The parties agreed to three amendments to the Option Agreement: (i) Amendment, dated July 20, 2009; (ii) Second Amendment to Option Agreement, dated November 1, 2010; and (iii) Amendment 3 to Option Agreement, dated November 1, 2011. LMNO SUF ¶ 11. However, neither party contends the substantive amendments to the Option Agreement are material to the issues presented in this action.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-04543 JAK (SKx) | Date | May 15, 2020 |
|---|---|---|---|
| Title | LMNO Cable Group, Inc. v. Discovery Communications, LLC | | |

On November 8, 2008, LMNO and Discovery entered a "Co-Production Agreement" pursuant to which Discovery was granted certain distribution rights to the Program in exchange for sharing with LMNO the cost of its production. *See* Horwitz SUF ¶ 4; Co-Production Agreement, Ex. 3 to Horwitz Motion, Dkt. 239-3 at 69-75. It is undisputed that, pursuant to the Co-Production Agreement and its subsequent amendments, LMNO and Discovery negotiated and agreed to a production budget for the Program. It stated that Discovery would provide to LMNO a cash equivalent of 70% of the production costs. *See* Horwitz SUF ¶ 4.[4]

3.   The Surviving Agreement

In June 2014, LMNO assigned to Discovery all of its rights in the Option Agreement, as amended. LMNO SUF ¶ 12. As a result of that assignment, on June 1, 2014, Arnold and Klein entered into a "Surviving Agreement" with LMNO. *Id.* ¶ 13; Surviving Agreement, Ex. G. to Nelson Decl., Dkt. 241-2 at 60-66. It is undisputed that by entering into the Surviving Agreement, Plaintiffs expressly acknowledged that the Option Agreement had been assigned to Discovery. *See* Surviving Agreement, Recitals A-B.

The Surviving Agreement is similar in form and content to the Option Agreement. It describes the contingent compensation to which Klein and Arnold were entitled under the Option Agreement, and to which they would remain entitled under the Surviving Agreement. *Id.* § 3. It provides, in relevant part, that Klein and Arnold "shall be entitled to receive 25% of 100% of Producer's share of any contingent compensation received by Producer from the exploitation of the Property by third parties . . . after Producer first recoups any un-recouped direct, out of pocket third party customary development, production, and distribution costs." *Id.* The Surviving Agreement also provides Plaintiffs with accounting and audit rights similar to the ones they had under the Option Agreement. *Id.*

It is undisputed that Plaintiffs' current relationship with Discovery is governed by the Option Agreement, that Plaintiffs continue to perform and receive payment under the Option Agreement, and that the Plaintiffs agreed to amend the Option Agreement as recently as April 2017. *See* LMNO SUF ¶¶ 65, 68-72.

**C.   Plaintiffs' Allegations Against LMNO**

Plaintiffs have alleged that, during the course of their business relationship with LMNO, it materially breached its contractual obligations to Plaintiffs and defrauded them with respect to the contingent compensation to which they were entitled under the Option and Surviving Agreements. *Id.* ¶ 16. The primary evidentiary basis for these claims is certain profit participation statements. They state amounts to which Plaintiffs claim they were entitled under the Option and Surviving Agreements, and which purported to reflect calculations of the production deficit,[5] as well as the revenue received by LMNO

---

[4] The parties refer to the production costs as the "production deficit." At the April 2, 2018 hearing, the parties disputed the extent to which Plaintiffs' references to the production deficit distinguished the costs relevant to LMNO's agreements with Discovery and the substantially narrower set of costs that apply to the calculation of Plaintiffs' contingent compensation under their agreements with LMNO. There is a genuine issue of material fact as to this matter, which cannot be resolved through the MSJs.

[5] LMNO disputes the extent to which the "production deficit" had any direct relevance to the profit participation statements sent to Plaintiffs under the Option Agreement. The basis for this position is that the production deficit

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-04543 JAK (SKx) | Date | May 15, 2020 |
|---|---|---|---|
| Title | LMNO Cable Group, Inc. v. Discovery Communications, LLC | | |

from its exploitation of the Program. Horwitz SUF ¶ 8. Horwitz testified that, as part of the negotiation of the Co-Production Agreement with Discovery, he prepared a production budget that was intended to reflect an "industry standard bottom line" rather than the actual costs associated with producing the Program. Horwitz Depo. Tr. 26:8-14. Discovery then agreed that, as part of the Co-Production Agreement, it would contribute 70% of the amount of this production budget toward the actual costs of producing the Program. *See* Horwitz SUF ¶ 5. Horwitz testified that, through an internal LMNO document, he separately tracked how much Discovery actually contributed toward the production costs. *See* Horwitz Depo Tr. 432:3-9.[6]

It is undisputed that Horwitz was primarily responsible for providing the profit participation statements to Plaintiffs. Horwitz SUF ¶ 8. It is also undisputed that Horwitz sent these statements to Plaintiffs at least nine times, and that he did so by attaching them to emails between November 5, 2010 through June 26, 2015. *Id.* ¶ 9; Exs. 7-15 to Horwitz Motion.[7] These profit participation statements formed the basis from which the contingent compensation owed to Plaintiffs was determined. The dispute as to their accuracy is at the center of the disagreement that gave rise to this action. Horwitz SUF ¶ 8; *see also* LMNO SUF ¶ 16.

Plaintiffs claim that the profit participation statements were inaccurate, and were part of a fraudulent scheme whose purpose was to avoid paying them the contingent compensation due under the Option and Surviving Agreements. In support of this assertion, Plaintiffs rely primarily on the testimony of Paul Ikegami ("Ikegami"). Ikegami was formerly the Chief Financial Officer ("CFO") of LMNO. *See* Plaintiffs' Statement of Uncontroverted Facts in Support of Their Opposition to the Horwitz Motion ("Plaintiffs' Horwitz SUF") ¶ 6, Dkt. 256-9. Klein declares that, in December 2015, Ikegami contacted Plaintiffs, through their attorney, and informed them that LMNO had committed "certain accounting irregularities." Klein Decl. ¶ 8.[8]

---

[6] LMNO responded as follows to an interrogatory from Plaintiffs concerning the relationship between the negotiated production budget and its internal tracking data: "Once the contract budget was finalized, LMNO would adjust the internal document to reflect Discovery's actual agreed contribution. The purpose of the document was to plan how LMNO would utilize Discovery's contribution to cover some of the out-of-pocket expenses that LMNO would incur in the production. The internal document was never intended to include all of the expenses that LMNO anticipated that it would incur in connection with the production, or to reflect all of the internal contributions that LMNO planned to make to the production." LMNO Response to Plaintiffs' First Set of Interrogatories, No. 1, Ex. 5 to Horwitz Motion, Dkt. 239-3 at 97-103.

[7] Plaintiffs have submitted evidence that, prior to 2010, they had not received any profit participation statements from LMNO, and that Horwitz provided "excuses" as to the reason that there was a delay in sending them. *See* Declaration of William Klein ("Klein Decl.") ¶ 4, Dkt. 256-7.

[8] Ikegami also allegedly contacted Discovery, through an ethics hotline, and made allegations that LMNO had been defrauding Discovery. *See* Dkt. 17 ¶ 96; Klein Decl. ¶ 8. Ikegami's whistleblower statements were one cause of the underlying litigation between LMNO and Discovery. LMNO also brought an action against Ikegami. *See* Ikegami Depo Tr. 20:23-21:4, Ex. B to Declaration of Arun Dayalan ("Dayalan Decl."), Dkt. 256-3. No evidence has been submitted as to any factual bases or causes of action advanced in that state court action.

was defined by LMNO's contract with Discovery, and that the terms of that agreement were significantly broader in scope and value than LMNO's contract with Plaintiffs. It is undisputed that the contingent compensation owed to Plaintiffs under the Option Agreement was based, in part, on the expenses incurred by LMNO in connection with its production of the Program. References in this Order to the "production deficit" are to those expenses that affected Plaintiffs' contingent compensation. They do not resolve the factual dispute over whether the production deficit under the Discovery contracts overlaps with the direct expenses incurred in the production of the Program.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-04543 JAK (SKx) | | Date | May 15, 2020 |
|---|---|---|---|---|
| Title | LMNO Cable Group, Inc. v. Discovery Communications, LLC | | | |

#

Ikegami testified that LMNO "rigged its budgets, books and records" in an effort to maximize its revenues. *See* Ikegami Depo Tr. 44:14-25. Ikegami testified that LMNO maintained two versions of its budgets. *Id.* at 45:14-48:5. One was provided to Discovery, and was the basis of the production deficit calculations. *Id.* It was allegedly inaccurate. *Id.* The other was an internal budget, which reflected LMNO's actual contribution of production costs. *Id.* According to Ikegami, the internal budget reflected that LMNO had failed to make any contributions to the production costs of the Program, notwithstanding that LMNO had agreed to pay 30% of them under the production budget negotiated with Discovery in connection with the Co-Production Agreement. *Id.* at 47:8-15, 47:25-48:5. Ikegami testified that the purpose of "re[-]creat[ing] the accounting records" for the Program was to state, falsely, that LMNO had contributed 30% of the production deficits, when it had not actually contributed any portion of them. *Id.* at 67:8-68:14.

    **D.    The Individual Roles of Schotz and Horwitz in LMNO's Alleged "Re-creating" of Its Accounting Records**

As noted, it is undisputed that Horwitz provided profit participation statements to Plaintiffs in accordance with LMNO's obligations under the Option Agreement. Horwitz SUF ¶ 8. Horwitz and Ikegami both testified, however, that it was Ikegami, not Horwitz, who compiled these statements. They also testified that Horwitz acted primarily as a liaison between LMNO and Plaintiffs. *See* Horwitz Depo. Tr. 442:20-443:4, 445:6-15; Ikegami Depo. Tr. 67:3-69:20, 75:20-77:2. Horwitz also submitted emails he sent to Plaintiffs' representatives, to which he had attached the profit statements, noting that they were prepared by Ikegami. *See* Exs. 10, 11, 16-19 to Horwitz Motion, Dkt. 293-3 at 162-82, 198-207.

Ikegami testified that Schotz, who was the final decision-maker on production and accounting decisions, instructed him to re-create the accounting records so that they would show that LMNO had contributed 30% of the production deficit. *See* Ikegami Depo Tr. 69:14-20. Ikegami also testified that Horwitz was aware that Ikegami was performing this alleged re-creation of the accounting records. *Id.* at 69:23-25.

**III.   Analysis**

    **A.    The Motions for Summary Judgment**

        1.    General Legal Standards

A motion for summary judgment will be granted where the "depositions, documents, electronically stored information, affidavits or declarations, stipulations[,] . . . admissions, interrogatory answers, or other materials" show that there is "no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a), (c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party seeking summary judgment bears the initial burden to show the basis for its motion and to identify those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 322. Where the

---

However, Horwitz did submit evidence suggesting that Ikegami had misrepresented to LMNO that he is a CPA. Horwitz SUF ¶ 8.

#

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-04543 JAK (SKx) | Date | May 15, 2020 |
|----------|--------------------------|------|--------------|
| Title | LMNO Cable Group, Inc. v. Discovery Communications, LLC | | |

moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. Where the nonmoving party will have the burden of proof on an issue, however, the movant need only demonstrate that there is an absence of evidence to support the claims of the nonmoving party. *See id.* If the moving party meets its initial burden, the nonmoving party must set forth "specific facts demonstrating the existence of genuine issues for trial." *In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex*, 477 U.S. at 324).

Only admissible evidence may be considered in connection with a motion for summary judgment. Fed. R. Civ. P. 56(c). In considering such a motion, a court is not to make any credibility determinations or weigh conflicting evidence. All inferences are to be drawn in the light most favorable to the nonmoving party. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987). However, conclusory, speculative testimony in declarations or other evidentiary materials is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).[9]

2.  Application

LMNO and Schotz moved for summary judgment as to the following claims and issues: (i) the fraud and conversion claims as to both LMNO and Schotz, because they are barred by the economic loss rule; (ii) the conversion claim as to both LMNO and Schotz because there is no evidence that Plaintiffs had an ownership in any property that was converted; (iii) the fraud claim as to Schotz, because Plaintiffs have not established that Schotz made a misrepresentation; (iv) the claim for rescission of the Option Agreement, because that is not an available remedy; (v) the request for declaratory relief, because Plaintiffs have not established a legal basis for an ownership interest in any intellectual property rights related to the Program; and (vi) the scope of damages available under the breach of contract claim, because certain identified payments received by LMNO from a third party distributor do not qualify as the "contingent compensation" to which Plaintiffs are entitled under the relevant agreements. *See* Dkt. 241 at 2-3.

Horwitz moved for summary judgment as to both of the claims asserted against him, *i.e.*, fraud and conversion. *See* Dkt. 239. He argues that those claims are barred by the economic loss rule, and that the necessary elements of both claims cannot be established based on the undisputed facts. *See id.* at 15-24.

a)  The Fraud and Conversion Claims – Against All Defendants

(1)  Legal Standards: The Economic Loss Rule

In general, the economic loss rule bars tort claims that "merely restate contractual obligations," limiting the available remedies to ones under contract law. *Aas v. Superior Court*, 24 Cal. 4th 627, 643 (2000);

---

[9] Horwitz made evidentiary objections to portions of Ikegami's deposition testimony and the Klein Declaration. *See* Horwitz's Objections in Supp. of Mot. for Summary Judgment, Dkt. 259. They are addressed in a separate order issued concurrently with this Order. The discussion in this Order relies only on admissible evidence.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-04543 JAK (SKx) | | Date | May 15, 2020 |
|----------|-------------------------|---|------|--------------|
| Title | LMNO Cable Group, Inc. v. Discovery Communications, LLC | | | |

*see also Giles v. Gen. Motors Acceptance Corp.*, 494 F.3d 865, 873 (9th Cir. 2007) ("The term 'economic loss' refers to damages that are solely monetary, as opposed to damages involving physical harm to person or property."). "Restrictions on contract remedies serve to protect the 'freedom to bargain over special risks and [to] promote contract formation by limiting liability to the value of the promise.'" *Erlich*, 21 Cal. 4th 543, 553 (1999) (alteration in original) (quoting *Freeman & Mills, Inc. v. Belcher Oil Co.*, 11 Cal. 4th 85, 98 (1995)). The rule "prevents the law of contract and the law of tort from dissolving one into the other." *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 988 (2004) (internal modification and quotations omitted).

There are exceptions to the economic loss doctrine. "[A] breach of contract is tortious only when some independent duty arising from tort law is violated." *Erlich*, 21 Cal. 4th at 554. A tortious breach of contract may arise where:

> (1) the breach is accompanied by a traditional common law tort, such as fraud or conversion; (2) the means used to breach the contract are tortious, involving deceit or undue coercion; or (3) one party intentionally breaches the contract intending or knowing that such a breach will cause severe unmitigable harm in the form of mental anguish, personal hardship, or substantial consequential damages.

*Id.* at 553-54. "In addition to the independent duty requirement, the economic loss rule 'requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise.'" *Century of Progress Prods. v. Vivendi S.A.*, No. CV 16-7733 DMG (ASx), 2018 WL 4191340, at *9 (C.D. Cal. Aug. 28, 2018) (quoting *Robinson Helicopter*, 34 Cal. 4th at 988).

(2)    <u>Application</u>

(a)    Fraud

Although Plaintiffs allege that Defendants committed four types of fraud, the allegedly fraudulent conduct at the heart of each is the preparation and transmission of the profit participation statements. As noted, Plaintiffs contend that Defendants overstated the production deficit in order to reduce the payment due to Plaintiffs under the contracts. FACI ¶¶ 88-121.[10] The claim that the statements were not accurate is also a basis for the cause of action for breach of the contract. *See id.* ¶¶ 77, 81. Because the contract and tort claims arise from the same factual allegations, the issue presented is whether the latter is barred by the economic loss rule. *See* Dkt. 239 at 16-19; Dkt. 241 at 13-15.

---

[10] Plaintiffs dispute that their fraud claim is based solely on alleged misrepresentations in the profit participation statements. They contend that it also relies on oral misrepresentations made by Schotz and Horwitz. LMNO SUF ¶ 17. To support this position, Plaintiffs rely on Klein's declaration in which he states that Defendants falsely told Plaintiffs that there was a large "producer deficit," *i.e.*, production deficit, that the Program was running a large deficit and that Plaintiffs were fortunate the Program was still in production. *Id.*; Klein Decl. ¶ 11. These oral statements are not materially different from the fraudulent misrepresentations in the profit participation statements; both arise from the claim that Defendants made misrepresentations about the production deficit. *See* § II.C *supra*. Consequently, the present analysis applies to both the alleged oral and written misrepresentations.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-04543 JAK (SKx) | Date | May 15, 2020 |
|---|---|---|---|
| Title | LMNO Cable Group, Inc. v. Discovery Communications, LLC | | |

Plaintiffs respond that the economic loss rule does not bar claims based on intentional misrepresentations. *See* Dkt. 255 at 14-15; Dkt. 256 at 13-15. Plaintiffs argue that the evidence is sufficient to show a triable issue as to whether Defendants fraudulently misrepresented the production deficit to reduce the amount paid to Plaintiffs. *Id.* From this premise, Plaintiffs then contend that their claims are broader than the "simple failure to pay money due under a contract" to which the economic loss rule can apply because they suffered more than contract damages, including damages as the result of out-of-pocket expenses to investigate the fraud, as well as emotional distress *See* Dkt. 255 at 15-16; Dkt. 256 at 15.

The applicability of the economic loss rule turns on whether the evidence presented as to Defendants' actions constitutes tortious conduct that is distinct from the duties Defendants owed under the terms of the Option and Surviving Agreements. *See Robinson Helicopter*, 34 Cal. 4th at 989-90. The allegation that Defendants' conduct constituted "intentional, rampant fraud" *see* Dkt. 255 at 15; Dkt. 256 at 15, is not itself a sufficient basis to warrant the application of the exception to the economic loss rule. In response to a motion for summary judgment, it is necessary to present evidence that supports the non-moving party's position as to the conduct at issue. *See, e.g.*, *Food Safety Net Servs. v. Eco Safe Sys.*, 209 Cal. App. 4th 1118, 1131-32 (2012) (affirming summary judgment on fraud claim where evidence "suggest[ed] no misrepresentation 'beyond a broken contractual promise.'") (quoting *Robinson Helicopter*, 34 Cal. 4th at 988)). Therefore, to determine whether the economic loss rule bars the tort claims in this action, it is necessary to examine Defendants' obligations under the relevant contracts, and to compare those duties and the allegedly fraudulent conduct, as well as the claimed, resulting harm.

Under the Option and Surviving Agreements, LMNO was obligated to pay Plaintiffs 25% of certain contractually defined "contingent compensation" arising out of LMNO's distribution and exploitation of the Program. *See* Option Agreement § 3; Surviving Agreement § 3. To determine the amount of contingent compensation owed, written accountings, including profit participation statements, were prepared. Horwitz SUF ¶ 8. They contained calculations of the production deficit, as well as revenue received by LMNO in connection with its use of the Program. *Id.* These statements, which were periodically provided by LMNO to Plaintiffs, form the basis of Plaintiffs' contention that LMNO underreported the contingent compensation owed to Plaintiffs in breach of the Option and Surviving Agreements. *See* LMNO SUF ¶ 16.

In support of the claim that these actions may present the basis for a tort claim, and not just a "garden variety contract dispute," *see* Dkt. 256 at 7, Plaintiffs rely primarily on the testimony of Ikegami. As noted, he was the former CFO of LMNO, and prepared the disputed profit participation statements that Horwitz forwarded to Plaintiffs. *See* Horwitz SUF ¶ 8; Horwitz Depo. Tr. 442:20-443:4, 445:6-15; Exs. 10, 11, 16-19 to Horwitz Motion; Ikegami Depo Tr. 76:7-10. Ikegami testified that, in order to calculate the production deficit that is contained in the profit participation statements sent to Plaintiffs, he used the production budget that was negotiated as part of the Co-Production Agreement between LMNO and Discovery. *See* Ikegami Depo Tr. 231:10-24. He also testified that those figures did not correspond to the actual production costs reflected in LMNO's internal cost reports. *Id.* at 231:25-232:2. According to Ikegami, LMNO "recreate[ed] [sic] the accounting records" by relying on the budgeted costs, rather than the actual costs as shown in the internal reports. *Id.* at 67:8-10. He testified that it did so to create the impression that LMNO had contributed the agreed-upon 30% of the production deficit when, in fact, it had not contributed any of those costs. *See id.* at 45:14-48:5, 47:8-15, 47:25-48:5; 67:8-68:14.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-04543 JAK (SKx) | Date | May 15, 2020 |
|---|---|---|---|
| Title | LMNO Cable Group, Inc. v. Discovery Communications, LLC | | |

#

Ikegami's testimony supports the position that there were two potential sources of data from which the production costs could have been calculated in creating the profit statements that were sent to Plaintiffs. First, the production budget as defined by the contract, which provided that LMNO would contribute 30% of the expenses. Second, LMNO's internal cost reports, which, according to Ikegami, reflect that LMNO contributed less than 30% of those costs. Ikegami's testimony also supports the conclusion that he used the 30% figure from the production budget when he created the profit participation statements. Viewed in the light most favorable to Plaintiffs, *see T.W. Elec. Serv.*, 809 F.2d at 630-31, it can also reasonably be inferred that Defendants decided to use the production budget, instead of the internal data, as the source for the deficit calculations in order to minimize the amount of contingent compensation due and payable to Plaintiffs under the Option and Surviving Agreements.[11]

Neither Ikegami's testimony nor any other evidence submitted by Plaintiffs supports the conclusion that the methodology used to calculate the production deficits that were reported constitutes a violation of a duty that is independent of the contracts. Instead it is evidence supporting the claimed breach of those contracts. Defendants do not contest that the parties have divergent views as to how the contingent compensation owed to Plaintiffs should have been calculated. Whether the decision to use the production budget instead of the internally-tracked production costs constituted a breach of those agreements is part of the breach of contract claim. Therefore, the fraud claim is barred by the economic loss rule. *See Robinson Helicopter*, 34 Cal. 4th at 989-90.

*Food Safety* is instructive. There, a fraud claim was advanced by a food safety equipment company, Eco Safe, against a testing agency, Food Safety, that had contracted with Eco Safe to test its equipment. *See* 209 Cal. App. 4th at 1122-23. Eco Safe presented evidence supporting the contention that Food Safety had deliberately misrepresented the results of that testing, including "false numerical data" which "should have been presented [to Eco Safe] in a different manner." *Id.* at 1131. The court held that under the economic loss rule, "a party alleging fraud or deceit in connection with a contract must establish tortious conduct independent of a breach of the contract itself." *Id.* at 1131.

> Although this evidence may raise triable issues regarding whether the study disappointed Eco Safe's expectations under the contract, it suggests no misrepresentation beyond a broken contractual promise to perform the tests appropriately pursuant to the protocol and to report the results . . . Even if Eco Safe's evidence raises triable issues whether the study contains inaccuracies or falsehoods, they are not conceptually distinct from the contract, as Food Safety's obligation to perform the tests and report the results arose exclusively from the contract.

*Id.* at 1131-32 (internal quotation marks and citations omitted).

---

[11] At the hearing, Defendants argued that Ikegami's testimony was irrelevant to the interpretation of the Option and Surviving Agreements because it pertained to LMNO's obligations to Discovery, under separate agreements. Defendants also argued that the scope of costs relevant to the Discovery agreements was substantially broader than the expenses that would be applied to calculate the payments due to the Plaintiffs under the Option and Surviving Agreements. However, no evidence as to the calculations of the relevant expenses under the Discovery contracts was timely submitted. Therefore, these factual questions cannot be assessed in connection with the MSJs that are addressed in this Order.

#

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-04543 JAK (SKx) | | Date | May 15, 2020 |
|---|---|---|---|---|
| Title | LMNO Cable Group, Inc. v. Discovery Communications, LLC | | | |

The fraud claim advanced in this action is analogous to the one that was analyzed in *Food Safety*. Assuming *arguendo* that Ikegami's testimony raises triable issues of fact as to whether the profit participation statements sent to Plaintiffs contained "inaccuracies or falsehoods," LMNO's obligation to provide such statements "arose exclusively from the contract[s]" it entered into with Plaintiffs. *See id.* at 1132. Therefore, because the fraud claim is not distinguishable from those for breach of the contract, they are barred under the economic loss rule. *See id.*

Defendants also cite several district court cases that have reached similar conclusions. Dkt. 239 at 16-19; Dkt. 241 at 14-15. In *Alvarado Orthopedic Res., L.P. v. Linvatec Corp.*, a manufacturer of surgical blades entered into a licensing agreement that required the licensee to pay royalties to the manufacturer for each blade that the licensee sold. No. CV 11-246 IEG, 2011 WL 3703192, at *1 (S.D. Cal. Aug. 23, 2011). The manufacturer claimed that the licensee was miscalculating the royalties owed under the licensing agreement. The manufacturer brought breach of contract and fraud claims. The fraud claim was dismissed under the economic loss doctrine:

> Here, Plaintiffs' fraud claims are based on the same factual allegations—regarding both misconduct and damages—as Plaintiffs' breach of contract claim: [the licensee] failed [to] provide complete and accurate quarterly royalty reports as required under the agreement, and, as a result, [] did not pay Plaintiffs the full amount of royalties due under the agreement. Plaintiffs have not alleged that [the licensee] violated any duty independent of its contractual obligation to accurately report the types, numbers, and list prices of blades sold. Nor do Plaintiffs allege [Defendant's] actions exposed them to liability for—or that they suffered—damages independent of their economic loss related to Linvatec's alleged breach. In short, the allegations underlying Plaintiffs' fraud claim mirror those underlying Plaintiff's breach of contract claim. Thus, Plaintiff's fraud claim is barred by the economic loss doctrine.

*Id.* at *3.

Plaintiffs attempt to distinguish *Alvarado*, arguing that there was no allegation there that defendant created false financial documents to deceive plaintiffs and there were no resulting emotional distress damages. Dkt. 255 at 16-17; Dkt. 256 at 16-17. The first distinction fails because the allegations in *Alvarado* concerning the incomplete and inaccurate royalty reports involved intentional misrepresentations on the royalty reports. These are quite similar to the intentional misrepresentations on the profit participation statements that are alleged here. *See Alvarado*, 2011 WL 3703192, at *1-2. Plaintiffs' second distinction also fails. Although the plaintiff in *Alvarado* did not allege emotional distress damages, as noted below, the allegation of such damages does not *per se* establish that Defendants violated a duty independent of the contract. *See id.* at 3 ("'[C]onduct amounting to a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from principles of tort law' and 'exposes a plaintiff to liability for personal damages independent of the plaintiff's economic loss.'") (quoting *Robinson Helicopter*, 34 Cal. 4th at 989).

*JMP Securities LLP v. Altair Nanotechnologies Inc.*, 880 F. Supp. 2d 1029 (N.D. Cal. 2012), is also similar. There, JMP, a financial advisor was hired on a contingency fee basis in connection with anticipated business transactions. *Id.* at 1033. A transaction covered by the relevant contract was

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-04543 JAK (SKx) | Date | May 15, 2020 |
|---|---|---|---|
| Title | LMNO Cable Group, Inc. v. Discovery Communications, LLC | | |

completed, but the defendant allegedly failed to pay the amount due under the contingency fee contract. *Id.* at 1042. JMP advanced both fraud and contract claims. *Id.* at 1042. In support of the fraud claim, JMP argued that the defendant intentionally misrepresented that it would pay JMP a higher fee under the agreement when defendant always knew that it would not do so. *Id.* The fraud claims were dismissed under the economic loss rule: "JMP's assertions of tortious conduct come down essentially to a claim that Altair not only broke its promises, but did so in bad faith. A tort cause of action will not lie on those facts." *Id.* at 1044.

Here, as in *JMP Securities*, the alleged tortious conduct distills to a claim that Defendants breached their promise to pay appropriate contingent compensation to Plaintiffs under the contract and did so in bad faith. This is not enough to avoid the economic loss rule. Plaintiffs argue that *JMP Securities* is distinguishable because it did not involve the falsification of records or intentional misrepresentations. Dkt. 255 at 17-18. To the contrary, *JMP Securities* did involve intentional misrepresentations. The plaintiff there alleged that defendant intentionally misrepresented the fee that would be paid under the contract, and that plaintiff had relied on those misrepresentations to its detriment. *See JMP Securities*, 880 F. Supp. 2d 1029 at 1042. That the alleged tortious conduct here involves misrepresentations on statements, which were contractually required, does not distinguish *JMP Securities*.

The outcome was similar in *UMG Recordings, Inc. v. Global Eagle Entm't, Inc.*, 117 F. Supp. 3d 1092 (C.D. Cal. 2015). There, Inflight, an entity that contracted with airlines to provide in-flight entertainment, was sued by record companies for copyright infringement based on allegations that Inflight had distributed music, for which plaintiffs held licensing rights, without a license to do so. 117 F. Supp. 3d at 1100-01. Inflight filed counterclaims for fraud and negligent misrepresentation against the record companies. *Id.* at 1101-02. Inflight alleged that those companies agreed to an oral license agreement with Inflight, which authorized the distribution of the copyrighted works, and had also represented that a written contract would follow to document the oral agreement. *Id.* Inflight's fraud claims were rejected under the economic loss doctrine:

> "[C]ounterclaimants' promissory fraud and fraudulent concealment claims allege that plaintiffs had no intention of honoring their promise to permit counterclaimants to continue to reproduce the copyrighted sound recordings. Their negligent misrepresentation claim is based on the same conduct. Counterclaimants effectively seek to take 'allegations underpinning a straightforward claim for breach of a commercial contract and recast them as torts,' which 'consist of nothing more than [defendants'] alleged failure to make good on its contractual promises.'"

*Id.* at 1105-06 (second alteration in original) (quoting *JMP Securities*, 880 F. Supp. 2d at 1042).

Like the claims made in *UMG Recordings*, Plaintiffs' fraud claim is premised on Defendants' alleged failure to adhere to the obligations under the contract. They allegedly did so by providing profit participation statements that understated the contingent compensation owed to Plaintiffs. The outcome here is not changed by the proffered evidence that LMNO's conduct was intentional, and motivated by a desire to obtain a financial benefit by underpaying Plaintiffs.

After the hearing on Defendants' Motions, Plaintiffs submitted a notice of supplemental authority, which cited *Century of Progress*. Plaintiffs' Not. of Supplemental Authority, Dkt. 266. *Century of Progress* is

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-04543 JAK (SKx) | | Date | May 15, 2020 |
|---|---|---|---|---|
| Title | LMNO Cable Group, Inc. v. Discovery Communications, LLC | | | |

also distinguishable. In *Century of Progress*, plaintiffs' fraud claims "occurred in the context of the alleged contractual relationship between the parties." 2018 WL 4191340, at *11. The breach of contract claim was premised on defendants' alleged failure to provide the required accounting statements and to remit all royalties owed to plaintiffs. *Id.* In addition to the breach, plaintiffs alleged fraudulent conduct that went "above and beyond" defendants' contractual obligations because defendants allegedly "engaged in separate nefarious accounting practices to conceal and underreport (and therefore underpay)" plaintiffs, which included misrepresenting and manufacturing false expense deductions, self-dealing between subsidiaries, and lying about the recovery of a $1.6 million settlement. *Id.* The district court held that the economic loss rule did not bar plaintiffs' fraud claims because they were based on allegations that went beyond defendants' specific obligations under the contract. *Id.* The alleged conduct also imposed additional costs on plaintiffs that the parties did not reasonably contemplate during their bargaining that led to the entry of the contract. *Id.* This included the out-of-pocket expenses incurred to discover defendant's fraudulent conduct. *Id.*

Here, unlike *Century of Progress*, Defendants' alleged fraudulent conduct that forms the basis of Plaintiffs' fraud claim does not go beyond Defendants' contractual obligations. Plaintiffs' fraud claim is premised on the defendants' alleged misrepresentations made in connection with the profit participation statements, which were provided to Plaintiffs as part of defendants' contractual obligations. Although Plaintiffs allege that Defendants "created fictional financial books to deceive Plaintiffs" (Dkt. 255 at 14; Dkt. 256 at 14), as Horwitz correctly notes (Dkt. 258 at 7), Plaintiffs have not offered any evidence that they viewed, accessed or were given these fictional financial books as part of the alleged fraudulent scheme. *See* Ikegami Depo Tr. Thus, Plaintiffs' fraud claim is distinct from the one addressed in *Century of Progress.* Further, as discussed below, Plaintiffs' claim that they suffered out-of-pocket expenses investigating Defendants' alleged fraud does not align this case with *Century of Progress* because any out-of-pocket expenses incurred by Plaintiffs do not constitute a harm beyond the alleged contract breach.

The economic loss rule does not bar claims for the fraudulent inducement of a plaintiff to enter a contract. *See Robinson Helicopter*, 34 Cal. 4th at 989-91. However, to establish such a claim, a plaintiff must show that the defendant purposefully induced the plaintiff to enter the contract by making material misstatements or omissions that the defendant did not intend to honor. *See Tenzer v. Superscope, Inc.*, 39 Cal. 3d 18, 30 (1985). No evidence of any such inducement has been submitted. "[A]lthough that fraudulent intent is often established by circumstantial evidence, 'something more than nonperformance is required to prove the defendant's intent not to perform his promise.'" *Food Safety Net*, 209 Cal. App. 4th at 1131 (quoting *Tenzer*, 39 Cal. 3d at 30).

Plaintiffs assert that Defendants never intended to honor their contractual obligations. *See* Plaintiffs' Statement of Uncontroverted Facts in Support of Opposition to LMNO and Schotz's MSJ ¶ 19, Dkt. 255-8. To support this position, they present only Klein's declaration. *Id.* He declares about his belief as to Defendants' alleged improper intentions. Klein Decl. ¶ 14. Thus, as in *Food Safety Net*, because Plaintiffs' showing, which rests on the alleged fraudulent profit participation statements, concerns only Defendants' "actual performance under the contract, it does not demonstrate fraudulent inducement." 209 Cal. App. 4th at 1132. Moreover, "[g]enerally speaking, the terms of a contract cannot form the basis of a fraudulent inducement claim for purposes of the economic loss rule." *Lee v. Fed. St. L.A., LLC*, No. CV 2:14-06264 CAS (SSx), 2016 WL 2354835, at *9 (C.D. Cal. May 3, 2016). Further, as discussed below, Plaintiffs' fraudulent inducement claim fails on the merits.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-04543 JAK (SKx) | | Date | May 15, 2020 |
|---|---|---|---|---|
| Title | LMNO Cable Group, Inc. v. Discovery Communications, LLC | | | |

#

California courts have recognized a narrow exception to the economic loss doctrine in the context of products liability actions. In *Robinson Helicopter*, a helicopter manufacturer contracted with Dana to provide clutches that Robinson used in its helicopters. 34 Cal. 4th at 985. These clutches were used as part of the safety systems in the helicopters. *Id.* Some of the clutches Dana provided to Robinson did not conform either to Robinson's written specifications or FAA regulations. *Id.* at 985-86. However, Dana nevertheless knowingly presented with its shipments of the clutches certificates of conformance that falsely stated that the clutches were compliant with these standards. *See id.* at 985-86, 990-91. *Robinson Helicopter* concluded that providing false and inaccurate certificates of conformance constituted an independent tort not shielded by the economic loss doctrine:

> By issuing false certificates of conformance, Dana unquestionably made affirmative representations that Robinson justifiably relied on to its detriment. But for Dana's affirmative misrepresentations by supplying the false certificates of conformance, Robinson would not have accepted delivery and used the nonconforming clutches over the course of several years, nor would it have incurred the costs of investigating the cause of the faulty clutches. Accordingly, Dana's tortious conduct was separate from the breach itself, which involved Dana's provision of the nonconforming clutches. In addition, Dana's provision of faulty clutches exposed Robinson to liability for personal damages if a helicopter crashed and to disciplinary action by the FAA. Thus, Dana's fraud is a tort independent of the breach.

*Id.* at 990-91 (citing *Erlich*, 21 Cal. 4th at 553-54).

Unlike the fraudulent certificates in *Robinson Helicopter*, which were required by the FAA not the contract, the allegedly inaccurate profit participation statements at issue here were required only as part of LMNO's contractual obligations. Thus, although Plaintiffs may have justifiably relied on the statements as to contingency compensation that they received by continuing to perform under the relevant contracts, Defendants' alleged intentional misrepresentations in those statements did not violate a duty independent of those under the contracts.

The exception to the economic loss rule adopted in *Robinson Helicopter* also requires more than evidence of fraudulent statements independent of contractual obligations: "Our holding today is narrow in scope and limited to a defendant's affirmative misrepresentations on which a plaintiff relies *and which expose a plaintiff to liability for personal damages independent of the plaintiff's economic loss.*" *Id.* at 993 (emphasis added). Accordingly, even if Defendants' alleged misrepresentations were comparable to those in *Robinson Helicopter*, the fraud claims here do not fall under the narrow exception created there. Plaintiffs have not shown, or even alleged, that they have been subjected to actual or potential liability for damages to non-parties to the contracts. *See also County of Santa Clara v. Atl. Richfield Co.*, 137 Cal. App. 4th 292, 328 (2006) (interpreting *Robinson Helicopter* to "preclude[] the application of the economic loss rule to any intentional affirmative fraud action *where the plaintiff can establish that the fraud exposed the plaintiff to liability*") (emphasis added); *Astrium S.A.S. v. TRW, Inc.*, 197 F. App'x 575, 576 (9th Cir. 2006) (fraud claim barred by economic loss rule because "there is no showing that people or property were placed at risk or that [plaintiff] was exposed to 'personal damages' beyond economic losses.") (quoting *Robinson Helicopter*, 34. Cal. 4th at 993).

#

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-04543 JAK (SKx) | Date | May 15, 2020 |
|---|---|---|---|
| Title | LMNO Cable Group, Inc. v. Discovery Communications, LLC | | |

Plaintiffs allege that, as a result of Defendants' fraud, they have suffered primarily out-of-pocket damages because they had to pay their transactional attorney to investigate Defendants' conduct. They also claim emotional distress damages. *See* LMNO SUF ¶19 (relying on Klein's declaration). However, Plaintiffs do not provide any basis for concluding that these alleged damages were caused by something other than the alleged breach of the contract. That claim is based on the same factual allegations as those made in support of the fraud claim. *Cf. BNSF Ry. Co. v. San Joaquin Valley R. Co.*, No. CV 1:08-01086 AWI, 2011 WL 3328398, at *5 (E.D. Cal. Aug. 2, 2011) ("In California, economic losses are defined as 'damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits—without any claim of personal injury or damages to other property.'") (quoting *Frank M. Booth, Inc. v. Reynolds Metal Co.*, 754 F. Supp. 1441, 1449 n.4 (E.D. Cal. 1991)).

*Century of Progress*, 2018 WL 4191340, at *11 is also distinguishable. There, the plaintiffs suffered harm beyond what was caused by the breach of the contract. They incurred out-of-pocket expenses to investigate the defendant's fraudulent conduct that was outside of that related to fulfilling its contractual obligations. The alleged fraud here is based on the same conduct that underlies the claim for breach of the contract -- a failure to provide accurate financial statements. Thus, any out-of-pocket expenses Plaintiffs incurred by paying fees to their transactional attorney for inquiring about the accuracy of the profit participation statements is not a harm beyond the alleged breach of contract. That same work applies to the breach of contract claim.

Plaintiffs cite to no cases in which a court has permitted damages like the ones alleged here to serve as a basis for an exception to the economic loss rule absent a finding that defendant violated a duty that arose independently from the contract. *See* Dkt. 255 at 15-16; Dkt. 256 at 15; *see also Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 516 (1994) ("[P]unitive or exemplary damages, which are designed to punish and deter statutorily defined types of wrongful conduct, are available only in actions 'for breach of an obligation not arising from contract.'") (emphasis omitted) (quoting Cal. Civ. Code § 3294(a)). These types of damages also do not fall under any of the established exceptions to the economic loss rule. *See Erlich*, 21 Cal. 4th at 551 (tort damages have been permitted in contract cases where a breach of duty causes a physical injury; the covenant of good faith and fair dealing is breached in an insurance contract; an employee was wrongfully discharged in violation of a fundamental public policy; or a contract was fraudulently induced).

Emotional distress damages are not the same as potential liability to non-parties due to fraudulent conduct. Moreover, emotional distress damages would be unavailable even if the economic loss doctrine did not apply. *See Ehrlich*, 21 Cal. 4th at 555 ("[A] preexisting contractual relationship, without more, will not support a recovery for mental suffering where the defendant's tortious conduct has resulted only in economic injury to the plaintiff.") (citing *Smith v. Superior Court*, 10 Cal. App. 4th 1033, 1040 n.1 (1992)); *Mercado v. Leong*, 43 Cal. App. 4th 317, 324 (1996)).

Also unpersuasive is Plaintiffs' argument that applying the economic loss rule to their fraud claim would be contrary to public policy. California courts have expressed policy concerns that applying the economic loss rule could encourage fraud in contracting. *See Robinson Helicopter*, 34 Cal. 4th at 993 ("[parties] to a contract cannot rationally calculate the possibility that the other party will deliberately misrepresent terms critical to that contract"). However, exceptions to the economic loss rule are quite narrow, and none applies here. Nothing in *Robinson Helicopter* supports the proposition that fraud

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-04543 JAK (SKx) | | Date | May 15, 2020 |
|---|---|---|---|---|
| Title | LMNO Cable Group, Inc. v. Discovery Communications, LLC | | | |

claims are categorically exempt from the rule, or that a plaintiff may sidestep the limitations on contract damages simply by advancing allegations of fraud. *See United Guaranty Mortg. Indem. Co. v. Countrywide Fin. Corp.*, 660 F. Supp. 2d 1163, 1183 (C.D. Cal 2009) (*Robinson Helicopter* "demonstrates California's strong resistance to further eroding the economic loss rule."). Such an exception would swallow the rule, and would defeat the express purpose of the doctrine, which is to prevent the law of contract and the law of tort from dissolving into each other. *Robinson Helicopter*, 34 Cal. 4th at 988.

For these reasons, the fraud claim is barred by the economic loss rule.[12] Consequently, it is unnecessary to address the remaining challenges to this cause of action.

(b)    Conversion

Defendants argue that the conversion claim is also barred by the economic loss rule because it is based solely on the allegation that Defendants converted money owed to Plaintiffs under the contracts. Dkt. 239 at 19-20; Dkt. 241 at 15. Alternatively, Defendants argue that a contractual right to payment is an insufficient basis to support a claim for conversion. Dkt. 239 at 22-23; Dkt. 241 at 15-16. In response, Plaintiffs contend that Defendants' conduct is a breach of an independent duty not to commit such fraud. Dkt. 255 at 20; Dkt. 256 at 19. Although Plaintiffs agree that a mere contractual right to property does not meet the first element of conversion, they argue that their claim is based on a different right, *i.e.*, an equitable lien on the property. Dkt. 255 at 20-23; Dkt. 256 at 21-24.

"The elements of a conversion are the plaintiff's ownership or right to possession of the property at the time of the conversion; the defendant's conversion by a wrongful act or disposition of property rights; and damages." *Oakdale Vill. Grp. v. Fong*, 43 Cal. App. 4th 539, 543-44 (1996), *as modified on denial of reh'g* (Apr. 10, 1996). Conversion is an intentional tort that, in certain circumstances, can give rise to "exceptions to the general rule against tortious breach of contract claims." *Schulz v. Cisco Webex, LLC*, No. CV 13-04987 BLF, 2014 WL 2115168, at *6 (N.D. Cal. May 20, 2014). Whether the economic loss rule bars a conversion claim turns on "whether the ownership interest that formed the basis for the conversion claim preexisted the contract or arises from the contract." *Expedited Packages, LLC v. Beavex Inc.*, No. CV 15-00721 MMM (AGRx), 2015 WL 13357436, at *4 (C.D. Cal. Sept. 10, 2015). "Where the interest preexisted the contract, a conversion claim will lie." *Id.* "By contrast, where the duty arises as a result of the contract, the claim is not cognizable." *Id.*; *see also Culp Constr. Co. v. Sposito*, No. SACV 19-727 JVS (ADSx), 2019 WL 6357971, at *4 (C.D. Cal. July 31, 2019) (same).

The property that is the basis of Plaintiffs' conversion claim is the contingent compensation to which they were allegedly entitled under the Option and Surviving Agreements. However, because Plaintiffs'

---

[12]  Plaintiffs also summarily assert that the economic loss rule is not available to Horwitz because he was not a party to the Agreements. However, they do not cite any cases that support this position. *See* Dkt. 256 at 19. Horwitz was not a party to the Agreements and is not a defendant in the breach of contract claims. However, because the fraud claims are premised on allegations that Defendants, including Horwitz, breached the contractual duties under the Agreements, the economic loss rule also applies to claims against Horwitz. *Cf. UMG Recordings, Inc. v. Glob. Eagle Entm't, Inc.*, No. CV 14-3466 MMM (JPRx), 2015 WL 12746208, at *12 (C.D. Cal. Oct. 30, 2015) (because the alleged promises that formed the basis of the fraud claims were not contractual duties, the economic loss rule did not apply).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-04543 JAK (SKx) | Date | May 15, 2020 |
|---|---|---|---|
| Title | LMNO Cable Group, Inc. v. Discovery Communications, LLC | | |

entitlement to this contingent compensation arises entirely from these two agreements, it is barred by the economic loss rule. *See, e.g., Expedited Packages*, 2015 WL 13357436 at *4 ("[A] conversion claim seeking the $800,000 plaintiffs are allegedly owed under the contract would arise entirely from the contract itself, and be barred by the economic loss rule."); *Baggett v. Hewlett-Packard Co.*, No. SACV 07-0667 AG (RNBx), 2009 WL 3178066, at *3 (C.D. Cal. Sept. 29, 2009) (holding that because plaintiff's relationship with defendant "arises solely out of their contract and commercial transaction," "the economic loss rule applies to bar Plaintiff's tort claims for conversion and trespass to chattels.").

Defendants also rely on *McGehee v. Coe Newnes/McGehee ULC*, No. C 03-5145 MJJ, 2004 WL 2452855 (N.D. Cal. Feb. 10, 2004). Dkt. 239 at 19-20; Dkt. 241 at 15. *McGehee* held that defendant's conversion counterclaim, which arose from a claimed property interest in plaintiff's patents and corresponding inventions, failed under the economic loss rule. 2004 WL 2452855, at *3. The basis for this determination was that defendant's alleged right to possess the patents was based solely on its contract with plaintiffs. *Id.* Thus, "[w]ithout a separate societal duty, Defendant has not pled an independent tort." *Id.* This action is similar. Plaintiffs' property interest in the contingent compensation is based solely on the Agreements. Plaintiffs attempt to distinguish *McGehee* by asserting that it did not involve pervasive fraud. Dkt. 255 at 20; Dkt. 256 at 19. But, as discussed above, Plaintiffs have failed to establish that Defendants' alleged fraudulent conduct violated any duty independent of those owed under the Option and Surviving Agreements.

Summary judgment as to the conversion claim is also warranted for independent reasons. Plaintiffs have failed to establish that Defendants exercised dominion over any personal property in which Plaintiffs had an ownership or possessory interest. *See Oakdale Vill.*, 63 Cal. App. 4th at 543-44. The basis for the conversion claim is the contingent compensation allegedly owed to Plaintiffs under the Option and Surviving Agreements. However, "a mere contractual right of payment, without more, does not entitle the obligee to the immediate possession necessary to establish a cause of action for the tort of conversion." *In re Bailey*, 197 F.3d 997, 1000 (9th Cir. 1999) (applying California law). "Money cannot be the subject of a cause of action for conversion unless there is a specific, identifiable sum involved." *PCO Inc v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP*, 150 Cal. App. 4th 384, 395 (2007) (quoting *McKell v. Wash. Mut. Inc.*, 142 Cal. App. 4th 1457, 1491 (2006)). A general allegation that a defendant failed to pay royalties over a certain period of time does not sufficiently identify a specific sum of money. *Gerawan Farming, Inc. v. Rehrig Pac. Co.*, No. 1:11-cv-01273 LJO (BAMx), 2012 WL 691758, at *6 (E.D. Cal. Mar. 2, 2012). A claim for conversion of money can be stated where there is an attorney's lien on settlement proceeds or a specific amount held in trust. *See id.*

Plaintiffs' argument that they had an equitable lien on the money at issue, and that a conversion claim can attach to such a lien, is not convincing. An equitable lien is "a right to subject property not in the possession of the lienor to the payment of a debt as a charge against that property." *Farmers Ins. Ex. v. Zerin*, 53 Cal. App. 4th 445, 453 (1997) (citing 42 Jur. 3d, Liens § 10). Standing alone, a promise to pay a debt out of a particular fund, without more, does not create an equitable lien on that fund. *Id.* at 454; *see also Morrison v. Havens*, 24 Cal. App. 2d 504, 505-06 (1938) (where a written instrument "manifests no intention to create a lien upon the [] property," no equitable lien arises).

For the foregoing reasons, the Horwitz Motion is **GRANTED**, and the LMNO Motion is **GRANTED** as to the fraud and conversion claims.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-04543 JAK (SKx) | Date | May 15, 2020 |
|---|---|---|---|
| Title | LMNO Cable Group, Inc. v. Discovery Communications, LLC | | |

#

b)      Whether Rescission is an Available Remedy

LMNO seeks partial summary judgment as to the remedy of rescission of the Option Agreement. *See* Dkt. 241 at 17. It argues that rescission is not available for several reasons: (i) Plaintiffs have failed to show a triable issue as to whether they were fraudulently induced to enter the Option Agreement; (ii) rescission has been waived by Plaintiffs' continued performance under the Option Agreement; and (iii) rescission is an inappropriate remedy because its application, given the substantial amount of time that has passed since the Option Agreement was entered, would prejudice third parties, including Discovery. *Id.* Plaintiffs disagree, and contend that rescission of the Option Agreement is an available remedy due to Defendants' material misrepresentations. *See* Dkt. 255 at 24-26.[13]

A party may be entitled to rescind a contract if it is shown that "consent of the party rescinding . . . was given by mistake, or obtained through duress, menace, fraud, or undue influence, exercised by or with the connivance of the party as to whom he rescinds." Cal Civ. Code § 1689(b)(1). Thus, fraudulent inducement of a contract can result in its rescission, where "the promisor knows what he is signing but his consent is *induced* by fraud . . . ." *Rosenthal v. Great W. Fin. Secs. Corp.*, 14 Cal. 4th 394, 415 (1996) (emphasis in original) (quoting *Ford v. Shearson Lehman Am. Express, Inc.*, 180 Cal. App. 3d 1011, 1028 (1986)). "It is elementary that to justify the rescission of a contract on the ground that there was a misrepresentation of a material fact, it must be shown that the party seeking to rescind relied on the representation and that he would not have entered into the contract without it." *Wood v. Kalbaugh*, 39 Cal. App. 3d 926, 923 (1974).

Plaintiffs have failed to present any evidence that they were fraudulently induced by LMNO to enter the Option Agreement. In response to an interrogatory asking Plaintiffs to state the misrepresentations made by LMNO, Plaintiffs identified statements between November 2010 and May 2016. *See* Plaintiffs Response to LMNO's Interrogatories, No. 1, Ex. H to Nelson Decl., Dkt. 241-2 at 69-79. The Option Agreement was executed in 2008, two years before the first misrepresentation identified in the response to the interrogatory. Further, Ikegami's testimony, read in the light most favorable to Plaintiffs, does not support a claim of fraudulent inducement. He testified that he was told to re-create LMNO's accounting records to make it appear as if LMNO had contributed its share of the production deficit, and that this occurred "around 2015." *See* Ikegami Depo Tr. 69:7-10. That was seven years after the Option Agreement was executed. Even if, as Plaintiffs contend, the allegedly fraudulent profit participation statements included inaccurate accounting information dating back to the first season of the Program, no evidence of misrepresentations prior to the signing of the Option Agreement have been offered. *See, e.g.*, *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 976 (1997) (fraudulent inducement requires a showing that a pre-contract misrepresentation is an "immediate cause" of a plaintiff's decision to alter his legal relations, without which the plaintiff "would not, in all reasonable probability, have entered into the contract.") (quoting *Spinks v. Clark*, 147 Cal. 439, 444 (1905)). Therefore, there is

---

[13] LMNO argues it is not necessary to reach the rescission issue if summary judgment has been granted as to the fraud claim, given that is the basis for rescission. *See* Dkt. 241 at 17; FACI ¶ 121. However, because there are grounds, other than fraud, upon which a contract can be rescinded, *see* Cal. Civ. Code § 1689, the issue is considered separately.

#

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-04543 JAK (SKx) | | Date | May 15, 2020 |
|---|---|---|---|---|
| Title | LMNO Cable Group, Inc. v. Discovery Communications, LLC | | | |

no causal nexus, which is necessary for the claim of fraudulent inducement.[14]

LMNO also argues that rescission is unavailable because Plaintiffs continued to perform under the Option Agreement, continued to accept payments under the agreement, and agreed to renewals and further amendments to the agreement as recently as April 2017. *See* LMNO SUF ¶¶ 65, 68-72. In general, the "power of a party to avoid a contract for . . . misrepresentation is lost if after he knows . . . of the misrepresentation if it is fraudulent, he manifests to the other party his intention to affirm it or acts with respect to anything that he has received in a manner inconsistent with disaffirmance." Restatement (Second) of Contracts § 380; *see also Stewart v. Ragland*, 934 F.2d 1033, 1044 n.15 (9th Cir. 1991); *Bowmer v. H.C. Louis, Inc.*, 243 Cal. App. 2d 501, 503 (1966) ("The right to avoid for fraud, however, is lost if the injured party, after acquiring knowledge of the fraud, manifests an intention to affirm the contract.").

It is undisputed that Plaintiffs first learned of the alleged fraud when Ikegami approached them as a whistleblower in December 2015. LMNO SUF ¶ 68. Nonetheless, Plaintiffs assert that they did not realize until December 2016 that these statements were correct. That is when they were served with a subpoena seeking royalty statements in connection with the then-pending claims between LMNO and Discovery. Klein Decl. ¶ 9. However, it is undisputed that Plaintiffs continued to perform, and accept payment, under the Option Agreement after December 2015, including the time period after December 2016. LMNO SUF ¶ 69. It is also undisputed that, in April 2017, an amendment of the Option Agreement was signed by Plaintiffs. *Id.* ¶ 70. Although Plaintiffs argue that this is irrelevant because Defendants were no longer a party to the contract at that time (Dkt. 255 at 25-26), it is undisputed that the April 2017 amendment contains express language stating that, by signing the amendment, Candu ratified and confirmed the terms of the Option Agreement. LMNO SUF ¶ 72. Thus, even assuming that Plaintiffs did not have complete knowledge of Defendants' alleged fraud until December 2016, or could not have obtained it by then through a reasonable, diligent inquiry, they continued to perform and accept payments under the Option Agreement, and expressly ratified it after that time. As a result, Plaintiffs do not have a right to rescind the Option Agreement due to Defendants' alleged fraud.

Finally, rescission is an equitable remedy. It is appropriate where necessary to "'bring about substantial justice by adjusting the equities between the parties' despite the fact that 'the status quo cannot be exactly reproduced.'" *Wong v. Stoler*, 237 Cal. App. 4th 1375, 1386 (2015) (quoting *Sharabianlou v. Karp*, 181 Cal. App. 4th 1113, 1144-45 (2010)). But, where "the passage of time has rendered the complete restoration of the parties to the *status quo ante* difficult if not impossible," courts have consistently found rescission is not an appropriate remedy. *Strategic Diversity, Inc. v. Alchemix Corp.*, 666 F.3d 1197, 1207-08 (9th Cir. 2012); *see also Beckwith v. Sheldon*, 165 Cal 319, 324 (1913) ("It is, of course, fundamental that, where the rights of others have intervened and circumstances have so far changed that rescission may not be decreed without injury to those parties and their rights, rescission will be denied and the complaining party left to his other remedies.").

---

[14] Plaintiffs also argue that Defendants' material misrepresentations deprived Plaintiffs of contingent compensation, which constitutes a partial failure of consideration and entitles Plaintiffs to rescind the Option Agreement. Dkt. 255 at 25. Even if Plaintiffs had adequately pleaded this theory for rescission, which LMNO argues they have not (Dkt. 257 at 8 n.1), it would not provide a basis for rescission. As noted in the discussion that follows, rescission is not an available remedy for two other independent reasons: Plaintiffs' waiver, and the passage of time, which has made rescission inappropriate and impracticable.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-04543 JAK (SKx) | Date | May 15, 2020 |
|----------|--------------------------|------|--------------|
| Title | LMNO Cable Group, Inc. v. Discovery Communications, LLC | | |

The parties entered into the Option Agreement in 2008. It was later assigned to Discovery. Dozens of episodes of the Program have been produced. Plaintiffs' performance under the Option Agreement and the Surviving Agreement is ongoing. Rescission would be inappropriate, and impractical, in these circumstances. The parties cannot be restored to their initial positions.

For the foregoing reasons, the LMNO Motion is **GRANTED** as to the unavailability of rescission as a remedy.

> c)    Whether Summary Judgment is Appropriate as to the Claim for Declaratory Relief

Plaintiffs request declaratory relief as to their ownership of "certain intellectual property rights in and to the Program," which LMNO construes to mean the copyrights in each finished episode of the Program. Dkt. 241 at 20 (quoting FACI ¶ 139). LMNO seeks summary judgment on the ground that it has exclusive ownership in the copyrights of the Program. LMNO advances two reasons for its claimed ownership: (i) the terms of the Option Agreement granted LMNO exclusive ownership over the Program and all rights with respect to it; and (ii) under copyright law, LMNO has exclusive copyrights as the party who "fixed" the work in a tangible medium. *See id.* at 20-21.

Plaintiffs concede that they agreed to convey certain intellectual property rights to LMNO through the Option Agreement. However, they argue that they are entitled to the rights they conveyed as part of the Option Agreement because LMNO breached the contract and Defendants engaged in related fraud. Dkt. 255 at 27; *see also* FACI ¶¶ 139-41. Plaintiffs also argue that LMNO has not presented any evidence to support its contention that it created or fixed the program. Further, they contend that, due to their contributions to the Program as on-screen performers and off-screen directors with respect to the themes and stories of the Program, they have ownership rights in the Program. *See* Dkt. 255 at 27-28.

Plaintiffs have acknowledged that they signed the Option Agreement, and that it provides that LMNO would become the sole owner of the Program and all rights with respect to the Program. LMNO SUF ¶¶ 79-80. The Option Agreement states:

> LMNO shall be the sole and exclusive Owner of the [Program] and all rights with respect thereto . . . which shall include all rights in and to the material created by Artist, in whole or in part, in all media and all forms of exploitation whether now known or hereafter devised, throughout the universe in all languages, including, without limitation, all rights in all forms of television (including, without limitation, free syndication, network, basic and/or pay cable television exhibition), theatrical and video exhibition (including but not limited to videocassettes, videodiscs and video on demand), and allied and subsidiary rights. Included among such exclusive Rights (but not by way of limitation) are remake, prequel, sequel and spin-off rights, merchandising rights, rights in and to the title, music, soundtrack album rights, non-interactive and interactive electronic publication rights and multimedia rights (including but not limited to CD, CD-I, and 16 bit and 32 bit cartridges) and publication rights.

Option Agreement, Terms and Conditions ¶ 8. Plaintiffs also acknowledge that when Klein entered into

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-04543 JAK (SKx) | Date | May 15, 2020 |
|---|---|---|---|
| Title | LMNO Cable Group, Inc. v. Discovery Communications, LLC | | |

the Option Agreement, he understood that LMNO would own all rights to the Program. LMNO SUF ¶ 80.

Assuming, *arguendo*, that the Option Agreement is enforceable, under its terms LMNO received all ownership rights to the Program. Thus, to the extent Plaintiffs had any ownership rights in the Program before they entered the Option Agreement, they conveyed them by entering it in 2008.

Plaintiffs' claimed right to have their intellectual property and ownership rights revert to them based on the Defendants' alleged fraud and breach of contract breach is unconvincing. The motions for summary judgment as to both the fraud claim and the request for rescission of the Option Agreement have been granted. Consequently, because rescission is not an available remedy to Plaintiffs, their request for declaratory relief as to their ownership rights to the Program fails. Thus, they concede that they conveyed that right in the Option Agreement, whose language on this transfer is clear. *See* Cal. Civ. Code § 1638 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.").[15] Because the Option Agreement governs, the Court does not need to address whether Plaintiffs have an ownership interest in the Program under copyright law.

For the foregoing reasons, the LMNO Motion is **GRANTED** as to the claim for declaratory relief.

> d)      Whether the Damages on the Breach of Contract Claim Against LMNO Should be Limited

LMNO seeks partial summary judgment as to Plaintiffs' breach of contract claim. LMNO argues that revenue it received from a third-party license agreement should be excluded from the "contingent compensation" to which Plaintiffs are entitled under the Option and Surviving Agreements. *See* Dkt. 241 at 21.

> (1)      Relevant Facts

The Option Agreement provides that "contingent compensation" would be paid by LMNO to Plaintiffs in connection with LMNO's exploitation of the Program as follows:

> Contingent Compensation: Artist shall be entitled to Twenty-Five Percent (25%) of One Hundred Percent (100%) of LMNO's share of any contingent compensation received by LMNO from the exploitation of the [Program] by third parties (e.g. all media including television, DVD's, merchandising, domestic and foreign), after LMNO first receives any un-recouped, direct, out of pocket third party customary development, production and distribution costs. In the event LMNO distributes or otherwise exploits the [Program] directly, the LMNO and Artist shall negotiate the definition of 'profits' in good faith based on the custom and practice of the industry.

---

[15]  *See also MacKinnon v. Truck Ins. Exchange*, 31 Cal. 4th 635, 647-48 (2003) ("The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the mutual intention of the parties. . . . Such intent is to be inferred, if possible, solely from the written provisions of the contract. The clear and explicit meaning of these provisions, interpreted in their ordinary and popular sense . . . controls judicial interpretation.") (internal quotations and citations omitted).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-04543 JAK (SKx) | Date | May 15, 2020 |
|----------|-------------------------|------|--------------|
| Title | LMNO Cable Group, Inc. v. Discovery Communications, LLC | | |

#

Option Agreement § 3.

The Surviving Agreement similarly provides:

> <u>Contingent Compensation</u>: Artist shall be entitled to receive 25% of 100% of Producer's share of any contingent compensation received by [LMNO] from the exploitation of the [Program] by third parties (e.g., all media including television, DVDs, merchandising, publishing, domestic and foreign), after [LMNO] first recoups any un-recouped direct, out of pocket third party customary development, production and distribution costs. In the event [LMNO] distributes or otherwise exploits the [Program] directly, Artist shall be entitled to receive 25% of 100% of Producer's "Net Proceeds" and [LMNO] and Artist shall negotiate the definition of "Net Proceeds" in good faith based on the custom and practice of the industry.

Surviving Agreement § 3.

In October 2012, LMNO entered a distribution agreement (the "Cineflix Agreement") with a third party -- Cineflix International Media Limited ("Cineflix"). LMNO SUF ¶ 96; Ex. L to Nelson Decl. Dkt. 262 at 19-26 (filed under seal) (the "Cineflix Agreement").[16] Through the Cineflix Agreement, LMNO granted to Cineflix "the exclusive distribution rights to all available programmes [sic] produced and developed by it over an agreed term." Cineflix Agreement at 1. This included the rights to all programs developed by LMNO, not just *the* Program. LMNO SUF ¶ 97. The Cineflix Agreement contains two types of payments: guarantee payments and contingent payments based on the sales for the shows. *Id.* ¶ 98.

Three types of payments under the Cineflix Agreement are relevant to issues presented by the LMNO Motion. *First*, LMNO received a "Catalogue Guarantee" of $1,050,000, which was paid as compensation for LMNO's license to Cineflix of its preexisting catalogue of programs. *See id.* ¶ 99; Cineflix Agreement § 7.2; *see also* Cineflix 30(b)(6) Depo Tr. 62:3-13, Ex. D to Nelson Decl., Dkt. 262 at 2-12. *Second*, LMNO received an "Output Guarantee" of $1,250,000, as compensation for LMNO's license to Cineflix of future episodes of programs. *See* LMNO SUF ¶ 102; *see also* Cineflix Agreement § 7.4; Cineflix 30(b)(6) Depo Tr. 62:23-63:7. *Third*, LMNO received an "Additional Programme Guarantee" as compensation for future programs developed by LMNO and licensed to Cineflix. *See* LMNO SUF ¶ 105; Cineflix Agreement § 7.6. The Additional Programme Guarantee was a specified amount that would be paid to LMNO per hour of content for future programs, which had a default amount unless otherwise agreed, and could be paid in two installments. Cineflix Agreement §§ 4.3, 4.4, 4.11, 7.6.

(2)    <u>Legal Standards</u>

Under California law, principles of contract interpretation are to be applied to "give effect to the mutual

---

[16] Although the contract with Cineflix has been filed under seal (Dkt. 262), the Statement of Facts has been filed on the public docket. Dkt. 241-1; Dkt. 255-9. Because the discussion in this Order is largely based on the latter, it is not filed under seal and the portions that relate to exhibits filed under seal beyond what is disclosed in the Statement of Facts have been redacted.

#

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-04543 JAK (SKx) | | Date | May 15, 2020 |
|---|---|---|---|---|
| Title | LMNO Cable Group, Inc. v. Discovery Communications, LLC | | | |

#

intent of the parties as it existed at the time of contracting." *U.S. Cellular Inv. Co. v. GTE Mobilnet, Inc.*, 281 F.3d 929, 934 (9th Cir. 2002). "When a contract is reduced to writing, this intent 'is to be ascertained from the writing alone, if possible.'" *Id.* (quoting Cal. Civ. Code § 1639). "Interpretation of a contract is solely a question of law unless the interpretation turns upon the credibility of extrinsic evidence." *Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 799 (1998). In general, "summary judgment is appropriate only if the contract or the contract provision in question is unambiguous." *Nat. Union Fire Ins. Co. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir. 1983) (quoting *Castaneda v. Dura-Vent Corp.*, 648 F.2d 612, 619 (9th Cir. 1981)).

Where the parties dispute the meaning of specific contract language, "the court must decide whether the language is 'reasonably susceptible' to the interpretations urged by the parties." *Badie*, 67 Cal. App. 4th at 798 (quoting *Oceanside 84, Ltd. v. Fidelity Federal Bank*, 56 Cal. App. 4th 1441, 1448 (1997)). Where the contract is clear and express, its plain language governs. *See MacKinnon*, 31 Cal. 4th at 647-48. If the contract is susceptible to more than one reasonable interpretation, the analysis turns to which interpretation gives better effect to the mutual intention of the parties. *See Badie*, 67 Cal. App. 4th at 798; *Winet v. Price*, 4 Cal App. 4th 1159, 1165 (1992).

(3)     Application

LMNO argues that, as a matter of law, when the plain language of the Option and Surviving Agreements is applied, it shows that Plaintiffs are not entitled to any share of the Catalogue Guarantee, the Output Guarantee, and the Additional Programme Guarantee paid to LMNO under the Cineflix Agreement. Dkt. 241 at 21-24. This argument is based on the first sentence of the contingent compensation clauses of the Option and Surviving Agreements. LMNO contends that this language precludes a claim by Plaintiffs to a share of these payments because they are "guarantees" as opposed to payments that are "contingent" on a future event. *See* Dkt. 241 at 23. In response, Plaintiffs focus on the "Net Proceeds" provision in the contingent compensation clause of the Surviving Agreement. Dkt. 255 at 28-29. They contend that it entitles them to 25% of 100% of all revenue derived from LMNO's direct exploitation of the Program, including the Cineflix payments. *Id.* LMNO replies that the "Net Proceeds" provision applies only to direct distribution by LMNO, which is not a basis for its motion for partial summary judgment. Dkt. 257 at 10-11.

To support its position, LMNO relies on a dictionary definition of contingent, which Plaintiffs do not dispute: "dependent on or conditioned by something else." LMNO SUF ¶ 94 (quoting Merriam Webster). LMNO has put forth undisputed evidence that the Catalogue Guarantee and Output Guarantee were specific amounts of monies that Cineflix guaranteed to pay to LMNO under the Cineflix Agreement. LMNO SUF ¶¶ 102, 104. Plaintiffs only dispute these facts to the extent it conflicts with their understanding of the "Net Proceeds" provision. Although parole evidence may in appropriate circumstances be admitted as part of the process for interpreting a contract, the proffered evidence is not sufficient to create a genuine issue of material fact. *See Shane v. Greyhound Lines, Inc.*, 868 F.2d 1057, 1061 (9th Cir. 1989) ("Because the affidavit contains only conclusory allegations, not backed up by statements of fact, it cannot defeat a motion for summary judgment"); *Cambridge Elecs. Corp. v. MGA Elecs., Inc.*, 227 F.R.D. 313, 317 n.2 (C.D. Cal. 2004) (unless the plaintiff sets forth specific facts that raise a valid dispute, the facts recited by the defendants will be considered undisputed for purposes of summary judgment as long as they are supported by evidence in the record and not mere legal conclusions).

#

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-04543 JAK (SKx) | Date | May 15, 2020 |
|---|---|---|---|
| Title | LMNO Cable Group, Inc. v. Discovery Communications, LLC | | |

#

In light of these standards, applying the plain language of the Option and Surviving Agreements, neither the Catalogue Guarantee nor the Output Guarantee were obligations to LMNO that were conditioned or dependent on the occurrence of any future event. Therefore, neither constitutes "contingent compensation" that was to be received by LMNO from the exploitation of the Program by Cineflix. Option Agreement § 3; Surviving Agreement § 3. As a result, Plaintiffs are not entitled to any share of the Catalogue Guarantee and Output Guarantee under the Option and Surviving Agreements.

The Additional Programme Guarantee is different. Unlike the Catalogue Guarantee and Output Guarantee, the Additional Programme Guarantee was not a specific amount of money whose payment to LMNO was unconditional. The Additional Program Guarantee would be a specific sum to be paid to LMNO per hour of content delivered. However, the total amount paid to LMNO as to the Additional Programme Guarantee was dependent on, or conditioned by the number of hours of content delivered. Thus, under the plain language of the Option and Surviving Agreements, the Additional Programme Guarantee may be considered "contingent compensation" received by LMNO from the exploitation of the Program by Cineflix. Agreement § 3; Surviving Agreement § 3. No other evidence has been submitted that would warrant a different interpretation. Nor has any evidence been submitted that reflects how the Additional Programme Guarantee was applied, and what, if any, payments resulted. As a result, partial summary judgment is not appropriate because based on the current record, Plaintiffs are not precluded from establishing that they are entitled to a share of the Additional Programme Guarantee under the Option and Surviving Agreements.

Plaintiffs are not entitled to a share of the Cineflix payments under the "Net Proceeds" provision in the contingent compensation clause in the Surviving Agreement. The premise of Plaintiffs' argument in support of how this clause should be applied is that the Cineflix Agreement constitutes one through which LMNO directly exploited the Program. *See* Dkt. 255 at 28-29. However, LMNO was not doing so. Under the Cineflix Agreement, LMNO granted Cineflix "the exclusive [foreign] distribution rights to" LMNO's programs. LMNO SUF ¶ 97 (quoting Cineflix Agreement). Accordingly, the payments at issue were received by LMNO in connection with Cineflix's distribution of the Program, not through LMNO's direct exploitation of the Program. Therefore, Plaintiffs' argument that the "Net Proceeds" provision applies to the Cineflix payments at issue fails because such an interpretation is at odds with the plain language of the Surviving Agreement.

In the Option Agreement, there were two paths by which Plaintiffs could receive contingent compensation, *i.e.*, payments beyond those guaranteed to them when the Agreement was entered. The first was they could receive a share of "LMNO's share of any contingent compensation received by LMNO from the exploitation of the [Program] by third parties (e.g. all media including television, DVD's, merchandising, domestic and foreign)." Option Agreement § 3. That obligation could arise in the event that LMNO entered such an agreement with a third party such as Cineflix. The second, alternative path would arise if, instead of working with a third party like Cineflix, "LMNO distributes or otherwise exploits the [Program] directly." *Id.* If LMNO did so, it would then have a direct obligation to share a portion of its profits with Plaintiffs "based on the custom and practice of the industry." *Id.* This language parallels that used in the Surviving Agreement, and logically has the same meaning there. Therefore, through the Cineflix Agreement, LMNO did not "distribute[] or otherwise exploit[]" the Program "directly." *Id.*

Klein's declaration as to his understanding of the Surviving Agreement does not alter this analysis.

#

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-04543 JAK (SKx) | Date | May 15, 2020 |
|---|---|---|---|
| Title | LMNO Cable Group, Inc. v. Discovery Communications, LLC | | |

When the plain language of a contract is clear, as it is here, a party's subjective intent or understanding is irrelevant. *See Yi v. Circle K Stores, Inc.*, 258 F. Supp. 3d 1075, 1083 (C.D. Cal. 2017), *aff'd*, 747 F. App'x 643 (9th Cir. 2019) ("The parties' objective intent, demonstrated by the contract words and the contract as a whole, rather than the parties' subjective intent, controls interpretation."); *Thor Seafood Corp. v. Supply Mgmt. Servs.*, 352 F. Supp. 2d 1128, 1132 (C.D. Cal. 2005) ("Plaintiff's arguments amount to using the extrinsic evidence to show that the parties 'meant something other than what they said,' which is an improper use of extrinsic evidence.") (quoting *Denver D. Darling, Inc. v. Controlled Env'ts Constr., Inc.*, 89 Cal. App. 4th 1221, 1236 (2001)). Further, as noted, Klein's statement is only a conclusion; its factual basis, if any, is not provided.

For these reasons, Plaintiffs are not entitled to any share of the Catalogue Guarantee and Output Guarantee under the Option and Surviving Agreements as a matter of law. However, Plaintiffs are not precluded from establishing that they are entitled to a share of the Additional Programme Guarantee payments paid to LMNO in connection with the Program. They are also not precluded from seeking a portion of other contingent compensation paid to LMNO by Cineflix under the Cineflix Agreement. *See* LMNO SUF ¶ 98 (the Cineflix Agreement contained two types of payments: guaranteed payments and contingent payments); Dkt. 241 at 21-24 (LMNO has not moved for summary judgment as to contingent payments made under the Cineflix Agreement). Therefore, LMNO's Motion as to this issue is **GRANTED** *in part* and **DENIED** *in part*.

### B.    The Expert Witness Motion

Through the Expert Witness Motion, Plaintiffs seek to amend the disclosure as to Ben Sheppard to add the financial conditions of LMNO and Schotz as matters on which Sheppard would offer opinions. *See* Dkt. 234 at 5. Plaintiffs argue this amendment is necessary to support their claim for punitive damages. The claim for those damages is based on the fraud and conversion claims advanced against those Defendants. *Id.* Because summary judgment has been granted as to both the fraud and conversion claims, the Expert Witness Motion is **MOOT**.

## IV.   <u>Conclusion</u>

For the reasons stated in this Order, the Horwitz Motion is **GRANTED**.[17] Because there remain no viable claims advanced against Horwitz, he is dismissed from the action with prejudice. The LMNO and Schotz Motion is **GRANTED IN PART** and **DENIED IN PART**. Summary judgment is **GRANTED** as to the fraud and conversion claims, in favor of all Defendants. Because the fraud and conversion claims were the only claims advanced against Schotz, he is dismissed as a Defendant with prejudice. Summary judgment is also **GRANTED** in favor of LMNO as to the claims for rescission and declaratory relief. Summary judgment is **GRANTED IN PART** and **DENIED IN PART** as to LMNO's request to narrow the scope of damages for Plaintiffs' breach of contract claim. The Expert Witness Motion is **MOOT**.

Within 14 days of the entry of this Order, following a meet and confer process, the parties shall file a joint report stating their collective and/or respective positions as to a schedule for any remaining pre-trial matters, and trial. The joint report shall also state whether any further settlement efforts would be

---

[17]  As noted, Horwitz's previously pending motion to dismiss is **MOOT**.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV16-04543 JAK (SKx) | Date | May 15, 2020 |
|---|---|---|---|
| Title | LMNO Cable Group, Inc. v. Discovery Communications, LLC | | |

productive, and if so, through what means and on what schedule. The joint report shall also address any other material matters that either or both parties wish to present. Finally, the joint report should state whether a telephonic status conference to discuss any of these issues would be productive. Upon receiving the joint report, a determination will be made as to whether to conduct a status conference and/or to set a schedule in this matter based on the joint report.